**VIRGINIA: IN THE CIRCUIT COURT OF YORK COUNTY/CITY OF POQUOSON**

FILED IN THE CIRCUIT COURT CLERK'S
OFFICE FOR THE COUNTY OF YORK
AND CITY OF POQUOSON, VA
KRISTEN N. NELSON, CLERK
By Donna Wilson, D.C.
9/29/2026 10:28 AM
9/28/2026 3:13 PM

**MATTHEW A. POHLMAN,**

**Plaintiff,**

**v.** **CASE NO. 26-**CL26-6237

**AMERICAN ECONOMY INSURANCE COMPANY,**

**Serve: American Economy Insurance Company**
**c/o Corporation Service Company, R/A**
**100 Shockoe Slip, Floor 2**
**Richmond, VA 23219**

**Defendant.**

## COMPLAINT

Plaintiff, Matthew A. Pohlman ("Mr. Pohlman"), by counsel, for his complaint against defendant, American Economy Insurance Company ("American Economy"), states as follows:

## PARTIES

1. Mr. Pohlman is a citizen of Virginia, and at all relevant times, was the owner and occupant of the residence located at 103 Court DeAyllon, Poquoson, Virginia 23662 (the "Property").

2. American Economy is an Indiana stock corporation authorized to do business in Virginia. American Economy is the underwriting company identified on the Declarations page of the Policy (as defined below) and is the contracting insurer under the Policy, and upon information and belief, is a wholly owned subsidiary of Liberty Mutual Insurance Company ("Liberty Mutual"). Upon information and belief, Liberty Mutual acted as claims administrator and agent for American Economy in adjusting the Claim, and all conduct alleged herein by Liberty Mutual personnel was undertaken on American Economy's behalf.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over American Economy pursuant to Virginia Code § 8.01-328.1(A)(7), because American Economy issued a policy of home insurance covering real property located in Virginia, and regularly conducts insurance business within the Commonwealth.

4. Venue is proper in this court pursuant to Virginia Code § 8.01-262 as the Property is located in Poquoson, and the Loss (as defined below) occurred at the Property.

## FACTS

### The Policy

5. Effective on or about September 15, 2025, for a one year period expiring September 15, 2026, American Economy issued Homeowners Policy No. OF3392464 (the "Policy") to Plaintiff. A true and accurate copy of the Policy is attached hereto as **Exhibit A**.

6. The Policy named Mr. Pohlman as the insured, and at all relevant times, Mr. Pohlman paid all applicable premiums.

7. The Policy covered the Property.

8. The Policy provides coverage for "accidental direct physical loss to property described in Building Property We Cover except as limited or excluded." *See* Ex. A, Section I, pg. 5.

9. While the Policy excludes coverage for, among other things, direct loss due to "continuous or repeated seepage or leakage of water or steam . . . which occurs over a period of weeks, months or years; wear and tear, marring, scratching, deterioration; inherent vice, latent defect, mechanical breakdown; smog, rust, or other corrosion," notwithstanding the foregoing exclusions, the Policy expressly "provide[s] coverage for ensuing loss" that results from the above exclusions unless the ensuing loss is itself excluded under the Policy. *See* Ex. A., Section I, pg. 5.

10. The Policy affirmatively requires that the insured, after a loss, ". . . protect the property from further damage, [and] make reasonable and necessary repairs required to protect the property." *Id.* at Section I, pg. 14.

**The Loss and Initial Claim**

11. On or about January 14, 2026, a hot water supply line (the "Supply Line") to the kitchen faucet suddenly burst in the early morning hours, flooding the Property (the "Loss").

12. Upon discovering the Loss, Mr. Pohlman promptly turned off the main water supply valve to the Property and engaged Great Rentals Management, LLC ("GR Management") to perform immediate emergency water remediation, including placing blower fans and dehumidifiers throughout the Property, and removing the fully saturated top floor boards from the subfloor to allow the subfloor to dry properly and to prevent mold growth.

13. On or about January 17, 2026, Mr. Pohlman notified American Economy of the Loss (the "Claim").

14. On or about January 19, 2026, American Economy dispatched its vendor, Stanley Steemer, to the Property to perform an initial inspection, including moisture readings, documentation, and measurements.

15. American Economy advised Mr. Pohlman that a portable storage container ("POD") would be delivered to the Property on January 21, 2026 to enable Mr. Pohlman to store personal property within the same while remediation was ongoing. Upon information and belief, due to an internal communication error between American Economy and Stanley Steemer, the POD did not arrive until January 26, 2026, on which date Stanley Steemer also arrived to move items into the POD.

16. Stanley Steemer did not commence tear-down work (the removal of unsalvageable, contaminated, or damaged building materials) in the Property until January 27, 2026. Stanley Steemer removed the flooring and floor-mounted cabinetry throughout the Property, which was done, upon information and belief, at American Economy's direction.

17. On or about January 28, 2026, Stanley Steemer began remediation and mitigation work at the Property, but (i) failed to remove two saturated wet subfloor layers located beneath a layer of non-porous laminate in the main floor bathroom, which impacted the drying of the remaining subfloor, and (ii) failed to properly remove tar-like paper substances from the kitchen subfloor, which likewise prevented the kitchen subfloor from properly drying.

18. Stanley Steemer's work quality was subpar and unsafe because Stanley Steemer left debris and protruding nails and staples on the Property, and on or about February 1, 2026, Stanley Steemer took final moisture readings and removed its drying equipment from the Property.

19. On or about February 2, 2026, Mr. Pohlman contacted American Economy to express his dissatisfaction with Stanley Steemer's work. Alexia Lawson-Hooks ("Ms. Lawson-Hooks"), a claim inspector with American Economy, was reassigned as the claim inspector for the Claim that same day.

20. On or about February 3, 2026, Ms. Lawson-Hooks scheduled a visit to the Property with Mr. Pohlman, and sent Mr. Pohlman a reservation of rights letter, which identified a concern regarding long-term damage such as rot and black mold as the stated reason for the reservation of rights. A true and accurate copy of the February 3, 2026 letter is attached hereto as **Exhibit B**.

21. On or about February 5, 2026, Ms. Lawson-Hooks performed a walk-through of the Property and advised Mr. Pohlman that she was displeased with Stanley Steemer's work, noting staples and nails protruding from the floor and subfloor and uncleaned debris. Ms. Lawson-

Hooks also expressed her dissatisfaction with Stanley Steemer's disposal of flooring, cabinets, the countertop, and the sink without an opportunity for her to view the same. Ms. Lawson-Hooks further stated that a "full pack-out" (removal, itemized cataloguing, professional cleaning, and secure storage for all personal belongings and content) had been necessary, not just a single POD in the driveway.

22. On or about February 7, 2026, Stanley Steemer, at American Economy's direction, returned to the Property to remove debris, staples, nails, and the tar-like paper substance on the kitchen subfloor. Upon information and belief, Stanley Steemer's representatives, including Michael Grant ("Mr. Grant"), a Water Restoration Manager with Stanley Steemer, took moisture readings that day that reflected 50%-100% moisture in the bathroom.

23. Mr. Grant and other Stanley Steemer representatives indicated that the multiple layers of subfloor in the bathroom were preventing proper drying. Upon information and belief, Mr. Grant thereafter contacted Stanley Steemer's corporate office to request authorization to remove the additional subfloor layers and to install additional dehumidifiers, and that authorization was not granted.

24. Mr. Grant thereafter advised Mr. Pohlman that the subfloor would need to be removed to protect the Property from further damage.

25. In order to protect the Property from the immediate threat of wood decay, structural rot, and hazardous mold growth (as the Policy itself requires), Mr. Pohlman removed only the two affected, non-salvageable, saturated subfloor layers in the bathroom, and those two subfloor layers were not disposed of or removed from the Property. Instead, they were placed next to the Property's garage, where they remained available for American Economy's inspection.

26. Prior to such removal, American Economy did not instruct Mr. Pohlman in writing not to remove those subfloor layers.

27. On February 10, 2026, Mr. Pohlman contacted his insurance agent, Lisa Johnson ("Ms. Johnson"), to report the mishandling of the Claim and to request escalation to American Economy management. Ms. Johnson forwarded Mr. Pohlman's correspondence to claims adjuster Tiffany Putenis ("Ms. Putenis"), who responded via email that same day with an accusation that Mr. Pohlman had violated the Policy and prejudiced their inspection by removing the two subfloor layers, notwithstanding that those layers were preventing the remaining subfloor from drying, and notwithstanding that the removed materials remained at the Property, available for inspection. A copy of Ms. Putenis' February 10, 2026 correspondence is attached hereto as **Exhibit C**.

**The Reports and Denial**

28. American Economy thereafter retained Rimkus Consulting Group, Inc. ("Rimkus") to inspect the Property and investigate the source of the Loss. Upon information and belief, the reason American Economy retained Rimkus was because American Economy claimed that it was aware of evidence that indicated the Loss was due to a long-term leak.

29. On or about February 18, 2026, Jack Burkhardt ("Mr. Burkhardt") of Rimkus conducted a site inspection and prepared a report of his findings (the "Initial Rimkus Report"). American Economy never provided a copy of the Initial Rimkus Report to Mr. Pohlman.

30. Subsequent to the Initial Rimkus Report, American Economy requested a supplemental report from Mr. Burkhardt addressing whether the water damage observed was indicative of additional leak sources.

31. Rimkus's resulting Supplemental Report of Findings, dated March 25, 2026 (the "First Supplemental Rimkus Report", attached hereto as **Exhibit D**) reaffirmed that "the source of

the water leak from beneath the kitchen sink was due to a burst/rupture of the [Supply Line]. This was the only observed source of water noted during the site inspection and review of mitigation photographs." *See* Ex. D, pg. 2.

32. The First Supplemental Rimkus Report also noted, in connection with an old stain in the bathroom subfloor, that "[t]he dark, discolored plywood subfloor that remained in place where the toilet had been removed displayed signs of an independent leak source . . . the remaining subfloor discoloration pattern was not consistent with damage from the kitchen sink area." *Id.*, pg. 9.

33. Despite the findings of the First Supplemental Rimkus Report, on or about March 25, 2026, American Economy issued a letter to Mr. Pohlman denying the Claim (the "Claim Denial Letter"). A true and correct copy of the Claim Denial Letter is attached hereto as **Exhibit E**.

34. The Claim Denial Letter asserted that the Policy excludes coverage for "continuous or repeated seepage or leakage of water . . . which occurs over a period of weeks, months or years. . . ." *See* Ex. E, pg. 3-4.

35. The Claim Denial Letter, directly contrary to the findings of American Economy's own engineer, concluded that "[b]ecause the damage was caused by a long-term leak, you have no coverage for the claim." *Id.*

36. The Claim Denial Letter also asserted that Mr. Pohlman's removal of the two subfloor layers constituted unauthorized "additional demolition" conducted "after being advised not to do so", in purported breach of the Policy. *Id.* at pg. 1-2.

37. Following receipt of the Claim Denial Letter, Mr. Pohlman retained James H. Fletcher, P.E., who conducted a site visit on April 2, 2026, reviewed the First Supplemental Rimkus Report and mitigation photographs, and on April 8, 2026, issued a report of his findings

(the "Fletcher Report"). A true and correct copy of the Fletcher Report is attached hereto as **Exhibit F**.

38. The Fletcher Report concluded that (1) the damage to the structural and substructural components was exclusively consistent with a single, sudden, high-volume water event; (2) there was no evidence of long-term or chronic water exposure; and (3) the discoloration observed in the bathroom was a historical, dry-set stain from a previously repaired issue, unrelated to the Loss. *See* Ex. F, pg. 3.

39. Mr. Pohlman thereafter provided the Fletcher Report to American Economy, but American Economy failed and refused to change its coverage position.

40. Concurrently with the Fletcher Report, Mr. Pohlman retained Forensic Analysis & Engineering Corp. ("FAEC"), which, through Craig Callewaert, P.E., issued a report of its findings on or about May 4, 2026 (the "FAEC Report"). A true and correct copy of the FAEC Report is attached hereto as **Exhibit G**.

41. The FAEC Report concluded, yet again, that "all evidence suggests the burst hose was the single source of water creating the damage observed and requiring extensive mitigation," and in relation to the bathroom stain, that ". . . the discoloration indicates a separate prior event, likely occurring years before [the Loss]. This earlier event (likely a failed toilet wax ring) did not contribute to the water damage that was observed or remediated." *See* Ex. G, pg. 5-6.

42. Mr. Pohlman provided American Economy with the FAEC Report, and American Economy thereafter engaged Rimkus to prepare yet another supplemental report (the "Second Supplemental Rimkus Report"), which was issued on May 27, 2026. A true and correct copy of the Second Supplemental Rimkus Report is attached hereto as **Exhibit H**.

43. The Second Supplemental Rimkus Report, *again*, affirmed that the source of the Loss was due to the burst/rupture of the Supply Line, that it was the only observed source of water, and that the bathroom discoloration reflected "additional, prior water damage, unrelated to the subject water intrusion." *See* Ex. H, pg. 1-4.

44. Notwithstanding the unanimous conclusions of three independent engineers (including two reports from American Economy's own retained engineer, Rimkus) that the Loss was caused by a sudden burst of the Supply Line, American Economy failed and refused to change its position on the Claim, and persisted in denying the Claim on the theory that the Loss resulted from long-term seepage excluded under the Policy.

45. On or about July 28, 2026, American Economy issued a notice of nonrenewal of the Policy (the "Nonrenewal Notice") that repeated the same, disproven mischaracterization set forth in the Claim Denial Letter, and that Mr. Pohlman's removal of the two subfloor layers constituted an unauthorized demolition in breach of the Policy. A copy of the Nonrenewal Notice is attached hereto as **Exhibit I**.

46. On August 26, 2026, counsel for Mr. Pohlman sent American Economy a detailed, six-page letter (the "Demand Letter") setting forth the factual and legal bases requiring American Economy to honor the Claim and enclosing copies of all relevant documents. A true and correct copy of the Demand Letter is attached hereto as **Exhibit J**.

47. On September 8, 2026, American Economy responded with a letter (the "Response Letter") stating that "[a]s no new information has been provided for consideration, we are upholding the previously communicated coverage decision." A true and correct copy of the Response Letter is attached hereto as **Exhibit K**.

48. The Response Letter, outside of the cursory acknowledgement of receipt of the Demand Letter, restated, essentially verbatim, the originally sent March 25, 2026 Claim Denial Letter, and did not address any of the factual or legal arguments raised in the Demand Letter.

49. Upon information and belief, American Economy failed and refused to review the Demand Letter, and failed and refused to engage in good faith in attempting to explain why American Economy continued to rely upon its repeated, disproven assertion that the Loss was caused by long-term water seepage.

50. As a direct and proximate result of American Economy's wrongful denial of the Claim and breach of the Policy, Mr. Pohlman has incurred, to date, at least $87,870.01 in out-of-pocket expenses (not including attorneys' fees) to repair the Property, and expects to incur additional costs to complete the repairs.

## COUNT I: BREACH OF CONTRACT

51. Mr. Pohlman incorporates by reference Paragraphs 1 through 50 above as if fully set forth herein.

52. The Policy constitutes a binding contract between the parties.

53. The Loss is a covered loss under the Policy. The Loss was caused by the sudden burst/rupture of the Supply Line, and not by continuous or repeated seepage or leakage excluded under the Policy.

54. To the extent the Loss was caused in part by continuous seepage, wear and tear, corrosion, and/or mechanical issues that damaged the Supply Line prior to the burst/rupture of the Supply Line, the Loss is an ensuing loss that is still covered under the Policy.

55. American Economy has breached the terms of the Policy by failing and refusing to approve and pay the Claim.

56. As a direct result and proximate result of American Economy's breach, Mr. Pohlman has sustained damages in an amount no less than $150,000, together with prejudgment and post-judgment interest as provided by law.

57. Additionally, as evidenced by American Economy's actions, American Economy was not acting in good faith when it repeatedly denied the Claim despite the clear and unambiguous determinations of multiple engineers, including its own engineer, that the Loss was not an excluded loss under the Policy.

58. Mr. Pohlman is entitled to recover his attorneys' fees pursuant to Virginia Code § 38.2-209(A) because of American Economy's bad faith actions.

WHEREFORE, Plaintiff, Matthew A. Pohlman, prays that this Court enter judgment in his favor against Defendant, American Economy Insurance Company, in the amount of $150,000.00, plus prejudgment interest from January 17, 2026 and postjudgment interest at the judgment rate, attorneys' fees and costs, and such other and further relief this Court deems appropriate.

**MATTHEW A. POHLMAN**

By: ______________________
Of Counsel

Clark J. Belote, Esq. (VSB No. 87310)
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
T: (757) 624-3000
F: (888) 360-9092
clark.belote@kaufcan.com

Ahmed E. Mohamed Khalil, Esq. (VSB No. 98315)
KAUFMAN & CANOLES, P.C.
11815 Fountain Way, Suite 400
Newport News, VA 23606
T: (757) 597-6410
F: (888) 360-9092
ahmed.khalil@kaufcan.com
*Counsel for Plaintiff*

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

Safeco Insurance™
A Liberty Mutual Company

GOODRICH & WATSON INSURERS INC
11837 ROCK LANDING DR STE 102
NEWPORT NEWS VA 23606-4492

September 14, 2025

Policy Number: OF3392464
24-Hour Claims: 1-800-332-3226
Policy Service: (757) 591-2032
Online Account Services: www.safeco.com

**THIS IS NOT A BILL.**

MATTHEW POHLMAN
103 CT DEAYLLON
POQUOSON VA 23662-2241

Welcome to Safeco]

We believe insurance shouldn't be any more complex than it has to be. Welcome to an easier experience with Safeco.

Enclosed is your new homeowners policy. Read it through carefully. It will give you a detailed description of the type and amount of your coverage, any deductibles (your out-of-pocket costs) that apply and the effective date of your policy. If, after reading your policy, you have any questions or want to find out about discounts that may apply to your policy, please call (757) 591-2032.

Your policy has a special deductible for losses caused by wind or hail. Please see your declarations page for the dollar amount of this deductible.

The premium for your policy is $2,690.00 for the September 15, 2025 to September 15, 2026 policy term. When you receive your billing statement, please review it carefully for the amount and date of your next payment. Please also verify that your requested payment method is correct.

You can uncomplicate your bill paying experience by choosing our Automatic Deduction Payment Plan, which offers the convenience of monthly deductions from your checking account that can be scheduled any day of the month you like. Enroll in Automatic Deduction online at www.safeco.com.

For added convenience, visit www.safeco.com and make use of our automated services available to you including, but not limited to:

PLEASE SEE REVERSE

**AMERICAN ECONOMY INSURANCE COMPANY (A SAFECO Company)**
P O BOX 704000, SALT LAKE CITY, UT 84170

EXHIBIT
A

OC-429/EP 10/13
G1

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

- Make a payment by online check, or credit card.
- Review your billing history.
- Change your billing due date.
- View your policy documents.
- Order a copy of your policy and/or insurance ID cards.
- Report to us a name change, or change of address.
- Review Safeco's Producer Compensation Disclosure.

For all other assistance please call your agent at (757) 591-2032.

Thank you for your business. We look forward to serving you.

Sincerely,

Tyler Asher
President, Safeco Insurance

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

# IMPORTANT NOTICE — PLEASE READ CAREFULLY

## Notice of Earthquake Exclusion

This policy does **NOT** include coverage for earthquake. Coverage for this peril is excluded under the ***Earth Movement*** exclusion under ***Section I*** of your policy.

Restated, the exclusion eliminates coverage for:

> **Earth Movement,** meaning the sinking, rising, shifting, expanding or contracting of earth, all whether combined with water or not. Earth movement includes but is not limited to **earthquake,** landslide, mudflow, mudslide, sinkhole, subsidence, erosion or movement resulting from improper compaction, site selection or any other external forces. Earth movement also includes volcanic explosion or lava flow.
>
> This exclusion applies whether the earth movement is caused by or resulting from human or animal forces or any act of nature.
>
> We do cover direct loss by fire, explosion, theft and breakage of glass which is part of the building, storm door or storm window.

Coverage may be available at your request. If you have already purchased Earthquake coverage, it will be shown on your Policy Declarations. If you have not purchased this coverage and are interested in more information, please contact the agent or broker listed on the Policy Declarations.

---

***No coverage is provided by this notice, nor does it replace any provision of your policy. It is important that you read your policy and all accompanying endorsements carefully. If your policy and this notice conflict, the policy prevails.***

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

# IMPORTANT NOTICE — PLEASE READ CAREFULLY

## Notice of Policy Conditions

Your homeowners Policy may include Extended Dwelling Coverage. This coverage provides protection that your home will be restored to its value, up to an additional 25% or 50% of the limit of liability stated on the Declarations page.

However, there are conditions that must be met for this coverage to apply. Those conditions require you:

- Insure the dwelling to its replacement cost as agreed by us;
- Accept any yearly adjustments by us of Coverage A reflecting changes in the cost of construction for the area based upon average factors for your area supplied to us by the recognized appraisal agency stated on the Policy Declarations;
- Notify us of any addition or other remodeling which increases the replacement cost of the dwelling $5,000 or more. This must be done within 90 days of the start of the construction or before the end of the current policy period, whichever is longer. You must pay the resulting additional premium.
- Repair or replace the damaged dwelling.

If you fail to comply with any of the above provisions, the limit of liability shown on the Declarations page for Coverage A shall apply.

From time to time we may make requests of you for updated dwelling information. If you fail to provide the information, we may delete Extended Dwelling Coverage effective at policy renewal.

Extended Dwelling Coverage is an optional coverage and applicable only if purchased and shown in the Declarations.

---

**No coverage is provided by this notice, nor does it replace any provision of your policy. It is important that you read your policy and all accompanying endorsements carefully. If your policy and this notice conflict, the policy prevails.**

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

# IMPORTANT NOTICE — PLEASE READ CAREFULLY

## Notice of Flood Exclusion

This policy does **NOT** include coverage for flood. Coverage for this peril is excluded under the **Water Damage** exclusion under **Section I** of your policy. Restated, the exclusion eliminates coverage for:

**Water Damage**, meaning:

**a.** **(1)** flood, surface water, waves, tidal water, tsunami, seiche, overflow of a body of water, storm surge or spray from any of these, whether or not driven by wind, including hurricane or similar storm; or

**(2)** release of water held by a dam, levee, dike, or by a water or flood control device or structure;

**b.** water below the surface of the ground, including that which exerts pressure on, or seeps or leaks through a building, wall, bulkhead, sidewalk, driveway, foundation, swimming pool, hot tub, or spa, including their filtration and circulation systems, irrigation systems, including any outdoor water source for the ***residence premises*** or other structure;

**c.** water which escapes or overflows from sewers, drains, or related plumbing appliances located off the ***residence premises***;

**d.** water which escapes or overflows from drains on the ***residence premises***. However, this exclusion (**12.d.**) does not apply to overflow and escape caused by malfunction on the ***residence premises***, or obstruction on the ***residence premises***, of a drain or plumbing appliance on the ***residence premises***; or

**e.** water which escapes or overflows or discharges, for any reason, from within a sump pump, sump pump well, or any other system designed to remove water which is drained from the foundation area.

Water includes any water borne materials.

This exclusion applies whether the water damage is caused by or resulting from human or animal forces or any act of nature.

Direct loss by fire, explosion, or theft resulting from water damage is covered.

Coverage for water which escapes or overflows from sewers or drains is available at your request. If you have already purchased this coverage, please review your limits to be sure they are adequate. If you have not purchased this coverage and are interested in more information, please contact your independent Safeco agent.

Information regarding availability of Flood Insurance for your area may be obtained from us or your independent Safeco agent or the National Flood Insurance Program. Coverage for contents may be available on a Flood Insurance policy, for an additional premium.

---

***No coverage is provided by this notice, nor does it replace any provision of your policy. It is important that you read your policy and all accompanying endorsements carefully. If your policy and this notice conflict, the policy prevails.***

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

# IMPORTANT NOTICE — PLEASE READ CAREFULLY

## Building Ordinance or Law Coverage Available

Coverage can now be added to your policy for increased costs to repair or replace damaged property due to the application of ordinances or laws that regulate construction, repair, or demolition.

This additional coverage provides protection when a building damaged by a covered cause of loss must be repaired or rebuilt in a more costly manner because the type of construction used when the building was built does not comply with current building codes. Coverage can also be provided when laws or ordinances require the demolition of damaged buildings, including undamaged portions, prior to rebuilding in compliance with current building codes.

**NOTE:** We are required to provide the above notice under Virginia law. Your policy declarations page shows the amount of Building Ordinance or Law coverage that is currently included in your policy.

Contact your independent Safeco agent if would like additional information or wish to review your current coverage.

---

***No coverage is provided by this notice, nor does it replace any provision of your policy. It is important that you read your policy and all accompanying endorsements carefully. If your policy and this notice conflict, the policy prevails.***

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

# Ask yourself: Do you have enough insurance coverage?

**How much would it take to reconstruct your home?**

Surprisingly, it has been estimated that 58% of American homes are underinsured by an average of 21%*. Make sure yours isn't one of them.

Each home is unique. You know your home best. It's your responsibility to make sure you're "fully insured" and "insured to value." That means you need to have enough insurance coverage to rebuild your home and replace all of your personal belongings in the event of total loss.

**How can you determine your needs? Ask yourself the questions below. If you need help answering them, call your agent and discuss your insurance needs with them.**

They will assist you in determining how much insurance would be needed to fully protect your home and belongings.

**How much would it take to reconstruct your home at today's prices?**

Things to consider:

- Your home's age (older homes tend to be more expensive to reconstruct) and style (contemporary, colonial, ranch, etc.)
- Features — fireplaces, cabinetry, built-in features, vaulted ceilings
- Flooring — hardwood, tile, natural stone, carpeting
- Finishes — crown molding, window and floor trim, faux paint, wall paper, wainscoting, chair rails, staircases, etc.
- Recent improvements you may have made (remodeled bathroom or kitchen, recessed lighting, built-in cabinets)
- A basement you may have finished or a room you may have added

**How much is enough to replace the structures surrounding your home at today's prices?**

Things to consider:

- Your fence, detached garage, gazebo, barn or storage shed
- If you have an in-ground swimming pool or just repaved your driveway or sidewalk

**What would it take to replace your personal belongings at today's prices?**

Things to consider:

- All your basics (furniture, rugs, linens, kitchenware, tools) and every electronic gadget
- Your entire wardrobe, your jewelry, medicines and personal effects
- Have you made any big purchases lately?
- If you have a garage full of tools, are passionate about the latest gadgets or collect just about anything, you should seriously consider getting more personal belongings coverage than the standard policy provides.

*Copyright 2008 Marshall & Swift / Boeckh, LLC and its licensors. All rights reserved. Used with permission.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

# Let's make sure you're "fully insured."

Your agent uses replacement cost estimation tools to establish a starting point for your insurance coverage. But you know your home best. And we look to you to give your agent the most complete, up-to-date information in order to protect your home and lifestyle. Here are two quick things you can do today:

1. **Look critically at your coverage statement page (also known as the policy declarations page, which comes after the opening letter in this package).** Do you believe you have enough Coverage A? (This is the amount you'd get for reconstruction of an as-close-as-possible replica of your home in the event of total loss.) If you're not sure, call your agent for help.

2. **Take inventory.** Compare the value of your personal belongings to the Coverage C amount on your coverage statement page.

**It's important to know: your home's market value is totally different from what it would cost to reconstruct.** Today's market value reflects economic conditions, taxes, school districts, the market value of land and many other factors that have nothing to do with how much it would cost to reconstruct your home from scratch.

Reconstruction cost — the amount needed to get you back home quickly — is based almost exclusively on the cost of materials and labor as well as demand for contractor services. In the event of total loss, a properly insured Safeco policyholder can rebuild with the same quality of materials and workmanship in their current home (unless a functional replacement cost policy was deliberately selected). Of course, we hope you'll never need these services. But we'll all sleep better knowing you're fully insured.

Thank you for trusting Safeco with your home insurance needs.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

Safeco Insurance
A Liberty Mutual Company

# NOTICE OF INFORMATION PRACTICES

Safeco appreciates the trust you place in us when you purchase insurance from one of our companies. We are committed to protecting your nonpublic personal information ("personal information" or "information" about you or members of your household) and we value you as a customer.

To learn more about how we collect and use information about you, please read the following notice.

## OUR SOURCES OF INFORMATION ABOUT YOU

Most of the information we obtain comes directly from you and your independent insurance producer. Your application gives us information we need to review your request, such as your name, address and Social Security Number.

We may also ask for information from other outside sources, including:

- Your transactions with our affiliates or other insurance companies (such as your payment history or claims history); and/or,
- The information we receive from a consumer reporting agency or insurance support organization (such as your credit history, driving record, claims history or verification of the value and condition of your property).

Insurance support organizations from which we obtain information may keep such information and disclose it to others as permitted by law.

If we obtain medical information about you, it is generally received in connection with the administration or management of your insurance policy or claim or for the detection and prevention of fraud. We will not share your medical information with our affiliates or non-affiliates for marketing purposes.

It is our policy to treat information we receive about you in the same confidential way we treat information that you have provided to us on your application. The same confidentiality applies to information about our former customers.

## OUR USE OF INFORMATION ABOUT YOU

We only disclose personal information about you as permitted by law. Generally, this includes sharing it with third parties to administer your transactions with us, service your insurance policy or claim, detect and prevent fraud, or with your authorization. When we do, we require these parties to use your personal data only for the reasons we gave it to them. These third parties may include:

- Insurance support organizations, consumer reporting agencies or other insurance companies (including for the detection and prevention of fraud);
- Independent insurance producers authorized to sell Safeco insurance products;
- Independent contractors (such as automobile repair facilities, towing companies, property inspectors and independent claims representatives);
- Auditors, attorneys, courts and government agencies;
- Other companies which may reinsure your policy or with which you have other coverage;
- Group policyholders in connection with reporting claims data or an audit; and/or,
- Other companies and insurance support organizations for actuarial or research studies.

We may also disclose your personal information in response to judicial orders such as subpoenas.

We may also share information about our transactions (such as payment history) and experiences (such as claims made) with you within the Liberty Mutual Group of Companies.

We do not sell your personal information to others and we do not provide your information to third parties who are doing business on our behalf for their own marketing purposes.

## PROTECTING YOUR INFORMATION FROM UNAUTHORIZED ACCESS

We maintain physical, electronic and administrative safeguards to protect your information from unauthorized access. Our employees are authorized to access customer information only for legitimate business purposes.

Copyright, 2012 Safeco Insurance Company of America, A Liberty Mutual Company. All rights reserved

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

## INDEPENDENT SAFECO INSURANCE AGENTS

The independent insurance producers authorized to sell Safeco products are not Safeco employees and are not subject to Safeco's privacy policy. Because they have a unique business relationship with you, they may have additional personal information about you that Safeco does not have. They may use this information differently than Safeco. Contact your Safeco producer to learn more about their privacy practices.

## HOW YOU CAN REVIEW YOUR INFORMATION

You can request to see and obtain copies of the information about you in our files or request that a copy be sent to you to review it for accuracy. You must make your request in writing. Within 30 business days (or as required by law) of receiving your request, we will send you the information. We will advise you of any person or group to whom we have given the information during the last two years. We will also give you the name and address of any reporting organization from which we received information about you.

There are certain types of information, such as information collected when we evaluate a claim or when the possibility of a lawsuit exists, that we are not required to provide you. We obtain medical information about you only in connection with claims and lawsuits. If the law allows you to review such information in our files, we will include it with the other information we send to you.

## IF YOU DISAGREE WITH OUR RECORDS

If you believe information in our files is wrong, you can notify us in writing. We will review your file within 30 business days of receiving your notice. If we agree with you, we will correct, amend or delete the portion of the recorded personal information in dispute and notify you about the change. This change will become part of the file. It will be included in any future disclosures to others and will be sent to:

- Anyone you designate who may have received the information during the previous two years.
- Any person or organization who may have received the information from us during the previous seven years.
- Insurance support organizations that provided the information that was amended or changed pursuant to your request.

If we disagree with you, we will explain why. You can provide us with a concise written statement setting forth what you think is the correct, relevant or fair information and explaining why you disagree with the refusal to correct, amend or delete recorded personal information. This statement will become part of the file and will be included in any future disclosures of the disputed subject matter. Your statement will also be sent to the persons listed above.

## YOUR RIGHT TO HAVE YOUR POLICY RE-EVALUATED

Your premium is determined by many factors. Like most insurance companies, Safeco uses credit information as a factor in determining the cost for some of the insurance products we offer. If you have an automobile, homeowners, condominium, renters, dwelling fire or motorcycle policy, then Safeco used your credit information to help determine your rate. You have the option to request that we re-evaluate your insurance premium using current credit information. You can make one request per year. If you request a re-evaluation, your new premium may be higher or lower than your current premium. Any changes to your policy premium will appear at your next renewal. Send us your request in writing; include your name, policy number and clearly state your request for a re-evaluation. Mail your request to Safeco Insurance, Attn: UW Verification & Policy Support, P.O. Box 704000, Salt Lake City, UT 84170-4000.

## SAFECO'S WEB SITE

If you have Internet access and want to learn more about our web site specific privacy and security practices, click on the Privacy Policy link on www.safeco.com.

**This notice applies to the following members of the Liberty Mutual Group of Companies:**

**American Economy Insurance Company**
**American States Insurance Company**
**American States Insurance Company of Texas**
**American States Preferred Insurance Company**
**First National Insurance Company of America**
**General Insurance Company of America**
**Insurance Company of Illinois**
**Safeco Insurance Company of America**
**Safeco Insurance Company of Illinois**
**Safeco Insurance Company of Indiana**
**Safeco Insurance Company of Oregon**
**Safeco National Insurance Company**
**Safeco Surplus Lines Insurance Company**

(For mailing address, please contact your agent or the nearest local Safeco office.)

Copyright, 2012 Safeco Insurance Company of America, A Liberty Mutual Company All rights reserved

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

Safeco Insurance
A Liberty Mutual Company

## AMERICAN ECONOMY INSURANCE COMPANY (A SAFECO Company)

Administrative office: 175 Berkeley St., Boston, MA 02116 (A stock insurance company.)

## HOMEOWNERS POLICY DECLARATIONS

**POLICY NUMBER:**
OF3392464

**POLICY PERIOD: FROM:** SEPT 15, 2025 12:01 A.M.
**TO:** SEPT 15, 2026 12:01 A.M.

**NAMED INSURED AND MAILING ADDRESS:**
MATTHEW POHLMAN
103 CT DEAYLLON
POQUOSON VA 23662-2241

**AGENT:**
GOODRICH & WATSON INSURERS INC
11837 ROCK LANDING DR STE 102
NEWPORT NEWS VA 23606-4492

**Valued Homeowners Customer Since: SEPT 15, 2025**

**INSURED LOCATION:**
Same

**POLICY SERVICE INFORMATION:**
**TELEPHONE:** (757) 591-2032
**E-MAIL:** INFO@GOODRICHWATSON.COM
**WEBSITE:** www.goodrichwatson.com

**IMPORTANT MESSAGES**

- Your new policy is effective September 15, 2025.
- The appraisal agency used in your state is Marshall & Swift/Boeckh.

**LIMITS OF LIABILITY**
(Policy Section I - Property Coverages and Section II - Liability Coverages)

| Coverage A — Dwelling | Coverage B — Other Structures | Coverage C — Personal Property | Coverage D — Additional Living Expense | Coverage E — Personal Liability | Coverage F — Medical Payments |
|---|---|---|---|---|---|
| $388,000 | $50,000 | $194,000 | $77,600 | $500,000 | $5,000 |

**DEDUCTIBLES.**
The following deductibles apply unless otherwise stated within the policy.

| | AMOUNT |
|---|---|
| **Section I, except as noted below** | $ 5,000 |
| **Windstorm or Hail Deductible** | 7,760 |

| | | PREMIUM |
|---|---|---|
| **BASIC COVERAGES** | | $ 2,560.00 |
| **OTHER COVERAGES, LIMITS AND OPTIONAL COVERAGES** | | $ 130.00 |
| **DISCOUNTS AND SURCHARGES** | You Saved $406.00 | **Included** |
| **TOTAL POLICY PREMIUM:** | | **$ 2,690.00** |

**Premium Payer:** Insured

You may pay your premium in full or in installments. There is no installment fee for the following billing plans: Full Pay. Installment fees for all other billing plans are listed below. If more than one policy is billed on the installment bill, only the highest fee is charged. The fee is:
$2.00 per installment for recurring automatic deduction (EFT)
$5.00 per installment for recurring credit card or debit card
$6.00 per installment for all other payment methods

CONTINUED

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

## AMERICAN ECONOMY INSURANCE COMPANY (A SAFECO Company)
## HOMEOWNERS POLICY DECLARATIONS

CONTINUED **POLICY NUMBER:** 0F3392464

Servicing Mortgagee
FULTON BANK NA
PO BOX 200058
KENNESAW GA 30156-9246
LOAN NUMBER: 3800019601

**POLICY LIMITS AND OTHER ADDITIONAL COVERAGES**
(Unless otherwise stated, all limits and coverages are included in basic coverages)
**COVERAGE LEVEL: OPTIMUM**
SECTION I - PROPERTY COVERAGES
COVERAGE C - PERSONAL PROPERTY - 3. SPECIAL LIMITS OF LIABILITY

| | | | |
|---|---|---|---|
| a.Money... | $ 1,000 | g.Business Property | |
| b.Rare coins and currency... | $ 5,000 | On Premises... | $ 3,000 |
| c.Securities... | $ 5,000 | Off Premises Sub-limit | $ 1,000 |
| d.Watercraft... | $ 3,000 | h.Tapes, records, discs... | $ 500 |
| e.Trailers... | $ 3,000 | i.Grave Markers... | $ 5,000 |
| f.Theft of jewelry, watches... | $ 5,000 | | |

| **OTHER INCLUDED COVERAGES/POLICY PROVISIONS** | **Limit** | **Premium** |
|---|---|---|
| Loss Assessment Coverage | $ 5,000 | Included |
| Building Ordinance or Law Coverage ( 10%) | $ 38,800 | Included |
| Refrigerated Spoilage Coverage | | Included |
| Fire Department Service Charge | $ 5,000 | Included |
| Land Stabilization | $ 10,000 | Included |
| Arson Reward | $ 25,000 | Included |
| Criminal Conviction Reward - Item a. Information | $ 2,500 | Included |
| Criminal Conviction Reward - Item b. Property Recovery | $ 5,000 | Included |
| Credit Card, Fund Transfer, Forgery & Counterfeit Money | $ 5,000 | Included |
| Volunteer America | | Included |
| Section I (All Perils Coverage) | | Included |
| Section II - Liability Coverage | | Included |
| Section II - Property Damage | $ 2,000 | Included |

| **OPTIONAL COVERAGES** | **Limit** | **Premium** |
|---|---|---|
| Personal Property Replacement Cost | | Included |
| Extended Dwelling Coverage | Up to 100% | Included |
| Service Line Coverage | $ 12,000 | $ 66.00 |
| Personal Offense Coverage | $ 500,000 | $ 16.00 |
| Escape of Water from Sump (Building/Contents) | $ 25,000 | Included |
| Special Personal Property | | Included |
| Identity Recovery Coverage | $ 25,000 | $ 12.00 |
| Equipment Breakdown Coverage | $ 50,000 | $ 36.00 |

| **DISCOUNTS AND SURCHARGES** | **Premium** |
|---|---|
| Claim Free Discount | Included |
| Paid In Full Discount | Included |
| Advance Quote Discount | Included |

For information on other deductibles, coverages or discounts available in your state or to review your account online, log on to www.safeco.com

**FORMS APPLICABLE TO THIS POLICY:**

HOM-7350/EP 1/09 - PERSONAL OFFENSE COVERAGE
HOM-7230/EP 1/09 - WINDSTORM/HAIL DEDUCTIBLE
HOM-7307/EP 1/09 - IDENTITY RECOVERY COVERAGE
HOM-7300/VAEP 9/09 - EXTENDED DWELLING COVERAGE
HOM-7232/EP 1/09 - EXECUTION CLAUSE
HOM-7301/VAEP 7/23 - PERSONAL PROPERTY REPLACEMENT COST

CONTINUED

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

**AMERICAN ECONOMY INSURANCE COMPANY (A SAFECO Company)**
**HOMEOWNERS POLICY DECLARATIONS**

CONTINUED **POLICY NUMBER:** 0F3392464

HOM-7329/VAEP 7/23 - SERVICE LINE COVERAGE - VIRGINIA
HOM-7311/VAEP 5/23 - ESCAPE OF WATER FROM A SUMP, SUMP PUMP OR DRAIN ON THE RESID
HOM-7306/VAEP 7/23 - EQUIPMENT BREAKDOWN COVERAGE - VIRGINIA
HOM-7220/VAEP 7/23 - SAFECO OPTIMUM HOMEOWNERS COVERAGE - VIRGINIA
HOM-7030/VAEP 12/23 - SAFECO HOMEOWNERS POLICY - VIRGINIA
HOM-7308/VAEP 7/23 - SPECIAL PERSONAL PROPERTY COVERAGE - VIRGINIA

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

Safeco Insurance
A Liberty Mutual Company

AMERICAN ECONOMY INSURANCE COMPANY

# SAFECO HOMEOWNERS POLICY — VIRGINIA

## Table of Contents


| | Beginning On Page |
|---|---|
| **INSURING AGREEMENT** | 1 |
| **POLICY DEFINITIONS** | 1 |
| **SECTION I — PROPERTY COVERAGES** | 4 |
| **COVERAGE A — DWELLING** | 4 |
| **COVERAGE B — OTHER STRUCTURES** | 4 |
| Building Property We Cover | 4 |
| Building Property We Do Not Cover | 4 |
| Building Property Losses We Cover | 5 |
| Building Property Losses We Do Not Cover | 5 |
| **COVERAGE C — PERSONAL PROPERTY** | 7 |
| Personal Property We Cover | 7 |
| Personal Property We Do Not Cover | 8 |
| Personal Property Losses We Cover | 9 |
| Personal Property Losses We Do Not Cover | 10 |
| **COVERAGE D — ADDITIONAL LIVING EXPENSE AND LOSS OF RENT** | 10 |
| **ADDITIONAL PROPERTY COVERAGES** | 11 |
| **SECTION I — PROPERTY CONDITIONS** | 14 |
| Deductible | 14 |
| Your Duties | 14 |
| Loss Settlement | 15 |
| **SECTION II — LIABILITY COVERAGES** | |
| **COVERAGE E — PERSONAL LIABILITY AND COVERAGE F — MEDICAL PAYMENTS TO OTHERS** | |
| Liability Losses We Cover | 17 |
| Liability Losses We Do Not Cover | 17 |
| **ADDITIONAL LIABILITY COVERAGES** | 20 |
| **SECTION II — LIABILITY CONDITIONS** | 22 |
| **SECTIONS I AND II — PROPERTY AND LIABILITY CONDITIONS** | |
| Policy Period and Changes | 23 |
| Concealment or Fraud | 24 |
| Liberalization Clause | 24 |
| Cancellation | 24 |
| Non-Renewal | 24 |
| Assignment | 25 |
| Our Right to Recover Payment | 25 |
| Death | 25 |

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

## INSURING AGREEMENT

In reliance on the information you have given us, we will pay claims and provide coverage as described in this policy if you pay your premiums when due, comply with all applicable provisions outlined in this policy, and inform us of any change in title, use, or occupancy of the ***residence premises***.

This policy applies only to losses occurring during the policy period.

## POLICY DEFINITIONS

**1.** Throughout this policy, "you" and "your" refer to:

**a.** the "named insured" shown in your Policy Declarations; and

if a resident of the same household:

**b.** the spouse;

**c.** the civil partner by civil union licensed and certified by the state; or

**d.** the ***domestic partner***.

**2.** "We", "us" and "our" refer to the underwriting company providing this insurance as shown in your Policy Declarations.

**3.** In addition, certain words and phrases are defined as follows:

**a.** ***"Actual cash value"*** means the amount equal to the ***replacement cost*** minus depreciation of damaged or stolen property at the time of the loss.

**b.** ***"Aircraft"*** means a machine or device capable of atmospheric flight, including hobby or model ***aircraft***, drones, self-propelled missiles, and spacecraft.

**c.** ***"Bodily injury"*** means bodily harm, sickness, or disease, including required care, loss of services, and death resulting therefrom.

**d.** ***"Business"*** means a trade, profession, or occupation whether a full-time, part-time, or occasional activity including:

**(1)** ***home-sharing***;

**(2)** ***farming***;

**(3)** the rental of the whole or a part of the ***residence premises*** by an ***insured***;

**(4)** the ***business*** use of a part of the ***insured location***; or

**(5)** any other activity engaged in for money, except the following:

**(a)** one or more activities, not described in **(b)** below, for which no ***insured*** receives more than $2,500 in total compensation for the applicable policy period; or

**(b)** ***volunteer*** activities for which no money or other compensation is received other than for expenses incurred to perform the activity.

***Business*** does not include:

**(6)** the ***occasional rental*** of the whole or a part of the ***residence premises*** for dwelling purposes;

**(7)** the rental or holding for rental of a part of the ***residence premises*** for no more than two roomers or boarders for use as a primary residence;

**(8)** the rental of a part of the ***residence premises*** as a private garage;

**(9)** the rental of a part of the ***residence premises*** as an office, school, or studio; or

**(10)** the ***insured's*** use of the ***residence premises*** for remote work under an agreement with the ***insured's*** employer.

**e.** ***"Domestic partner"*** means a person living as a continuing partner with you and:

**(1)** is at least 18 years of age and competent to contract;

**(2)** is not a relative; and

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

**(3)** shares with you the responsibility for each other's welfare, evidence of which includes:

**(a)** the sharing in domestic responsibilities for the maintenance of the household;

**(b)** having joint financial obligations, resources, or assets; or

**(c)** one with whom you have made a declaration of domestic partnership or similar declaration with an employer or government entity.

***Domestic partner*** does not include more than one person, a roommate whether sharing expenses equally or not, or one who pays rent to the named ***Insured***.

**f.** ***"Earthquake"*** means shaking or trembling of the earth, whether caused by volcanic activity, tectonic processes, or any other cause.

**g.** ***"Farming"*** means the use of land and buildings primarily for agricultural purposes with the objective of:

**(1)** raising animals to produce food for sale or distribution to the public; and/or

**(2)** growing crops for sale or distribution to the public.

**h.** ***"Home-sharing"*** means rental of the whole or a part of the ***residence premises*** for lodging purposes to a ***home-sharing*** occupant established through an online-enabled application, website, or digital network:

**(1)** for more than seven consecutive or random days; and/or

**(2)** that generates revenue of more than $2,500.

An individual occupying the ***residence premises*** through ***home-sharing*** is not a roomer, boarder, tenant, or guest.

***Home-sharing*** host activities refers to any other related property or services made available by an ***Insured*** for use during such rental and outlined in the agreement which is entered into through the ***home-sharing*** network platform except those property or services provided by another party.

**i.** ***"Insured"*** means:

**(1)** you; and

**(2)** the following residents of the ***residence premises***:

**(a)** your relatives;

**(b)** any other person under the age of 21 who is in the care of any person described in **i.(1)** or **i.(2)(a)** above;

**(c)** a ***domestic partner*** if not a named ***insured***;

**(d)** your spouse.

Anyone described above who is a student temporarily residing away from your ***residence premises*** while attending school shall be considered a resident of your ***residence premises***.

Under **Section II — Liability Coverage**, ***"insured"*** also means:

**(3)** with respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person included in **i.(2)(a)** or **i.(b)**. A person or organization using or having custody of these animals or watercraft in the course of their ***business***, or without permission of the owner is not an ***insured***;

**(4)** with respect to any vehicle or watercraft to which this policy applies:

**(a)** any person while engaged in your employment or the employment of any person included in **i.(2)(a)** through **i.(d)**; or

**(b)** any other person using the vehicle or watercraft on an ***insured location*** with any ***insured's*** permission.

**j.** ***"Insured location"*** means:

**(1)** the ***residence premises***;

**(2)** that part of any other premises, other structures, and grounds, used by you as a residence and which is shown in your Policy Declarations. This includes any premises, structures, and grounds you acquire during the policy period for your use as a residence;

**(3)** any premises not owned by you which you have the right or privilege to use arising out of **j.(1)** or **j.(2)** above;

**(4)** any part of a premises not owned by any ***insured*** but where any ***insured*** is temporarily residing;

**(5)** ***vacant*** land, including that which is ***vacant*** except for a fence, owned by or rented to any ***insured*** other than farmland;

**(6)** land owned by or rented to any ***insured*** on which a one, two, three, or four family dwelling is being constructed as a residence for any ***insured***;

**(7)** individual or family cemetery plots or burial vaults of any ***insured***; or

**(8)** any part of a premises occasionally rented to any ***insured*** for other than ***business*** purposes.

**k.** ***"Motor vehicle"*** means a vehicle that is self-propelled or designed for self-propulsion and is designed or licensed for use on public roads.

**l.** ***"Occasional rental"*** means rental of the whole or a part of the ***residence premises*** for lodging purposes during a policy term:

**(1)** for seven or fewer consecutive or random days; or

**(2)** that generates revenue of up to $2,500.

***Occasional rental*** is not ***home-sharing***.

**m.** ***"Occurrence"*** means an accident, including exposure to conditions which results in:

**(1)** ***bodily injury***; or

**(2)** ***property damage***;

during the policy period. Repeated or continuous exposure to the same general conditions is considered to be one ***occurrence***.

**n.** ***"Pollutants"*** means solid, liquid, gaseous, thermal, or radioactive irritants or contaminants, including acids, alkalis, chemicals, fumes, vapors, and waste.

**o.** ***"Property damage"*** means physical damage to or destruction of tangible property, including loss of use of this property.

**p.** ***"Recreational motor vehicle"*** means a vehicle designed for recreational use off public roads and not subject to motor vehicle registration.

**q.** ***"Replacement cost"***

**(1)** In case of loss or damage to buildings or other structures, ***replacement cost*** means the cost, at the time of loss, to repair or replace the damaged property with new materials of like kind and quality, without deduction for depreciation.

**(2)** In case of loss to personal property, ***replacement cost*** means the cost, at the time of loss, of a new article identical to the one damaged, destroyed, or stolen. When the identical article is no longer manufactured or is unavailable, ***replacement cost*** shall mean the cost of a new article similar to the one damaged or destroyed and which is of comparable quality and usefulness, without deduction for depreciation.

**r.** ***"Residence employee"*** means an employee of any ***insured*** who performs duties in connection with the maintenance or use of the ***residence premises***, including household or domestic services, or who performs duties elsewhere of a similar nature not in connection with the ***business*** of any ***insured***.

**s.** ***"Residence premises"*** means:

**(1)** any residence specifically named in the policy;

**(2)** the one, two, three, or four family dwelling, used principally as a private residence;

**(3)** other structures and grounds;

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

where you, your spouse, or your ***domestic partner*** reside and which is shown in your Policy Declarations; and

(4) that part of any other building occupied by the named ***insured***, spouse, or ***domestic partner*** for residential purposes.

t. ***"Vacant"*** means a dwelling that has not been occupied for more than 30 consecutive days immediately before a loss and where most of the named ***insured's*** personal property has been removed such that the dwelling is not functional as a customary place of residence. A dwelling under construction, including being newly built, remodeled, reconstructed, renovated, or repaired is not considered ***vacant***.

A dwelling is not occupied if the dwelling is being used without the permission of an ***insured***.

u. ***"Volunteer"*** means an ***insured*** employed by an organization for a charitable purpose or in direct service to the general public or the community.

***Volunteer*** service does not include the ***insured's*** primary employment. ***Volunteer*** service includes, but is not limited to, service performed for churches, schools, hospitals, and charitable arts and civic organizations.

## SECTION I — PROPERTY COVERAGES

### BUILDING PROPERTY WE COVER

### COVERAGE A — DWELLING

With respect to the dwelling limit listed on your Policy Declarations, we cover:

1. the dwelling shown on your Policy Declarations used principally as a private residence, including attached carpeting, built-in appliances, fixtures, and structures attached to the dwelling other than fences, driveways, or walkways; and
2. materials and supplies located on or next to the dwelling listed on your Policy Declarations used to construct, alter, or repair that dwelling.

Coverage A is provided only for the dwelling at the covered location listed on your Policy Declarations. No coverage will be provided under Coverage A for any dwelling that is not listed on your Policy Declarations.

### COVERAGE B — OTHER STRUCTURES

With respect to the premises listed on your Policy Declarations, used principally as a private residence, we cover:

1. its fences, driveways, and walkways;
2. its other structures and the fixtures of other structures separated from the dwelling by clear space. This includes retaining walls, decorative or privacy walls, and other structures connected to the dwelling by only a fence, utility line, plumbing, or similar connection; and
3. materials and supplies located on or next to other structures of the location listed on your Policy Declarations used to construct, alter, or repair those same other structures.

Coverage B is provided only for the location listed on your Policy Declarations. No coverage will be provided under Coverage B for other structures of a premises that is away from the ***residence premises*** listed on your Policy Declarations.

### BUILDING PROPERTY WE DO NOT COVER

1. Land, no matter where it is located, including land on which the dwelling is located, except as noted in **Additional Property Coverages, Land Stabilization**.
2. Other structures:

   a. used in whole or in part for ***business***; or

   b. rented or held for rental to any person not a roomer, boarder, or tenant of the dwelling, unless used solely as a private residence or garage.

**BUILDING PROPERTY LOSSES WE COVER**

We cover accidental direct physical loss to property described in **Building Property We Cover** except as limited or excluded.

**BUILDING PROPERTY LOSSES WE DO NOT COVER**

We do not cover direct loss caused by any of the following excluded perils:

1. Freezing of a plumbing, heating, or air conditioning system, or of a household appliance, or by discharge, leakage, or overflow from within the system or appliance caused by freezing, while the dwelling is ***vacant***, unoccupied, or under construction for four or more consecutive days. This provision does not apply if you have exercised due diligence to:

   **a.** maintain heat in the building; or

   **b.** shut off the water supply and drain the system and appliances of water.

2. Freezing, thawing, pressure, or weight of water, or ice whether driven by wind or not, to a swimming pool, hot tub, fence, pavement, patio, foundation, retaining wall, bulkhead, pier, wharf, or dock.

3. Theft in, to, or from a dwelling under construction, including materials and supplies for use in the construction, until or unless the dwelling is completed and occupied.

4. Vandalism and malicious mischief or breakage of glass and safety glazing materials if the dwelling is ***vacant***. A dwelling under construction, including being newly built, remodeled, reconstructed, renovated, or repaired is not considered ***vacant***.

5. Continuous or repeated seepage or leakage of water or steam from within a plumbing, heating, or air conditioning system or from within a domestic appliance which occurs over a period of weeks, months, or years. However, this exclusion does not apply to personal property.

6. **a.** wear and tear, marring, scratching, deterioration;

   **b.** inherent vice, latent defect, mechanical breakdown;

   **c.** smog, rust or other corrosion, mold, wet or dry rot;

   **d.** smoke from agricultural smudging or industrial operations;

   **e.** settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundations, walls, floors, roofs, or ceilings;

   **f.** birds, insects, vermin, rodents, or animals owned or kept by an ***insured***, except for breakage of glass;

We provide coverage for ensuing loss that results from items **1.** through **6.** unless the ensuing loss is itself excluded under **Building Property Losses We Do Not Cover** in this Section.

7. **Pollution**, except as provided by **Additional Property Coverages — Household Products Coverage** under **Section I — Property Coverages**. However, any ensuing loss not excluded is covered.

8. **Neglect**, meaning your failure to use all reasonable means to save and preserve property at and after the time of a loss.

9. **Intentional Loss.**

   We do not provide coverage for an ***insured*** who commits or directs an act with the intent to cause a loss but only with respect to the ***insured***.

For items **10.** through **15.** below, we do not cover loss caused directly or indirectly by the following perils, regardless of any other cause of loss or event contributing concurrently or in any sequence:

10. **Ordinance or Law**, except as provided by **Additional Property Coverages — Building Ordinance or Law** under **Section I — Property Coverages**. Ordinance or Law means any ordinance or law:

    **a.** requiring or regulating the construction, remodeling, renovation, repair, or demolition of building property, including removal of resulting debris, unless specifically provided under this policy. However, loss for damage to glass caused by any **Building Property Losses We Cover** shall

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

be settled on the basis of replacement with safety glazing materials when required by ordinance or law;

b. the requirements of which result in a loss in value to property; or

c. requiring any ***insured*** or others to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects of, ***pollutants***.

This exclusion applies whether or not the building property has been physically damaged.

11. **Earth Movement**, meaning but not limited to the sinking, rising, shifting, expanding, or contracting of earth, all whether combined with water or not. Earth movement includes but is not limited to ***earthquake***, landslide, mudflow, mudslide, sinkhole, subsidence, erosion, or movement resulting from improper compaction, site selection or any other external forces. Earth movement also includes volcanic explosion or lava flow.

This exclusion applies whether the earth movement is caused by or resulting from human or animal forces or any act of nature.

We do cover direct loss by fire, explosion, theft, and breakage of glass which is part of the building, storm door, or storm window.

12. **Water Damage**, meaning:

a. **(1)** flood, surface water, waves, tidal water, tsunami, seiche, overflow of a body of water, storm surge, or spray from any of these, whether or not driven by wind, including hurricane or similar storm; or

**(2)** release of water held by a dam, levee, dike, or by a water or flood control device or structure;

b. water below the surface of the ground, including that which exerts pressure on, or seeps or leaks through a building, wall, bulkhead, sidewalk, driveway, foundation, swimming pool, hot tub, or spa, including their filtration and circulation systems, irrigation systems, including any outdoor water source for the ***residence premises*** or other structure;

c. water which escapes or overflows from sewers, drains, or related plumbing appliances located off the ***residence premises***;

d. water which escapes or overflows from drains on the ***residence premises***. However, this exclusion (**12.d.**) does not apply to overflow and escape caused by malfunction on the ***residence premises***, or obstruction on the ***residence premises***, of a drain on the ***residence premises***; or

e. water which escapes or overflows or discharges, for any reason, from within a sump pump, sump pump well, or any other system designed to remove water which is drained from the foundation area.

Water includes any water borne materials.

This exclusion applies whether the water damage is caused by or resulting from human or animal forces or any act of nature.

Direct loss by fire, explosion, or theft resulting from water damage is covered.

13. **Power Interruption**, meaning the failure of power or other utility service if the failure takes place off the ***residence premises***. If any **Building Property Losses We Cover** ensues on the ***residence premises***, we will pay only for the ensuing loss.

14. Loss caused directly or indirectly by war, including the following and any consequence of any of the following:

a. undeclared war, civil war, insurrection, rebellion, or revolution;

b. warlike act by a military force or military personnel; or

c. destruction or seizure or use for a military purpose.

However, we insure for acts of destruction, due to an order of civil authority, to prevent the spread of fire, provided the fire did not originate from an excluded cause of loss.

Discharge of a nuclear weapon shall be deemed a warlike act even if accidental.

15. **Nuclear Hazard**, meaning nuclear reaction, nuclear radiation, or radioactive contamination, all whether controlled or uncontrolled, and whether or not one of the forces initiating or contributing to

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

these nuclear hazards is covered within the losses we cover in Section I except direct loss by fire resulting from the nuclear hazard is covered.

Exclusions **10.** through **15.** of this section apply even if one or more of the following in **16.** through **18.** concurrently contribute to the loss:

**16.** **Acts or Decisions**, including the failure to act or decide, of any person, group, organization, or governmental body. However, any ensuing loss not excluded is covered.

**17.** **Weather** that contributes in any way with a cause or event not covered in this section to produce a loss. However, any ensuing loss caused by a covered peril and not otherwise excluded is covered.

**18.** **Planning, Construction, or Maintenance**, meaning faulty, inadequate, or defective:

- **a.** planning, zoning, development, surveying, siting;
- **b.** design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
- **c.** materials used in repair, construction, renovation, or remodeling; or
- **d.** maintenance;

of property whether on or off the ***insured location*** by any person or organization. However, any ensuing loss not excluded is covered.

We do not cover direct loss caused by the following excluded peril:

**19.** **Collapse**, except as provided under **Additional Property Coverages — Collapse** in **Section I — Property Coverages**. However, any ensuing loss caused by a covered peril and not otherwise excluded is covered.

---

**PERSONAL PROPERTY WE COVER**

**COVERAGE C — PERSONAL PROPERTY**

**1.** Personal property owned or used by any ***insured*** is covered while it is anywhere in the world.

For personal property located at a self-storage facility or that is usually located at an ***insured's*** residence other than the ***residence premises*** listed on your Policy Declarations, coverage is limited to 10% of the Coverage C limit or a minimum of $1,000.

This limit does not apply to personal property:

- **a.** for the first 30 days while being moved to your newly acquired principal residence;
- **b.** temporarily moved from the ***residence premises*** on your Policy Declarations while property covered under Coverage A or Coverage B is being remodeled, renovated, or repaired and is not fit to live in or store property in; or
- **c.** covered under **Additional Coverages 5. Property Removed**.

The 30 days under **1.a.** is not limited by the expiration of the policy.

With respect to coverage afforded under **1.a.** above, if personal property owned by an ***insured*** is covered by two separate insurance policies, coverage afforded under this policy will be proportionate to the other policy's coverage.

Except to the extent of coverage afforded under paragraph **1.a.**, personal property owned by an ***insured***, located off the ***residence premises*** described on your Policy Declarations, and covered under separate homeowners coverage is not covered by this policy.

**2.** After a loss and at your request, we cover:

- **a.** personal property owned by others while the property is on that part of the ***residence premises*** listed on your Policy Declarations occupied exclusively by any ***insured***;
- **b.** personal property owned by a guest or a ***residence employee,*** while the property is at any residence occupied by any ***insured***; or
- **c.** owned by a ***residence employee*** while actually engaged in the service of an ***insured*** and while such property is in the physical custody of the ***residence employee***.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

3. **SPECIAL LIMITS FOR PERSONAL PROPERTY**

The following groups of personal property are covered only up to the special limit shown in your Policy Declarations. The special limit is the total amount available for each group for any one loss and does not increase the Coverage C limit. The loss of, or damage to, more than one item in a group arising from the same cause or event is considered one loss.

a. Money, bank notes, bullion, gold other than gold-plated ware or goldware, silver other than silver-plated ware or silverware and platinum.

b. Rare coins, stamps, and other numismatic property, including any of these that are part of a collection.

c. Securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, passports, and tickets.

The dollar limit applies to these categories regardless of the medium (such as paper or computer software) on which the material exists.

The limit includes the cost to research, replace, or restore the material from the lost or damaged medium.

d. Watercraft, including their trailers, furnishings, equipment, and outboard motors.

This limit does not apply to rowboats or canoes.

e. Trailers not used with watercraft.

f. Theft of jewelry, watches, furs, precious and semiprecious stones.

g. ***Business*** property, not excluded elsewhere, while located on the ***residence premises***. Up to $1,000 of this limit may be used for ***business*** property, not excluded elsewhere, while located off the ***residence premises***.

h. Tapes, records, discs, or other media used with any device for the transmitting, recording, receiving, or reproduction of sound while in or upon a ***motor vehicle*** on or away from the ***residence premises***.

i. Monuments, headstones, grave markers, and urns.

---

**PERSONAL PROPERTY WE DO NOT COVER**

1. Articles separately described and specifically insured, regardless of insured limit, in this or any other insurance.

2. Animals, birds, or fish.

3. ***Motor vehicles*** and motorized bikes including their equipment and parts while permanently installed in or upon the vehicle. However, we do cover:

   a. vehicles, other than ***motor vehicles***, used to service the ***residence premises***;

   b. electric mobility devices designed to assist an individual that has a disability;

   c. utility trailers not licensed for road use; or

   d. motorized bikes used to service the ***residence premises***.

4. Electronic apparatus for the transmitting, recording, receiving, or reproduction of sound, including their accessories and antennas, designed to be operated solely by power from the electrical system of a ***motor vehicle***. This exclusion applies only while such property is permanently installed in or upon a ***motor vehicle***.

5. ***Aircraft*** (including disassembled parts of ***aircraft***), drones, or model ***aircraft*** designed for carrying persons or cargo. This exclusion does not apply to:

   a. drones without cameras not capable of carrying people or cargo; or

   b. hobby or model ***aircraft*** not capable of carrying people or cargo.

6. Hovercraft. Hovercraft means a self-propelled air cushioned vehicle that can travel over land and water. This exclusion does not apply to hovercraft used to service the ***residence premises***.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

7. Property of roomers, boarders, tenants, ***home-sharing*** occupants during ***home-sharing***, and other residents not related to any ***insured***. With regards to this exclusion, ***residence employees*** are not considered to be roomers, boarders, or other tenants.
8. Property, away from the ***residence premises***, rented to others.
9. ***Business*** property or merchandise:
   - **a.** in storage;
   - **b.** held as a sample; or
   - **c.** held for sale or delivery after sale.
10. Property that is unlawful to own or possess under state or federal law.
11. Property:
    - **a.** associated with ***home-sharing*** and ***home-sharing*** activities during a ***home-sharing*** rental; or
    - **b.** subject to paragraph **11.a.**, an apartment rented to others by an ***insured***.

    **11.b.** does not apply to ***occasional rental*** or on the part of the ***residence premises*** occupied by roomers, boarders, or tenants.
12. Virtual currency of any kind, by whatever name known, whether actual or fictitious including, but not limited to, digital currency, cryptocurrency, or any other type of electronic currency.

---

**PERSONAL PROPERTY LOSSES WE COVER**

We cover accidental direct physical loss to property described in Coverage C — Personal Property caused by a peril listed below except as limited or excluded.

1. **Fire or lightning**.
2. **Windstorm or hail.**

   This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand, or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand, or dust enters through this opening.

   This peril includes loss to watercraft only while inside a building. This limitation does not apply to rowboats and canoes.
3. **Explosion**.
4. **Riot or civil commotion**.
5. **Aircraft**, including self-propelled missiles and spacecraft.
6. **Vehicles**.
7. **Smoke**, meaning sudden and accidental damage from smoke or soot.

   This peril does not include loss caused by smoke from agricultural smudging or industrial operations.
8. **Vandalism or malicious mischief.**
9. **Theft**, including attempted theft and loss of property from a known location when it is likely that the property has been stolen.

   This peril does not include loss caused by theft:
   - **a.** committed by an ***insured***;
   - **b.** in, to, or from a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is completed and occupied; or
   - **c.** to the following personal property that is part of the ***residence premises***, customarily occupied by an ***insured***, if rented to someone other than an ***insured***.
     - **(1)** money, bullion, silver, gold, platinum, numismatic property, or bank notes;
     - **(2)** securities, accounts, manuscripts, bills, deeds, evidences of debt, letters of credit, notes other than bank notes, passports, railroad and other tickets, or stamps, including philatelic property;

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

**(3)** jewelry, silverware, goldware, pewterware, silver-plated ware and gold-plated ware, or any article of fur or article containing fur which represents its principal value; or

**(4)** caused by a tenant, a tenant's employees or members of the tenant's household while renting the portion of the described dwelling customarily occupied exclusively by any ***insured.***

Property of a student who is an ***insured*** is covered while at a residence away from home.

**10. Falling objects.**

This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

**11. Weight of ice, snow, or sleet** which causes damage to property contained in a building.

**12. Collapse of a building or any part of a building.**

This peril does not include settling, cracking, shrinking, bulging, or expansion.

**13. Accidental discharge, leakage, or overflow of water or steam** from within a plumbing, heating, air conditioning, or automatic fire protective sprinkler system, or from within a household appliance.

This peril does not include loss:

**a.** to the appliance or system from which the water or steam escaped; or

**b.** caused by or resulting from freezing except as provided in the peril of freezing below;

For purposes of coverage under this peril, a plumbing system or household appliance does not include a sump, sump pump, or related equipment or a roof drain, gutter, downspout, or similar equipment.

**14. Sudden and accidental tearing apart, cracking, burning, or bulging** of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

We do not cover loss caused by or resulting from freezing under this peril.

**15. Freezing** of a plumbing, heating, air conditioning, or automatic fire protective sprinkler system, or of a household appliance.

This peril does not include loss on the ***residence premises*** while the dwelling is ***vacant***, under construction, or unoccupied for four or more consecutive days, unless you have used due diligence to:

**a.** maintain heat in the building; or

**b.** shut off the water supply and drain the system and appliances of water.

For purposes of coverage under this peril, a plumbing system or household appliance does not include a sump, sump pump, or related equipment or a roof drain, gutter, downspout, or similar equipment.

**16. Sudden and accidental damage from artificially generated electrical current.**

**17. Breakage of glass**, meaning damage to personal property caused by breakage of glass which is a part of a building on the ***residence premises***. There is no coverage for loss or damage to the glass except as provided under **Building Property Losses We Cover**.

---

## PERSONAL PROPERTY LOSSES WE DO NOT COVER

We do not cover loss caused directly by any of the **Building Property Losses We Do Not Cover**. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

---

## COVERAGE D — ADDITIONAL LIVING EXPENSE AND LOSS OF RENT

The limit of liability for Coverage D applies separately to **1.** and **2.** and includes any coverage provided under **3.** below. Coverage provided under **3.** does not increase the limit of liability for **Additional Living Expense** or **Fair Rental Value.**

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

1. If a loss covered under this Section makes that part of the ***residence premises*** where you reside uninhabitable we cover **Additional Living Expense**, meaning any necessary increase in living expenses you incur so that your household can maintain its normal standard of living.

   Payment shall be for the time reasonably required to repair or replace the damage or, if you permanently relocate, the time reasonably required for your household to settle elsewhere.

2. If a loss covered under this section makes that part of the ***residence premises*** you rent to others or hold for rental uninhabitable, we cover:

   **Fair Rental Value**, meaning the fair rental value of that part of the ***residence premises*** listed on your Policy Declarations you rent to others or hold for rental, less any expenses that do not continue while the premises is uninhabitable. However, we do not cover any fair rental value arising out of or in connection with ***home-sharing***.

   Payment shall be for the time reasonably required to repair or replace the damage.

   We do not cover loss or expense due to cancellation of a lease or agreement.

3. If a civil authority prohibits you from use of the ***residence premises*** as a result of direct damage to neighboring premises by a cause of loss we cover in this policy we cover the **Additional Living Expense** as provided under **1.** or **Fair Rental Value** as provided under **2.** above for no more than two weeks during which use is prohibited.

The period of time under **1.**, **2.**, and **3.** above are not limited by expiration of this policy.

No deductible applies to this coverage.

---

**ADDITIONAL PROPERTY COVERAGES**

The following **Additional Property Coverages** are subject to all the terms, provisions, exclusions, and conditions of this policy.

1. **Debris Removal.** We will pay the reasonable expense you incur in the removal of debris of covered property provided coverage is afforded for the peril causing the loss. Debris removal expense is included in the limit of liability applying to the damaged property. When the amount payable for the actual damage to the property plus the expense for debris removal exceeds the limit of liability for the damaged property, an additional 5% of that limit of liability will be available to cover debris removal expense.

   We will also pay the reasonable expense for the removal of trees from the ***residence premises***, provided the trees damage covered property.

2. **Reasonable Repairs.** We will pay the reasonable cost you incur for necessary repairs made to protect covered property from further damage, following a covered loss. This coverage does not increase the limit of liability applying to the property being repaired.

3. **Trees, Shrubs and Other Plants.** We cover, as an additional amount of insurance, trees, shrubs, plants, or lawns, on the ***residence premises***, for loss caused by the following perils: Fire or lightning, Explosion, Riot or civil commotion, ***Aircraft***, Vehicles not owned or operated by a resident of the ***residence premises***, Vandalism or malicious mischief, Theft and attempted theft.

   **a.** We will pay up to 5% of the limit of liability that applies to the dwelling for all trees, shrubs, plants, and lawns.

   **b.** We will pay up to $500 for:

   **(1)** any one tree, shrub, or plant; and

   **(2)** debris removal coverage when the tree, shrub, or plant does not cause damage to covered property.

4. **Fire Department Service Charge.**

   **a.** We will pay, up to the amount shown in your Policy Declarations, as an additional amount of insurance, for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a loss we cover.

   We do not cover fire department service charges if the property is located within the limits of the city, municipality, or protection district furnishing the fire department response.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

**b.** In addition, and if the fire department service charge is not covered under the terms of paragraph **a.** above, we will pay up to $250 for your liability assumed for fire department charges incurred when a volunteer fire department is called into save or protect covered property from a loss we cover.

This additional coverage limit is in addition to the amount shown in your Policy Declarations for coverage under **a.** above and applies to your liability for service charges billed to you by a volunteer fire department provided:

**(1)** the volunteer fire department is not fully funded by real estate taxes or other property taxes; and

**(2)** the charge is not made pursuant to a contract for service outside the volunteer fire department's fire protection district, city, or municipality.

**5.** **Property Removed**. We insure covered property against direct loss from any cause while being removed from a premises endangered by a loss we cover. We will cover this property for a maximum of 30 days while removed. This coverage is not limited by the expiration date of the policy. This coverage does not change the limit of liability that applies to the property being removed.

**6.** **Land Stabilization**. We will pay up to the amount shown in your Policy Declarations for the cost required to replace, rebuild, stabilize, or otherwise restore the land necessary to support the insured dwelling or other structures sustaining a covered loss. This is an additional amount of insurance.

**7.** **Building Ordinance or Law Coverage**. We will pay up to the amount shown in your Policy Declarations for the increased costs you incur for **Building Property We Cover** due to the enforcement of any ordinance or law which requires or regulates:

**a.** The construction, demolition, remodeling, renovation, or repair of that part of a covered building or other structure damaged by a peril insured against;

**b.** The demolition and reconstruction of the undamaged part of a covered building or other structure, when that building or other structure must be totally demolished because of damage by a peril insured against to another part of that covered building or other structure; or

**c.** The remodeling, removal, or replacement of the portion of the undamaged part of a covered building or other structure necessary to complete the remodeling, repair, or replacement of that part of the covered building or other structure damaged by a peril insured against.

You may use all or part of this **Building Ordinance or Law Coverage** to pay for the increased costs you incur to remove debris resulting from the construction, demolition, remodeling, renovation, repair, or replacement of property as stated above.

We do not cover the loss in value to any covered building or other structure due to the requirements of any ordinance or law.

The limit of liability shown in your Policy Declarations is the most we will pay for the total of all loss or costs for **Building Property We Cover**, regardless of the number of locations or number of claims made.

This coverage does not apply unless you choose to repair or rebuild your property at its present location.

This is an additional amount of insurance.

**8.** **Arson Reward**. We will pay up to the amount shown in your Policy Declarations for information which leads to an arson conviction in connection with a fire loss to property covered by this policy. This coverage may increase the limit otherwise applicable.

However, we will not pay more than the amount shown in your Policy Declarations per event regardless of the number of persons providing information.

**9.** **Household Products Coverage**. We cover direct physical loss to the property described in Coverage A and B arising out of a discharge, dispersal, spill, leak, release, escape, emission, transmission, or absorption of household products on the ***residence premises.*** Household products include items currently in use or your possession at the ***residence premises*** in normal household quantities such as paint thinners, bleach, pesticides, herbicides, motor oil, gasoline, heating fuel, and similar items. For purposes of this coverage, household products do not include materials containing asbestos, lead, or formaldehyde.

We will pay up to 5% of the Coverage A limit of liability shown in the Policy Declarations for any loss resulting from a covered cause of loss during the policy period under this coverage after you have paid your deductible. This is an additional amount of insurance.

**** REPRINTED FROM THE ARCHIVE, THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

This coverage does not apply to:

**a.** any fee, assessment or expense of any governmental authority;

**b.** loss arising out of household products possessed or used:

**(1)** for ***business*** purposes;

**(2)** for illegal purposes;

**(3)** by contractors; or

**(4)** on driveways or walkways.

**Pollution** under **Section I — Building Property Losses We Cover** does not apply to this **Additional Property Coverage**.

In the event that a loss is covered under both this coverage and **Additional Property Coverages — Building Ordinance or Law Coverage**, you may elect either one of these coverages, but not both.

**10. Volunteer America.** We insure for all risks of accidental and direct physical loss to the property described in **Coverage C — Personal Property**, when the loss occurs as a direct result of acting as a ***volunteer***.

No deductible applies to this coverage.

**11. Criminal Conviction Reward.**

**a.** We will pay the amount shown in your Policy Declarations to an eligible person for information leading to the arrest and conviction of the person(s) committing a crime resulting in loss to covered property; and

**b.** We will pay up to the amount shown in your Policy Declarations to an eligible person for the return of stolen covered property, when the loss is caused by theft. However, we will pay no more than the lesser of the following amounts:

**(1)** ***actual cash value*** of the stolen property at the time the property is returned, but not more than the amount that would have been required to repair or replace; or

**(2)** the amount determined by the loss settlement procedure applicable to the property returned had the property not been recovered.

**c.** This coverage applies subject to the following conditions:

**(1)** An eligible person means that person identified by a law enforcement agency as being the first to provide the necessary information or return the stolen property, and who is not:

**(a)** an ***insured***;

**(b)** a relative of an ***insured***;

**(c)** an employee of a law enforcement agency;

**(d)** an employee of a ***business*** engaged in property protection;

**(e)** any person who had custody of the property at the time the theft was committed; or

**(f)** any person involved in the crime.

**(2)** No reward will be paid unless and until the person(s) committing the crime is (are) convicted or the property returned. The amount of the reward in items **a.** and **b.** above is the most we will pay for any one loss to an eligible person.

**12. Tear Out.** If we cover loss to property covered under Coverage **A** or **B** resulting from an accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning, or automatic fire protective sprinkler system, or household appliance on the ***residence premises***. We will also pay the cost to tear out and replace any part of the dwelling or other structure on the ***residence premises***, but only when necessary to repair the system or appliance. However, such tear out and replacement coverage only applies to other structures if the water or steam causes actual damage to a building on the ***residence premises***.

We do not cover loss to the system or appliance from which this water or steam escaped. For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout, or similar equipment.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

**13. Collapse.**

a. For the purpose of this **Additional Coverage — Collapse**, collapse means falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

b. This **Additional Coverage — Collapse** does not apply to:

(1) a building or any part of a building that is in danger of falling down or caving in;

(2) a part of a building that is standing, even if it has separated from another part of the building; or

(3) a building or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

c. We insure for direct physical loss to covered property involving collapse of a building or any part of a building if such collapse was caused by one or more of the following:

(1) the **Personal Property Losses We Cover** named under Coverage C;

(2) decay, of a building or any part of a building, that is hidden from view;

(3) insect or vermin damage, to a building or any part of a building, that is hidden from view;

(4) weight of contents, equipment, animals, or people;

(5) weight of rain which collects on a roof; or

(6) use of defective material or methods in construction, remodeling, or renovation if the collapse occurs during the course of the construction, remodeling, or renovation.

d. Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf, or dock is not included under **c.(2)** through **(6)** above unless the loss is a direct result of the collapse of a building or any part of a building.

e. This coverage does not increase the limit of liability that applies to the damaged covered property.

## SECTION I — PROPERTY CONDITIONS

1. **Deductible.** In case of loss under Section I — Property Coverages of this policy, we cover only that part of the loss over the applicable deductible stated in the Policy Declarations.

   The deductible does not apply to **Coverage D — Additional Living Expense And Loss Of Rent** or **Fire Department Service Charge.**

2. **Your Duties to Select and Maintain Policy Limits.** It is your responsibility to select and maintain adequate amounts of insurance on your dwelling, other structures, and personal property. To assist you with this responsibility, we will suggest annual changes to your policy limits. These suggestions will be made effective on the renewal of your policy and will be based on information provided to us by you or your agent about your dwelling's features and may be supplemented by public record or inspection. Labor and material cost trends for your area supplied to us by recognized residential construction cost specialists will be included. Payment of your renewal is all that is necessary to indicate your acceptance of the new amount.

3. **An Insured's Duties After Loss.** In case of a loss to which this insurance may apply, you must perform the following duties:

   a. cooperate with us in the investigation, settlement, or defense of any claim or suit;

   b. give immediate notice to us or our agent;

   c. notify the police in case of loss by theft;

   d. protect the property from further damage, make reasonable and necessary repairs required to protect the property, and keep an accurate record of repair expenses;

   e. prepare an inventory of the personal property showing in detail the quantity, description, ***actual cash value***, and age. Attach all bills, receipts, and related documents that justify the figures in the inventory;

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

**f.** as often as we reasonably require:

**(1)** exhibit the damaged and undamaged property;

**(2)** provide us with records and documents we request and permit us to make copies; and

**(3)** submit to examinations under oath and subscribe the same.

**g.** submit to us, within 60 days after we request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

**(1)** the time and cause of loss;

**(2)** interest of the ***insured*** and all others in the property involved and all encumbrances on the property;

**(3)** other insurance which may cover the loss;

**(4)** changes in title or occupancy of the property during the term of the policy;

**(5)** specifications of any damaged building and detailed repair estimates;

**(6)** an inventory of damaged personal property described in **3.e.**;

**(7)** receipts for **Additional Living Expenses** incurred or records supporting the **Loss of Rent**.

**4. Insurable Interest and Limit of Liability.** Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

**a.** for more than the amount of the ***insured's*** interest at the time of loss; or

**b.** for more than the applicable limit of liability,

whichever is less.

**5. Loss Settlement.** Covered property losses are settled as follows:

**a. Replacement Cost.** Property under Coverage A or B, including fences, at ***replacement cost***, not including those items listed in **5.b.(2)** below, subject to the following:

**(1)** We will pay the full cost of repair or replacement, but not exceeding the smallest of the following amounts:

**(a)** the limit of liability under the policy applying to Coverage A or B;

**(b)** the ***replacement cost*** of that part of the damaged building, fence, or other structures for equivalent construction and use on the same premises as determined shortly following the loss; or

**(c)** the full amount actually and necessarily incurred to repair or replace the damaged building, fence, or other structures as determined shortly following the loss.

**(2)** If the cost to repair or replace is $2,500 or more, we will pay the difference between ***actual cash value*** and ***replacement cost*** only when the damaged or destroyed property is repaired or replaced. However, if the cost to repair or replace the damaged property is less than $2,500 we will pay the full cost of repair or replacement before the repair or replacement has been completed.

**(3)** You may disregard the ***replacement cost*** loss settlement provisions and make claim under this policy for loss or damage to buildings or other structures on an ***actual cash value*** basis.

You may still make claim, for the difference between ***actual cash value*** and the full ***replacement cost*** within 6 months of the later of:

**(a)** the last date you received a payment for ***actual cash value***; or

**(b)** the date of entry of a final order of a court of competent jurisdiction declaring your right to ***replacement cost***.

**b. Actual Cash Value.**

**(1)** Personal property covered under Coverage C;

**(2)** Outdoor antennae and awnings, all whether attached or not to buildings;

at ***actual cash value*** at the time of loss not exceeding the amount necessary to repair or replace.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

6. **Loss to a Pair or Set.** In case of loss to a pair or set we may elect to repair or replace any part to restore the pair or set to its value before the loss.

7. **Appraisal.** If you and we fail to agree on the amount of the loss, then, on the written demand of either, each will select a competent and disinterested appraiser and notify the other of the appraiser selected within 20 days of such demand. The two appraisers will choose a competent and disinterested umpire. If they cannot agree on an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record having jurisdiction.

   The appraisers will separately state the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed on will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two shall set the amount of the loss.

   Each party will:

   a. pay its own appraiser; and

   b. bear the other expenses of the appraisal and umpire equally.

   However, if we make the written demand, then you will be reimbursed by us for the reasonable cost of your appraiser and your portion of the cost of the umpire.

8. **Suit Against Us.** No action shall be brought against us unless there has been compliance with the policy provisions and the action is started within two years after the inception of the loss or damage.

9. **Our Option.** If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the property damaged with equivalent property.

10. **Loss Payment.** We will adjust all losses with you. We will pay you unless some other person is named in the policy to receive payment. Loss will be payable 30 days after:

    a. we reach agreement with you;

    b. there is an entry of a final judgment; or

    c. there is a filing of an appraisal award with us.

11. **Abandonment of Property.** We need not accept any property abandoned by any ***insured***.

12. **Mortgage Clause.**

    The word "mortgagee" includes trustee. If a mortgagee is named in this policy, any loss payable under Coverage A or B shall be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment shall be the same as the order of precedence of the mortgages.

    If we deny your claim, that denial shall not apply to a valid claim of the mortgagee, if the mortgagee:

    a. notifies us of any change in ownership, occupancy, or substantial change in risk of which the mortgagee is aware;

    b. pays any premium due under this policy on demand if you have neglected to pay the premium;

    c. submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so; and

    d. complies with item **3.e.** of **Section I — Property Conditions.**

    Policy conditions relating to **Appraisal**, **Suit Against Us**, and **Loss Payment** apply to the mortgagee. If the policy is canceled or not renewed by us, the mortgagee shall be notified at least 20 days before the date cancellation or non-renewal takes effect.

    If we pay the mortgagee for any loss and deny payment to you:

    e. we are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

    f. at our option, we shall receive full or partial assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt as our payment, including any accrued interest, as it bears to the amount of the principal on the mortgage.

    Subrogation shall not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

13. **No Benefit to Bailee.** We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing, or transporting property for a fee regardless of any other provision of this policy.

14. **Other Insurance and Service Agreements.** If a loss covered by this policy is also covered by:

    a. other insurance, we will pay only the proportion of the loss caused by a peril insured against under this policy that the limit of liability applying under this policy bears to the total amount of insurance covering the loss; or

    b. a service agreement, this insurance is excess over any amounts payable under any such agreement. Service agreement includes a home warranty or similar service warranty.

15. **Recovered Property.** If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery. At your option, the property will be returned to or retained by you or it will become our property. If the recovered property is returned to or retained by you, the loss payment will be adjusted based on the amount you received for the recovered property.

16. **Salvage Value.** Any value that may be realized from salvage will not diminish the amount of your deductible. We need not accept, but have all rights to salvage.

    Salvage means property having value and included in a covered loss.

17. **Loss Clause.** Payment of loss will not reduce the amount of this insurance.

## SECTION II — LIABILITY COVERAGES

### LIABILITY LOSSES WE COVER

### COVERAGE E — PERSONAL LIABILITY

If a claim is made or a suit is brought against any ***insured*** for damages because of ***bodily injury*** or ***property damage*** caused by an ***occurrence*** to which this coverage applies, we will:

1. pay up to our limit of liability for the damages for which the ***insured*** is legally liable; and

2. provide a defense at our expense by counsel of our choice even if the allegations are groundless, false, or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the ***occurrence*** equals our limit of liability.

### COVERAGE F — MEDICAL PAYMENTS TO OTHERS

We will pay the necessary medical expenses incurred or medically ascertained within three years from the date of an accident causing ***bodily injury***. Medical expenses means reasonable charges for medical, surgical, X-ray, dental, ambulance, hospital, professional nursing, prosthetic devices, rehabilitation, pharmaceuticals, and funeral services. This coverage does not apply to you or regular residents of your household other than ***residence employees***. As to others, this coverage applies only:

1. to a person on the ***insured location*** with the permission of any ***insured***; or

2. to a person off the ***insured location***, if the ***bodily injury***:

    a. arises out of a condition on the ***insured location*** or the ways immediately adjoining;

    b. is caused by the activities of any ***insured***;

    c. is caused by a ***residence employee*** in the course of the ***residence employee's*** employment by any ***insured***;

    d. is caused by an animal owned by or in the care of any ***insured***; or

    e. is sustained by a ***residence employee*** and arises out of the ***residence employee's*** employment by the ***insured***.

### LIABILITY LOSSES WE DO NOT COVER

1. **Coverage E — Personal Liability and Coverage F — Medical Payments to Others** do not apply to ***bodily injury*** or ***property damage***:

    a. which is expected or intended by any ***insured*** or which is the foreseeable result of an act or omission intended by any ***insured***, but only with respect to the ***insured***.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

This exclusion applies even if:

**(1)** such ***bodily injury*** or ***property damage*** is of a different kind or degree than expected or intended; or

**(2)** such ***bodily injury*** or ***property damage*** is sustained by a different person, or persons, than expected or intended.

This exclusion does not apply to ***bodily injury*** resulting from the use of reasonable force by any ***insured*** to protect persons or property.

**b.** arising out of ***business*** pursuits of any ***insured***.

This exclusion does not apply to:

**(1)** activities which are ordinarily incident to non-***business*** pursuits;

**(2)** incidental ***business*** activities conducted by an ***insured*** who is younger than 21 years of age that produces revenues of no more than $2,500 during the policy period.

**(3)** the rental or holding for rental of any part of the ***residence premises*** rented to fewer than three roomers or boarders;

**(4)** the rental of any part of the ***residence premises***, in part, as an office, school, studio, or private garage;

**c.** arising out of the rendering or failing to render professional services;

**d.** arising out of any premises owned by, controlled by, or rented to any ***insured*** which is not an ***insured location***;

**e.** arising out of the ownership, maintenance, use, loading, or unloading of:

**(1)** ***aircraft***.

This does not apply to:

**(a)** drones without cameras not capable of carrying people or cargo; or

**(b)** hobby or model ***aircraft*** not capable of carrying people or cargo.

**(2)** ***motor vehicles*** including any trailers towed by or carried on a ***motor vehicle***, ***recreational motor vehicle***, or hovercraft.

This exclusion does not apply to:

**(a)** a trailer not towed by or carried on a ***motor vehicle***;

**(b)** a motorized golf cart at the time of an ***occurrence*** is within the legal boundaries of:

**i.** a golfing facility and is parked or stored there, or being used by an ***insured*** to:

**(i)** play the game of golf or for other recreational or leisure activity allowed by the facility;

**(ii)** travel to or from an area where ***motor vehicles*** or golf carts are parked or stored; or

**(iii)** cross public roads at designated points to access other parts of the golfing facility; or

**ii.** a private residential community, including its public roads upon which a motorized golf cart can legally travel, which is subject to the authority of a property owners association and contains an ***insured's*** residence.

**(c)** ***recreational motor vehicles*** or hovercraft on an ***insured location***;

**(d)** electric motorized ride-on vehicles while off an ***insured location*** designed to be operated by children under the age of eight and designed for speeds of less than six miles per hour;

**(e)** a ***motor vehicle*** in dead storage on the ***residence premises***; or

**(f)** vehicles, other than ***motor vehicles***, primarily used in servicing the ***residence premises*** while on or off the ***residence premises***.

**** REPRINTED FROM THE ARCHIVE, THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

**(3)** watercraft:

**(a)** owned by or rented to any ***insured*** if it has inboard or inboard-outdrive motor power of more than 25 horsepower;

**(b)** owned by or rented to any ***insured*** if it is a sailing vessel 26 feet or more in overall length, with or without auxiliary power;

**(c)** powered by one or more outboard motors with 26 or more total horsepower if the outboard motors are owned by any ***insured***.

However, outboard motors of 26 or more total horsepower are covered for the policy period if:

**i.** you acquired them prior to the policy inception, and:

**(i)** declared them at policy inception; or

**(ii)** you ask us in writing to insure them within 45 days after you become the owner;

**ii.** you acquire them during the policy period, provided you ask us to insure them:

**(i)** during the policy period in which you become the owner; or

**(ii)** within 45 days after you become the owner;

whichever is greater, and pay any resulting additional premium from the date acquired.

unless it occurs on the ***insured location***.

This exclusion does not apply to watercraft:

**(d)** while stored;

**(e)** powered by an engine with less than 26 horsepower; or

**(f)** sailing vessels 26 feet or less in length with or without auxiliary power.

Horsepower means the maximum power rating assigned to the engine or motor by the manufacturer.

Exclusions **d.** and **e.** do not apply to ***bodily injury*** to a ***residence employee*** arising out of and in the course of the ***residence employee's*** employment by any ***insured***;

**f.** arising out of smuggling or trafficking.

**g.** arising out of:

**(1)** the entrustment by any ***insured*** to any person;

**(2)** the supervision by any ***insured*** of any person; or

**(3)** vicarious liability, whether or not imposed by law, for the actions of a child or minor;

with regard to any ***aircraft***, ***motor vehicle***, ***recreational vehicle***, hovercraft, or watercraft which is not covered under Section II of this policy.

**h.** caused directly or indirectly by war, including the following and any consequences of the following:

**(1)** undeclared war, civil war, insurrection, rebellion, or revolution;

**(2)** warlike act by a military force or military personnel; or

**(3)** destruction or seizure or use for a military purpose.

Discharge of a nuclear weapon shall be deemed a warlike act even if accidental.

**i.** which arises out of the transmission of a communicable disease by any ***insured***;

**j.** arising out of physical or mental abuse, sexual molestation, or corporal punishment.

**k.** arising out of the use, sale, manufacture, delivery, transfer, or possession by any person of a controlled substance(s) as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812. Controlled substances include but are not limited to cocaine, LSD, marijuana, and all narcotic drugs.

**** REPRINTED FROM THE ARCHIVE THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

However, this exclusion does not apply to the legitimate use of prescription drugs by a person following the orders of a licensed health care professional.

2. **Coverage E — Personal Liability** does not apply to:

   a. Liability:

      (1) for your share of any loss assessment charged against all members of any property owner's association; or

      (2) assumed by any ***insured*** under contracts or agreements that are not in writing. This exclusion does not apply to liability that any ***insured*** would have had without a contract or agreement;

   b. ***property damage*** to property owned by any ***insured***;

   c. ***property damage*** to property of others in the care, custody, or control of any ***insured***. This exclusion does not apply to ***property damage*** caused by fire, smoke, explosion, or water;

   d. ***bodily injury*** to any person eligible to receive any benefits required to be provided or voluntarily provided by any ***insured*** under:

      (1) any workers compensation;

      (2) non-occupational disability; or

      (3) occupational disease law;

   e. ***bodily injury*** or ***property damage*** for which any ***insured*** under this policy is also an ***insured*** under a nuclear energy liability policy or would be an ***insured*** but for its termination upon exhaustion of its limit of liability. A nuclear energy liability policy is a policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada, or any of their successors;

   f. ***bodily injury*** to an ***insured*** within the meaning of parts **(1)** or **(2)** of Policy Definitions, **3.i.** ***Insured***;

3. **Coverage F — Medical Payments to Others** does not apply to ***bodily injury***:

   a. to a ***residence employee*** if the ***bodily injury*** occurs off the ***insured location*** and does not arise out of or in the course of the ***residence employee*'s** employment by an ***insured***;

   b. to any person, eligible to receive any benefits required to be provided or voluntarily provided under any workers' compensation, non-occupational disability, or occupational disease law;

   c. from any nuclear reaction, radiation or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these;

   d. to any person, other than a ***residence employee*** of any ***insured***, regularly residing on any part of the ***insured location***.

---

## ADDITIONAL LIABILITY COVERAGES

We cover the following in addition to the limits of liability:

1. **Claim Expenses**. We pay:

   a. expenses we incur and costs taxed against any ***insured*** in any suit we defend;

   b. premiums on appeal bonds required in a suit we defend; premiums on bonds to release attachments in a suit we defend, but not for bond amounts greater than the limit of liability for **Coverage E — Personal Liability**; and the cost of bail bonds required of the ***insured*** because of an ***occurrence*** to which this policy applies, not to exceed $250 per bail bond, except we are not obligated to apply for or furnish any bond; and

   c. reasonable expenses incurred by any ***insured*** at our request, including actual loss of earnings (but not loss of other income), and vacation time or other benefit loss up to $200 per day, for assisting us in the investigation or defense of any claim or suit.

2. **First Aid Expenses**. We will pay expenses for first aid to others incurred by any ***insured*** for ***bodily injury*** covered under this policy. We will not pay for first aid to you or any other ***insured***.

3. **Damage to Property of Others**. We will pay on a ***replacement cost*** basis up to $500 per ***occurrence*** for ***property damage*** to property of others caused by any ***insured***.

We will not pay for ***property damage***:

a. if insurance is otherwise provided in this policy;

b. caused intentionally by any ***insured*** who is 13 years of age or older;

c. to property owned by or rented to:

(1) any ***insured***; or

(2) a tenant of any ***insured***, a roomer or boarder of any ***insured***, a ***home-sharing*** occupant during ***home-sharing***, or a resident in your household; or

d. arising out of:

(1) ***business*** pursuits or professional services;

(2) any act or omission in connection with a premises owned, rented, or controlled by an ***insured***, other than the ***insured location***; or

(3) the ownership, maintenance, operation, use, loading or unloading of ***aircraft***, watercraft, or ***motor vehicles***, trailer or semi-trailer, or farming machinery or equipment. This does not apply to a ***recreational motor vehicle*** not owned by any ***insured***.

4. **Credit Card, Fund Transfer Card, Forgery, and Counterfeit Money.**

We will pay up to the limit shown on your Policy Declarations for:

a. the legal obligation of an ***insured*** to pay because of theft or unauthorized use of credit cards issued to or registered in any ***insured's*** name;

b. loss resulting from theft or unauthorized use of a fund transfer card used for deposit, withdrawal, or transfer of funds, issued to or registered in any ***insured's*** name.

We do not cover use by a resident of your household, a person who has been entrusted with the credit card or fund transfer card or any person if any ***insured*** has not complied with all terms and conditions under which the credit card or fund transfer card is issued.

c. loss to any ***insured*** caused by forgery or alteration of any check or negotiable instrument; and

d. loss to any ***insured*** through acceptance in good faith of counterfeit United States or Canadian paper currency.

All loss resulting from a series of acts committed by any one person or in which any one person is concerned or implicated is considered to be one loss.

We do not cover loss arising out of ***business*** pursuits or dishonesty of any ***insured***.

Defense:

a. We may make any investigation and settle any claim or suit that we decide is appropriate.

b. If a suit is brought against any ***insured*** for liability covered under this **Credit Card or Fund Transfer Card Coverage**, we will provide a defense at our expense by counsel of our choice.

c. We have the option to defend at our expense any ***insured*** or any ***insured's*** bank against any suit for the enforcement of payment under the forgery coverage.

5. **Loss Assessment.**

a. we will pay loss assessments charged during the policy period against all members of any property owner's association up to the limit of liability shown in your Policy Declarations, when the assessment is made as a result of:

(1) each direct loss to property, caused by a peril that would be covered under **Section I — Property Coverages** of this policy;

**SPECIAL EXCLUSION**: There is no coverage for any loss assessment resulting from the peril of ***earthquake***. However, loss assessment for ensuing direct loss by fire, explosion, or theft is covered.

(2) each ***occurrence*** to which **Section II — Liability Coverages** of this policy would apply; and

(3) liability for each act of a director, officer, or trustee in the capacity as a director, officer, or trustee, provided:

(a) the director, officer, or trustee is elected by the members of the association of property owners; and

(b) the director, officer, or trustee serves without deriving any income from the exercise of his/her duties, which are solely on behalf of the association of property owners.

b. **DEDUCTIBLE.** We will pay only that part of your assessment per unit for property insured under Section I that exceeds $500. No other deductible applies to this coverage. If our liability for a loss results from Section I and coverage under this option, only the larger deductible will apply.

6. **Volunteer America.**

a. Under **Section II — Liability Coverages**, the following applies:

(1) **Property Damage to Others.** We will pay an additional $2,000 for direct damage caused as direct result of acting as a ***volunteer***.

(2) **Medical Payments to Others.** We will pay up to double the amount shown in your Policy Declarations for ***bodily injury*** caused as a direct result of acting as a ***volunteer***.

b. Under **Section II — Liability Losses We Do Not Cover** the following items are modified as follows:

(1) Item **1.b.** does not apply to activities as a ***volunteer***.

(2) Item **1.c.** does not apply to professional services, other than professional health care services by a doctor, performed as a ***volunteer***.

## SECTION II — LIABILITY CONDITIONS

1. **Limit of Liability.** Our total liability under Coverage E for all damages resulting from any one ***occurrence*** will not exceed the limit of liability for Coverage E shown in the Policy Declarations. This limit is the same regardless of the number of ***insureds***, claims made, or persons injured.

Our total liability under Coverage F for all medical expense payable for ***bodily injury*** to one person as the result of one accident shall not exceed the limit of liability for Coverage F shown in the Policy Declarations.

2. **Severability of Insurance.** This insurance applies separately to each ***insured***. This condition shall not increase our limit of liability for any one ***occurrence***.

3. **Your Duties After Loss.** In case of an accident or ***occurrence***, the ***insured*** shall perform the following duties that apply:

a. give written notice to us or our agent as soon as practicable, which sets forth:

(1) the identity of the policy and ***insured***;

(2) reasonably available information on the time, place, and circumstances of the accident or ***occurrence***;

(3) names and addresses of any claimants and witnesses; and

(4) in case of loss under the **Credit Card, Fund Transfer Card, Forgery, and Counterfeit Money** also notify the credit card or fund transfer card company;

b. promptly forward to us every notice, demand, summons, or other process relating to the accident or ***occurrence***;

c. at our request, help us:

(1) to make a settlement;

(2) to enforce any right of contribution or indemnity against any person or organization who may be liable to any ***insured***;

(3) with the conduct of suits and attend hearings and trials; and

(4) to secure and give evidence and obtain the attendance of witnesses;

d. under the **Additional Liability Coverages — Damage to the Property of Others** — submit to us within 60 days after the loss, a sworn statement of loss and exhibit the damaged property, if within the ***Insured's*** control;

e. submit within 60 days after the loss, evidence, or affidavit supporting a claim under the **Additional Liability Coverages, Credit Card, Fund Transfer Card, or Forgery, and Counterfeit Money Coverage**, stating the amount and cause of loss;

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

f. the ***insured*** shall not, except at the ***insured's*** own cost, voluntarily make any payment, assume any obligation, or incur any expense other than for first aid to others at the time of the ***bodily injury***.

4. **Duties of an Injured Person — Coverage F — Medical Payments to Others.** The injured person or someone acting for the injured person will:

   a. give us written proof of claim, under oath if required, as soon as practical; and

   b. authorize us to obtain copies of medical reports and records.

   The injured person shall submit to physical examination by a doctor selected by us when and as often as we reasonably require.

5. **Payment of Claim — Coverage F — Medical Payments to Others.** Payment under this coverage may reduce the amount payable for a covered injury and is not an admission of liability by any ***insured*** or us.

6. **Payment of Interest — Coverage E — Personal Liability.**

   If a notice, demand, summons, judgment, or other process is promptly forwarded to us as required by Liability Condition **3.b.** under **Your Duties After Loss** and we accept the defense or agree to the judgment, we will pay interest on the judgment, subject to all of the following:

   a. We will pay the interest on that part of the judgment that is covered by this policy.

   b. We will pay interest that accrues on the judgment until we pay, tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies.

   c. If we appeal the judgment, we will pay interest on the entire judgment.

   d. Post-judgment interest is in addition to the applicable limit of liability.

   e. Prejudgment interest shall be in addition to the applicable limit of liability.

7. **Suit Against Us.** No action shall be brought against us unless there has been compliance with the policy provisions.

   No one shall have any right to join us as a party to any action against any ***insured***. Further, no action with respect to Coverage E shall be brought against us until the obligation of the ***insured*** has been determined by final judgment or agreement signed by us.

   Any person or organization or their legal representative who has secured such judgment or written agreement against the ***insured*** shall be entitled to recover under this policy to the extent of the insurance afforded under this policy.

8. **Bankruptcy of an *Insured*.** Bankruptcy or insolvency of any ***insured***, or any ***insured's*** estate, shall not relieve us of any of our obligations under this policy.

9. **Other Insurance — Coverage E — Personal Liability.** If a loss covered by this policy is also covered by other insurance, we will pay only that proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss. However, with respect to ***bodily injury*** or ***property damage*** arising out of the ownership, maintenance, operation, use, loading, or unloading of any ***motor vehicle*** or watercraft to which this policy applies, this insurance under **Coverage E — Personal Liability** shall be excess insurance over any other valid and collectible insurance available to the ***insured***.

## SECTIONS I AND II — PROPERTY AND LIABILITY CONDITIONS

1. **Policy Period and Changes.**

   a. The effective time of this policy is 12:01 A.M. standard time at the ***residence premises***. This policy applies only to loss under Section I, or ***bodily injury*** or ***property damage*** under Section II, which occurs during the policy period. This policy may be renewed for successive policy periods if the required premium is paid and accepted by us on or before the expiration of the current policy period. The premium will be computed at our then current rate for coverage then offered.

   b. Changes:

      **(1)** Before the end of any policy period, we may offer to change the coverage provided in this policy. Payment of the premium billed by us for the next policy period will be your acceptance of our offer.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

**(2)** This policy contains all agreements between you and us. Its terms may not be changed or waived except by endorsement issued by us. If a change requires a premium adjustment, we will adjust the premium as of the effective date of change using rates in effect as of the policy effective date.

**2.** **Concealment or Fraud**. This policy was issued in reliance upon the information provided on your application. We may void this policy if you or an ***insured*** have intentionally concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct at the time application was made or any time during the policy period.

We may void this policy or deny coverage for a loss or ***occurrence*** if you or an ***insured*** have intentionally concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, in connection with the presentation or settlement of a claim.

We may void this policy or deny coverage because of fraud or material misrepresentation even after a loss or ***occurrence***. This means we will not be liable for any claims or damages which would otherwise be covered. If we make a payment, we may request that you reimburse us. If so, you must reimburse us for any payments we may have already made.

**3.** **Liberalization Clause**. If we make a change which broadens coverage without an additional premium charge, that change will automatically apply to your insurance as of the date we implement the change in your state.

**4.** **Cancellation.**

**a.** You may cancel this policy at any time by returning it to us or by notifying us in writing of the date cancellation is to take effect. We may waive the requirement the notice be in writing by confirming the date and time of cancellation to you in writing.

**b.** We may cancel this policy only for the reasons stated below by notifying you in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the Policy Declarations. Proof of mailing shall be sufficient proof of notice.

**(1)** When you have not paid the premium we may cancel at any time by notifying you at least 10 days before the date cancellation takes effect.

**(2)** When this policy has been in effect for less than 90 days and is not a renewal with us, we may cancel for any reason by notifying you at least 10 days before the date cancellation takes effect.

**(3)** When this policy has been in effect for 90 days or more, or at any time if it is a renewal with us, we may cancel for one or more of the following reasons:

**(a)** conviction of a crime arising out of acts increasing the probability that a peril insured against will occur;

**(b)** discovery of fraud or material misrepresentation;

**(c)** willful or reckless acts or omissions increasing the probability that a peril insured against will occur as determined from a physical inspection of the ***residence premises***;

**(d)** physical changes in the property which result in the property becoming uninsurable as determined from a physical inspection of the ***residence premises***; or

**(e)** Foreclosure efforts by the secured party against the subject property covered by the policy that have resulted in the sale of the property by a trustee under a deed of trust as duly recorded in the land title records of the jurisdiction in which the property is located.

This can be done by notifying you at least 30 days before the date cancellation takes effect.

**c.** When this policy is canceled, the premium for the period from the date of cancellation to the expiration date will be refunded. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us for cancellation, we will refund it within a reasonable time after the date cancellation takes effect. The return premium will be refunded pro rata.

**5.** **Non-Renewal.** We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your mailing address shown in the Policy Declarations, written notice at least 30 days before the expiration date of this policy. Proof of mailing shall be sufficient proof of notice.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

6. **Assignment.** Assignment of this policy shall not be valid unless and until we give our written consent.

7. **Our Right to Recover Payment.** You may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

   If an assignment is sought, the ***insured*** shall sign and deliver all related papers and cooperate with us in any reasonable manner.

   Subrogation does not apply under Section II to **Coverage F — Medical Payments to Others** or **Additional Liability Coverages, Damage to Property of Others.**

8. **Death.** If you die:

   a. we insure your legal representative, but only with respect to the premises and property of the deceased covered under the policy at the time of death.

   b. ***insured*** shall include:

      **(1)** any member of the household who is an ***insured*** at the time of your death, but only while a resident of the ***residence premises***;

      **(2)** with respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative; and

   c. the named ***insured*** includes your spouse, if not already a named ***insured***, and if a resident of the ***residences premises*** at the time of your death.

9. **Additional Policy Protection.** If one or more of our programs apply to you, you will be eligible to receive benefits specific to that program. The benefits enhance the safety, value, usability, life, or protection of you or your insurable assets. These benefits include, but are not limited to, reduced deductibles, devices, equipment, services, or other benefits provided by either us or a business partner.

10. **Modification of Terms.** The terms of this policy are amended to conform to the statutes, rules, and regulations of the state where this policy is issued whenever the terms of this policy are less favorable to the ***insured***.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

# SAFECO OPTIMUM™ HOMEOWNERS COVERAGE — VIRGINIA

It is agreed your policy is amended as follows:

**SECTION I — PROPERTY COVERAGES**

**PERSONAL PROPERTY WE DO NOT COVER**

Under **Personal Property We Do Not Cover, 3.**, describing motor vehicles and covered exceptions, the following is changed:

For item **3.d.**, electric motorized ride-on vehicles for children, the amount is increased to $5,000.

The following is added:

**e.** Up to $7,500 for golf carts.

---

**SECTION I — PROPERTY COVERAGES**

**ADDITIONAL PROPERTY COVERAGES**

The following item is deleted and replaced by:

**1.** **Debris Removal.** We will pay the reasonable expense you incur in the removal of debris of covered property provided coverage is afforded for the peril causing the loss. Debris removal expense is included in the limit of liability applying to the damaged property. When the amount payable for the actual damage to the property plus the expense for debris removal exceeds the limit of liability for the damaged property, an additional 5% of that limit of liability will be available to cover debris removal expense.

We will also pay the reasonable expense for the removal of trees from the ***residence premises***, provided the trees damage covered property.

For the removal of trees that do not damage covered property, we will pay the reasonable expenses you incur, up to $1,000, for the removal of trees from the ***residence premises***. No more than $500 of this limit will be paid for the removal of any one tree.

The following **Additional Property Coverages** are added:

**12.** **Locks.** We will pay the reasonable expenses you incur to re-key the locks on all entrances to the dwelling or other structure at the ***residence premises*** if the keys are lost or stolen. No deductible applies to this coverage.

This coverage includes the cost to replace an automatic garage door transmitter(s), and the cost to change the frequency of the garage door control unit and/or additional transmitters if:

**a.** the control unit is on the part of the ***residence premises*** where you reside; and

**b.** it is likely the corresponding transmitters have been lost or stolen.

This coverage does not apply to a dwelling under construction, renovation, or remodeling.

**13.** **Golf Cart Collision.** We cover accidental direct physical loss to any golf cart to which **Personal Property We Cover** under this policy applies caused by upset or impact with another vehicle or object.

**14.** **Refrigerated Spoilage.** We will pay up to $500 for any one loss to covered property stored in freezers or refrigerators on the ***residence premises*** for direct loss caused by:

**a.** the interruption of power or other utility service; or

**b.** mechanical failure of the unit storing the property.

Interruption of power or mechanical failure shall not include removal of a plug from an electrical outlet or turning off an electrical switch unless resulting from a loss we cover.

This coverage is subject to a $100 deductible in place of the deductible shown in the Declarations.

For purposes of this additional coverage, exclusion **Power Interruption** under **Building Property Losses We Do Not Cover** in your policy does not apply.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

15. **Kidnap/Ransom Negotiation Expenses.** We will pay up to $50,000 for ransom negotiation expenses incurred by you as a result of the kidnapping of an ***insured***. We will also pay up to $5,000 to any person or organization for information leading to the arrest and conviction of any person(s) who kidnaps an ***insured***. This coverage does not apply to the kidnapping of a child by the child's parent. This coverage also does not apply unless:
    - **a.** the kidnapping occurred in the contiguous continental United States, Alaska, or Hawaii; and
    - **b.** you have notified the Federal Bureau of Investigation or other law enforcement agency having jurisdiction over the kidnapping, and have complied with their recommendations and instructions.
    - **c.** **"Kidnap/Ransom Negotiation Expenses"** means reasonable fees and expenses of independent negotiators, and reasonable costs of travel, communications, and accommodations incurred by you.

      **Kidnap/Ransom Negotiation Expenses** does not include the ransom.

---

**SECTION I — PROPERTY CONDITIONS**

Item **6.** is deleted and replaced by the following:

6. **Loss to a Pair or Set.** In case of loss of an item belonging to a pair or set, at your option, we will pay:
    - **a.** to repair or replace any part to restore the pair or set to its value before the loss; or
    - **b.** pay the ***replacement cost*** of the pair or set. If you elect ***replacement cost***, the pair or set becomes our property.

---

**SECTION II — LIABILITY COVERAGES**

**ADDITIONAL LIABILITY COVERAGES**

The following items are changed:

1. **Claim Expenses.** The amount provided in item **c.** is increased to $500.
3. **Damage to Property of Others.** The amount stated for **Damage to Property of Others** is increased to $5,000.

All other provisions of this policy apply.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

# PERSONAL PROPERTY REPLACEMENT COST

1. **PROPERTY COVERED**

   For an additional premium, we cover:

   **a.** personal property under Coverage C; and

   **b.** awnings, carpeting which is not permanently installed, non-built-in appliances, and outdoor antennas, whether or not attached to buildings

   at ***replacement cost*** at the time of loss.

2. **PROPERTY NOT COVERED**

   The following property is not eligible for ***replacement cost*** settlement. Any loss shall be settled at ***actual cash value*** at the time of loss but not exceeding the amount necessary to repair or replace:

   **a.** antiques, fine arts, paintings and similar articles of rarity or antiquity which cannot be replaced;

   **b.** memorabilia, souvenirs, collectors items and similar articles whose age or history contribute to their value;

   **c.** personal property not maintained in good or workable condition;

   **d.** personal property that is outdated or obsolete and is stored or not being used;

   **e.** property not owned by any ***insured***; and

   **f.** ***motor vehicles*** or earth moving or excavating equipment used to service the ***residence premises***.

3. **CONDITIONS**

   **a.** We will pay the full cost of repair or replacement, but not exceeding the smallest of the following amounts:

   **(1)** the limit of liability of this policy applicable to the damaged, destroyed or stolen property;

   **(2)** the ***replacement cost*** of the property or any part; or

   **(3)** the full amount actually and necessarily incurred by the ***insured*** in repairing or replacing the property or any part.

   **b.** If the cost to repair or replace is $2,500 or more, we will pay the difference between ***actual cash value*** and ***replacement cost*** only when the damaged or destroyed property is repaired or replaced. However, if the cost to repair or replace the damaged property is less than $2,500 we will settle the loss whether or not actual repair or replacement is complete.

   **c.** You may make an initial claim for loss on an ***actual cash value*** basis and then make a claim, in accordance with the provisions above, for the difference between the ***actual cash value*** and the ***replacement cost*** within 6 months of the later of:

   **(1)** the last date you received a payment for ***actual cash value***; or

   **(2)** the date of entry of a final order of a court of competent jurisdiction declaring your right to ***replacement cost***.

All other provisions of this policy apply.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

# EXTENDED DWELLING COVERAGE

For an additional premium, we will settle covered losses to the dwelling described in Coverage A up to the additional limit of liability shown in the Policy Declarations for **Extended Dwelling Coverage** provided you:

1. insure the dwelling to 100% of its ***replacement cost*** as agreed by us;
2. accept any yearly adjustments by us of Coverage A reflecting changes in the cost of construction for the area supplied to us by the recognized appraisal agency stated in the Policy Declarations;
3. notify us of any addition or other remodeling which increases the ***replacement cost*** of the dwelling $5,000 or more within 180 days of the start of construction; and
4. repair or replace the damaged dwelling.

If you fail to comply with any of the above provisions, the limit of liability shown in the Policy Declarations for Coverage A shall apply.

From time to time we may make requests of you for updated dwelling information. If you fail to provide the information, or if we disagree on ***replacement cost,*** we may delete **Extended Dwelling Coverage** effective at policy renewal.

All other provisions of this policy apply.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

## SERVICE LINE COVERAGE — VIRGINIA

For an additional premium, it is agreed that the policy is amended as follows. All of the changes below apply only to the extent coverage is provided by this endorsement.

We cover up to $12,000 for physical loss or damage to your ***covered service line*** that is the direct result of a ***service line failure***.

However, we do not cover:

1. additional costs incurred for loss or increased usage of water, natural gas, propane, or any other service caused by or resulting from a ***service line failure***;
2. extra cost to alter or relocate ***covered service lines***, unless alteration or re-location is required by ordinance or law;
3. loss or damage to a ***covered service line*** that is damaged while it is being installed, dismantled, or repaired. However, this shall not apply if a covered ***service line failure*** necessitated such installation, dismantling, or repair; or
4. clean up or remove ***pollutants***, hazardous waste, or sewage.

---

**SECTION I — PROPERTY COVERAGES**

**BUILDING PROPERTY LOSSES WE DO NOT COVER**

Under item **9. Earth Movement**, the following is added:

However, Earth Movement does not include frost heave.

The following is added to **Building Property Losses We Do Not Cover**:

We will not pay for loss, under any part of this coverage, that consists of, or is directly and immediately caused by, one or more of the perils listed in items below, regardless of whether the loss occurs abruptly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:

- **a.** fire or water, or other means used to extinguish a fire;
- **b.** lightning, windstorm, or hail;
- **c.** explosion;
- **d.** riot or civil commotion, smoke, aircraft, including self-propelled missiles and spacecraft, theft; or
- **e.** breakage of glass.

**ADDITIONAL PROPERTY COVERAGES**

The following are added:

1. **Environmental, safety, and efficiency Improvements.** If a ***covered service line*** requires replacement due to a ***service line failure***, we cover the additional cost to replace with materials that are better for the environment, safer, or more energy or water efficient than the materials being replaced.

   However, an increase to the size or capacity of the materials is not covered.

   **SPECIAL LIMIT OF LIABILITY.** The most we will pay for this additional coverage is up to an additional 50% of the cost to repair or replace with like kind and quality and does not increase the limit of liability that applies under this endorsement.
2. **Excavation costs**, meaning the necessary and reasonable excavation costs that are required to repair or replace the damaged ***covered service line***.
3. **Expediting expenses**, meaning the reasonable extra cost to:
   - **a.** make temporary repairs; and
   - **b.** expedite permanent repairs or permanent replacement.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

4. **Coverage for outdoor property.** We cover outdoor property, including but not limited to, trees, shrubs, plants, lawns, walkways, and driveways, that are damaged as a result of a ***service line failure*** or that is damaged during the excavation of your ***covered service line*** following a ***service line failure***.

---

**SECTION I — PROPERTY CONDITIONS**

Item **1. Deductible** is deleted and replaced by the following:

1. **Deductible.** We cover only that part of the loss over $500. No other deductible applies to this coverage.

Item **5. Loss Settlement** is deleted and replaced by:

5. **Loss Settlement.**

   a. We will pay the full cost of repair or replacement but not exceeding the smallest of the following amounts:

      (1) the limit of liability that applies to this endorsement;

      (2) the ***replacement cost*** of that part of the damaged covered property for like kind, quality, size, capacity, and use on the same premises as determined shortly following the loss, except as provided in Additional Property Coverages, Environmental, Safety, and Efficiency Improvements above;

      (3) the full amount actually and necessarily incurred to repair or replace the damaged covered property as determined shortly following the loss;

      (4) the direct financial loss you incur; or

      (5) our pro rata share of any loss when divided with any other valid and collectible insurance applying to the covered property at the time of loss.

   b. You may disregard the ***replacement cost*** loss settlement provisions and make claim under this endorsement for loss or damage on an ***actual cash value*** basis but not exceeding the smallest of the following amounts:

      (1) the applicable limit of liability;

      (2) the direct financial loss you incur; or

      (3) our pro rata share of any loss when divided with any other valid and collectible insurance applying to the covered property at the time of loss.

      You may still make claim, for the difference between ***actual cash value*** and the full ***replacement cost*** within 6 months of the later of:

      (4) the last date you received a payment for ***actual cash value***; or

      (5) the date of entry of a final order of a court of competent jurisdiction declaring your right to ***replacement cost***.

The following are added:

**Limit of Liability.** The limit of liability stated in this endorsement is the most we will pay for loss or expense arising from any ***one service line failure*** and does not increase any limit of liability under Section I of the policy.

**Other Coverage.** If a loss covered under this endorsement is also covered by another provision in the policy, we will pay only that portion of the loss which exceeds the coverage provided elsewhere in the policy.

---

**POLICY DEFINITIONS**

The following are added to item **3.**:

"***Covered service line***"

(1) ***Covered service line*** means exterior underground piping and wiring, including permanent connections, valves, or attached devices providing one of the following services to your ***residence premises***:

   (a) Communications, including cable transmission, data transmission, internet access, and telecommunications;

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

**(b)** Compressed air;

**(c)** Drainage;

**(d)** Electrical power;

**(e)** Heating, including geothermal, natural gas, propane, and steam;

**(f)** Waste disposal; or

**(g)** Water.

**(2)** A ***covered service line*** must be owned by you or you must be responsible for its repair or replacement as required by law, regulation, or service agreement. Should repair or replacement be your responsibility, a ***covered service line*** ends at the precise location where your responsibility for such repair or replacement ends. However, in no event will a ***covered service line*** extend beyond the point of connection to the main service or utility line.

**(3)** A ***covered service line*** does not include:

**(a)** That part of piping or wiring that runs through or under a body of water, including but not limited to, a swimming pool, pond, or lake;

**(b)** That part of piping or wiring that runs through or under the dwelling or other structure, other than walkways and driveways;

**(c)** Piping or wiring that is not connected and ready for use;

**(d)** Septic systems, including leach fields, septic tanks, pumps, motors, or piping that runs from the septic tank to the leach fields, other than covered waste disposal piping running from your dwelling or other structure to a septic tank;

**(e)** Water wells, including well pumps or motors;

**(f)** Heating and cooling systems, including heat pumps; or

**(g)** Sprinkler system pumps, motors, or heads.

"***One service line failure***" means: When an initial ***service line failure*** which causes other ***service line failures***, all will be considered ***one service line failure***. All ***service line failures*** that are the result of the same event will be considered ***one service line failure***.

"***Service line failure***" means a leak, break, tear, rupture, collapse, or arcing of a ***covered service line*** not otherwise excluded. A ***service line failure*** may be caused by, but is not limited to, the following perils:

**(1)** Wear and tear, marring, deterioration, or hidden decay;

**(2)** Rust or other corrosion;

**(3)** Mechanical breakdown, latent defect, or inherent vice;

**(4)** Weight of vehicles, equipment, animals, or people;

**(5)** Vermin, insects, rodents, or other animals;

**(6)** Artificially generated electrical current;

**(7)** Freezing or frost heave;

**(8)** External force from a shovel, backhoe, or other form of excavation; or

**(9)** Tree or other root invasion.

***Service line failure*** does not include blockage or low pressure of a covered service line when there is no physical damage to the ***covered service line***.

All other provisions of this policy apply.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

# PERSONAL OFFENSE COVERAGE

For an additional premium the definition of ***bodily injury*** includes ***personal offense*** as described in this endorsement.

**POLICY DEFINITIONS**

For purposes of coverage under this endorsement, the following is added:

***"Personal Offense"*** means: injury arising out of one or more of the following offenses:

**a.** false arrest, detention or imprisonment, or malicious prosecution;

**b.** libel, slander or defamation of character; or

**c.** invasion of privacy, wrongful eviction or wrongful entry.

Coverage does not include:

**d.** liability assumed by any ***insured*** under any contract or agreement except any indemnity obligation assumed by the ***insured*** under a written contract directly relating to the ownership, maintenance or use of the ***insured location;***

**e.** injury resulting from violation of criminal law committed by, or with the knowledge or consent of any ***insured.***

**f.** injury sustained by any person as a result of an offense directly or indirectly related to the employment of this person by any ***insured;***

**g.** injury arising out of the ***business*** pursuits of any ***insured.*** This exclusion does not apply to ***bodily injury*** to a ***residence employee*** arising out of and in the course of the ***residence employee's*** employment by any ***insured;*** or

**h.** injury arising out of civic or public activities performed for pay by any ***insured.***

For purposes of coverage under this endorsement, ***occurrence,*** as defined in your policy, includes a ***personal offense*** as defined above in this endorsement.

All other provisions of this policy apply.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

# ESCAPE OF WATER FROM A SUMP, SUMP PUMP, SEWER, OR DRAIN (BUILDING AND CONTENTS) — VIRGINIA

**THIS IS NOT FLOOD INSURANCE.**

1. To the extent coverage is provided by this **EXTENSION OF COVERAGE** and up to the **LIMIT OF LIABILITY** described below, **Section I — Building Property Losses We Do Not Cover, Water Damage, 12.c., 12.d.,** and **12.e.** and **13. Power Interruption** do not apply.

2. **EXTENSION OF COVERAGE**

   For an additional premium, we cover accidental direct physical loss to property covered under **Section I — Property Coverages** directly caused by water, which:

   a. escapes from sewers or drains within the dwelling on the ***residence premises***; or

   b. escapes, overflows, or discharges from a sump, sump pump, sump pump well, or related equipment;

   even if such escape, overflow, or discharge results from mechanical breakdown or power failure. This coverage does not apply to direct physical loss of the sump pump, or related equipment, which is caused by mechanical breakdown or power failure.

3. **EXCLUSION**

   There shall be no coverage under this **EXTENSION OF COVERAGE** for water which escapes through sewers or drains, or escapes, overflows, or is discharged from a sump, sump pump, or related equipment as a direct or indirect result of **12.a.** or **12.b.** under **Section I — Building Property Losses We Do Not Cover, Water Damage.**

   Water includes any water borne materials.

   This exclusion applies whether the water damage is caused by or resulting from human or animal forces or any act of nature.

   Direct loss by fire, explosion, or theft resulting from water damage is covered.

4. **LIMIT OF LIABILITY**

   Our limit of liability for this **EXTENSION OF COVERAGE** shall be up to the amount shown in the Declarations for this **EXTENSION OF COVERAGE**. This is an additional amount of insurance.

5. **DEDUCTIBLE**

   We will pay only that part of the loss that exceeds the applicable deductible shown in the Policy Declarations.

All other provisions of this policy apply.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

## SPECIAL PERSONAL PROPERTY COVERAGE — VIRGINIA

For an additional premium **Section I — Property Coverages** is amended as described below.

**Personal Property We Cover, Coverage C — Personal Property** is amended as follows:

Under **3. Special Limits of Liability** item **f.**, coverage is extended beyond theft to include misplacing or losing the described property.

---

**Personal Property Losses We Cover** and **Personal Property Losses We Do Not Cover** are deleted and replaced by the following:

### PERSONAL PROPERTY LOSSES WE COVER

We insure for accidental direct physical loss to property described in Coverage C, except as limited or excluded under **Personal Property Losses We Do Not Cover.**

### PERSONAL PROPERTY LOSSES WE DO NOT COVER

We do not cover loss caused directly by any of the **Building Property Losses We Do Not Cover.**

In addition, we do not insure loss caused directly by any of the following excluded perils:

**1.** Breakage of eyeglasses, glassware, statuary, objects made from marble, porcelain, and similar fragile articles. However, jewelry, watches, bronzes, cameras, and photographic lenses are covered.

There is coverage for breakage of the above described personal property which is caused by or results from:

**a.** fire, lightning, windstorm, hail;

**b.** smoke or soot, other than smoke from agricultural smudging or industrial operations;

**c.** explosion, riot, civil commotion;

**d.** ***aircraft***, vehicles, vandalism and malicious mischief not otherwise excluded, volcanic eruption, or ***earthquake***;

**e.** collapse of a building or any part of a building;

**f.** water not otherwise excluded;

**g.** theft or attempted theft;

**h.** sudden and accidental tearing apart, cracking, burning, or bulging of:

**(1)** a steam or hot water heating system;

**(2)** an air conditioning or automatic fire protective sprinkler system; or

**(3)** an appliance for heating water.

**i.** falling objects

This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

**j.** weight of ice, snow, or sleet which causes damage to property contained in a building;

**k.** accidental discharge, leakage, or overflow of water or steam from within a plumbing, heating, air conditioning or from within a household appliance.

This peril does not include loss:

**(1)** to the appliance or system from which the water or steam escaped;

**(2)** caused by or resulting from freezing except as provided in the peril of freezing;

For purposes of coverage under this peril, a plumbing system or household appliance does not include a sump, sump pump, or related equipment or a roof drain, gutter, downspout, or similar equipment.

**l.** freezing of a plumbing, heating, air conditioning, or of a household appliance.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

This peril does not include loss on the ***residence premises*** while the dwelling is ***vacant***, under construction, or unoccupied for four or more consecutive days, unless you have used due diligence to:

**(1)** maintain heat in the building; or

**(2)** shut off the water supply and drain the system and appliances of water.

For purposes of coverage under this peril, a plumbing system or household appliance does not include a sump, sump pump, or related equipment or a roof drain, gutter, downspout, or similar equipment.

**m.** sudden and accidental damage from artificially generated electrical current; or

**n.** breakage of glass, meaning damage to personal property caused by breakage which is a part of a building on the ***residence premises***. There is no coverage for loss or damage to the glass if the building is ***vacant***.

**2.** Dampness of atmosphere. This peril does not include loss caused directly by rain, snow, sleet, or hail.

**3.** Refinishing, renovating, or repairing property other than watches, jewelry, and furs;

**4.** Sinking, swamping, stranding, or collision, other than collision with a land vehicle, of watercraft, including their trailers, furnishings, equipment, and outboard motors.

**5.** Destruction or seizure by order of any government or public authority.

---

Under **Section I — Property Coverages, Additional Property Coverages**, item **9. Household Products Coverage** is amended to include loss to property described in **Coverage C — Personal Property**.

All other provisions of this policy apply.

# IDENTITY RECOVERY COVERAGE

## ID THEFT CASE MANAGEMENT SERVICE AND EXPENSE REIMBURSEMENT

Service and coverage under this endorsement applies to any ***insured*** as defined in this policy.

**DEFINITIONS**

The following definitions are added with respect to this endorsement only:

1. ***"ID Recovery Case Manager"*** means a person assigned by us to help an ***insured*** to recover control over his or her personal identity (ID). This help may include contacting authorities, credit bureaus, creditors and businesses. Such contacts will take place with the permission and cooperation of the ***insured.***

2. ***"ID Theft"*** means the fraudulent use of the Social Security number or other method of identifying an ***insured.*** This includes the fraudulent use of the personal identity of an insured to establish credit accounts, secure loans, enter into contracts or commit crimes.

   ***ID theft*** does not include the fraudulent use of a business name, d/b/a or any other method of identifying a business activity.

   ***ID theft*** does not include the unauthorized use of a valid credit card, credit account or bank account. However, ***ID theft*** does include the fraudulent alteration of account profile information, such as the address to which statements are sent.

3. ***"ID Theft Expenses"*** means any of the following when they are reasonable and necessary expenses that are incurred in the United States or Canada as a direct result of an ID theft.

   **a.** Costs for re-filing applications for loans, grants or other credit instruments.

   **b.** Costs for notarizing affidavits or other similar documents, long distance telephone calls and postage.

   **c.** Costs for up to 12 credit reports from established credit bureaus dated within 12 months after discovery of the ***ID theft.***

   **d.** Fees and expenses for an attorney approved by us for the following.

   **(1)** The defense of any civil suit brought against an ***insured*** by a creditor or entity acting on behalf of a creditor for non-payment of goods or services or default on a loan.

   **(2)** The removal of any civil judgment wrongfully entered against an ***insured.***

   **e.** Actual lost wages of the ***insured*** for time reasonably and necessarily taken away from work and away from the work premises. Time away from work includes partial or whole work days. Actual lost wages may include payment for vacation days, discretionary days, floating holidays and paid personal days. Actual lost wages does not include sick days or any loss arising from time taken away from self employment. Necessary time off does not include time off to do tasks that could reasonably have been done during non-working hours.

   **f.** Actual costs for supervision of children or elderly or infirm relatives or dependants of the ***insured*** during time reasonably and necessarily taken away from such supervision. Such care must be provided by a professional care provider who is not a relative of the ***insured.***

The following Additional Coverage is added under **Section I:**

**IDENTITY RECOVERY COVERAGE**

We will provide the Case Management Service and Expense Reimbursement Coverage indicated below if all of the following requirements are met.

1. There has been an ***ID theft*** involving the personal identity of an ***insured*** under this policy; and
2. Such ***ID theft*** is first discovered by the ***insured*** during the policy period for which this Identity Recovery coverage is applicable; and
3. Such ID ***theft*** is reported to us within 60 days after it is first discovered by you.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**** REPRINTED FROM THE ARCHIVE, THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

If all three of the requirements listed above have been met, then we will provide the following to the ***insured:***

1. **Case Management Service**

   Services of an ***ID recovery case manager*** as needed to respond to the ***ID theft.***

2. **Expense Reimbursement**

   Reimbursement of necessary and reasonable ***ID theft expenses*** incurred as a direct result of the ***ID theft.***

This coverage is additional insurance.

**LIMITS**

Case Management Service is available as needed for any one ***ID theft*** for up to 12 months in a row from the inception of the service. Expenses we incur to provide Case Management Service do not reduce the amount of limit available for Expense Reimbursement coverage.

Expense Reimbursement coverage is subject to a limit of $25,000 annual aggregate per ***insured.*** This limit is the most we will pay for the total of all loss or expense arising out of all ***ID thefts*** to any one ***insured*** which are first discovered by the ***insured*** during the present annual policy period. This limit applies regardless of the number of claims during that period.

An ***ID theft*** may be first discovered by the ***insured*** in one policy period and continue into other policy periods. If so, all loss and expense arising from such ***ID theft*** will be subject to the aggregate limit applicable to the policy period when the ***ID theft*** was first discovered by the ***insured.***

Coverage for legal costs is found under item **d.** of the definition of ***ID theft*** expenses. Such legal costs are part of, and not in addition to, the Expense Reimbursement coverage limit.

Item **e.** Lost Wages and item **f.** Child and Elder Care Expenses of the definition of ***ID theft expenses*** are jointly subject to a sub-limit of $250 per day, not to exceed $5,000 in total. This sub-limit is part of, and not in addition to, the Expense Reimbursement coverage limit. Coverage is limited to wages lost and expenses incurred within 12 months after the first discovery of the ***ID theft*** by the ***insured.***

**DEDUCTIBLE**

Case Management Service is not subject to a deductible.

Expense Reimbursement coverage is subject to a deductible as shown on your Declarations page. You shall be responsible for only one deductible under this endorsement during any one policy period.

**EXCLUSIONS**

The following additional exclusions apply to this coverage. These exclusions apply to both Case Management Service and Expense Reimbursement.

We do not cover loss or expense arising from any of the following.

1. The theft of a professional or business identity.
2. Any fraudulent, dishonest or criminal act by an ***insured.*** This includes any such act by a person aiding or abetting an ***insured.*** This also includes any such act by an authorized representative of an ***insured.*** In all these cases, it does not matter whether the individual is acting alone or in collusion with others.
3. Loss other than ***ID theft expenses.*** Account balances which arise out of fraudulent charges would be one example of loss other than ***ID theft expenses.***
4. An ***ID theft*** first discovered by the ***insured*** prior to or after the period for which this coverage applies. This exclusion applies whether or not such ***ID theft*** began or continued during the period of coverage.
5. An ***ID theft*** that is not reported to us within 60 days after it is first discovered by the ***insured.***
6. An ***ID theft*** that is not reported in writing to the police.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**** REPRINTED FROM THE ARCHIVE THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

**CONDITIONS**

The following additional Conditions apply to this coverage.

**A. Assistance and Claims**

If you have questions or need help, please call the **ID Recovery Help Line** at **1 (800) 631-9073.**

The **ID Recovery Help Line** is available to provide you with the following.

1. Information on how to respond to a possible ***ID theft.***
2. Instructions for how to submit a service request for Case Management Service and/or a claim form for Expense Reimbursement Coverage.

In some cases, we may provide Case Management services at our expense to an ***insured*** prior to a determination that a covered ***identity theft*** has occurred. Our provision of such services is not an admission of liability under the policy. We reserve the right to deny further coverage or service if, after investigation, we determine that a covered ***identity theft*** has not occurred.

As respects Expense Reimbursement Coverage, you must send to us receipts, bills or other records that support your claim for ***ID theft expenses.*** Such records must be sent to us within 60 days after our request.

**B. Computer Security**

Each ***insured*** has the responsibility to use and maintain security for his or her computer system. This includes the use of personal firewalls and anti-virus software. This also includes the proper disposal of used hard drives.

**C. Services**

The following conditions apply as respects any services provided by us or our designees to you or any ***insured*** under this endorsement.

1. Our ability to provide helpful services in the event of an ***ID theft*** depends on your cooperation, permission and assistance.
2. All services may not be available or applicable to all individuals. For example, ***insureds*** who are minors or foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in the United States and Puerto Rico in accordance with local conditions.
3. We do not warrant that our services will end or solve all problems associated with an ***ID theft.*** We do not warrant that our services will prevent future ***ID thefts.***

All other provisions of this policy apply.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

# EQUIPMENT BREAKDOWN COVERAGE — VIRGINIA

**PROPERTY WE COVER**

For an additional premium we cover up to the amount stated in your policy declarations for accidental direct physical loss to your covered property located on the ***residence premises*** caused by equipment ***breakdown*** as described in this endorsement.

**BUILDING PROPERTY WE COVER**

We cover ***equipment breakdown***. To the extent ***equipment breakdown*** coverage is provided under this endorsement, "mechanical breakdown" named in **Building Property Losses We Do Not Cover**, **6.b.**, does not apply.

**PERSONAL PROPERTY WE COVER**

***Equipment breakdown*** is added to **Personal Property Losses We Cover**

**EQUIPMENT BREAKDOWN ADDITIONAL COVERAGES**

The following ***Equipment Breakdown*** coverages are added:

1. **Expediting Expense**

   We will pay up to $3,000 per occurrence for the extra costs to expedite repair or replacement to covered property for loss due to an ***equipment breakdown***, meaning:

   The reasonable extra cost of temporary repair and of expediting the repair or replacement of damaged equipment, including overtime and the extra cost of express or other rapid means of transportation.

2. **Spoilage Coverage**

   We will pay up to $3,000 per occurrence for loss of perishable goods due to spoilage resulting from lack of power, light, heat, steam, or refrigeration caused by an ***equipment breakdown*** to covered property.

3. **Cleanup and Removal of Pollutants**

   We will pay up to $3,000 per occurrence for the necessary clean up and removal of ***pollutants*** resulting from an ***equipment breakdown***.

   The limit of liability for each additional coverage described in **1.** through **3.**, above, shall not increase the limit of liability shown in the policy declarations for this endorsement.

**EQUIPMENT BREAKDOWN CONDITIONS**

The following Loss Settlement Conditions shall apply to covered loss caused by ***equipment breakdown***:

1. **Deductible** We cover only that part of the loss that exceeds $500. In the event that more than one deductible may be applied to a loss that includes ***equipment breakdown*** the single highest deductible shall be applied.

   You may, however, elect a separate loss settlement for ***equipment breakdown***, separate from any other loss covered under the policy, subject to a $500 deductible.

2. **Loss Settlement**

   **a.** We will pay the amount actually and necessarily incurred to repair or replace covered property damaged by an ***equipment breakdown***. Our payment will be the lesser of:

   **(1)** the cost at the time of the ***equipment breakdown*** to repair the damaged covered property;

   **(2)** the cost at the time of the ***equipment breakdown*** to replace the covered property with property of like kind, capacity, size, and quality; or

   **(3)** the amount you actually spend that is necessary to repair or replace the damaged property.

   **b.** Repair parts or replacement covered property must be:

   **(1)** of like kind, capacity, size, and quality; and

   **(2)** used for the same purpose.

   **c.** If the cost of repairing or replacing only a part of the covered property is greater than:

   **(1)** the cost of repairing the covered Property; or

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

(2) the cost of replacing the entire Covered Property on the same site.

We will pay the lesser of (1) or (2).

d. You may still make a claim for the difference between ***actual cash value*** and the full ***replacement cost*** within six months of the later of:

(1) the last date you received a payment for ***actual cash value***; or

(2) the date of entry of a final order of a court of competent jurisdiction declaring your right to ***replacement cost***.

e. ***Equipment Breakdown*** coverage does not extend beyond the ***Residence Premises***.

f. **ENERGY STAR Improvements — *Using Less Energy, Saving Money and Helping to Protect our Environment***

If Covered Property requires replacement due to an ***equipment breakdown***, we will pay the additional cost to replace non ENERGY STAR rated equipment with equipment that is an ENERGY STAR Qualified Product as stated within www.energystar.gov.

However, we will not pay more than 125% of what the cost would have been to repair or replace with like kind and quality. This condition does not increase any of the applicable coverage limits or apply to any Actual Cash Value loss settlement.

ENERGY STAR is a joint program of the U.S. Environmental Protection Agency and the U.S. Department of Energy whose objective it is to help you save money and protect the environment through energy efficient products and practices.

**DEFINITIONS**

The following definition is added with respect to this endorsement only:

***Equipment breakdown*** means:

1. Accidental physical loss or damage originating within:

a. Boilers, fired or unfired pressure vessels, vacuum vessels, and pressure piping, all normally subject to vacuum or internal pressure other than static pressure of contents, excluding:

(1) waste disposal piping;

(2) any piping forming part of a fire protective system; and

(3) any water piping other than:

(a) boiler feed water piping between the feed pump and the boiler;

(b) boiler condensate return piping; or

(c) water piping forming part of a refrigerating or air conditioning system used for cooling, humidifying, or space heating purposes;

b. all mechanical, electrical, electronic, or fiber optic equipment;

2. caused by, resulting from, or consisting of:

a. mechanical breakdown;

b. electrical or electronic breakdown; or

c. rupture, bursting, bulging, implosion, or steam explosion.

3. However, ***Equipment breakdown*** shall not mean loss, damage, cost, or expense directly caused by, contributed to, resulting from, or arising out of the following causes of loss:

a. losses excluded under the policy to which this endorsement is attached; or

b. perils insured against under Personal Property Losses We Cover of the policy to which this endorsement is attached; or

c. any sinkhole collapse, volcanic action, earth movement, leakage from fire extinguishing equipment, water, or flood.

All other provisions of this policy apply.

**** REPRINTED FROM THE ARCHIVE. THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

## WINDSTORM OR HAIL DEDUCTIBLE

We will pay only that part of the total applicable loss for all **SECTION I — PROPERTY COVERAGES** that exceeds the windstorm or hail deductible stated on the Declarations. This deductible applies in the event of direct physical loss to property covered under this policy caused directly or indirectly by windstorm or hail. Such deductible applies regardless of any other cause or event contributing concurrently or in any sequence to the loss. No other deductible provision in the policy applies to direct physical loss caused by windstorm or hail.

All other provisions of this policy apply.

**** REPRINTED FROM THE ARCHIVE, THE ORIGINAL TRANSACTION MAY INCLUDE ADDITIONAL FORMS ****

This policy is signed on our behalf by our President and Secretary.

Hamid Mirza
President

Damon Hart
Vice President and Secretary

This policy includes copyrighted material of Insurance Services Office, Inc. with its permission.

Safeco Insurance™
A Liberty Mutual Company

American Economy Insurance Company
P.O. Box 5014
Scranton, PA 18505-5014

CONTACT US

Alexia.Lawson-Hooks@LibertyMutual.com

Direct: (800) 225-2467
Fax: 888-268-8840

**American Economy Insurance Company**
P.O. Box 5014
Scranton, PA 18505-5014
800-332-3226

Safeco.com

Matthew Pohlman
103 CT DEAYLLON
POQUOSON, VA 23662-2241

February 03, 2026

| | |
|---|---|
| Claim Number: | 060776175-01 |
| Date of Incident: | 01/14/2026 |
| Insured(s): | Matthew Pohlman |
| Loss Location: | 103 CT DEAYLLON, POQUOSON, VA 23662-2441 |
| Policy Number: | OF3392464 |
| Underwriting Company: | American Economy Insurance Company |

Dear Matthew Pohlman

This letter confirms our receipt of the above-referenced Property Claim No. 060776175. We're writing regarding our on-going investigation of the damage from Water at the above-referenced location. As fully described in this letter, based on the known facts and review of the issued insurance policy, our continued investigation of the claim is subject to the following reservation of rights. We reserve the right to amend or supplement this coverage position as our investigation continues.

**Claim Details**

Our first notice of loss was on 01/17/2026.

The claim you submitted included the following information:

A hose from the shut-off valve to the front faucet exploded in the middle of the night, causing extensive water damage to multiple areas of the house including the kitchen, bathroom, hallway, dining room, kids playroom, and crawl space. The floor is rotted and black mold is present. Water is still leaking into the crawl space. The pipe has been repaired, but water mitigation is required. No personal items were affected.

**Policy Information**

EXHIBIT B

Safeco Insurance™
A Liberty Mutual Company

We issued the following Home Policy to Matthew Pohlman

Policy Number: OF3392464
Policy Period: 09/15/2025– 09/15/2026

The applicable Policy form and endorsements state in relevant part as follows:

## SECTION I — PROPERTY COVERAGES

**BUILDING PROPERTY LOSSES WE COVER**
We cover accidental direct physical loss to property described in **Building Property We Cover.** However, we do not cover loss caused by:

...

**5.** continuous or repeated seepage or leakage of water or steam from within a plumbing, heating or air conditioning system or from within a domestic appliance which occurs over a period of weeks, months or years;

**6.** **a.** wear and tear, marring, scratching, deterioration;
**c.** smog, rust, corrosion, mold, fungus, wet or dry rot;

If loss to covered property is caused by water or steam not otherwise excluded, we will cover the cost of tearing out and replacing any part of the dwelling necessary to repair the system or appliance. We do not cover loss to the system or appliance from which water or steam escaped.

**COVERAGE D — ADDITIONAL LIVING EXPENSE AND LOSS OF RENT**
The limit of liability for Coverage D applies separately to **1.** and **2.** and includes any coverage provided under **3.** below. Coverage provided under **3.** does not increase the limit of liability for **Additional Living Expense** or **Fair Rental Value.**

**1.** If a loss covered under this Section makes that part of the ***residence premises*** where you reside uninhabitable we cover **Additional Living Expense,** meaning any necessary increase in living expenses you incur so that your household can maintain its normal standard of living. Payment shall be for the time reasonably required to repair or replace the damage or, if you permanently relocate, the time reasonably required for your household to settle elsewhere.

**2.** If a loss covered under this section makes that part of the ***residence premises*** you rent to others or hold for rental uninhabitable, we cover:
**Fair Rental Value**, meaning the fair rental value of that part of the residence premises listed on your Policy Declarations you rent to others or hold for rental, less any expenses that do not continue while the premises is uninhabitable. However, we do not cover any fair rental value arising out of or in connection with ***home-sharing***.
Payment shall be for the time reasonably required to repair or replace the damage.
We do not cover loss or expense due to cancellation of a lease or agreement.

**3.** If a civil authority prohibits you from use of the ***residence premises*** as a result of direct damage to neighboring premises by a cause of loss we cover in this policy we cover the **Additional Living Expense** as provided under **1**. or **Fair Rental Value** as provided under **2.** above for no more than two weeks during which use is prohibited.

The period of time under **1., 2.,** and **3.** above are not limited by expiration of this policy.
No deductible applies to this coverage

I am also required to direct your attention to Section 1 – Property Conditions, "Suit Against Us," within the policy that states, "No action shall be brought against us unless there has been compliance with the policy provisions and the action is started within two years after the inception of the loss or damage."

Safeco Insurance™
A Liberty Mutual Company

**SECTION I — PROPERTY CONDITIONS**

3. An Insured's Duties After Loss. In case of a loss to which this insurance may apply, you must perform the following duties:

a. cooperate with us in the investigation, settlement or defense of any claim or suit;

d. protect the property from further damage, make reasonable and necessary repairs required to protect the property and keep an accurate record of repair expenses;

e. prepare an inventory of the loss to the building and damaged personal property showing in detail the quantity, description, replacement cost and age. Attach all bills, receipts and related documents that justify the figures in the inventory;

f. as often as we reasonably require:

(1) exhibit the damaged and undamaged property;

(2) provide us with records and documents we request and permit us to make copies; and

The Policy is incorporated by reference into this letter in its entirety. Although we have attempted to include all of the policy provisions that we believe are pertinent to this matter, the provisions set forth above in no way replace the provisions of the actual Policy issued. If you have any questions regarding the terms contained in the applicable Policy, you should refer to the Policy itself. To the extent there is any discrepancy between this letter and the Policy, the Policy controls.

**Our Coverage Position**

Based on the information available, the reasons for our reservation of rights under the Policy or under applicable law include, but are not limited to, the following:

> We must review the file in full as there is concern of long-term damage such as rot and black mold that was reported in the home.

**INVESTIGATION UNDER A RESERVATION OF RIGHTS**

We will continue to investigate this loss, but we wanted to bring the above policy provisions to your attention as they may be applicable. We completely reserve our rights under the Policy and applicable law to apply the above provisions at a later date as warranted to the loss that may impact coverage for the loss. Please note that other provisions of the policy may also be relevant to the loss, and we reserve the right to rely on all such provisions. It is our intent to incorporate by reference all of the terms and conditions of the Policy through this reservation of rights.

If you have any information relative to the loss, please provide it to us at your earliest convenience.

Although we tried to identify and address above all relevant insurance coverage considerations, the foregoing specificity is not intended and should not be understood as a waiver or estoppel of any right or basis we have to disclaim coverage under the policy or applicable law, and we reserve all rights in this regard.

**We're Here To Help**

If you have any additional information, questions or comments related to this letter, please feel free to call me at (800) 225-2467 or email me at Alexia.Lawson-Hooks@LibertyMutual.com.

Sincerely,
ALEXIA LAWSON-HOOKS
Claims Department

Safeco Insurance™
A Liberty Mutual Company

Begin forwarded message:

On Tuesday, February 10, 2026, 6:22 PM, Putenis, Tiffany <Tiffany.Putenis@libertymutual.com> wrote:

Safeco Insurance
A Liberty Mutual Company

Matthew,

I wanted to quickly reach out to follow up with you regarding the concerns you expressed in your email to Lisa. I understand your frustration regarding the need for further investigation into your claim, so I want to be clear that this is necessary due to the conditions discovered in your home following the claim you reported for the hot water supply line leak under your kitchen sink.

When you initially reported the claim on January 17, 2026 (3 days post-loss), you advised us Great Rental Management (GR Management) had completed mitigation in your home. You also advised you had demoed the flooring yourself, but a program vendor was still assigned to complete additional mitigation of your home. Stanley Steemer first arrived at your home on January 19 to do a walkthrough with you. On January 20, they arrived at your home to begin mitigation (3 days after claim report). In their initial notes to Liberty Mutual, they reported you had demoed the floor in the kitchen and hallway yourself prior to their arrival and noted they would need to demo the particle board on the floor of the kitchen, as well as detaching the cabinets and moving the appliances. A pack out was requested the same day.



tabbies EXHIBIT 2

On January 23, you spoke with Sher'e Cutliff, the original adjuster assigned to the claim, and asked for next steps. At this time, she asked for clarification regarding who would be completing the mitigation, as we had received an invoice from Great Rental Management (GR Management). You confirmed you had contacted them and stated they sucked up the water and did some demo of the flooring. You also stated Stanley Steemer was waiting for approval for a POD; we had not yet received a request for a POD from them. Per our notes from Stanley Steemer, they had reached out to you directly on 1/21 and were awaiting a call back regarding the pack out list. Sher'e called Stanley Steemer and was able to straighten out the confusion regarding the POD at that time. POD delivery was delayed due to inclement weather.

GR Management spoke with our Water Mitigation Unit on January 27 and confirmed they had performed services at your home on January 14, prior to the claim being reported, including sucking up the water, vacuuming it from the HVAC system ducts, and set up dehumidifiers and fans to dry everything. They also fixed the broken hose and installed a new kitchen faucet. Stanley Steemer began demo at your home following the completion of the pack out on January 28. As noted in the timeline I have just provided you, Safeco Insurance did not, at any point, delay mitigation in your claim.

On January 30, you notified Sher'e that you did not want to use the Contractor Repair Network vendor for the repairs at your home. At that time, she requested claim reassignment to the field and Alexia was assigned to your claim. The claim was assigned to her on the next business day, February 2, 2026. She completed a full review of your claim to get up to speed and contacted you in the morning on February 3, 2026, arranging an inspection of your home on February 5, 2026 at 2:30pm to accommodate your school schedule. She also notified you of coverage concerns during her initial call due to rot and black mold noted in the mitigation photos provided by Stanley Steemer.

During her inspection, rotted areas of subfloor were noted in several areas of the main floor of your home, all of which had been demoed prior to our inspection; black mold was also seen during the inspection. The demoed flooring was not left on-site, so we were unable to ascertain its condition. Due to the rot, Alexia reviewed the claim with myself and other claims leadership on February 6, 2026, to determine next steps, as there appeared to be multiple long-term leaks occurring in your home. You were notified that afternoon that

we would be assigning an engineer to complete an inspection of your home to determine the number of water sources and whether the damage occurred concurrently to the hot water supply line leak you reported to us.

On Monday, February 9, 2026, Stanley Steemer arrived at your home to check on the subfloor after Alexia raised concerns that many areas still appeared wet. They were advised by our Mitigation Unit that further drying was not approved, as the areas were previously reported as dry; this indicates a possible separate issue, which would be considered a separate occurrence. Following their visit to your home, they notified us you were demoing additional layers of subfloor and vinyl flooring, despite being notified that we had engaged an engineer to inspect your home.

I want to be clear. Your policy states the following:

Safeco Homeowners Optimum Policy (Form #HOM-7030/VAEP 12/23)
3. An Insured's Duties After Loss. In case of a loss to which this insurance may apply, you must perform the following duties:
a. cooperate with us in the investigation, settlement, or defense of any claim or suit;
...
f. as often as we reasonably require: (1) exhibit the damaged and undamaged property;

As we made you aware, an engineer's inspection is required for us to determine coverage for your claim. By removing additional materials from your home, you have violated the policy's conditions as listed above. Moving forward, you must not remove any other materials from your home, and all materials removed must remain at your home for the engineer to inspect.

An additional investigator has been assigned to assist Alexia with your claim. She may reach out to you to discuss the claim and ask questions. As noted above, you must cooperate with our investigation of your claim; please ensure you answer any questions fully and to the best of your ability.

While I wish Alexia and I could provide you with a date and time for the engineer, we do not have access to their schedules. I have requested that Rimkus Consulting, the independent engineering firm, reach out to you as quickly as possible to schedule their inspection.

If you have further concerns, you are welcome to reach out to Alexia for assistance. Please note, she is in the field for the bulk of each workday. If you are unable to reach her, please leave a voicemail. She will return your call within one business day.

Regards,

**Tiffany Putenis, M.A., AINS, AIC-M, AIM**

**(She/Her/Hers)**
Claims Team Manager
Regional Field

Liberty Mutual Insurance
P.O. Box 5014

Scranton, PA 18505-5014
Direct Dial: 862-432-5164
Toll Free: 844-325-2467

Facsimile: 888-268-8840 (please include your claim number on all faxes)
FL Adjuster License #: W261495

Scan my Business Card

For faster claims processing, we strongly encourage customers to file new claims online and to monitor and manage their claims online at Libertymutual.com/online-claims or Safeco.com/online-claims.

Coverage provided and underwritten by American Economy Insurance Company

Liberty Mutual Insurance Company, with a principal place of business at 175 Berkeley Street, Boston, MA 02116 USA

© 2025 Liberty Mutual Insurance

RIMKUS

5707 S. Laburnum Avenue
Richmond, VA 23231
(757) 229-2226

# Supplemental Report of Findings

Pohlman Plumbing Evaluation
Claim Number: 060776175

Rimkus Matter No: 100332953

Prepared For:
Liberty Mutual Insurance Company
175 Berkeley Street
Boston, MA 02116

Attention:
Ms. Alexia Lawson

Jack K Burkhardt Digitally signed by: Jack K Burkhardt DN: CN = Jack K Burkhardt C = US O = Unaffiliated Date: 2026.03.25 13:08:41 -04'00'

Jack K. Burkhardt, P.E.
NJ Reg. Engr. Number GE024186300
Senior Consultant

STATE OF NEW JERSEY JACK K. BURKHARDT No. 24GE06186300 LICENSED PROFESSIONAL ENGINEER

EXHIBIT D

March 25, 2026

# [redacted] TABLE OF CONTENTS


| | | |
|---|---|---|
| I. | Introduction | 1 |
| II. | Conclusions | 2 |
| III. | Discussion | 3 |
| | Background | |
| | Interview | |
| | Site Observations | |
| | Analysis | |
| IV. | Basis of Report | 10 |
| V. | Attachments | 11 |
| | A. Photographs | |
| | B. Curriculum Vitae | |

# Section I
## INTRODUCTION

On the morning of January 14, 2026, a reported water leak located underneath the kitchen sink was discovered within the residence owned by Mr. Matthew Pohlman (Mr. Pohlman), located at 103 Court Deayllon in Poquoson, Virginia.

Rimkus was retained to conduct a site inspection of the property and to determine the cause of the reported water leak. Jack K. Burkhardt, P.E., Rimkus Senior Consultant, conducted a site inspection of the subject property on February 18, 2026. Following the Rimkus site inspection, the faucet and hose assembly were photo-documented and collected. Mr. Burhardt's images and notes were the basis for this report.

Subsequent to our **Report of Findings**, Rimkus was asked to address if the water damage observed in the documentation provided and conditions observed on site were indicative of additional leak sources, separate from the reported sink loss.

This report was prepared for the exclusive use of Liberty Mutual Insurance Company and is not intended for any other purpose. The opinions and conclusions herein are based on sufficient facts or data; they are the product of our analysis utilizing reliable, generally accepted principles and methods in our applicable professional field; and they reflect a reliable application of these principles and methods to the facts of this matter. This report is based on the information available to us at this time, as described in the **Basis of Report.** Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on the opinions and conclusions set forth herein and to revise these opinions and conclusions if necessary. This report was reviewed by Mr. Richard Rambacher, Practice Leader.

## Section II
## CONCLUSIONS

We affirm our conclusions one through three made in our original **Report of Findings.** Conclusion four has been added as stated below. The conclusions from our original **Report of Findings** are provided below for reference.

1. The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line. This was the only observed source of water noted during the site inspection and review of mitigation photographs.

2. Mechanical damage to the stainless-steel supply line led to fraying and fracture of individual strands within the braiding, which likely punctured the inner hose, resulting in small weeps onto the stainless-steel surface. The accumulation of chlorides from the city water on the stainless steel strands likely led to stress corrosion cracking (SCC) of the stainless-steel supply line. Once the braided reinforcement was compromised, the line pressure was sufficient to rupture the polymer liner, resulting in the water event.

3. Destructive analysis, including scanning electron microscopy (SEM) and energy dispersive spectroscopy (EDS), would be needed to confirm SCC as the fracture mechanism.

### Supplemental Conclusions

4. Based on the provided documentation and observations made during the Rimkus site inspection, the dark discoloration observed at the ground-level bathroom plywood subfloor area was consistent with an additional source of water damage.

# Section III

# DISCUSSION

## Background

The property at 103 Court Deayllon was a 3-bedroom, 2.5-bathroom, 1,824-square-foot, single-family residence, originally built in 1973 and last sold in 2014 to the current owners.[1] The subject residence was reportedly serviced by the local municipal water supply.[2] On January 14, 2026, a water leak reportedly occurred in the cabinet underneath the kitchen sink. The source of the water was a breach in the braided stainless steel water supply line feeding the faucet, identified as a Moen Single-Handle High Arc Pulldown Kitchen Faucet, Model Number CA87003BRB.[3] This model included a pull-down hose, which allowed for the extension of the dispensing wand/faucet (**Figure 1**). During extension of the faucet, the pull-down hose supply line moved up and down, adjacent to the supply line connection, beneath the sink.



**Figure 1** - Quick connect hose connection between supply line and pull-down hose (left) and replacement hose kit.

[1]Property information, from 103 Ct Deayllon, Poquoson, VA 23662 | Redfin accessed March 10, 2026.
[2]Newport News, VA Waterworks, from https://www.nnva.gov/275/Drinking-Water-Quality, accessed March 11, 2026.
[3]Replacement hose from Moen, from https://shop.moen.com/products/150259?variant=48238025179446, accessed March 11, 2026.

**Interview**

During the on-site inspection on February 18, 2026, Mr. Burkhardt spoke with Mr. Pohlman and obtained the following information:

> Mr. Pohlman purchased the residence in May 2014. It was the primary residence for Mr. Pohlman and his two children.
>
> In 2023, Mr. Pohlman purchased the faucet from The Home Depot and installed it as part of a kitchen remodel project.
>
> At approximately 6:00 a.m. on January 14, 2026, Mr. Pohlman's father (who was visiting) discovered standing water throughout the ground level of the residence and an active water leak in the kitchen. Mr. Pohlman and his father observed a rupture in the stainless-steel braided hot water supply line.
>
> After turning off the main water supply valve to the property, Mr. Pohlman called a local property management company, GR Management, to assist with water remediation. They arrived later that day to perform mitigation work and placed several blower fans and dehumidifiers throughout the ground level of the property to assist with drying. They also closed the water supply valves beneath the sink and disconnected the water supply lines and faucet.

**Site Observations**

An on-site inspection was performed by Mr. Burkhardt on February 18, 2026. Photographs of the observed conditions are included in **Attachment A**. The photographs and information outlined below were representative and were not intended to include all conditions that may have existed during the inspection. During the course of the inspection, Mr. Pohlman provided access to the residence (**Photograph 1**). The demolition/partial remediation of the kitchen area, including removal of all construction materials within the kitchen area (flooring, cabinetry, plumbing piping and fixtures, etc.) had been completed prior to our inspection (**Photograph 2**). A pair of multi-turn isolation valves were in the closed position in the cabinet underneath where the subject kitchen sink and faucet fixture had been installed (**Photographs 3 and 4**). The faucet was still connected to the stainless steel braided hot and cold-water supply lines (**Photograph 5**). The faucet was manufactured by Moen, a Single-Handle High Arc Pulldown Kitchen

Faucet with Model Number CA87003BRB. The pull-down hose line was not visible or connected.

The exterior surface of the braided stainless steel hot water supply line was frayed, and the inner liner had ruptured and severely deteriorated (e.g., strands were discolored, bent, fractured) (**Photographs 6 through 8**). In areas away from the rupture/burst, including on the cold-water line, there were additional strands visible that had been frayed/fractured, accompanied by local discoloration (**Photographs 9 and 10**).

Following our site inspection, the faucet and hose assemblies were collected and transferred to Rimkus's Westerville, Ohio, office for further documentation and storage (**Photograph 11**). Images taken in the office were reviewed by Gregory Smith, Ph. D., Rimkus Senior Consultant. As previously documented, the primary rupture/burst site was located on the hot water supply hose and was heavily discolored/corroded, with substantial fiber fracture and bending (**Photographs 12 and 13**). Areas away from the primary rupture/burst site also exhibited bent and fractured strands; these areas were accompanied by local discoloration, though less severe than the primary burst/rupture site (**Photographs 14 and 15**). Higher magnification images of both the rupture site and away from the rupture site showed highly bent and fractured strands, which were accompanied by dark orange/black corrosion product (**Photographs 16 through 18**).

The photographs within Safeco Insurance Company Onsite Inspection Report, dated February 13, 2026, were reviewed. These photographs were taken after the "partial mitigation demo" phase of the remediation work was completed. As shown in the provided Photograph 12 from this document, there was localized dark discoloration in the plywood subfloor concentrated around the toilet area, where the O-ring seal meets the subfloor, as shown below, in **Figure 2**:



**Figure 2:** Photograph 12 taken from the Safeco Insurance Company Onsite Inspection Report.

Although there were other areas where the plywood subfloor looked slightly discolored or worn, the toilet area was the only area of note that displayed signs of a potential independent leak source. The ground-level dining room and entry foyer had also been demolished, with several layers of subfloor and finished floor removed prior to the Rimkus site inspection. These areas did not show any signs of independent water leaks, but these areas had also had multiple layers of flooring removed prior to the Safeco Insurance Company site visit, as well as the Rimkus site inspection.

**Analysis**

Stainless steel braided reinforcement is commonly used for flexible water supply lines. The combination of the water-sealing inner liner and outer structural reinforcement is commonly used for these applications by many different manufacturers where a flexible water supply conduit is desired (e.g., for end connections to appliances) or in cases where movement is expected (e.g., for a pull-down faucet). If damage occurs to the outer stainless steel, e.g., via abrasion, rubbing, or other mechanical force, the individual stainless-steel strands can fracture or fray. Such fraying of stainless-steel strands, which was observed on the incident supply line (**Photographs 8 through 10, 15, and 16**), can

occur during installation and/or operation of the sink/faucet. When the line is kinked or pressed, the individual frayed/fractured stainless-steel strands can then puncture the inner lining, creating a slow water weep.

The design of the supply line is such that water is contained within the polymer inner liner. The outer stainless steel braiding acts as a support structure to the inner liner. If the inner liner is compromised, e.g., punctures or ruptures from frayed strands, unmitigated weeps or leaks will allow water to wet the braids. As the water from the slow weep or leak evaporates, the chloride-containing salts dissolved in the water for disinfection are left behind on the stainless-steel surface, leading to and accelerating a condition called SCC. These ongoing leaks represent non-normal operating conditions. SCC is a well-known failure mechanism in austenitic stainless steel and is consistent with observations made on the supply line to date. SCC is driven by pre-existing conditions, namely a residual "stress" present within the material system and ongoing exposure to an aggressive service environment. Chloride-induced SCC can occur when the local service environment contains chloride salts.

Fractured stainless steel strands, consistent with installation-related abrasion or movement of the water supply line, were observed along the length of the incident supply line, including both at the primary rupture/burst site as well as areas away from the burst site (**Photographs 8 through 10, 15, and 16**). Both the primary site and other locations exhibited local discoloration, evidence of the ongoing corrosion at these locations (**Photographs 9, 10, and 12**). Discoloration was more pronounced around the primary burst/rupture site.

Other sources of potential water to the exterior surface of the hot water supply line may have originated from small leaks at the plumbing connections, especially at the quick-connect connection to the pull-down supply line. However, because the supply line had been disconnected and the pull-down supply line was not available prior to Rimkus's site inspection, this could not be verified. Mitigation photographs show the location of the burst at a loop/bend of the hot water supply line (**Figure 2**); if a leak was present from above, water would accumulate at or near the burst location, accelerating the SCC.

Based on the above, the source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line. This was the only observed source of water noted during the site inspection and review of mitigation photographs.

Mechanical damage to the stainless-steel supply line led to fraying and fracture of individual strands within the braiding, which likely punctured the inner hose, resulting in small weeps onto the stainless-steel surface. The accumulation of chlorides from the city water on the stainless-steel strands likely led to SCC of the stainless-steel supply line. Once the braided reinforcement was compromised, the line pressure was sufficient to rupture the polymer liner, resulting in the water event. Destructive analysis, including scanning electron microscopy (SEM) and energy dispersive spectroscopy (EDS), would be needed to confirm SCC as the fracture mechanism.



**Figure 3** – Provided photograph to Rimkus from Liberty Mutual Insurance Company, of the supply line connection prior to removal.

Although demolition of the various construction finishes and additional layers of subfloor throughout the ground level of the subject property had been completed prior to the Rimkus site inspection, the only reported source of water intrusion came from beneath the kitchen sink area. However, based on the review of the Safeco photographs, taken on February 13, 2026, the dark discoloration of the plywood subfloor surrounding the toilet

area was consistent with a long-term, independent leak source within the ground-level bathroom as well. Mr. Pohlman had stated that he purchased and installed the subject faucet in the kitchen area in 2023. The hot water supply line connected to the kitchen faucet was the source of the reported water damage, and therefore, this was the central focus of the Rimkus inspection. However, in the course of the Rimkus inspection, the adjacent rooms, including the dining room, entry foyer, and bathroom, had also been inspected for additional sources of water damage. Due to the demolition work conducted at the property prior to the Rimkus site inspection, several layers of additional subfloor and finished floor materials had already been removed in the dining room and entry foyer areas; therefore, additional potential independent leak sources could not be determined in these locations. However, the bathroom, located adjacent to the kitchen, contained water supply piping to various bathroom fixtures, including the toilet, sink, and laundry equipment. The dark, discolored plywood subfloor that remained in place where the toilet had been removed displayed signs of an independent leak source. Typically, a toilet's deteriorated wax seal O-ring can loosen and dry out over time, causing long-term slow water leakage. Although the other construction materials, as well as the toilet and O-ring seal, had been removed prior to the Rimkus site inspection, the remaining subfloor discoloration pattern was not consistent with damage from the kitchen sink area. Therefore, based on the provided documentation and observations made during the Rimkus site inspection, the dark discoloration observed at the ground-level bathroom plywood subfloor area was consistent with an additional potential source of water damage. Additional inspection is needed to determine any further extent of this source of water damage.

## Section IV
## BASIS OF REPORT


1. Property Information, https://www.redfin.com/VA/Poquoson/103-Ct-Deayllon-23662/home/49252359, accessed March 10, 2026.

2. On February 18, 2026, Jack K. Burkhardt, P.E., inspected the subject residence, located at 103 Court Deayllon in Poquoson, Virginia, and documented the physical inspection with photographs.

3. On February 18, 2026, Jack K. Burkhardt, P.E., interviewed the homeowner, Mr. Matthew Pohlman, during the Rimkus site inspection.

4. Product literature for the Moen Single-Handle High Arc Pulldown Kitchen Faucet was reviewed.

5. Safeco Insurance Company Site Inspection Photographs and additional PV and NPV Photographs provided to Rimkus.

6. ASM Handbook Volume 11: Failure Analysis and Prevention, ed. Brett A. Miller, Roch J. Shipley, Ronald J. Parrington, and Daniel P. Dennies. ASM International, 2021.

7. ASM Handbook, Volume 11A: Analysis and Prevention of Component and Equipment Failures, ed. B.A. Miller, R.J. Shipley, R.J. Parrington, D.P. Dennies. ASM International, 2021.

8. ASM Handbook Volume 13A: Corrosion: Fundamentals, Testing, and Protection, ed., Stephen D. Cramer and Bernard S. Covino, Jr., ASM International, 2023.

9. Newport News Waterworks, Newport News, VA, Drinking Water Quality, from https://www.nnva.gov/275/Drinking-Water-Quality, accessed March 11, 2026.

10. Newport News Waterworks, Newport News, VA, Combined Annual Summarizing Test Results from 2024 (*latest available*).

## Section V
## ATTACHMENTS

A. Photographs

B. Curriculum Vitae

## Section V
## ATTACHMENT A

# Photographs

Photographs taken during our inspection, including photographs that were not included in this report, were retained in our files and are available to you upon request.

**Photograph 1**
Exterior view of the subject residence.



**Photograph 2**
View of the subject kitchen area with plumbing connection locations indicated by RED arrows.



**Photograph 3**
Additional view of the plumbing connections within the kitchen area.



**Photograph 4**
View of the multi-turn valve at the hot water plumbing connection.



**Photograph 5**
View of the subject faucet and stainless-steel braided hoses assembly.



**Photograph 6**
Additional view of the hoses with fracture location indicated by a **BLACK** arrow.



**Photograph 7**
View of the burst/fracture location. Frayed and fractured strands are visible both at and away from the primary burst location.



**Photograph 8**
Additional view of the fracture location. Frayed and fractured strands are visible both at and away from the primary burst location.



**Photograph 9**
View of hot-water hose, away from the burst site. Frayed and fractured strands are visible away from the primary burst location.



**Photograph 10**
View of the cold-water hose. Frayed and fractured strands are visible away from the primary burst location.



**Photograph 11**
Office photographs of subject faucet and supply lines.



**Photograph 12**
Area of rupture/bust on hot water supply line



**Photograph 13**
Additional view of rupture/bust site.



**Photograph 14**
Area slightly away from rupture/bust site, with additional fraying strands and localized discoloration.



**Photograph 15**
Area slightly away from rupture/bust site, with additional fraying strands and localized discoloration.



**Photograph 16**
Higher magnification image with bent and fractured strands, near the primary burst/rupture site.



**Photograph 17**
Higher magnification image with bent and fractured strands, near the primary burst/rupture site.



**Photograph 18**
Higher magnification image with bent and fractured strands, away from the primary burst/rupture site.



## Section V

## ATTACHMENT B

# Curriculum Vitae

RIMKUS

**Jack Burkhardt, P.E.**
Senior Consultant

930 Harvest Drive, Suite 210
Blue Bell, PA 19422



(267) 649-1575

JBurkhardt@rimkus.com

## Background

Mr. Jack Burkhardt received his B.S. degree in Mechanical Engineering from Trinity College in 2011. He is a licensed professional engineer with a broad background of knowledge in mechanical engineering in commercial and residential construction. As a forensic engineer, he has provided consulting services for legal, insurance, and corporate clients in both plaintiff and defendant matters.

His professional background consists of over 10 years of experience in heating, ventilation, and air conditioning (HVAC) design, project management, construction management, and forensic engineering. Mr. Burkhardt has analyzed and determined the causations of mechanical component failures of consumer products, HVAC systems, plumbing systems, and fire protection systems. He has also investigated incidents and accidents related to equipment use and safety.

Mr. Burkhardt's technical evaluations of equipment failures include a variety of commercial and residential air conditioning systems and associated piping and ductwork, fire suppression systems, building envelope leaks, and refrigeration systems. His forensic experience includes investigating oil-fired boilers and furnaces, indoor air quality issues, kitchen hoods and cooking equipment, natural gas explosions, and product liability evaluation and testing of items such as electric cooktops, lawnmowers, and overhead rolling doors.

## Professional Engagements

- **HVAC Design and Analysis**
  - South Windsor, CT (2013), Provided projected heating and cooling load calculations for a new build-out and selected equipment for LEED-certified New Construction project. Accounted for and documented all HVAC-related LEED points.
  - New Haven, CT (2013), Performed heating and cooling load calculations for existing buildings and utilized energy modeling software to forecast upgrades and potential savings for local performing arts theatre.
  - Danbury, CT (2012), Designed and selected package of high-efficiency rooftop equipment and controls for industrial property. Provided utility company with projected energy savings for qualified tax incentive rebate.

- **Engineering and Construction Management**
  - Easton, PA (2020), Expanded the active hospital intensive care unit by overseeing the installation of additional medical gas outlets and associated piping.

- Scottsdale, AZ (2018), Managed the installation and implementation of high-efficiency variable refrigerant flow system with integrated controls for an out-of-the-ground, 40,000-square-foot retail store.
- Denver, CO (2017), Supervised the rebuild of severe water-damaged wing of shopping mall through a reconstruction of roof system and redistribution of rainwater runoff and storm drain piping.
- New York, NY (2016), Oversaw the installation and implementation of six submersible sump pumps and commercial-grade air dehumidifier in the basement-storage level of a newly constructed retail store to address excessive, ongoing humidity problems.
- New York, NY (2015), Investigated and fixed pipe freeze for a commercial client with exploded sprinkler pipe in a stock room.
- New York, NY (2014), Coordinated replacement of rooftop packaged equipment in high-traffic, densely populated area of lower Manhattan.

## Forensic Engagements

- **Mechanical Analysis**
  - Bristol, PA (2024), Mechanical evaluation of a material hoist lift and determined reusability and appropriate repair cost estimate for replacement components.
  - York, PA (2024), Performed load calculations to determine cooling demands for school classrooms served by PTAC units.
  - Milford, PA (2024), Investigated the failure of a residential water treatment system that leaked.
  - Pocopson, PA (2024), Evaluated the effects of a power surge to a commercial property and determined reusability of traction elevator system, HVAC system, and associated electrical components.
  - Glenolden, PA (2024), Investigated the cause of water loss within a residential B vent pipe installation.
  - Allentown, PA (2024), Evaluated the resultant damage to an overloaded tractor-trailer assembly.
  - Wilkes Barre, PA (2024), Conducted smoke damage evaluation to hotel property and assessment of hydraulic elevator system.
  - Kingston, PA (2024), Mechanical evaluation of water damage to laundromat equipment and determined reusability and appropriate repair cost estimate for replacement equipment.
  - Horsham, PA (2024), Determined cause of reported oil tank leak within an oil-fired furnace system.
  - Fairless Hills, PA (2023), Evaluated residential washing machine and associated stainless steel water supply hoses following reported water loss.
  - Lewes, DE (2023), Evaluated residential dishwasher circulation pump that reportedly failed and caused water damage to the property.
  - Coatesville, PA (2023), Investigated the PEX water supply piping system of an apartment complex that reportedly leaked.
  - Tamaqua, PA (2023), Evaluated black soot and smoke damage within a residential property related to a furnace heating system puffback.
  - Harrisburg, PA (2023), Evaluated a commercial fire pump system and determined reusability and appropriate repair cost estimate for replacement components.
  - Philadelphia, PA (2023), Evaluated a reported fuel contamination within the fuel system of a commercial vehicle.
  - Philadelphia, PA (2023), Assessed electrical service and hydraulic elevator system damage related to water intrusion.
  - Media, PA (2022), Investigated water loss causation related to an improperly pressed fitting on a copper domestic water supply line.
  - Wilmington, DE (2022), Evaluated an electrical short circuit within a commercial HVAC system.

- Harleysville, PA (2022), Evaluated a hydronic circulator pump and associated piping fittings within a commercial office complex.
- Bethesda, MD (2022), Evaluated a residential pipe freeze burst at an exterior hose bibb.
- Woodlyn, PA (2022), Evaluated a brass ball valve substituted for the plastic drain valve on a residential water heater that failed, causing water damage throughout the property.
- Lebannon, PA (2022), Mechanical evaluation of refrigerant piping and alarm system wiring of an indoor climate control system for a medical marijuana growing facility.
- Stroudsburg, PA (2022), Investigated the mechanical failure of a mobile fire pump that was being utilized for firefighter training by the county.
- Philadelphia, PA (2022), Evaluated the failure of a cast-iron sectional boiler serving the office and classrooms within a church building.
- Langhorne, PA (2021), Evaluated residential fuel oil-fired boiler and associated piping and equipment. Determined origin and cause of failure resulting in soot, smoke, and oil damage throughout the property.
- Saint Clair, PA (2021), Investigated a propane-fired water heater to determine the root cause of fire damage to a commercial laundromat.
- Elkins Park, PA (2021), Investigated failure and corrosion of cast-iron drainpipe serving commercial athletic facility.
- Hazleton, PA (2021), Evaluated and performed destructive testing on fire suppression hood system that failed to mitigate commercial kitchen grease fire.
- Princeton, NJ (2021), Evaluated hydraulic fluid line and associated equipment failure on a platform scissor lift at a commercial property loading dock.
- Philadelphia, PA (2021), Evaluated water leak in supply line of above-ceiling water source heat pump unit serving tenant in a commercial apartment complex building.
- Bridgeport, PA (2021), Evaluated fire damage to gas-fired, HVAC rooftop units serving a commercial property.
- Kunkletown, PA (2021), Investigated oil spill and associated equipment failure of a residential, oil-fired furnace heating system.
- Willow Grove, PA (2021), Evaluated brake system and associated controls for commercial-use aerial platform boom lift.
- South Sterling, PA (2021), Investigated pipe freeze within residential hydronic heating system served by oil-fired boiler unit.
- Chester, PA (2021), Investigated a reported dryer fire within a residential basement apartment unit.
- Paradise, PA (2021), Evaluated water damage to fire pump equipment and associated commercial property as a direct result of tropical storm.

## Professional Experience

- **Rimkus** **2021 – Present**
  - Senior Consultant
    Responsible for investigation and evaluation of deficiencies, failures, design, construction, maintenance, and operation of commercial and residential HVAC, plumbing, and fire protection systems. Capable of preparing damage assessments, repair estimates, as well as code compliance and safety evaluations.

- **Irwin & Leighton Commercial Builders** **2018 – 2020**
  - Project Superintendent

  Oversaw construction of commercial and residential projects including office buildings, retail stores, hospital renovations, and multi-family residential communities. Verified all MEP equipment, building materials, and finishes were installed in accordance with manufacturer requirements, local codes, and standards.

- **Shawmut Design & Construction** **2013 – 2018**
  - Project Manager/Project Superintendent

  Composed and evaluated detailed budgets and scopes of work for restoration and remodel projects in high-end retail division ranging from $50K to $10M. Worked closely with architects and engineers of record to determine constructability and implementation of design/build scope.

- **Controlled Air Inc.** **2011 – 2013**
  - HVAC Design Engineer

  Provided engineering analysis to the sales team on all design/build projects, evaluated existing HVAC equipment and building conditions on renovation projects, and selected new equipment to optimize overall mechanical system efficiency.

## Education and Certifications

- **Mechanical Engineering, B.S.:** Trinity College (2011)
- **Registered Professional Engineer:** Delaware, Maryland, and Pennsylvania
- **OSHA 30 Certified**

Safeco Insurance™
A Liberty Mutual Company

American Economy Insurance Company
P.O. Box 5014
Scranton, PA 18505-5014

CONTACT US

Alexia.Lawson-Hooks@LibertyMutual.com

Direct: (800) 225-2467
Fax: 888-268-8840

**American Economy Insurance Company**
P.O. Box 5014
Scranton, PA 18505-5014
800-332-3226

Safeco.com

Matthew Pohlman
103 CT DEAYLLON
POQUOSON, VA 23662-2241

March 25, 2026

| | |
|---|---|
| Claim Number: | 060776175-01 |
| Date of Incident: | 01/14/2026 |
| Insured: | Matthew Pohlman |
| Policy Number: | OF3392464 |
| Loss Location: | 103 CT DEAYLLON, POQUOSON, VA 23662-2441 |
| Underwriting Company: | American Economy Insurance Company |

Dear Matthew Pohlman,

We're writing to inform you that we completed our review of your claim based on information provided by you or on your behalf. The following is a summary of our findings and position on coverage for this claim.

The insurance policy provides coverage subject to policy terms and conditions. Based on our review of the policy, there is no coverage available for your loss as outlined below.

**Claim Details**

Our first notice of loss was on 01/17/2026. It was reported as an Accidental/Sudden Plumbing/HVAC - Broken Pipe/Hose/Fixture loss.

Our review of your claim revealed the following relevant information:

During our onsite inspection, water damage was found in your kitchen, dining room, living room, hallway, family room, bathroom, pantry, and crawlspace. Rimkus Engineering completed an onsite inspection of your home on 02/18/2026. The damaged pipe was sent to lab facilities where the cause of loss was confirmed as a long-term leak due to the individual frayed/fractured stainless-steel strands puncturing the inner lining, creating a slow



EXHIBIT
E

Safeco Insurance™
A Liberty Mutual Company

water weep. The observed deterioration condition of the materials in the kitchen and surrounding rooms impacted in the loss were consistent with a long-term seepage issue. The engineer also confirmed a secondary leak that occurred in the bathroom wax ring causing deterioration and water damage in the observed material. The policy will not extend coverage for this loss as the policy excludes long-term seepage, deterioration, and wear and tear.

The additional demolition you conducted after being advised not to do so as we investigated coverage denied Safeco Insurance the ability to conduct an unprejudiced investigation. This is a breach of the Insured Duties After a Loss as outlined in the policy conditions.

**Policy Information**

We issued the following Home Policy to Matthew Pohlman
Policy Number: OF3392464
Policy Period: 09/15/2025 - 09/15/2026

The applicable Policy form and relevant endorsements (your coverages) state in part:

**SAFECO HOMEOWNERS POLICY — VIRGINIA**
**INSURING AGREEMENT**
In reliance on the information you have given us, we will pay claims and provide coverage as described in this policy if you pay your premiums when due, comply with all applicable provisions outlined in this policy, and inform us of any change in title, use, or occupancy of the residence premises. This policy applies only to losses occurring during the policy period.

**SECTION I — PROPERTY COVERAGES**
**BUILDING PROPERTY LOSSES WE COVER**
We cover accidental direct physical loss to property described in Building Property We Cover except as limited or excluded.

**BUILDING PROPERTY LOSSES WE DO NOT COVER**
We do not cover direct loss caused by any of the following excluded perils:
...

**5.** Continuous or repeated seepage or leakage of water or steam from within a plumbing, heating, or air conditioning system or from within a domestic appliance which occurs over a period of weeks, months, or years.

**6. a.** wear and tear, marring, scratching, deterioration;
**b.** inherent vice, latent defect, mechanical breakdown;
**c.** smog, rust, corrosion, mold, fungus, wet or dry rot;

We provide coverage for ensuing loss that results from items 1. through 6. unless the ensuing loss is itself excluded under Building Property Losses We Do Not Cover in this Section.
...

**18. Planning, Construction, or Maintenance**, meaning faulty, inadequate, or defective:
**a.** planning, zoning, development, surveying, siting;
**b.** design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
**c.** materials used in repair, construction, renovation, or remodeling; or
**d.** maintenance;
of property whether on or off the ***insured location*** by any person or organization. However, any ensuing loss

Safeco Insurance™
A Liberty Mutual Company

not excluded is covered.

**COVERAGE D — ADDITIONAL LIVING EXPENSE AND LOSS OF RENT**
The limit of liability for Coverage D applies separately to **1.** and **2.** and includes any coverage provided under **3.** below. Coverage provided under **3.** does not increase the limit of liability for **Additional Living Expense** or **Fair Rental Value.**

1. If a loss covered under this Section makes that part of the ***residence premises*** where you reside uninhabitable we cover **Additional Living Expense**, meaning any necessary increase in living expenses you incur so that your household can maintain its normal standard of living.

> Payment shall be for the time reasonably required to repair or replace the damage or, if you permanently relocate, the time reasonably required for your household to settle elsewhere.

...

The period of time under **1.**, above are not limited by expiration of this policy.

No deductible applies to this coverage.

**SECTION I — PROPERTY CONDITIONS**

...

**3. An Insured's Duties After Loss.** In case of a loss to which this insurance may apply, you must perform the following duties:
a. cooperate with us in the investigation, settlement or defense of any claim or suit;
d. protect the property from further damage, make reasonable and necessary repairs required to protect the property and keep an accurate record of repair expenses;
f. as often as we reasonably require:
(1) exhibit the damaged and undamaged property;
(2) provide us with records and documents we request and permit us to make copies; and
(3) submit to examinations under oath and subscribe the same.

...

**8. Suit Against Us.** No action shall be brought against us unless there has been compliance with the policy provisions and the action is started within two years after the inception of the loss or damage.

The Policy is incorporated by reference into this letter in its entirety. Although we have attempted to include all of the policy provisions that we believe are pertinent to this matter, the provisions set forth above in no way replace the provisions of the actual Policy issued. If you have any questions regarding the terms contained in the applicable Policy, you should refer to the Policy itself. To the extent there is any discrepancy between this letter and the Policy, the Policy controls.

**Our Coverage Position**

Based upon the information available to date, the grounds for our denial of coverage under the Policy, or under applicable law, with respect to the claim, include, but are not limited to, the following:

The policy does not provide coverage for continuous or repeated seepage or leakage of water or steam, or the presence or condensation of humidity, moisture or vapor which occurs over a period of weeks, months or years,

Safeco Insurance™
A Liberty Mutual Company

whether hidden or not. Because the damage was caused by a long-term leak, you have no coverage for the claim.

Based on these grounds, no insurance coverage is available to you for the claim. While we sought to identify and address all relevant insurance coverage considerations above, these specific considerations are not intended and should not be understood as a waiver of any other right or basis we may have to deny coverage, and we reserve all rights in this regard.

If you have any information you believe may impact our coverage position, please bring it to our immediate attention, so we may assess whether such information or pleading impacts our coverage position or obligations.

**We're Here To Help**

We understand this is disappointing news and we want to make sure you fully understand our decision. If you have any questions or concerns, please feel free to call or email me anytime.

Sincerely,

ALEXIA LAWSON-HOOKS
Claims Department

# FLETCHER & ASSOCIATES
**CONSULTING STRUCTURAL ENGINEERS**

April 8, 2026

Mr Matthew Pohlman
103 Court Deayllon
Poquoson, VA 23662

**RE: STRUCTURAL INSPECTION - 103 COURT DEAYLLON, POQUOSON, VA**

Dear Mr. Pohlman:

Fletcher and Associates, P.C. has carefully inspected and analyzed the above referenced project. The purpose of this inspection is to provide an engineering opinion regarding apparent damage to the floor system.

James H. Fletcher, P.E.
Fletcher And Associates
201 Woodroof Rd, Newport News, VA 23606
757-508-3156 | jfandassoc@gmail.com
Virginia Professional Engineer License No. 0402026629
INSPECTION DATE: April 2, 2026
FILE NO: 26-12569
SUBJECT: Structural Engineering Assessment: Nature of Water Damage to Building Components
PROPERTY: 103 Court Deayllon, Poquoson, VA
DATE OF LOSS: January 14, 2026
CLIENT: Mr. Matthew Pohlman

1.0 INTRODUCTION ; ASSIGNMENT

I, James Fletcher, a licensed Professional Engineer in the Commonwealth of Virginia specializing in structural engineering, was retained by the homeowner, Mr. Matthew Pohlman. My firm was contacted following a denial of an insurance claim (Claim #060776175-01) and after significant demolition of interior finishes had been performed by the insurance carriers vendor.

The purpose of this investigation was twofold:

1. To assess the condition of the water-affected structural and sub-structural components (wood framing, subfloor) and provide a professional opinion as to whether the damage patterns are consistent with a single, high-volume water event or a long-term, chronic leak, in preparation for the eventual reconstruction of the home.

2. To conduct a professional review of the engineering report prepared by Mr. Jack Burkhardt of Rimkus Consulting Group, Inc. (Rimkus Supplemental Report of Findings, Pohlman Plumbing Evaluation Claim Number: 060776175 Rimkus Matter No: 100332953), dated March 25, 2026, which was cited as the basis for the claim denial.
The scope of this structural engineering report is to analyze the effects of the reported water loss on the building's structural components and to conduct a professional review of the report prepared by Rimkus Consulting Group, Inc. The precise metallurgical failure mechanism of the plumbing hardware is outside the scope of this structural assessment. Therefore, this report will focus primarily on the effects of the water on the buildings structure and the validity of the conclusions in the Rimkus report from a structural and professional practice perspective.

P.O. BOX 5592 WILLIAMSBURG, VA 23188
(757) 508-3156 (O) / (757) 508-3156 (M) / (757) 240-5017 (F) jfandassoc@gma

EXHIBIT
F

2.0 DOCUMENTS ; EVIDENCE REVIEWED

Site Visit: A physical inspection of the subject property was conducted on April 2, 2026.
Rimkus Report: Report prepared by Mr. Jack Burkhardt, dated [Date of Rimkus Report].
Photographic Evidence: Mitigation photographs and high-resolution photographs of the failed plumbing components.
Client Statement: First-hand account from Mr. Matthew Pohlman regarding the loss and the history of a prior, repaired toilet wax ring leak.

3.0 STRUCTURAL ANALYSIS OF WATER-DAMAGED BUILDING COMPONENTS

My site investigation focused on the condition of the exposed wood subfloor and framing members in the kitchen, dining room, living room, and ground-level bathroom.

3.1 Analysis of Widespread Water Damage: The wood subfloor components across the kitchen, dining room, and foyer exhibited evidence of significant, recent saturation. However, these materials remain structurally sound. There is a complete absence of the wood rot, delamination, fungal decay, or loss of section that are the unambiguous hallmarks of exposure to moisture over a period of days; weeks, months, or years; The observed damage is exclusively consistent with a single, high-volume wetting event.

3.2 Analysis of Localized Bathroom Staining: A dark, localized stain was observed on the subfloor at the location of the previously removed toilet. This area was tested with a moisture meter and found to be dry at the time of my inspection. The client provided testimony that this stain was the result of a previous, minor leak from a toilet wax ring, which had been repaired. My analysis confirms this account. The stain is an historical artifact—a cosmetic, dry-set stain—and does not represent active moisture or structural degradation. The Rimkus reports conclusion that this was an " independent leak source" is incorrect; a competent engineering investigation requires differentiating between historical and active conditions, a fundamental step that was clearly omitted.

4.0 REVIEW AND PROFESSIONAL REBUTTAL OF RIMKUS ENGINEERING

REPORT

From the perspective of a licensed Professional Engineer in Virginia, the report authored by Mr. Burkhardt contains multiple jurisdictional, factual, and methodological failures that render its conclusions unreliable and invalid.

4.1 Jurisdictional ; Professional Invalidity: The report is fundamentally invalid for use in the Commonwealth of Virginia. Its author does not hold a Virginia P.E. license, constituting the unauthorized practice of engineering per Virginia Code §54.1-406. Furthermore, the contradictory license numbers on the reports face invalidate its professional seal and demonstrate a lack of professional rigor.

4.2 Gross Misinterpretation of Structural Evidence: The reports author demonstrated an inability to perform a basic differential diagnosis of water damage. By misidentifying a historical, dry, and structurally insignificant stain as an active, long-term leak, he has shown a lack of the fundamental skills required for water intrusion investigation. His conclusions regarding the condition of the structure are therefore unreliable.

4.3 Reliance on Unproven and Contradicted Theories: The reports primary conclusion rests on a theory of ;Stress Corrosion Cracking; that is admittedly unproven. As a structural engineer, my expertise is in evaluating how materials fail. Any credible failure analysis must be based on evidence, not speculation. The Rimkus report fails to correctly identify the product that failed, rendering its entire technical analysis irrelevant.

5.0 CONCLUSIONS

Based on my site investigation and professional engineering analysis, I have made the following conclusions to a reasonable degree of professional certainty:

1. The damage to the homes structural and sub-structural components is exclusively consistent with a single, sudden, high-volume water event.
2. There is no physical evidence of long-term or chronic water exposure that would result in the degradation of wood building materials. The subfloor and framing, while saturated, remain structurally sound.
3. The discoloration observed in the bathroom is a historical, dry-set stain from a previously repaired issue and is not evidence of an ongoing leak contributing to the current loss.
4. The engineering report prepared by Rimkus Consulting Group, Inc. is professionally and jurisdictionally invalid. Its conclusions are based on a misinterpretation of structural evidence, speculation instead of fact, and a fundamental misidentification of the core components. It is my professional opinion that this report is without merit and cannot be relied upon for any purpose. This property is structurally sound for repair, and reconstruction can proceed once the source of the single, catastrophic water event has been addressed.

Fletcher and Associates, P.C. appreciates this opportunity to be of service to you in this matter. If you have any questions, please call at your convenience.

COMMONWEALTH OF VIRGINIA
JAMES H. FLETCHER
April 8, 2026
No. 26629
PROFESSIONAL ENGINEER

Sincerely,

James H. Fletcher, P.E.
Fletcher and Associates
VA Reg #26629

JHF:kcf

FORENSIC™
ANALYSIS CORPORATION
"Establishing Why"™ since 1966

PREPARED FOR:

Kimberly Marchant, Matt Pohlman

SUBJECT:

Documentation Review

Company Claim: 060776175-01
Insured: Matthew Pohlman
D.O.L.: January 14, 2026
FAEC File No.: IND-3741-VA-26L

PREPARED BY:

FORENSIC ANALYSIS & ENGINEERING CORPORATION

Craig Callewaert, PE
Lab Manager and Staff Engineer
Virginia State License Number: 0402063244

May 4, 2026

corporate@4n6engr.com
546 Denbigh Blvd., Suite B
Newport News, VA 23608
www.forensic-analysis.com
757-265-9333

EXHIBIT 6

We appreciate the opportunity to be of support to you, State Farm Insurance and your insured in this matter. We trust that you will find our report to be suitable for its intended purposes. We look forward to earning an opportunity to prove our technical competence once again in the near future.

Respectfully submitted,
**FORENSIC ANALYSIS & ENGINEERING CORPORATION**

COMMONWEALTH OF VIRGINIA
CRAIG A. CALLEWAERT
Lic. No. 0402063244
PROFESSIONAL ENGINEER

E-SIGNED by Craig Callewaert
on 2026-05-04 15:45:23 GMT

Craig Callewaert, P.E.
Lab Manager and Staff Engineer
Virginia State PE No: 0402063244

This firm follows the practice of having all technical reports read and reviewed by a peer for completeness, reader comprehension, technical approach, and reasonableness of the stated conclusions and repair protocols. This report has been reviewed by the undersigned for the firm.

E-SIGNED by Todd Ford
on 2026-05-04 16:00:21 GMT

Todd Ford, P.E.
Vice President of Engineering

## BACKGROUND INFORMATION

FAEC was contacted on April 1, 2026, and requested to evaluate and perform a forensic investigation into the cause of the claimed loss. Specifically, we were asked to examine the reports and documentation surrounding a water claim from a kitchen sink burst supply line that was located at 103 Court Deayllon, in Poquoson, Virginia and to provide an objective expert opinion including supporting rationale that fulfilled the following provided request:

- Perform a documentation review of the report of findings contained in the March 25, 2026, Rimkus report, Supplemental Report of Findings, Rimkus matter no. 100332953; and other documents to determine the cause of failure leading to the water damage claim
- Summarize the Rimkus report identifying areas of facts, errors, and open questions requiring further investigation
- Analyze the Safeco Insurance claim denial letter with regards to the facts of the case

For quick reference, the Opinions & Conclusions in response to the provided question(s) may be found on page 8.

FAEC received the documentation via email at our Newport News, Virginia Evidence Examination Center April 2 through 27, 2026.

A complete list of the documents received is shown in Appendix A. Relevant pictures and references from this documentation have been copied to Appendix B for use in this report.

## OBSERVATIONS & FINDINGS

FAEC was asked to perform an engineering investigation and evaluation into the causation of the water loss at the documented residence. Based upon the documentation provided and other information identified during our laboratory investigation, FAEC was able to determine the following:

1. The subject is a commercial style (or spring pull down style) kitchen faucet, claimed to be a Glacier Bay (Home Depot) brand. The faucet had been removed from the kitchen sink by the homeowner shortly after the incident. Photographs 1 and 2.

2. The faucet and its connection lines were analyzed and reported by Rimkus, an engineering firm in Richmond, Virginia. The original report was not available for review, but a follow-up supplemental report was available - the March 25, 2026, Rimkus report; Supplemental Report of Findings, Rimkus matter no. 100332953. The subject faucet was pictured in this report. Photograph 3.
3. This faucet was claimed by the homeowner to be a Glacier Bay brand purchased from Home Depot in 2023. The product could not be located on the current Home Depot website, but a similar product was located on Amazon. Photograph 4.
4. Although the product is called a pull-down faucet, the sprayer hose is fixed. The sprayer can be unhooked from its mount and moved where desired, flexibility provided by the flexible hose and guide spring on the high arch.
5. A photo taken before removal from the underside of the faucet shows only the two supply lines. A third line with a loop and weight typical of most pull-down faucets does not exist on this model of faucet. Other under sink photos show the burst location in the hot water supply line. Photographs 5 through 7.
6. The burst location and supply hoses were analyzed and shown in the Rimkus engineering report. Photographs 8 through 16.
7. These photos also show areas of discolorations appearing as rust stains. Several frayed and fractured stainless-steel braid strands were visible away from the primary burst location. Photographs 11 through 16.
8. One error in the Rimkus report is the identification of the faucet. The report misidentified the faucet as a Moen CA87003BRB, the bronze Anabelle One-Handle High Arc Pulldown Kitchen Faucet. With the failed faucet, a soap dispenser was also recovered for analysis by Rimkus. This part, with a Moen label and logo, is seen in the background of one of the Rimkus report photos. Photograph 17.
9. The model CA87003BRB Moen faucet was located online and is a distinctly different style than the subject failed faucet. Photographs 18 and 19.
10. Examination of pictures from the GR Management mitigation work show the Moen faucet installed on the sink. Photographs 20 through 24.
11. The extent of the water damage was not immediately known to the homeowner. He replaced the failed faucet with the Moen faucet to provide functionality and livability in the home as soon as possible after the initial failure. After the mitigation company arrived and measured moisture levels, they determined it was necessary to remove flooring and cabinets to be able to dry the house and mitigate the damage.
12. The house was built in 1973 and purchased by the current owner in 2014. Removal of the flooring indicated several layers of flooring needed to be

removed. Beneath these layers, the subfloor in the bathroom had dark staining at the entryway and in front of the toilet. The kitchen and living room floors were clear. The staining indicates a previous event or events. Photographs 25 through 27.

13. The conclusions of the Rimkus supplemental report are shown in Photograph 28:

Conclusion 1: "The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line. This was the only observed source of water noted during the site inspection and review of mitigation photographs."

Agree, all evidence suggests the burst hose was the single source of water creating the damage observed and requiring extensive mitigation.

Conclusion 2: "Mechanical damage to the stainless-steel supply line led to fraying and fracture of individual strands within the braiding, which likely punctured the inner hose, resulting in small weeps onto the stainless-steel surface. The accumulation of chlorides from the city water on the stainless-steel strands likely led to stress corrosion cracking (SCC) of the stainless-steel supply line. Once the braided reinforcement was compromised, the line pressure was sufficient to rupture the polymer liner, resulting in the water event."

Partially Agree, the stainless-steel braiding had fraying and fracture damage. It is, however, highly unlikely that these small frays and fractures could puncture the inner hose. It is more likely that these frays and fractures themselves cause weakening of the cover and eventual burst failure.

The cause of the frays and fractures is not known. They could be mechanical, although the failed faucet did NOT have a pulldown hose loop and weight that could abrade the supply lines. This is common and was wrongly suggested by Rimkus guided by their misidentification of the subject faucet. Photograph 29.

The supply lines were looped close to each other, close to the shut off valves, and close to the dishwasher drain hose. Under sink storage of many items is also common. All of these are possible causes of mechanical damage.

The rust staining on the supply lines is indicative of some water presence. Some possible sources include the supply line attachment joint to the faucet, the faucet to countertop seal, drain leaks, or even wet items stored under the sink. This moisture could

have corroded or caused SCC, further weakening the stainless-steel strands.

Conclusion 3: "Destructive analysis, including scanning electron microscopy (SEM) and energy dispersive spectroscopy (EDS), would be needed to confirm SCC as the fracture mechanism."

Agree, further testing is required to identify the exact mechanism by which the stainless-steel braids weakened and failed.

In this case, however, the exact failure mechanism does not need to be known. The stainless-steel braiding had weakened, leading to a sudden and unexpected burst rupture of the hot water faucet supply line, resulting in the water event.

Supplemental Conclusion 4: "Based on the provided documentation and observations made during the Rimkus site inspection, the dark discoloration observed at the ground-level bathroom plywood subfloor area was consistent with an additional source of water damage."

Agree, the discoloration indicates a separate prior event, likely occurring years before the faucet failure and resulting water loss. This earlier event (likely a failed toilet wax ring) did not contribute to the water damage that was observed or remediated.

Pictures and further exploration of this stained floor were in the Rimkus report. Photograph 30.

14. Portions of the Safeco Insurance denial letter are shown in Photographs 31. The main detail for denial is contained in the following paragraph:

During our onsite inspection, water damage was found in your kitchen, dining room, living room, hallway, family room, bathroom, pantry, and crawlspace. Rimkus Engineering completed an onsite inspection of your home on 02/18/2026. The damaged pipe was sent to lab facilities where the cause of loss was confirmed as a long-term leak due to the individual frayed/fractured stainless-steel strands puncturing the inner lining, creating a slow

water weep. The observed deterioration condition of the materials in the kitchen and surrounding rooms impacted in the loss were consistent with a long-term seepage issue. The engineer also confirmed a secondary leak that occurred in the bathroom wax ring causing deterioration and water damage in the observed material. The policy will not extend coverage for this loss as the policy excludes long-term seepage, deterioration, and wear and tear.

15. This paragraph is countered by the Rimkus report where Conclusion 1 states: "The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line. This was the only observed source of water noted during the site inspection and review of mitigation photographs."

16. The slow water weep was speculated as a potential cause for weakening of the stainless-steel braids, not as a source of water damage.

17. Regarding the "observed deterioration condition of the materials in the kitchen and surrounding rooms", this is also counter to the Rimkus report where Conclusion 4 states: "Based on the provided documentation and observations made during the Rimkus site inspection, the dark discoloration observed at the ground-level bathroom plywood subfloor area was consistent with an additional source of water damage." The report mentions dark discoloration, NOT deterioration conditions. Furthermore, this discoloration was only evident in the bathroom, not the kitchen and other surrounding rooms. The discoloration indicates a separate prior event, likely occurring years before the faucet failure and resulting in water loss. This earlier event (likely a failed toilet wax ring) did not contribute to the water damage that was observed or remediated.

18. Portions of the Safeco Insurance denial letter are shown in Photographs 32. The Coverage Position detail for denial is contained in the following paragraph:

The policy does not provide coverage for continuous or repeated seepage or leakage of water or steam, or the presence or condensation of humidity, moisture or vapor which occurs over a period of weeks, months or years,

whether hidden or not. Because the damage was caused by a long-term leak, you have no coverage for the claim.

19. This paragraph is countered by the Rimkus report where Conclusion 1 states: "The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line. This was the only observed source of water noted during the site inspection and review of mitigation photographs." A burst occurs in seconds, not weeks, months or years. The insurance claim is solely for the mitigation effort and damages from this burst failure. The fact that evidence of prior events was found in a 53-year-old home should not be surprising.

## OPINIONS AND CONCLUSIONS

The conclusions and opinions presented in this report are based on the results of FAEC's investigation and analysis of this incident based upon the facts, as we know them to be at this time. If additional information or facts become available which materially affect the analysis performed, the conclusions and opinions presented herein are subject to revision accordingly. Based upon our laboratory evaluation and examination of the physical evidence along with the information that was provided to FAEC, we have been able to conclude the following:

1. The subject is a commercial style (or spring pull down style) kitchen faucet, claimed to be a Glacier Bay (Home Depot) brand. The hot water supply line to the faucet burst, leading to water damage in the home located at 103 Deayllon Court in Poquoson, Virginia.
2. The faucet and its connection lines were analyzed and reported by Rimkus, an engineering firm in Richmond, VA. The original report was not available for review, but a follow-up supplemental report was available - the March 25, 2026, Rimkus report, Supplemental Report of Findings, Rimkus matter no. 100332953.
3. Other documents were obtained and reviewed including photograph compilations by water mitigation companies GR Management and Stanley Steemer. Other miscellaneous documents and correspondence were also obtained. The complete list of documents is shown in Appendix A.
4. Although the subject faucet is called a pull-down faucet, the sprayer hose is fixed. The sprayer can be unhooked from its mount and moved where desired, flexibility provided by the flexible hose and guide spring on the high arch. As such, a third line with a loop and weight typical of most pull-down faucets does not exist on this model of faucet.
5. Errors identified in the Rimkus report include misidentification of the subject faucet as a Moen faucet and the presence of a third pull down hose line causing mechanical damage to the supply lines. The subject faucet is not a Moen and does not have a third pull down hose line.
6. The three conclusions and a fourth supplemental conclusion were evaluated. The first conclusion is correct; all evidence suggests the burst hose was the single source of water creating the damage observed and requiring extensive mitigation.
7. The second conclusion was regarding the source of damage to the stainless-steel braid wires. As the faucet was misidentified, the potential source of damage does not exist, and the speculations here need to be reconsidered.

8. The third conclusion identifies suggested testing for identifying the exact failure mechanism. This conclusion is correct; additional testing is needed to determine the wire braid and supply hose failure mechanism.
9. The fourth supplemental conclusion is correct; "Based on the provided documentation and observations made during the Rimkus site inspection, the dark discoloration observed at the ground-level bathroom plywood subfloor area was consistent with an additional source of water damage." The discoloration indicates a separate prior event, likely occurring years before the faucet failure and resulting in water loss. This earlier event (likely a failed toilet wax ring) did not contribute to the water damage that was observed or remediated.
10. The insurance denial letter was evaluated. Two details in the Claim Details section were clearly counter to statements made in the Rimkus report. The first statement; "the cause of loss was confirmed as a long-term leak" was clearly counter to the Rimkus report conclusion "The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line." The second statement; "The engineer also confirmed a secondary leak that occurred in the bathroom wax ring causing deterioration and water damage in the observed material" is clearly counter to the complete conclusion 1 in the Rimkus report stating: "The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line. This was the only observed source of water noted during the site inspection and review of mitigation photographs."
11. The summarizing statement in the Our Coverage Position section was also counter to the Rimkus report and other facts found in the other documentation. The statement "The policy does not provide coverage for continuous or repeated seepage or leakage of water or steam, or the presence or condensation of humidity, moisture or vapor which occurs over a period of weeks, months or years whether hidden or not" is clearly counter to the Rimkus report conclusion "The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line." Obviously, a burst occurs in seconds, not weeks, months or years.

# Appendix A:
# Document List

Taken or obtained by
FAEC
April 2 through 27, 2026

FORENSIC™ ANALYSIS & ENGINEERING

Matthew Pohlman
060776175-01
500-3741-VA-26L
Date of Loss/Damage: January 14, 2026

## Document list:

Forensic Analysis & Engineering > FAEC > CASE FILES > CASE FILES 2026 > IND-3741-VA-26 Matt Pohlman

| Name | Modified | Modified By | File size | Sharing | Activity |
|---|---|---|---|---|---|
| SUMMARY OF EVENTS 16 MARCH ALL.pdf | April 1 | Meagan McBride | 183 KB | Shared | |
| sink base cabinet (1).pdf | Monday at 2 23 PM | Alex Lane | 205 KB | Shared | |
| RE_ Non-DoD Source_ Fwd_ 103 Court DeAyllon POST Water Da.. | April 15 | Meagan McBride | 4 20 MB | Shared | |
| Possible Engineering Job in Poquoson_ VA.msg | April 7 | Meagan McBride | 13 5 MB | Shared | |
| Pohlman Full Denial Letter Final.pdf | Monday at 2 28 PM | Alex Lane | 232 KB | Shared | |
| Payment received_ Invoice #120924-(IND-3741-VA-26).msg | April 20 | Meagan McBride | 132 KB | Shared | |
| MOISTURE READING REPORT 12 FEB_16 FEB.pdf | April 1 | Meagan McBride | 301 KB | Shared | |
| MICA_Photo_Report_20260216_013824PM(UTC).pdf | April 1 | Meagan McBride | 4 23 MB | Shared | |
| IND-3741-VA-26 Claim #060776175-01 RE_ 103 Court DeAyllon P. | Monday at 2 23 PM | Alex Lane | | Shared | |
| Fw_ 103 Court DeAyllon POST Water Damage Inspection E-mail 2 . | April 7 | Meagan McBride | 101 KB | Shared | |
| FULL PACKAGE REVERSAL LETTER.pdf | April 1 | Meagan McBride | 2.51 MB | Shared | |
| Formal Rebutta to Engineering Report Concerning Water Loss Eve | April 1 | Meagan McBride | 28.5 KB | Shared | |
| FINAL EMAIL TO INSURANCE COMPANY.pdf | April 1 | Meagan McBride | 156 KB | Shared | |
| Exhibit F_A collection of damning photographic evidence.pdf | Monday at 2:29 PM | Alex Lane | 1 38 MB | Shared | |
| Exhibit A_Pohlman 103 Court Structural Inspection Report 4 26-12 . | Monday at 2:29 PM | Alex Lane | 313 KB | Shared | |
| email from MCM to insured eml | April 20 | Alex Lane | 303 KB | Shared | |
| email from insured to CC.eml | Monday at 2:24 PM | Alex Lane | 2 94 MB | Shared | |
| corporate@4n6engr com_20260401_130801.pdf | April 1 | Meagan McBride | 235 KB | Shared | |
| 103 PICTURES GR WORK.pdf | April 1 | Meagan McBride | 1 60 MB | Shared | |
| 103 COURT DEAYLLON INSURANCE PICTURES_SOE.pdf | April 1 | Meagan McBride | 1 19 MB | Shared | |
| 060776175 Rimkus Engineer's Report.pdf | April 1 | Meagan McBride | 2.44 MB | Shared | |
| #060776175-01 RE_ 103 Court DeAyllon POST Water Damage Insp . | April 14 | Meagan McBride | 105 KB | Shared | |

# Appendix B:
# Photographs

Taken or obtained by
Craig Callewaert, PE
On April 28, 2026



Photograph 1 – The failed faucet with burst hot water supply line from file: 103 PICTURES GR WORK.pdf



Photograph 2 – Zoom in on faucet from file: 103 PICTURES GR WORK.pdf



Photograph 3 – The Rimkus report "photograph 5 - View of the subject faucet and stainless-steel braided hoses assembly" from the report: 060776175 Rimkus Engineer's Report.pdf



Photograph 4 – A similar product located on Amazon:
https://www.amazon.com/gp/product/B0FQ4MYCWW?th=1



Photograph 5 – The burst hot water supply line from file: 103 PICTURES GR WORK.pdf



Photograph 6 – The burst hot water supply line from file: 103 PICTURES GR WORK.pdf



Photograph 7 – The burst hot water supply line from file: 103 PICTURES GR WORK.pdf



Photograph 8 – "Photograph 8 - Additional view of the fracture location. Frayed and fractured strands are visible both at and away from the primary burst location" from the report: 060776175 Rimkus Engineer's Report.pdf



Photograph 9 – "Photograph 9 - View of hot-water hose, away from the burst site. Frayed and fractured strands are visible away from the primary burst location" from the report: 060776175 Rimkus Engineer's Report.pdf



Photograph 10 – "Photograph 12 - Area of rupture/burst on hot water supply line" from the report: 060776175 Rimkus Engineer's Report.pdf



Photograph 11 – "Photograph 13 - Additional view of rupture/bust site" from the report: 060776175 Rimkus Engineer's Report.pdf



Photograph 12 – "Photograph 14 - Area slightly away from rupture/bust site, with additional fraying strands and localized discoloration" from the report: 060776175 Rimkus Engineer's Report.pdf



Photograph 13 – "Photograph 16 - Higher magnification image with bent and fractured strands, near the primary burst/rupture site" from the report: 060776175 Rimkus Engineer's Report.pdf



Photograph 14 – "Photograph 17 - Higher magnification image with bent and fractured strands, near the primary burst/rupture site" from the report: 060776175 Rimkus Engineer's Report.pdf



Photograph 15 – "Photograph 18 - Higher magnification image with bent and fractured strands, away from the primary burst/rupture site" from the report: 060776175 Rimkus Engineer's Report.pdf



Photograph 16 – "Photograph 10 - View of the cold-water hose. Frayed and fractured strands are visible away from the primary burst location" from the report: 060776175 Rimkus Engineer's Report.pdf



Photograph 17 – Zoom in on the soap bottle in the background of the previous photograph. Labeled Moen with a Moen logo, and possibly CA87003BRB.




Photograph 18 – The Moen CA87003BRB found here:
https://www.hardwareworld.com/p9w76i7/High-Arch-Kitchen-Faucet-with-Spray-Mediterranean-Bronze?gclid=CjwKCAjwtcHPBhADEiwAWo3sJqNBXX8hxU7RM76ylpVev81fLJHKCAIxreuljbe1bMhW9ufT11hHYhoCHaQQAvD_BwE




Photograph 19 – The Moen CA87003BRB also found here:
https://shop.moen.com/products/ca87003?variant=47989350826294




Photograph 20 – Page 6 from 103 PICTURES GR WORK.pdf



Photograph 21 – Zoom in on faucet.

**Kitchen [ IMG_1770472722381_LOSS.134131346946836126.jpg ]**



Photograph 22 – Page 55 from MICA_Photo_Report20260216_013824PM(UTC).pdf

**Kitchen [ IMG_1770472722437_LOSS.134131346946836126.jpg ]**



Photograph 23 – Page 67 from MICA_Photo_Report20260216_013824PM(UTC).pdf

**Kitchen [ IMG_1770472722166_LOSS.134131346946836126.jpg ]**



Photograph 24 – Page 75 from MICA_Photo_Report20260216_013824PM(UTC).pdf




Photograph 25 – Page 9 from 103 PICTURES GR WORK.pdf Note the many layers of flooring and the staining from a previous event.

LOSS#:134131346946836126 [ Loss_260208162239_7.jpg ]



Photograph 26 – Page 33 from MICA_Photo_Report20260216_013824PM(UTC).pdf

LOSS#:134131346946836126 [ LOSS_6135866_IMG_6103.jpeg ]



Photograph 27 – Page 49 from MICA_Photo_Report20260216_013824PM(UTC).pdf
Note the many layers of flooring.

## Section II
## CONCLUSIONS

We affirm our conclusions one through three made in our original **Report of Findings**. Conclusion four has been added as stated below. The conclusions from our original **Report of Findings** are provided below for reference.

1. The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line. This was the only observed source of water noted during the site inspection and review of mitigation photographs.

2. Mechanical damage to the stainless-steel supply line led to fraying and fracture of individual strands within the braiding, which likely punctured the inner hose, resulting in small weeps onto the stainless-steel surface. The accumulation of chlorides from the city water on the stainless steel strands likely led to stress corrosion cracking (SCC) of the stainless-steel supply line. Once the braided reinforcement was compromised, the line pressure was sufficient to rupture the polymer liner, resulting in the water event.

3. Destructive analysis, including scanning electron microscopy (SEM) and energy dispersive spectroscopy (EDS), would be needed to confirm SCC as the fracture mechanism..

### Supplemental Conclusions

4. Based on the provided documentation and observations made during the Rimkus site inspection, the dark discoloration observed at the ground-level bathroom plywood subfloor area was consistent with an additional source of water damage.

Photograph 28 – File page 4 from 060776715 Rimkus Engineer's Report.pdf

FORENSIC™ ANALYSIS & ENGINEERING

Matthew Pohlman
060776175-01
500-3741-VA-26L
Date of Loss/Damage: January 14, 2026

## Section III
## DISCUSSION

**Background**

The property at 103 Court Deayllon was a 3-bedroom, 2.5-bathroom, 1,824-square-foot, single-family residence, originally built in 1973 and last sold in 2014 to the current owners.[1] The subject residence was reportedly serviced by the local municipal water supply.[2] On January 14, 2026, a water leak reportedly occurred in the cabinet underneath the kitchen sink. The source of the water was a breach in the braided stainless steel water supply line feeding the faucet, identified as a Moen Single-Handle High Arc Pulldown Kitchen Faucet, Model Number CA87003BRB.[3] This model included a pull-down hose, which allowed for the extension of the dispensing wand/faucet (**Figure 1**). During extension of the faucet, the pull-down hose supply line moved up and down, adjacent to the supply line connection, beneath the sink.



**Figure 1** - Quick connect hose connection between supply line and pull-down hose (left) and replacement hose kit.

[1]Property Information, from 103 Ct Deaylion, Poquoson, VA 23662 | Redfin accessed March 10, 2026.
[2]Newport News, VA Waterworks, from https://www.nnva.gov/2750/Drinking-Water-Quality, accessed March 11, 2026.
[3]Replacement hose from Moen, from https://shop.moen.com/products/150259?variant=48238025179446, accessed March 11, 2026.

Photograph 29 – File page 5 from 060776715 Rimkus Engineer's Report.pdf

The photographs within Safeco Insurance Company Onsite Inspection Report, dated February 13, 2026, were reviewed. These photographs were taken after the "partial mitigation demo" phase of the remediation work was completed. As shown in the provided Photograph 12 from this document, there was localized dark discoloration in the plywood subfloor concentrated around the toilet area, where the O-ring seal meets the subfloor, as shown below, in **Figure 2**:



**Figure 2:** Photograph 12 taken from the Safeco Insurance Company Onsite Inspection Report.

Although there were other areas where the plywood subfloor looked slightly discolored or worn, the toilet area was the only area of note that displayed signs of a potential independent leak source. The ground-level dining room and entry foyer had also been demolished, with several layers of subfloor and finished floor removed prior to the Rimkus site inspection. These areas did not show any signs of independent water leaks, but these areas had also had multiple layers of flooring removed prior to the Safeco Insurance Company site visit, as well as the Rimkus site inspection.

Photograph 30 – File pages 7-8 from 060776715 Rimkus Engineer's Report.pdf

Dear Matthew Pohlman,

We're writing to inform you that we completed our review of your claim based on information provided by you or on your behalf. The following is a summary of our findings and position on coverage for this claim.

The insurance policy provides coverage subject to policy terms and conditions. Based on our review of the policy, there is no coverage available for your loss as outlined below.

**Claim Details**

Our first notice of loss was on 01/17/2026. It was reported as an Accidental/Sudden Plumbing/HVAC - Broken Pipe/Hose/Fixture loss.

Our review of your claim revealed the following relevant information:

During our onsite inspection, water damage was found in your kitchen, dining room, living room, hallway, family room, bathroom, pantry, and crawlspace. Rimkus Engineering completed an onsite inspection of your home on 02/18/2026. The damaged pipe was sent to lab facilities where the cause of loss was confirmed as a long-term leak due to the individual frayed/fractured stainless-steel strands puncturing the inner lining, creating a slow

1PDEN First Party Coverage Denial |060776175-01| Page 1 of 4

Safeco Insurance™
A Liberty Mutual Company

water weep. The observed deterioration condition of the materials in the kitchen and surrounding rooms impacted in the loss were consistent with a long-term seepage issue. The engineer also confirmed a secondary leak that occurred in the bathroom wax ring causing deterioration and water damage in the observed material. The policy will not extend coverage for this loss as the policy excludes long-term seepage, deterioration, and wear and tear.

The additional demolition you conducted after being advised not to do so as we investigated coverage denied Safeco Insurance the ability to conduct an unprejudiced investigation. This is a breach of the Insured Duties After a Loss as outlined in the policy conditions.

Photograph 31 – From pages 1-2 from Pohlman Full Denial Letter Final.pdf

**Our Coverage Position**

Based upon the information available to date, the grounds for our denial of coverage under the Policy, or under applicable law, with respect to the claim, include, but are not limited to, the following:

The policy does not provide coverage for continuous or repeated seepage or leakage of water or steam, or the presence or condensation of humidity, moisture or vapor which occurs over a period of weeks, months or years,

1PDEN First Party Coverage Denial 060776175-01 Page 3 of 4

Safeco Insurance™
A Liberty Mutual Company

whether hidden or not. Because the damage was caused by a long-term leak, you have no coverage for the claim.

Based on these grounds, no insurance coverage is available to you for the claim. While we sought to identify and address all relevant insurance coverage considerations above, these specific considerations are not intended and should not be understood as a waiver of any other right or basis we may have to deny coverage, and we reserve all rights in this regard.

If you have any information you believe may impact our coverage position, please bring it to our immediate attention, so we may assess whether such information or pleading impacts our coverage position or obligations.

Photograph 32 – From pages 3-4 from Pohlman Full Denial Letter Final.pdf

RIMKUS

5707 S. Laburnum Avenue
Richmond, VA 23231
(757) 229-2226

# Second Supplemental Report of Findings

Pohlman Plumbing Evaluation
Claim Number: 060776175

Rimkus Matter No: 100332953

Prepared For:
Liberty Mutual Insurance Company
175 Berkeley Street
Boston, MA 02116

Attention:
Ms. Alexia Lawson

Digitally signed by: Gregory M Smith
Date: 2026.05.27 12:19:24 -04'00'

Gregory M. Smith, Ph.D., P.E.
Virginia Engineering License No. 0402071960
Principal Consultant

COMMONWEALTH OF VIRGINIA
GREGORY MICHAEL SMITH
Lic. No. 0402071960
PROFESSIONAL ENGINEER

Jack Burkhardt

Jack Burkhardt
Senior Consultant

EXHIBIT
tabbies
H

May 27, 2026

[redacted]

# TABLE OF CONTENTS


| | | |
|---|---|---|
| I. | Introduction | 1 |
| II. | Conclusions | 2 |
| III. | Discussion | 5 |
| IV. | Basis of Report | 11 |
| V. | Attachments | 13 |
| | A. Curricula Vitae | |

# Section I
# INTRODUCTION

On the morning of January 14, 2026, a reported water leak located underneath the kitchen sink was discovered within the residence owned by Mr. Matthew Pohlman (Mr. Pohlman), located at 103 Court Deayllon in Poquoson, Virginia.

Rimkus was retained to conduct a site inspection of the property and to determine the cause of the reported water leak. Jack K. Burkhardt, P.E., Rimkus Senior Consultant, conducted a site inspection of the subject property on February 18, 2026. Following the Rimkus site inspection, the faucet and hose assembly were photo-documented and collected. Mr. Burhardt's images and notes were the basis for this report.

Subsequent to our initial **Report of Findings,** Rimkus was asked to address whether the water damage observed in the documentation provided, and conditions observed on site, were indicative of additional leak sources, separate from the reported sink loss, the findings of which were included in a March 25, 2026 **Supplemental Report of Findings**. Following that, Rimkus was also asked to review a May 6, 2026 report by Craig Callewaert, P.E., of Forensic Analysis & Engineering Corporation (FAEC).

This report was prepared for the exclusive use of Liberty Mutual Insurance Company and is not intended for any other purpose. The opinions and conclusions herein are based on sufficient facts or data; they are the product of our analysis utilizing reliable, generally accepted principles and methods in our applicable professional field; and they reflect a reliable application of these principles and methods to the facts of this matter. This report is based on the information available to us at this time, as described in the **Basis of Report**. Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on the opinions and conclusions set forth herein and to revise these opinions and conclusions if necessary. This report was reviewed by Mr. Richard Rambacher, Practice Leader.

## Section II
## CONCLUSIONS

We affirm our Conclusions 1 through 4, made in our original **Report of Findings** (Conclusions No. 1 through 3) and **Supplemental Report of Findings** (Conclusion No. 4). Conclusion 5 has been added as stated below to reflect new information gathered during the review of Mr. Callewaert's report. The conclusions from our original **Report of Findings** are provided below for reference.

1. The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line. This was the only observed source of water noted during the site inspection and review of mitigation photographs.

2. Mechanical damage to the stainless-steel supply line led to fraying and fracture of individual strands within the braiding, which likely punctured the inner hose, resulting in small weeps onto the stainless-steel surface. The accumulation of chlorides from the city water on the stainless steel strands likely led to stress corrosion cracking (SCC) of the stainless-steel supply line. Once the braided reinforcement was compromised, the line pressure was sufficient to rupture the polymer liner, resulting in the water event.

3. Destructive analysis, including scanning electron microscopy (SEM) and energy dispersive spectroscopy (EDS), would be needed to confirm SCC as the fracture mechanism.

4. Based on the provided documentation and observations made during the Rimkus site inspection, the dark discoloration observed at the ground-level bathroom plywood subfloor area was consistent with an additional source of water damage.

### Supplemental Conclusions

5. The findings of the May 6, 2026 FAEC Report included 11 conclusions. The Rimkus response to each conclusion is provided in detail in the Analysis section. A summary response to each conclusion is shown below:

   a. Rimkus agrees with *FAEC Conclusion 1*; however, we note (and being applicable to later conclusions) that Rimkus had previously identified the incident faucet as

manufactured by Moen, based on information provided by the homeowner, and agrees it is likely not a Moen faucet. Mr. Calleaert provided no additional affirmative identification of the faucet, except for the reported identification of the manufacturer by the Homeowner. No additional documentation was provided to substantiate the make or model of the faucet. The identification of the faucet as being manufactured by Glacier Bay relies exclusively on the homeowner's information. While the faucet may not be a Moen, we cannot be certain it was manufactured by Glacier Bay. Its manufacturer makes no substantive difference to the cause of the loss.

b. Rimkus neither agrees nor disagrees with *FAEC Conclusions 2 and 3*. As stated, these FAEC Conclusions do not contain an opinion or finding.

c. Rimkus agrees with *FAEC Conclusions 4 and 5* related to the different reported manufacturers of the faucet, but disagrees that manufacturer identification has a meaningful impact on the investigation or conclusions. The manufacturer does not change the location of the reported failure, failure mode, underlying mechanism, or the result of the hose burst.

d. Rimkus agrees with *FAEC Conclusion 6*.

e. Rimkus disagrees with *FAEC Conclusion 7*, that the "*potential source of damage does not exist,*" simply because of a misidentification of the faucet. The burst occurred on a supply line hose, damage to which very much existed and which Mr. Caelleaert described elsewhere in his report. While the faucet manufacturer was potentially misidentified, the stainless-steel braided water supply hose, which contained the subject rupture, was properly identified throughout the Rimkus analysis. Mr. Caelleaert also identified the fraying and fracture damage of the stainless-steel braiding and even suggests several different mechanical causes for said damage.

f. Rimkus agrees with *FAEC Conclusions 8 and 9*.

g. Rimkus neither agrees nor disagrees with *FAEC Conclusions 10 and 11* related to the analysis of the SafeCo Insurance (SafeCo) denial letter. As written, our Conclusion 4 references additional, prior water damage present in the residence, unrelated to the subject water intrusion, which, while likely to have occurred in a

matter of seconds, as stipulated by Mr. Caelleaert, the damage to the external surface of the supply line, as evidenced by the ongoing corrosion and staining, reflects long-term degradation of the supply line.

# Section III
# DISCUSSION

**Review of Forensic Analysis & Engineering Corporation Report**

The May 6, 2026 Forensic Analysis & Engineering Corporation (FAEC) report by Craig Calleaert, P.E., reviews broad details of the water loss at 103 Court Deayllon as well as details of the Safeco Insurance claim denial letter. Rimkus's review of the FAEC report will be focused on the evaluation of the report's technical merits and rebuttal of Rimkus's prior conclusions.

In the report, Mr. Calleaert stated 19 observations and findings, which include discussion of the subject faucet and its attributes and manufacturer, make, and model (Observations & Findings Nos. 1 through 7). Mr. Calleaert identifies a potential misidentification in the original Rimkus report, which identified the incident faucet as a Moen CA87003BRB, which Rimkus had made based on homeowner identification and a replacement Moen faucet installed post-incident (Observations & Findings Nos. 8 through 10). Mr. Calleaert reported the faucet to be a Glacier Bay product, purchased from Home Depot, but does not provide further model details or purchase information. Upon further review, Rimkus agrees that the subject faucet was likely not a Moen faucet, but has not provided further evidence to support it being manufactured by Glacier Bay or others.

Mr. Calleaert continued to describe the events of the loss as well as the mitigation procedures that were conducted at the Pohlman residence following the subject water leak (Observations & Findings Nos. 11 and 12).

Observations & Findings No. 13 discussed Mr. Caelleaert's review of the Rimkus report, and his agreement with Rimkus Conclusions 1, 3, and 4. With regards to Rimkus Conclusion 3, Mr. Caelleaert stated, "...the exact failure mechanism does not need to be known. The stainless-steel braiding had weakened, leading to a sudden and unexpected burst rupture of the hot water faucet supply line, resulting in the water event."[1] Regarding Rimkus Conclusion 2, Mr. Caelleaert stated he "Partially Agree (sic), the stainless-steel braiding had fraying and fracture damage. It is, however, highly unlikely that these small frays and fractures could puncture the inner hose. It is more likely that these frays and

[1]May 6, 2026, FAEC Report, Pg. 6

fractures themselves cause weakening of the cover and eventual burst failure". While he dismisses the contention of a pulldown hose loop as a potential mechanism for abrasion, he does identify other mechanical modes of abrasion to the supply line, including the proximity of other hoses and under-sink storage. He does not include installation-related abrasion in that discussion.

The subsequent observations and findings (Observations & Findings Nos. 14 through 19) address verbiage stated within the Safeco Insurance denial letter and Mr. Caelleaert's discussion of said language. This will not be directly addressed by Rimkus; however, it is worth noting that Mr. Caelleaert's assertion in Observations & Findings No. 16 is in agreement with Rimkus's prior findings – the long-term and ongoing slow weep or leak was indicated as the cause of the stainless-steel braid degradation and not an independent source or cause of water damage.

At the end of his report, Mr. Caelleaert stated 11 conclusions. These are restated below, followed by a Rimkus response.

**FAEC Conclusion 1:** *The subject is a commercial style (or spring pull down style) kitchen faucet, claimed to be a Glacier Bay (Home Depot) brand. The hot water supply line to the faucet burst, leading to water damage in the home located at 103 Deayllon Court in Poquoson, Virginia.*

**Rimkus Response:** Rimkus agrees. Rimkus had previously identified the incident faucet as a Moen, based on information provided by the homeowner, and agrees it is likely not a Moen faucet. Mr. Calleaert provided no additional affirmative identification of the faucet, except for the reported identification of the manufacturer by the homeowner. No additional documentation was provided to substantiate the make or model of the faucet.

**FAEC Conclusion 2:** *The faucet and its connection lines were analyzed and reported by Rimkus, an engineering firm in Richmond, VA. The original report was not available for review, but a follow-up supplemental report was available - the March 25, 2026, Rimkus report, Supplemental Report of Findings, Rimkus matter no. 100332953.*

**Rimkus Response:** Rimkus neither agrees nor disagrees. As stated, the FAEC Conclusion does not contain an opinion or finding and is rather just stating Rimkus's prior scope.

**FAEC Conclusion 3:** *Other documents were obtained and reviewed including photograph compilations by water mitigation companies GR Management and Stanley Steemer. Other miscellaneous documents and correspondence were also obtained. The complete list of documents is shown in Appendix A.*

**Rimkus Response:** Rimkus neither agrees nor disagrees. As stated, the FAEC Conclusion does not contain an opinion or finding and is rather just stating FAEC's scope and materials reviewed.

**FAEC Conclusion 4:** *Although the subject faucet is called a pull-down faucet, the sprayer hose is fixed. The sprayer can be unhooked from its mount and moved where desired, flexibility provided by the flexible hose and guide spring on the high arch. As such, a third line with a loop and weight typical of most pull-down faucets does not exist on this model of faucet.*

**Rimkus Response:** Rimkus agrees. Rimkus had previously identified the incident faucet as a Moen, based on information provided by the homeowner.

**FAEC Conclusion 5:** *Errors identified in the Rimkus report include misidentification of the subject faucet as a Moen faucet and the presence of a third pull down hose line causing mechanical damage to the supply lines. The subject faucet is not a Moen and does not have a third pull down hose line.*

**Rimkus Response:** Rimkus agrees that the hose was misidentified; however, disagrees that this has a meaningful impact on the investigation or conclusions. Rimkus had previously identified the incident faucet as a Moen, based on information provided by the homeowner and the subsequently installed faucet. However, this does not change the location of the reported failure, failure mode, underlying mechanism, or the result of the hose burst.

**FAEC Conclusion 6:** *The three conclusions and a fourth supplemental conclusion were evaluated. The first conclusion is correct; all evidence suggests the burst hose was the single source of water creating the damage observed and requiring extensive mitigation.*

**Rimkus Response:** Rimkus agrees. Rimkus had previously identified the source of water as the burst/rupture of the stainless-steel hot-water supply line beneath the kitchen sink

(Rimkus Conclusion 1). The discoloration observed in the ground-floor bathroom subfloor was consistent with an additional source *of prior* water damage.

**FAEC Conclusion 7:** *The second conclusion was regarding the source of damage to the stainless-steel braid wires. As the faucet was misidentified, the potential source of damage does not exist, and the speculations here need to be reconsidered.*

**Rimkus Response:** Rimkus disagrees that the "*potential source of damage does not exist,"* simply because of a misidentification of the faucet. The burst occurred on a supply line hose, damage to which very much existed and which Mr. Caelleaert described elsewhere in his report. While the faucet manufacturer was potentially misidentified, the stainless-steel braided water supply hose, which contained the subject rupture, was properly identified throughout the Rimkus analysis. Mr. Caelleaert also identified the fraying and fracture damage of the stainless-steel braiding and even suggests several different mechanical causes for said damage.

It should be noted that Mr. Calleaert has not provided any affirmative identification of the incident faucet. However, Rimkus reviewed several potential candidate Home Depot/Glacier Bay facets, including Model HD67458, which was labeled both as the Paulina Single-Handle Spring Neck Pull-Down Sprayer Kitchen Faucet and the Gage Single-Handle Spring Neck Pull-Down Sprayer Kitchen Faucet With Soap Dispenser. The respective Installation and Care Guide contained a warning, "NOTE: The hot side inlet tube is indicated by a label. Avoid twisting wires together or placing the wires close to each other and damaging." In Rimkus's experience, similar supply lines by other manufacturers often will contain similar warnings in their installation literature, cautioning against abrasion, kinking, or other hose damage.

**FAEC Conclusion 8:** *The third conclusion identifies suggested testing for identifying the exact failure mechanism. This conclusion is correct; additional testing is needed to determine the wire braid and supply hose failure mechanism.*

**Rimkus Response:** Rimkus agrees.

**FAEC Conclusion 9:** *The fourth supplemental conclusion is correct; "Based on the provided documentation and observations made during the Rimkus site inspection, the dark discoloration observed at the ground-level bathroom plywood subfloor area was*

*consistent with an additional source of water damage." The discoloration indicates a separate prior event, likely occurring years before the faucet failure and resulting in water loss. This earlier event (likely a failed toilet wax ring) did not contribute to the water damage that was observed or remediated.*

**Rimkus Response:** Rimkus agrees.

**FAEC Conclusion 10:** *The insurance denial letter was evaluated. Two details in the Claim Details section were clearly counter to statements made in the Rimkus report. The first statement; "the cause of loss was confirmed as a long-term leak" was clearly counter to the Rimkus report conclusion "The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line." The second statement; "The engineer also confirmed a secondary leak that occurred in the bathroom wax ring causing deterioration and water damage in the observed material" is clearly counter to the complete conclusion I in the Rimkus report stating: "The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line. This was the only observed source of water noted during the site inspection and review of mitigation photographs."*

**Rimkus Response:** Rimkus neither agrees nor disagrees with the analysis related to the SafeCo denial letter, but agrees as to the restating of conclusions from the Rimkus report. Conclusion 4 stated in the Supplemental Report of Findings referenced an additional, prior water damage present in the residence.

**FAEC Conclusion 11:** *The summarizing statement in the Our Coverage Position section was also counter to the Rimkus report and other facts found in the other documentation. The statement "The policy does not provide coverage for continuous or repeated seepage or leakage of water or steam, or the presence or condensation of humidity, moisture or vapor which occurs over a period of weeks, months or years whether hidden or not" is clearly counter to the Rimkus report conclusion "The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line. Obviously, a burst occurs in seconds, not weeks, months or years.*

**Rimkus Response:** Rimkus neither agrees nor disagrees with the analysis related to the SafeCo denial letter. As stated in our Conclusion 1, "The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply

line". While this burst likely occurred in a matter of seconds, as stipulated by Mr. Caelleaert, the damage to the external surface of the supply line, as evidenced by the ongoing corrosion and staining, reflects long-term degradation of the supply line.

## Section IV
## BASIS OF REPORT


1. Property Information, https://www.redfin.com/VA/Poquoson/103-Ct-Deayllon-23662/home/49252359, accessed March 10, 2026.

2. On February 18, 2026, Jack K. Burkhardt, P.E., inspected the subject residence, located at 103 Court Deayllon in Poquoson, Virginia, and documented the physical inspection with photographs.

3. On February 18, 2026, Jack K. Burkhardt, P.E., interviewed the homeowner, Mr. Matthew Pohlman, during the Rimkus site inspection.

4. Product literature for the Moen Single-Handle High Arc Pulldown Kitchen Faucet was reviewed.

5. Safeco Insurance Company Site Inspection Photographs and additional PV and NPV Photographs provided to Rimkus.

6. ASM Handbook Volume 11: Failure Analysis and Prevention, ed. Brett A. Miller, Roch J. Shipley, Ronald J. Parrington, and Daniel P. Dennies. ASM International, 2021.

7. ASM Handbook, Volume 11A: Analysis and Prevention of Component and Equipment Failures, ed. B.A. Miller, R.J. Shipley, R.J. Parrington, D.P. Dennies. ASM International, 2021.

8. ASM Handbook Volume 13A: Corrosion: Fundamentals, Testing, and Protection, ed. Stephen D. Cramer and Bernard S. Covino, Jr., ASM International, 2023.

9. Newport News Waterworks, Newport News, VA, Drinking Water Quality, from https://www.nnva.gov/275/Drinking-Water-Quality, accessed March 11, 2026.

10. Newport News Waterworks, Newport News, VA, Combined Annual Summarizing Test Results from 2024 (*latest available*).

11. Engineering Report, authored by Craig Calleaert, P.E., dated May 6, 2026, was reviewed.

12. Home Depot website listings for Paulina Single-Handle Spring Neck Pull-Down Sprayer Kitchen Faucet in Stainless Steel, and Gage Single-Handle Spring Neck Pull-Down Sprayer Kitchen Faucet With Soap Dispenser in Stainless Steel, by Glacier Bay, and respective Installation and Care Guide, with shared model number, HD67458.

# Section V

# ATTACHMENTS

A. Curricula Vitae

## Section V

## ATTACHMENT A

# Curricula Vitae

RIMKUS

**Gregory Smith, Ph.D., P.E.**
Principal Consultant

229 West 28th St., 9th Floor
New York, NY 10001



(551) 215-0739

gregory.smith@rimkus.com

## Background

Dr. Gregory Smith is a Materials Scientist, licensed Professional Engineer (including Connecticut, Florida, Massachusetts, Maryland, New Jersey, New York, and Pennsylvania), and AMPP Certified Coatings Inspector (NACE CIP Level 2). Dr. Smith has a B.E. in Engineering Science, a B.S. in Marine Sciences, and a Ph.D. in Materials Science and Engineering from Stony Brook University, State University of New York. Dr. Smith has experience in the analysis and forensic investigation of failures and other technical issues related to mechanical equipment, products, components, and systems. Dr. Smith's prior experience has included a focus on both research and development and practical engineering-related failure analysis, statistical process control, process and design engineering, and mechanical/thermal testing.

Dr. Smith has experience with and has inspected various aerospace-, sea-, and land-based power generation systems heavy machinery equipment, chemical processing equipment, boilers, furnaces, water heaters, water circulation and supply systems, water filtration systems, HVAC systems and components, valves/actuators, heat exchangers, plumbing, piping, and fire suppression system failures (including valves, unions, fittings, couplings, sprinklers, piping and joints in copper, brass, steel, stainless steel, PEX, PVC/CPVC, and other materials), weld failures, metallurgical, and fire protection system failures. He combines his background in both materials science and mechanical engineering to provide an in-depth analysis of complex system and component failures. Additionally, he has over 10 years of experience working with surface engineering and protective coatings for corrosive, marine, and other harsh environments and for general corrosion protection, involving paints, polymers, and cladding.

Dr. Smith began his professional career working as a process engineer with a start-up firm developing characterization tools and sensors for process measurement of welding, plating, metallizing, plasma spray, thermal spray, and cold spray activities. This included advancing a DARPA-funded non-distributive evaluation (NDE) inspection program using flash infrared thermography (FIT) to identify and visualize defects below spray-coated Navy ship decks using a digital image correlation algorithm that he developed.

He extended his NDE coating inspection focus internationally at GKN Aerospace Engines Sweden, where he implemented an eddy current-based thickness probe for contact thickness measurement of complex geometry ceramic thermal barrier coating (TBC) layers applied to a range of FeCrAlY and NiCoCrAlY metallic bond coats and Fe, Ni, and Ti-based substrates. Additionally, Dr. Smith supported statistical process control and process

engineering for commercial aerospace-, land-, and sea-based power generation gas turbines in the development of test reduction plans, to reduce QC/QA test burdens, and supported failure analysis on critical systems.

Dr. Smith's Materials Science and Engineering graduate work focused on mechanical property characterization of spray-coated systems, including thermal spray and cold spray coating systems. Externally facing, he heavily supported an Army Futures Command program developing temperature-resistant diesel piston coatings for improved power generation in heavy duty track vehicles. Additionally, he supported process parameter development and mechanical testing for aerospace original equipment manufacturer (OEM) components, such as $Al_2O_3$ clearance coatings in turbine compressor sections and WC-CoCr and CrC-NiCr hard-chrome alternative materials in landing gear struts, where resistance to fatigue and impact-based damage was a primary concern.

As a Materials Research Engineer for the US Navy, Dr. Smith supported shipyards, warfare centers, regional maintenance centers, and Navy technical authorities on a wide range of corrosion-related mitigation and prevention efforts. He was recognized as an expert in surface preparation, non-skid materials, and research and development within NAVSEA 05P Coatings and Corrosion Control technical pyramid and directly supported updates to NAVSEA Standard Item 009-32 and 009-124 to improve technology transfer to shipboard and fleet operation. Dr. Smith worked with a range of polymeric and thermal spray coatings systems under MIL-PRF-32577, -23236, and -24667, and with a range of aluminum, stainless steel, CuNi, Inconel, and high-yield carbon steel material components. Additionally, he is certified as a NACE/SSPC Level 1 Coatings Inspector.

Dr. Smith is an active member of ASM's Thermal Spray Society sub-committee and involved in the publication and peer-review of the Journal of Thermal Spray Technology papers. He additionally mentors and supports graduate students at his alma mater and participates as a member of the Department of Materials Science and Engineering's Industrial Advisory Board (IAB), as well as an active member of the Long Island, New York, ASM Professional Society Chapter.

Dr. Smith has testified in multiple depositions and arbitrations regarding the origin and cause of mechanical and materials failures.

## Professional Engagements

- **Residential and Commercial**
  - Freeze-Related Pipe Freezes – Investigated pipe freeze bursts in unconditioned spaces or due to failure to maintain heat in the residence, including via heating degree day analyses.
  - Corrosion-Related Copper, Stainless Steel, and Other Metallic and Plastic Fitting/Plumbing Failures – Investigated fitting and plumbing systems faucet, pipe fittings, and connections and other plumbing failures from residual stress, contamination, water chemistry, and stress corrosion cracking.
  - Oil Storage Tank Leaks – Investigated metal corrosion within chemical processing plant, underground storage tanks leaks, and transport system failures resulting in oil or feedstock product spills.
  - HVAC Equipment Transit Damage – Investigated damage for commercial "all-in-one" HVAC unit and other mechanical systems after transit-related accidents, installation damage, and other incident damage.
  - Fire Suppression System Sprinkler Activations – Investigated plumbing- and sprinkler-related failures resulting in water damage to multiple spaces.
  - Drainage and Age-Related Plumbing Failures – Investigated drainage, HVAC, fire suppression, and mechanical failures resulting in damage to multiple units in luxury condominiums and commercial buildings.
  - Window and Glass Product Defects – Investigated multiple window-related failures, including those related to UV transmittance, mechanical failures, and staining.

- Furniture Accidents – Investigated product failures and resulting injuries from wood and metal furniture failures or collapses, resulting in assorted injuries.
- Paint and Surface Failures – Investigated widespread paint issues during repainting of residential condominiums, paint failures from parking structures, and on commercial applications.
- Roofing Paint Failures – Investigated paint failures on metal roofing coils.
- Beverage Dispenser System Failures – Investigated leaks, bursts, and damage to filtration components.
- Water Treatment and Membrane Failures – Investigated damage and effectiveness of water filter membranes, filter cartidges, and filter media.
- Cooking Appliances and Residential Appliance Failures – Investigated coffee machines, water dispensers, pressure cookers, etc. related to potential failures and resulting injuries.

- **Industrial**
  - Roller Bearing Surfaces – Evaluated surface coating options for a commercial fabricator for a friction-related component and performed tribological testing on a range of WC-Co, diamond-like carbon (DLC), MoS2, and dry-film lubricant (DFL) coatings.
  - Water Treatment and Storage Plant Paint Failures – Investigated coating failures on a range of water treatment and filtration plants, involving paint defects, application issues, and contaminant/foreign damage.
  - Heavy equipment paint failures – Investigated paint failures on equipment operating at a steel plant.
  - DoT Infrastructure Repair – Developed test procedures to assess strain tolerance, shear lag, and composite strengths of rebuild/repair materials applied using metal deposition and evaluated feasibility of repair as a function of base substrate hardness and yield strengths.
  - Diesel Piston Crowns – Developed a multi-layer surface coating for protection of diesel piston crowns under high-load operating conditions, with low thermal inertia for reciprocating operation.
  - Boiler System Corrosion – Investigated brewery corrosion scale and steam boiler failure related to lack of water treatment.
  - Surface and Flooring Failures – Investigated flooring delamination at a chemical treatment plant related to concrete surface preparation.
  - Hospital Floor Coating Failure – Investigated adhesive and flooring failures in a healthcare facility.

- **Aerospace**
  - TBC Turbine Failure – Investigated failure of TBC layers applied to Haynes 240 and Hastalloy X superalloy turbine exhaust casings, including compositional analysis, furnace cycle life, application and process data, and equipment cooling water temperatures to determine thermally grown oxide (TGO) differences, hardness, and strain tolerance stemming from base alloy chemistry differences.
  - Landing Gear Coating Optimization – Characterized residual stress differences due to processing and metallurgy of different cermet powders used in deposition of chrome-replacement landing gear coatings and performed fatigue measurements on coated Ti6, 4, and 4340 steel to provide recommendations to OEM for material selection and processing guidance.
  - Deposition Torch Influence on Compressor Clearance Coatings – Evaluated two deposition options for an OEM and performed microscopy and mechanical testing to determine quantity and effect of retained powder unmelts. Develop testing methodologies to measure in-plane fracture resistance of the resulting coatings to quantify functional differences and performance.
  - Structure Corrosion Failures – Investigated corrosion on structural longeron member due to hydraulic and other fluid contamination.

- **DoD, Navy, and Marine**
  - CuNi Seawater Valves – Mechanical and long-term environmental corrosion testing support for replacement of brush-plating with cold spray for corrosion repair. Generated process parameters and compliance data for different powder blends for use with different repair components as a function of both the corrosive nature of the operation environments and anticipated loading.
  - RAST Deck and Jet Blast Deflectors– Develop spray-applied Al-Ti and $Al\text{-}Al_2O_3$ wire-based coating system for protection of HY80/HY100 steel deck plate and facilitated a multi-year shipboard demonstration on an active DDG-51 class destroyer to prove effectiveness of the coating system in a shipboard environment and expanded application to a trial/demonstration phase of similar material on Nimitz class aircraft carrier aluminum jet blast deflection panels.
  - Shipboard Capstan – Developed WC-Ni and Fe-NiCr laser weld overlay coatings to protect exposed wear surfaces. Process and layer thickness optimization was performed to control residual stress and crack formation during cooling and full-scale systems were subjected to long-duration environmental exposure.
  - Flight Deck Tie-Downs – Improved durability of 4130 metal deck fittings. Existing, non-metallic coating layers would fail during operation and expose underlying metal to corrosive attack. In the course of a multi-agency program, developed a Si-doped diamond-like carbon (DLC) and Al-Ti wire-spray system to provide improved resistance.
  - Non-Skid Epoxy Coating Failure – Investigated failure of a two-component deck epoxy system, falling under MIL-PRF-42667, which had been applied over several thousand square feet of ship decking and prematurely failed. Evaluated the failed system versus a control with a range of accelerated corrosion, mechanical, and chemical analysis techniques. Differential scanning calorimetry (DSC) revealed the contractor had not adequately mixed the two-component system.

- **Fire and Explosions**
  - Gas Storage Cylinder Explosions – Investigated explosions and bursts in fuel and air gas cylinders, cylinder valve failures, and connector hose failures.
  - Biofuel Blend Steam Boiler Explosion – Investigated damage to a steam boiler related to burner fuel changes, resulting in an explosion.
  - Intumescent Paint Failure – Investigated adhesion and delamination of a multi-layer fire-retardant coating system on an external surface.
  - Metal Sintering Plant Explosion – Investigated hydrogen explosion in metals processing plant.
  - Clothes Dryers and Kitchen Appliance Fires – Investigation of residential fires with mechanical and electrical originations.

## Professional Experience

- **Rimkus** **2022 – Present**
  - Principal Consultant
    Provides materials engineering consulting services to law firms, insurance companies, and corporations for the purpose of determining the root cause of product and equipment failures. Determine materials and mechanical systems failures, based on corrosion, fatigue, wear, or environmental-based degradation of metallic, ceramic, composite, or polymeric components, systems, and structures.

- **US Naval Research Laboratory** **2018 – 2022**
  - Materials Research Engineer
    Initiated and directed programs as a Principal Investigator addressing dynamic corrosion-related naval issues and maintenance practices involving thermal spray, cold spray, directed energy deposition, and laser

cladding for use in gas turbines, hypersonic applications, aerospace structural rebuild, barrier protection, functional integration, and degraded material repair. Provided facilities support, technical advisement, surface and feedstock materials characterization, processing and parameter modifications, and laboratory assessment for thermal spray, cold spray, and laser cladding coatings via microscopy, digital image correlation, corrosion testing, uniaxial tensile and fatigue, and mechanical evaluation for warfare centers, maintenance depots, and shipyards. Solicited and developed programs with a range of government sponsors to address fleet needs and transitioned solutions to active service. Managed multi-million-dollar annual budgets, program scopes, reporting, and technical responsibilities of small teams.

- **Center for Thermal Spray Research** **2014 – 2018**
  - Coatings Researcher

  Managed R&D programs involving structural and functional integration of thermal spray coatings for commercial and government customers and collaborated with internal researchers and technicians to develop test plans, spray methodologies, and comprehensive reports. Developed R&D test methodologies and instrumentation techniques for industrially relevant characterization of thermal spray and cold spray coatings in component-level applications, including of high "thermal swing" diesel piston coatings, TBC and abradable gas turbine coatings, hypersonic applications, carbide hard-facing coatings, and metal rebuild/repair.

- **GKN Aerospace Engines Sweden** **2013 – 2014**
  - Process Engineer

  Optimized thermal spray process controls, performed failure analysis, and reported on long-term statistical trends to improve lean manufacturing capabilities and maintain ISO 9001 compliance in production of industrial coatings. Reduced OEM required testing frequencies and transitioned 20+ reduction plans through concise reporting of statistical trends, resulting in multi-million-dollar annual savings, including $1.2 million annually for a single component. Introduced eddy current NDE thickness measurements and calibration protocols into production use, revitalized a burner rig "hot" test for dynamic assessment of TBC performance, and optimized powder and coating metallography protocols.

- **ReliaCoat Technologies/Center for Thermal Spray Research** **2012 – 2013**
  - Project Engineer

  Supported spray-based coating processing, property data collection and analysis, and advanced a DARPA remote sensing program by developing an image-processing algorithm to identify sub-surface coating defects. Supported development of an in-situ thickness sensor and implemented changes to materials based on the coefficient of thermal expansion (CTE) and weld-induced stresses.

## Education and Certifications

- **Engineering Science, B.S.:** State University of New York, Stony Brook (2013)
- **Marine Sciences, B.S.:** State University of New York, Stony Brook (2013)
- **Professional Engineer (P.E.):** Connecticut Engineering No. PEN.0036905, Florida Engineering No. 102153, New York Engineering No. 107451; New Jersey Engineering No. 24GE05941200; Maryland Engineering No. 62040, Massachusetts Engineering No. 58785, and Pennsylvania Engineering No. PE096807
- **Materials Science and Engineering, Ph.D.:** State University of New York, Stony Brook (2018)
- **PADI Advanced Open Water Diver**
- **Association for Materials Protection and Performance (AMPP) Basic Coatings Inspector / CIP Level 2 Certification (formerly NACE/SSPC) CIP Level 2:** N-82104

## Continuing Education

- **Georgia Tech:** Materials Data Sciences and Informatics Short Course, via Coursera (online)
- **Pohang University of Science and Technology:** Ferrous Technology I & II, via Coursera (online)
- **SSPC:** Fundamentals of Protective Coatings (C1) Short Course (online)
- **Association for Materials Protection and Performance:** Corrosion eCourse (online), Coating Inspection Program Level 1, 2 Courses (In-person)
- **Assorted safety, hazardous waste, and ethics trainings** as part of professional memberships and license upkeep.

## Publications

- Liddell, H., Erickson, L., Tagert, J., Arcari, A., Smith, GM., Martin, J., **"Mode Mixity and Fracture in Pull-off Adhesion Tests,"** Eng. Fract. Mech., 281 (2023).
- Smith, GM., et al., **"Discernment of Adhesion/Cohesion Character of Cold Spray and Thermal Spray Particle Bonding to Drive Improvement of Structural Integration of Corrosion Repair Coatings"**, Navy Memorandum Report., 6130-20-10,210. (2021).
- Brown, RF., Smith, GM., Potter, J., Eden, TJ., **"Ultrasonic Consolidation Post Treatment of Composite CuNi Cold Spray Coatings: A Mechanical and Microstructure Assessment"**, J. Therm. Spray Technol., 30, 2069–2082. (2021).
- Gingrich, E., Tess, M., Korivi, V., Schihl, P., Saputo, J., Smith, GM., Sampath, S., Ghandhi, J., **"The Impact of Piston Thermal Barrier Coating Roughness on High Load Diesel Operation"**, Int. J. Engine Res., 3, 890–910. (2021).
- Weathers, B., Smith, GM., Miller, C., Zuk, D. **"Test Method for Constrained Compressive Properties of Rubber and Rigid Cellular Plastics"**, Technical test method assessment, NAVSEA PMS 450. (2020).
- Brown, RF., Smith, GM., Potter, J., Eden, TJ., **"Parameter Development via In-Situ Residual Stress Measurement and Post-deposition Analysis of Cold Spray CuNi Coatings"**, J. Therm. Spray Technol., 29, 1876–1891. (2020).
- Saputo, JC., Smith, GM., Lee, H., Sampath, S., Gingrich, E., Tess, M., **"Thermal Swing Evaluation of Thermal Barrier Coatings for Diesel Engines"**, J. Therm. Spray Technol., 29, 1943–1957. (2020).
- Liddell, H., Smith, GM., Erickson, L., **"Extraction of Mode Mixity and Other Fracture Data from Crack Paths in Pull-Off Adhesion Tests"**, 43rd An. Meet Adh. Soc., (2020).
- Smith, GM., et al., **"Observation of Residual Stress and Fatigue Behavior of SI-TS Nickel Coatings"**, J. Therm. Spray Technol., Spec. Issue on Res. Stress., 29, 1229–1241. (2020).
- Abbas, M., Smith, GM., Munroe, P., **"Microstructural investigation of bonding and melting-induced rebound of HVOF sprayed Ni particles on an aluminum substrate"**, J Surf. Coat. Technol., 402, 126353 (2020).
- Abbas, M., Smith, GM., Munroe, P., **"Microstructural characterization of HVOF-sprayed Ni on polished and oxidized stainless steel substrates"**, J. Therm. Spray Technol., 29, 1093-1110. (2020).
- Abbas, M., Smith, GM., Munroe, P., **"Microstructural Evolution and Bonding of HVOF Sprayed Ni Particles on Both Mild and Stainless-Steel Substrates"**, Surf. Coat. Technol., 394, 125909 (2020).
- Smith, GM., et al., **"On the System and Surface Performance of Thermally Sprayed Carbide Coatings Produced Under Controlled Residual Stresses"**, Surf. Coat. Technol. 387, 12536 (2020).
- Smith, GM., Smith, A., Sampath, S. **"Fracture Toughness of Thermal Spray Ceramics: Measurement Techniques and Processing Dependence"**, J. Therm. Spray Technol. 27, 1076–1089 (2018).

- Luo, X., Smith, GM., Sampath, S. **"On the Interplay Between Adhesion Strength and Tensile Properties...Part I and Part II"**, J. Therm. Spray Technol. 27, 296 –318 (2018).
- Smith, GM., et al., **"Orientation Dependent Thermal and Mechanical Properties of Plasma Sprayed Ceramics"**, J. Am. Cer. Soc., 101 (2018).
- Smith, GM. and Sampath, S., **"Sustainability of Metal Structures Via Spray Clad Remanufacturing"**, TMS JOM., 70, 512–520 (2018).
- Smith, GM., Higgins, O., Sampath, S. **"In-Situ Observation of Strain and Cracking in Coated Laminates by Digital Image Correlation"**, Surf. Coat. Technol. 328 (2017).
- Wang, Q., Seshadri, R.C., Smith, GM., Sampath, S., **"Sliding Wear Behavior of Air Plasma Sprayed Al2O3 Coatings Sealed with Aluminum Phosphate"**, Tribol. Int. 116 (2017).
- Smith, GM., et al., **"Eddy Current Measurement Technique for Bi-Layer Thermal Barrier Systems"**, ITSC 2015—Proc. Int. Therm. Spray Soc. (2015).

## Presentations

- **"Leaks, Lawsuits, and Liability: The intersection of materials failures and insurance through a series of case studies"**, American Society of Materials (ASM), Long Island, NY Chapter, Centereach, NY, March 20, 2024.
- **"Measurement of Interfacial Toughness in Thermal Spray Coatings"**, Stony Brook University, Consortium for Thermal Spray Research, Annual Meeting, June 14, 2023.
- **"Jet-Blast Deflector Surface Coating Modifications and MPR 1057 Update"**, Naval Research Laboratory, Code 6138 Port Engineer Program Annual Meeting, February 15 – 16, 2023.
- **"System and Surface Properties of Hard Facing Coatings"**, Stony Brook University, Consortium for Thermal Spray Research, Annual Meeting, August 3 – 4, 2022.
- **"Cold Spray Activities and Updates, NRL Code 6130"**, NAVAIR Cold Spray Technical Interchange Meeting, Pensacola, Florida, April 11-12, 2022.
- **"Enabling Structural Repair via Cold Spray Additive Manufacturing"**, NRL RAC New Start, Washington, DC, November 10, 2021.
- **"Chemical Powder Deposition via Laser for Ship Capstans-6850 Project"**, NRL RAST Working Group Meeting, Key West, FL, Feb. 25-26, 2020.
- **"Use of Process Diagnostics and Residual Stress Measurements for Characterization and Design of High-Velocity Spray Coatings"**, Consortium for Thermal Spray Technology Spring Meeting, Jun. 25, 2020.
- **"Moving Beyond Adhesion Characterization in High-Velocity Spray Coatings for Determination and Assessment of Structurally Integrated Properties"**, Consortium for Thermal Spray Technology Spring Meeting, Jun. 25, 2020.
- **"Mechanical Testing of Epoxy Free-Films to Assess Cure Behavior and Integrated System Performance"**, 2020 SSPC Coatings+, Long Beach, CA, Feb. 3-6, 2020.
- **"Mechanical Property Evaluation of Infrastructure and Heavy Machinery Overlay and Repair Coatings Enabled via Spray Processing"**, International Thermal Spray Conference, Yokohama, Japan, May 26 – 31, 2019.
- **"Spray-based Remanufacturing and Structurally Integrated Coatings"**, Consortium for Thermal Spray Technology 2019 Fall Meeting, GE Energy, Schenectady, NY, Nov. 12-13, 2019.
- **"DLA Aviation, MIDPAC, PHNSY & NRL Project Update"**, Briefing to MIDPAC N43 Commanding Officer CAPT Namam, Pearl Harbor Naval Shipyard, December 9, 2019.

- **"Overcoming Challenges and Obstacles in Measurement of Fracture Toughness of Plasma Sprayed Ceramics"**, ICACC 2018, Daytona Beach, FL. January 2018.
- **"Infrastructure and Heavy Machinery Restoration Enabled via Additive Manufacturing Spray Processing"**, ASM Long Island Chapter, Centereach, NY. September 2017.
- **"Bio-Inspired, Damage Tolerant Layered Coatings, Indo-US Bilateral Workshop on Coatings and Multi-Layers"**, Coorg, India. February 2016.
- **"Multi-System, Multi-Material Analysis for Thermal Sprayed Processing and Coatings"**, Institute for Plasma Physics, Czech Academy of Sciences, Czech Republic. August 2015.

## Patents

- **US20220356583A1:** Post-Treatment via Ultrasonic Consolidation of Spray Coatings
- **US20220011057A1:** Cooling System and Fabrication Method Thereof
- **Application 17/938,681, 2023:** Nozzle Assembly for Cold Spray

RIMKUS



**Jack Burkhardt, P.E.**
Senior Consultant

930 Harvest Drive, Suite 210
Blue Bell, PA 19422

(267) 649-1575

JBurkhardt@rimkus.com

## Background

Mr. Jack Burkhardt received his B.S. degree in Mechanical Engineering from Trinity College in 2011. He is a licensed professional engineer with a broad background of knowledge in mechanical engineering in commercial and residential construction. As a forensic engineer, he has provided consulting services for legal, insurance, and corporate clients in both plaintiff and defendant matters.

His professional background consists of over 10 years of experience in heating, ventilation, and air conditioning (HVAC) design, project management, construction management, and forensic engineering. Mr. Burkhardt has analyzed and determined the causations of mechanical component failures of consumer products, HVAC systems, plumbing systems, and fire protection systems. He has also investigated incidents and accidents related to equipment use and safety.

Mr. Burkhardt's technical evaluations of equipment failures include a variety of commercial and residential air conditioning systems and associated piping and ductwork, fire suppression systems, building envelope leaks, and refrigeration systems. His forensic experience includes investigating oil-fired boilers and furnaces, indoor air quality issues, kitchen hoods and cooking equipment, natural gas explosions, and product liability evaluation and testing of items such as electric cooktops, lawnmowers, and overhead rolling doors.

## Professional Engagements

- **HVAC Design and Analysis**
  - South Windsor, CT (2013), Provided projected heating and cooling load calculations for a new build-out and selected equipment for LEED-certified New Construction project. Accounted for and documented all HVAC-related LEED points.
  - New Haven, CT (2013), Performed heating and cooling load calculations for existing buildings and utilized energy modeling software to forecast upgrades and potential savings for local performing arts theatre.
  - Danbury, CT (2012), Designed and selected package of high-efficiency rooftop equipment and controls for industrial property. Provided utility company with projected energy savings for qualified tax incentive rebate.

- **Engineering and Construction Management**
  - Easton, PA (2020), Expanded the active hospital intensive care unit by overseeing the installation of additional medical gas outlets and associated piping.

- Scottsdale, AZ (2018), Managed the installation and implementation of high-efficiency variable refrigerant flow system with integrated controls for an out-of-the-ground, 40,000-square-foot retail store.
- Denver, CO (2017), Supervised the rebuild of severe water-damaged wing of shopping mall through a reconstruction of roof system and redistribution of rainwater runoff and storm drain piping.
- New York, NY (2016), Oversaw the installation and implementation of six submersible sump pumps and commercial-grade air dehumidifier in the basement-storage level of a newly constructed retail store to address excessive, ongoing humidity problems.
- New York, NY (2015), Investigated and fixed pipe freeze for a commercial client with exploded sprinkler pipe in a stock room.
- New York, NY (2014), Coordinated replacement of rooftop packaged equipment in high-traffic, densely populated area of lower Manhattan.

## Forensic Engagements

- **Mechanical Analysis**
  - Bristol, PA (2024), Mechanical evaluation of a material hoist lift and determined reusability and appropriate repair cost estimate for replacement components.
  - York, PA (2024), Performed load calculations to determine cooling demands for school classrooms served by PTAC units.
  - Milford, PA (2024), Investigated the failure of a residential water treatment system that leaked.
  - Pocopson, PA (2024), Evaluated the effects of a power surge to a commercial property and determined reusability of traction elevator system, HVAC system, and associated electrical components.
  - Glenolden, PA (2024), Investigated the cause of water loss within a residential B vent pipe installation.
  - Allentown, PA (2024), Evaluated the resultant damage to an overloaded tractor-trailer assembly.
  - Wilkes Barre, PA (2024), Conducted smoke damage evaluation to hotel property and assessment of hydraulic elevator system.
  - Kingston, PA (2024), Mechanical evaluation of water damage to laundromat equipment and determined reusability and appropriate repair cost estimate for replacement equipment.
  - Horsham, PA (2024), Determined cause of reported oil tank leak within an oil-fired furnace system.
  - Fairless Hills, PA (2023), Evaluated residential washing machine and associated stainless steel water supply hoses following reported water loss.
  - Lewes, DE (2023), Evaluated residential dishwasher circulation pump that reportedly failed and caused water damage to the property.
  - Coatesville, PA (2023), Investigated the PEX water supply piping system of an apartment complex that reportedly leaked.
  - Tamaqua, PA (2023), Evaluated black soot and smoke damage within a residential property related to a furnace heating system puffback.
  - Harrisburg, PA (2023), Evaluated a commercial fire pump system and determined reusability and appropriate repair cost estimate for replacement components.
  - Philadelphia, PA (2023), Evaluated a reported fuel contamination within the fuel system of a commercial vehicle.
  - Philadelphia, PA (2023), Assessed electrical service and hydraulic elevator system damage related to water intrusion.
  - Media, PA (2022), Investigated water loss causation related to an improperly pressed fitting on a copper domestic water supply line.
  - Wilmington, DE (2022), Evaluated an electrical short circuit within a commercial HVAC system.

- Harleysville, PA (2022), Evaluated a hydronic circulator pump and associated piping fittings within a commercial office complex.
- Bethesda, MD (2022), Evaluated a residential pipe freeze burst at an exterior hose bibb.
- Woodlyn, PA (2022), Evaluated a brass ball valve substituted for the plastic drain valve on a residential water heater that failed, causing water damage throughout the property.
- Lebannon, PA (2022), Mechanical evaluation of refrigerant piping and alarm system wiring of an indoor climate control system for a medical marijuana growing facility.
- Stroudsburg, PA (2022), Investigated the mechanical failure of a mobile fire pump that was being utilized for firefighter training by the county.
- Philadelphia, PA (2022), Evaluated the failure of a cast-iron sectional boiler serving the office and classrooms within a church building.
- Langhorne, PA (2021), Evaluated residential fuel oil-fired boiler and associated piping and equipment. Determined origin and cause of failure resulting in soot, smoke, and oil damage throughout the property.
- Saint Clair, PA (2021), Investigated a propane-fired water heater to determine the root cause of fire damage to a commercial laundromat.
- Elkins Park, PA (2021), Investigated failure and corrosion of cast-iron drainpipe serving commercial athletic facility.
- Hazleton, PA (2021), Evaluated and performed destructive testing on fire suppression hood system that failed to mitigate commercial kitchen grease fire.
- Princeton, NJ (2021), Evaluated hydraulic fluid line and associated equipment failure on a platform scissor lift at a commercial property loading dock.
- Philadelphia, PA (2021), Evaluated water leak in supply line of above-ceiling water source heat pump unit serving tenant in a commercial apartment complex building.
- Bridgeport, PA (2021), Evaluated fire damage to gas-fired, HVAC rooftop units serving a commercial property.
- Kunkletown, PA (2021), Investigated oil spill and associated equipment failure of a residential, oil-fired furnace heating system.
- Willow Grove, PA (2021), Evaluated brake system and associated controls for commercial-use aerial platform boom lift.
- South Sterling, PA (2021), Investigated pipe freeze within residential hydronic heating system served by oil-fired boiler unit.
- Chester, PA (2021), Investigated a reported dryer fire within a residential basement apartment unit.
- Paradise, PA (2021), Evaluated water damage to fire pump equipment and associated commercial property as a direct result of tropical storm.

## Professional Experience

- **Rimkus** **2021 – Present**
  - Senior Consultant

    Responsible for investigation and evaluation of deficiencies, failures, design, construction, maintenance, and operation of commercial and residential HVAC, plumbing, and fire protection systems. Capable of preparing damage assessments, repair estimates, as well as code compliance and safety evaluations.

- **Irwin & Leighton Commercial Builders** **2018 – 2020**
  - Project Superintendent
  
  Oversaw construction of commercial and residential projects including office buildings, retail stores, hospital renovations, and multi-family residential communities. Verified all MEP equipment, building materials, and finishes were installed in accordance with manufacturer requirements, local codes, and standards.

- **Shawmut Design & Construction** **2013 – 2018**
  - Project Manager/Project Superintendent
  
  Composed and evaluated detailed budgets and scopes of work for restoration and remodel projects in high-end retail division ranging from $50K to $10M. Worked closely with architects and engineers of record to determine constructability and implementation of design/build scope.

- **Controlled Air Inc.** **2011 – 2013**
  - HVAC Design Engineer
  
  Provided engineering analysis to the sales team on all design/build projects, evaluated existing HVAC equipment and building conditions on renovation projects, and selected new equipment to optimize overall mechanical system efficiency.

## Education and Certifications

- **Mechanical Engineering, B.S.:** Trinity College (2011)
- **Registered Professional Engineer:** Delaware, Maryland, and Pennsylvania
- **OSHA 30 Certified**

Liberty Mutual.
INSURANCE

AMERICAN ECONOMY INSURANCE COMPANY
P O BOX 701000, SALT LAKE CITY, UT 84170

JULY 28, 2026

GOODRICH & WATSON INSURERS INC
11837 ROCK LANDING DR STE 102
NEWPORT NEWS VA 23606-1492

AGENT TELEPHONE: 1-757 591-2032

MATTHEW POHLMAN
103 CT DEAYLLON
POQUOSON VA 23662-2241

Re: Notice of Nonrenewal — Homeowners Policy OF3392464

Dear Policyholder,

After careful consideration, we have concluded that we will not be able to renew your Homeowners insurance policy. Coverage will end at 12:01 a.m standard time on September 15, 2026.

While we regret this decision, we feel it necessary for the following reason:

We are nonrenewing this policy because the property no longer meets our underwriting guidelines due to a substantial change in risk. Our review identified long term water damage, seepage, and related deterioration. In addition, demolition that you carried out after being instructed not to do so during our coverage investigation prevented us from conducting an impartial investigation. This action constitutes a breach of the 'Insured Duties After a Loss' provision of the policy.

As you can see from the date and time shown above, your coverage does not end immediately. This should allow you enough time to arrange for other insurance before your policy expires. Your Independent Agent has been informed of this decision and can best advise you on the available options.

AMERICAN ECONOMY INSURANCE COMPANY
Personal Lines Underwriting

CN-7044/EP 11/95
G6

EXHIBIT
I

INSURED'S COPY

You have the right to obtain the specific reason(s) for this action (if not shown on the other side of this notice) by submitting a written request to us. You have the right to know the specific items of information that support the reasons given for the decision and the identity of the source of that information. You also have the right to see and obtain copies of documents relating to this decision.

If you ask us to correct, amend, or delete any information about you in our files and if we refuse to do so, you have the right to give us a concise statement of what you believe is the correct information. We will put your statement in our file so that anyone reviewing your file will see it.

If you would like additional information concerning this action, state law requires that you submit a written request within 90 business days of the date this notice was mailed to you. Please send your request to: Underwriting Manager, Safeco Personal Lines Underwriting, PO Box 704000, Salt Lake City, UT 84170-4000.

**IMPORTANT NOTICE If this notice was mailed to you after the first 90 days of coverage on this policy:**

You may request the Commissioner of Insurance review this action by writing to: Commissioner of Insurance, State Corporation Commission, P.O. Box 1157, Richmond, VA 23218. Your letter must be mailed within 10 days (15 if your policy included optional business liability coverage) of receiving this notice.

You may be eligible to obtain insurance through the Virginia Property Insurance Association or through another insurer. Please contact your agent or broker for details.

K&C KAUFMAN & CANOLES

Ahmed E. Mohamed Khalil
(757) 597.6410
ahmed.khalil@kaufcan.com

August 26, 2026

**VIA EMAIL and FIRST CLASS MAIL**

Tiffany Putenis, M.A., AINS, AIC-M, AIM
Claims Team Manager
Liberty Mutual Insurance Claims Department
c/o Claim #060776175-01
P.O. Box 5014
Scranton, PA 18505
Tiffany.putenis@libertymutual.com

and

Underwriting Manager
Safeco Personal Lines Underwriting
PO Box 704000
Salt Lake City, UT 84170-4000

| | | |
|---|---|---|
| **Re:** | **Claim No.:** | **060776175-01 (the "Claim")** |
| | **Policy No.:** | **OF3392464 (the "Policy")** |
| | **Insured:** | **Matthew Pohlman ("Mr. Pohlman")** |
| | **Location of Loss:** | **103 Court Deayllon<br>Poquoson, VA 23552 (the "Property")** |
| | **Date of Loss:** | **January 14, 2026** |
| | **Your Reference:** | **2-15194** |

Dear Ms. Putenis:

Please be advised that our firm has been retained by Mr. Pohlman in connection with the above referenced Claim and Policy.

It is our understanding that SafeCo Insurance is a division and/or subsidiary of Liberty Mutual Insurance ("Liberty Mutual"), and American Economy Insurance Company, the underwriter of the Policy, is a subsidiary under Liberty Mutual. We are in receipt of Liberty Mutual's March 25, 2026 claim denial letter (the "Claim Denial Letter"), a copy of which is enclosed herein as **Exhibit A.**

As you are aware, on or about January 14, 2026, a loss occurred at the Property due to the sudden burst of a hot water supply line (the "Supply Line") to a Glacier Bay commercial style kitchen faucet (the "Loss"). Upon discovery of the Loss, Mr. Pohlman promptly turned off the main water supply valve to the Property,



EXHIBIT
J
tabbies
kaufCAN.com

and engaged GR Management to assist with immediate and emergency water remediation, such as placing blower fans and dehumidifiers throughout the ground level of the property, and removing the fully saturated top floor boards off of the subfloor to allow the subfloor to dry properly and prevent mold growth. On or about January 17, 2026, Mr. Pohlman notified Liberty Mutual of the Claim, and on or about January 19, 2026, Liberty Mutual dispatched Stanley Steemer to the Property to perform the initial inspection, which involved moisture readings, documentation, and measurements. Mr. Pohlman was told that a POD would be delivered on January 21, 2026, but from an internal communication mixup between Liberty Mutual and Stanley Steemer, the POD did not arrive until January 26, 2026, and Stanley Steemer arrived that day to move boxes into the POD.

Stanley Steemer did not commence tear down work until January 27, 2026, and at Liberty Mutual's direction, removed the flooring and floor mounted cabinetry, making the home unlivable. Stanley Steemer began remediation/mitigation work on January 28, 2026, but Stanley Steemer did not (i) remove two saturated wet subfloor layers that were located beneath a layer of non-porous laminate in the bathroom, and could not dry, nor did they (ii) properly remove tar-like paper substances from the kitchen subfloor, which prevented that from drying properly as well. The work performed by Stanley Steemer was subpar, and Mr. Pohlman was not comfortable with the quality of the work. Stanley Steemer took final moisture readings and removed all equipment on or about February 1, 2026. Mr. Pohlman contacted Liberty Mutual on or about February 2, 2026 to express his dissatisfaction with Stanley Steemer. On February 2, 2026, Alexia Lawson-Hooks ("Ms. Lawson-Hooks") was the reassigned claim inspector. On February 3, 2026, Ms. Lawson-Hooks scheduled a site visit with Mr. Pohlman, and sent a Reservation of Rights letter to Mr. Pohlman, which indicated that the reason for the reservation of rights was due to a concern of long-term damage such as rot and black mold. A copy of the Reservation of Rights letter is enclosed herein as **Exhibit B.**

On February 5, 2026, Ms. Lawson-Hooks performed a walkthrough of the property, and informed Mr. Pohlman that she was not pleased with the work that Stanley Steemer had performed, as there were staples and nails protruding from the floor/subfloor, and did not clean particles or debris. Ms. Lawson-Hooks also indicated she was displeased with Stanley Steemer's decision to dispose of the flooring, cabinets, countertop, and sink without her being able to view the same, and specifically stated that a full "pack-out" was necessary, not a storage container in the driveway.

On February 7, 2026 Stanley Steemer returned to the Property to remove debris, staples, and nails, and to remove the tar-like paper on the kitchen subfloor. Additionally, Stanley Steemer also took moisture readings that day, and the moisture readings in the bathroom ranged from 50%-100% moisture. Stanley Steemer's representatives, including Michael Grant ("Mr. Grant"), a Water Restoration Manager with Stanley Steemer agreed that the multiple layers of subfloor in the bathroom were preventing proper drying, and contacted their corporate office for authorization to remove the same, but upon information and belief, their corporate office did not grant approval to remove those subfloor layers and for additional dehumidifiers. Mr. Grant thereafter advised Mr. Pohlman that they would need to remove the subfloor to protect the Property from further damage.

In order to protect the Property (as required under the Policy) from the immediate threat of wood decay, structural rot, and hazardous mold growth, Mr. Pohlman removed only those two wet subfloor layers, and

kept those outside next to the Property's garage for viewing and inspection by Liberty Mutual. Mr. Grant also informed Mr. Pohlman to continue circulating air in the Property and to increase the temperature to aid in the dehumidification process, as Stanley Steemer did not have authorization from Liberty Mutual to reinstall fans and dehumidifiers prior to departing the Property, despite the elevated moisture readings, until they were authorized by Liberty Mutual to return to the Property.

On February 10, 2026, Mr. Pohlman contacted Lisa Johnson ("Ms. Johnson"), his insurance agent, to detail the mishandling of the Claim and requested escalation to Liberty Mutual management. Ms. Johnson forwarded Mr. Pohlman's correspondence to Ms. Putenis, who responded that same day with Liberty Mutual's version of the timeline, and an accusation that Mr. Pohlman had violated the Policy by removing the two wet subfloor layers in order to protect the Property from further damage, despite the fact that they were preventing the remaining subfloor from drying and that the two subfloor layers that were removed remained at the Property, available for inspection.

Liberty Mutual retained Rimkus Consulting Group, Inc. ("Rimkus") to perform an inspection of the Property and investigate the source of the Loss. On or about February 18, 2026, Jack Burkhardt ("Mr. Burkhardt") conducted a site inspection of the Property, and prepared a report of his findings (the "Initial Rimkus Report"). Mr. Pohlman has never been provided with the Initial Rimkus Report. Subsequent to the Initial Rimkus Report, it appears that Liberty Mutual requested a supplemental report from Mr. Burkhardt as to whether the water damage observed in the documentation provided and conditions observed at the site inspection were indicative of additional leak sources. A copy of the Rimkus Supplemental Report of Findings (the "First Supplemental Rimkus Report") dated March 25, 2026 is enclosed herein as **Exhibit C.**

The First Supplemental Rimkus Report reaffirmed conclusions made in the Initial Rimkus Report; notably, it reaffirmed that "[t]he source of the water leak from beneath the kitchen sink was due to a **burst/rupture** of the stainless-steel hot-water supply line. **This was the only observed source of water** noted during the site inspection and review of mitigation photographs." Ex. C, pg. 2 (emphasis added). The First Supplemental Rimkus Report also noted, in connection with an old stain in the bathroom, that "[t]he dark, discolored plywood subfloor that remained in place where the toilet had been removed displayed signs of an independent leak source . . . the remaining subfloor discoloration pattern was not consistent with damage from the kitchen sink area." Ex. C, pg. 9.

Liberty Mutual issued the Claim Denial Letter to Mr. Pohlman the same day it received the First Supplemental Rimkus Report. Despite the clear findings in the Initial and First Supplemental Rimkus Report, in the Claim Denial Letter, Liberty Mutual wrongfully asserted, as its basis for denial of coverage of the Claim, that "[t]he policy does not provide coverage for continuous or repeated seepage or leakage of water . . . which occurs over a period of weeks, months or years . . . Because the damage was caused by a long-term leak, you have no coverage for the claim." Ex. A, pg. 3-4.

Subsequent to the Claim Denial Letter, Mr. Pohlman retained James H. Fletcher, P.E. ("Mr. Fletcher") to conduct a structural inspection and provide an opinion regarding damage to the floor system of the Property, including a professional review of the First Supplemental Rimkus Report. In connection with the same, Mr. Fletcher conducted a site visit on April 2, 2026, reviewed the First Supplemental Rimkus

Report, reviewed mitigation photographs and photographs of the Supply Line, and discussed the matter with Mr. Pohlman. On April 8, 2026, Mr. Fletcher provided a report of his findings and conclusions (the "Fletcher Report"), a copy of which is enclosed herein as **Exhibit D.**

Of particular note in the Fletcher Report is the conclusion that (1) the damage to the structural and sub-structural components is exclusively consistent with a single, sudden, high-volume water event, (2) there is no evidence of long-term or chronic water exposure that would result in the degradation of wood building materials, (3) the discoloration observed in the bathroom is a historical, dry-set stain from a previously repaired issue, and is not evidence of an ongoing leak contributing to the current loss. Ex. D, pg. 3.

Mr. Pohlman provided the Fletcher Report to Liberty Mutual but Liberty Mutual failed and refused to change its position, insisting on denial of the Claim based upon its position that the Loss was caused by water damage resulting from a continuous or repeated seepage or leakage of water over a period of weeks, months, or years.

Concurrently with the preparation of the Fletcher Report, Mr. Pohlman also retained Forensic Analysis & Engineering Corp. ("FAEC") on or about April 1, 2026, to review the First Supplemental Rimkus Report and the Claim Denial Letter. On or about May 4, 2026, Craig Callewaert, P.E. ("Mr. Callewaert") prepared a report of his findings (the "FAEC Report"), a copy of which is enclosed herein as **Exhibit E.** The FAEC Report noted that "all evidence suggests the burst hose was the single source of water creating the damage observed and requiring extensive mitigation", and in relation to the bathroom stain, that "the discoloration indicates a separate prior event, likely occurring years before the faucet failure and resulting water loss. This earlier event (likely a failed toilet wax ring) did not contribute to the water damage that was observed or remediated." Ex. E, pg. 5-6.

The FAEC Report further noted that the explanation in the Claim Details section of the Claim Denial Letter that "the cause of loss was confirmed as a long-term leak due to the individual frayed/fractured stainless-steel strands puncturing the inner lining, creating a slow water weep. The observed deterioration condition of the materials . . . impacted by the loss were consistent with a long-term seepage issue," was entirely counter to the conclusions in the First Supplemental Rimkus Report, which expressly stated that the cause of the Loss was a burst/rupture of the Supply Line.

After Mr. Pohlman provided the FAEC Report to Liberty Mutual, Liberty Mutual engaged Rimkus to provide another supplemental report to respond to the FAEC Report (the "Second Supplemental Rimkus Report") (the Initial Rimkus Report, First Supplemental Rimkus Report, and the Second Supplemental Rimkus Report, collectively, the "Rimkus Reports"), a copy of which is enclosed herein as **Exhibit F**. The Second Supplemental Rimkus Report, dated May 27, 2026, affirmed the conclusions that the source of the water leak beneath the kitchen sink was due to a burst/rupture of the Supply Line, that it was the only observed source of water, and that the discoloration related to the bathroom subfloor was referencing "additional, prior water damage, unrelated to the subject water intrusion." Ex. F, pg. 1-4.

Despite the voluminous, repeated confirmation that the cause of the Loss and source of the water damage was a sudden burst/rupture of the Supply Line, Liberty Mutual persisted in denying coverage for

the Claim based on a blatantly incorrect allegation that the Loss was caused by slow seepage of water and was therefore excluded under the Policy. This basis for denial is not supported by the any of the expert reports discussed above. As clearly outlined in the Rimkus Reports, the Fletcher Report, and the FAEC Report, the sole source of Loss was the sudden burst of the Supply Line. There is no basis for denial by Liberty Mutual on these grounds.

To the extent that Liberty Mutual now claims that the speculation that the burst was caused in part by long term degradation of the supply line is sufficient to deny the Claim, that is not an exclusion under the Policy. The Policy expressly states that coverage is provided for "ensuing loss" that results from wear and tear, marring, scratching, deterioration, corrosion, and mechanical breakdown. Accordingly, the Loss is covered under the Policy, and Liberty Mutual's repeated refusal to adhere to its obligations under the Policy despite three concurring expert opinions, one of which was provided by Liberty Mutual's own expert, is evidence of its bad faith.

We are also in receipt of Liberty Mutual's July 28, 2026 notice of nonrenewal of the policy (the "Nonrenewal Notice"). Both the Claim Denial Letter and the Nonrenewal Notice include the same mischaracterization that Mr. Pohlman's removal of two saturated subfloor layers constituted an unauthorized "demolition" in breach of the "Insured's Duties After a Loss" provision in the Policy. Liberty Mutual's position cannot be reconciled with the plain language of that same provision. Section I — Property Conditions, Paragraph 3.d of the Policy does not merely permit but affirmatively requires that Mr. Pohlman "protect the property from further damage" and "make reasonable and necessary repairs required to protect the property . . . ."

Following Liberty Mutual's own vendor, Stanley Steemer, leaving saturated subfloor material trapped beneath non-porous laminate, that trapped moisture presented an immediate and worsening risk of wood decay, structural rot, and mold growth absent further action. Importantly, Stanley Steemer itself recognized the potential issues that leaving the subfloor in place, without remediation, could cause. Mr. Pohlman's removal of the two affected subfloor layers was the protection of the Property that the Policy itself obligates him to perform. No written instruction directing Mr. Pohlman not to remove the subfloor was issued prior to removal; the first written correspondence addressing further removal of materials was not issued until February 10, 2026. And, as set forth above, the removal was confined to the two non-salvageable, saturated subfloor layers and did not touch, alter, or obscure the Supply Line identified as the source of the Loss. Those two subfloor layers were not disposed of or removed from the Property; they were relocated next to the Property's garage, where they remained, available for Liberty Mutual's inspection. Consequently, Rimkus, Fletcher, and FAEC were each able to complete a full inspection and reach a conclusive opinion on cause and origin. Liberty Mutual suffered no prejudice, and Mr. Pohlman's compliance with his obligations under the Policy to protect the Property from further damage cannot simultaneously serve as the basis for denying the Claim and for nonrenewing his Policy.

Additionally, per the language in the Nonrenewal Notice, please accept this correspondence as a request for the specific items of information that support the reasons given for Liberty Mutual's decision, the identity of the source of that information, and the copies of the documents relating to that decision. We would also ask that you place this record in your file so that anyone reviewing Mr. Pohlman's file will be able to review this letter.

Based on the foregoing, Mr. Pohlman demands that Liberty Mutual approve coverage of the Loss and process the Claim. If Liberty Mutual refuses to do so, Mr. Pohlman will have no choice but to file suit. Mr. Pohlman has already incurred $87,870.01 in out of pocket expenses (not including attorneys' fees) to repair the Property due to Liberty Mutual's failure to approve the Claim, and he is expected to incur an additional $9,684.00 to complete the repairs to the Property. Given Liberty Mutual's insistence on denying the Claim despite the clear evidence presented to it, Mr. Pohlman will be seeking his attorneys' fees pursuant to Virginia Code § 38.2-209.

Mr. Pohlman reserves all rights and remedies available to him at law or in equity. I ask that you contact me within fourteen (14) days of this letter to discuss.

Very truly yours,

Ahmed E. Mohamed Khalil

AMK/
Enclosures
cc: Matthew Pohlman

Safeco Insurance™
A Liberty Mutual Company

American Economy Insurance Company
P.O. Box 5014
Scranton, PA 18505-5014

CONTACT US

Alexia.Lawson-Hooks@LibertyMutual.com

Direct: (800) 225-2467
Fax: 888-268-8840

**American Economy Insurance Company**
P.O. Box 5014
Scranton, PA 18505-5014
800-332-3226

Safeco.com

Matthew Pohlman
103 CT DEAYLLON
POQUOSON, VA 23662-2241

March 25, 2026

| | |
|---|---|
| Claim Number: | 060776175-01 |
| Date of Incident: | 01/14/2026 |
| Insured: | Matthew Pohlman |
| Policy Number: | OF3392464 |
| Loss Location: | 103 CT DEAYLLON, POQUOSON, VA 23662-2441 |
| Underwriting Company: | American Economy Insurance Company |

Dear Matthew Pohlman,

We're writing to inform you that we completed our review of your claim based on information provided by you or on your behalf. The following is a summary of our findings and position on coverage for this claim.

The insurance policy provides coverage subject to policy terms and conditions. Based on our review of the policy, there is no coverage available for your loss as outlined below.

**Claim Details**

Our first notice of loss was on 01/17/2026. It was reported as an Accidental/Sudden Plumbing/HVAC - Broken Pipe/Hose/Fixture loss.

Our review of your claim revealed the following relevant information:

During our onsite inspection, water damage was found in your kitchen, dining room, living room, hallway, family room, bathroom, pantry, and crawlspace. Rimkus Engineering completed an onsite inspection of your home on 02/18/2026. The damaged pipe was sent to lab facilities where the cause of loss was confirmed as a long-term leak due to the individual frayed/fractured stainless-steel strands puncturing the inner lining, creating a slow

EXHIBIT
A

Safeco Insurance™
A Liberty Mutual Company

water weep. The observed deterioration condition of the materials in the kitchen and surrounding rooms impacted in the loss were consistent with a long-term seepage issue. The engineer also confirmed a secondary leak that occurred in the bathroom wax ring causing deterioration and water damage in the observed material. The policy will not extend coverage for this loss as the policy excludes long-term seepage, deterioration, and wear and tear.

The additional demolition you conducted after being advised not to do so as we investigated coverage denied Safeco Insurance the ability to conduct an unprejudiced investigation. This is a breach of the Insured Duties After a Loss as outlined in the policy conditions.

**Policy Information**

We issued the following Home Policy to Matthew Pohlman
Policy Number: OF3392464
Policy Period: 09/15/2025 - 09/15/2026

The applicable Policy form and relevant endorsements (your coverages) state in part:

**SAFECO HOMEOWNERS POLICY — VIRGINIA**
**INSURING AGREEMENT**
In reliance on the information you have given us, we will pay claims and provide coverage as described in this policy if you pay your premiums when due, comply with all applicable provisions outlined in this policy, and inform us of any change in title, use, or occupancy of the residence premises. This policy applies only to losses occurring during the policy period.

**SECTION I — PROPERTY COVERAGES**
**BUILDING PROPERTY LOSSES WE COVER**
We cover accidental direct physical loss to property described in Building Property We Cover except as limited or excluded.

**BUILDING PROPERTY LOSSES WE DO NOT COVER**
We do not cover direct loss caused by any of the following excluded perils:
...

**5.** Continuous or repeated seepage or leakage of water or steam from within a plumbing, heating, or air conditioning system or from within a domestic appliance which occurs over a period of weeks, months, or years.

**6. a.** wear and tear, marring, scratching, deterioration;
**b.** inherent vice, latent defect, mechanical breakdown;
**c.** smog, rust, corrosion, mold, fungus, wet or dry rot;

We provide coverage for ensuing loss that results from items 1. through 6. unless the ensuing loss is itself excluded under Building Property Losses We Do Not Cover in this Section.
...

**18. Planning, Construction, or Maintenance**, meaning faulty, inadequate, or defective:
**a.** planning, zoning, development, surveying, siting;
**b.** design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
**c.** materials used in repair, construction, renovation, or remodeling; or
**d.** maintenance;
of property whether on or off the ***insured location*** by any person or organization. However, any ensuing loss

Safeco Insurance™
A Liberty Mutual Company

not excluded is covered.

**COVERAGE D — ADDITIONAL LIVING EXPENSE AND LOSS OF RENT**
The limit of liability for Coverage D applies separately to **1.** and **2.** and includes any coverage provided under **3.** below. Coverage provided under 3. does not increase the limit of liability for **Additional Living Expense** or **Fair Rental Value.**

1. If a loss covered under this Section makes that part of the ***residence premises*** where you reside uninhabitable we cover **Additional Living Expense**, meaning any necessary increase in living expenses you incur so that your household can maintain its normal standard of living.

   Payment shall be for the time reasonably required to repair or replace the damage or, if you permanently relocate, the time reasonably required for your household to settle elsewhere.

...

The period of time under **1.**, above are not limited by expiration of this policy.

No deductible applies to this coverage.

**SECTION I — PROPERTY CONDITIONS**
...

**3. An Insured's Duties After Loss.** In case of a loss to which this insurance may apply, you must perform the following duties:
a. cooperate with us in the investigation, settlement or defense of any claim or suit;
d. protect the property from further damage, make reasonable and necessary repairs required to protect the property and keep an accurate record of repair expenses;
f. as often as we reasonably require:
(1) exhibit the damaged and undamaged property;
(2) provide us with records and documents we request and permit us to make copies; and
(3) submit to examinations under oath and subscribe the same.
...

**8. Suit Against Us.** No action shall be brought against us unless there has been compliance with the policy provisions and the action is started within two years after the inception of the loss or damage.

The Policy is incorporated by reference into this letter in its entirety. Although we have attempted to include all of the policy provisions that we believe are pertinent to this matter, the provisions set forth above in no way replace the provisions of the actual Policy issued. If you have any questions regarding the terms contained in the applicable Policy, you should refer to the Policy itself. To the extent there is any discrepancy between this letter and the Policy, the Policy controls.

**Our Coverage Position**

Based upon the information available to date, the grounds for our denial of coverage under the Policy, or under applicable law, with respect to the claim, include, but are not limited to, the following:

The policy does not provide coverage for continuous or repeated seepage or leakage of water or steam, or the presence or condensation of humidity, moisture or vapor which occurs over a period of weeks, months or years,

Safeco Insurance™
A Liberty Mutual Company

whether hidden or not. Because the damage was caused by a long-term leak, you have no coverage for the claim.

Based on these grounds, no insurance coverage is available to you for the claim. While we sought to identify and address all relevant insurance coverage considerations above, these specific considerations are not intended and should not be understood as a waiver of any other right or basis we may have to deny coverage, and we reserve all rights in this regard.

If you have any information you believe may impact our coverage position, please bring it to our immediate attention, so we may assess whether such information or pleading impacts our coverage position or obligations.

**We're Here To Help**

We understand this is disappointing news and we want to make sure you fully understand our decision. If you have any questions or concerns, please feel free to call or email me anytime.

Sincerely,

ALEXIA LAWSON-HOOKS
Claims Department

Safeco Insurance™
A Liberty Mutual Company

American Economy Insurance Company
P.O. Box 5014
Scranton, PA 18505-5014

CONTACT US

Alexia.Lawson-Hooks@LibertyMutual.com

Direct: (800) 225-2467
Fax: 888-268-8840

**American Economy Insurance Company**
P.O. Box 5014
Scranton, PA 18505-5014
800-332-3226

Safeco.com

Matthew Pohlman
103 CT DEAYLLON
POQUOSON, VA 23662-2241

February 03, 2026

| | |
|---|---|
| Claim Number: | 060776175-01 |
| Date of Incident: | 01/14/2026 |
| Insured(s): | Matthew Pohlman |
| Loss Location: | 103 CT DEAYLLON, POQUOSON, VA 23662-2441 |
| Policy Number: | OF3392464 |
| Underwriting Company: | American Economy Insurance Company |

Dear Matthew Pohlman

This letter confirms our receipt of the above-referenced Property Claim No. 060776175. We're writing regarding our on-going investigation of the damage from Water at the above-referenced location. As fully described in this letter, based on the known facts and review of the issued insurance policy, our continued investigation of the claim is subject to the following reservation of rights. We reserve the right to amend or supplement this coverage position as our investigation continues.

**Claim Details**

Our first notice of loss was on 01/17/2026.

The claim you submitted included the following information:

A hose from the shut-off valve to the front faucet exploded in the middle of the night, causing extensive water damage to multiple areas of the house including the kitchen, bathroom, hallway, dining room, kids playroom, and crawl space. The floor is rotted and black mold is present. Water is still leaking into the crawl space. The pipe has been repaired, but water mitigation is required. No personal items were affected.

**Policy Information**

Safeco Insurance™
A Liberty Mutual Company

We issued the following Home Policy to Matthew Pohlman

Policy Number: OF3392464
Policy Period: 09/15/2025– 09/15/2026

The applicable Policy form and endorsements state in relevant part as follows:

**SECTION I — PROPERTY COVERAGES**

**BUILDING PROPERTY LOSSES WE COVER**
We cover accidental direct physical loss to property described in **Building Property We Cover.** However, we do not cover loss caused by:
...

5. continuous or repeated seepage or leakage of water or steam from within a plumbing, heating or air conditioning system or from within a domestic appliance which occurs over a period of weeks, months or years;

6. **a.** wear and tear, marring, scratching, deterioration;
   **c.** smog, rust, corrosion, mold, fungus, wet or dry rot;

If loss to covered property is caused by water or steam not otherwise excluded, we will cover the cost of tearing out and replacing any part of the dwelling necessary to repair the system or appliance. We do not cover loss to the system or appliance from which water or steam escaped.

**COVERAGE D — ADDITIONAL LIVING EXPENSE AND LOSS OF RENT**
The limit of liability for Coverage D applies separately to **1.** and **2.** and includes any coverage provided under **3.** below. Coverage provided under **3.** does not increase the limit of liability for **Additional Living Expense** or **Fair Rental Value.**

1. If a loss covered under this Section makes that part of the ***residence premises*** where you reside uninhabitable we cover **Additional Living Expense,** meaning any necessary increase in living expenses you incur so that your household can maintain its normal standard of living. Payment shall be for the time reasonably required to repair or replace the damage or, if you permanently relocate, the time reasonably required for your household to settle elsewhere.

2. If a loss covered under this section makes that part of the ***residence premises*** you rent to others or hold for rental uninhabitable, we cover:
   **Fair Rental Value,** meaning the fair rental value of that part of the residence premises listed on your Policy Declarations you rent to others or hold for rental, less any expenses that do not continue while the premises is uninhabitable. However, we do not cover any fair rental value arising out of or in connection with ***home-sharing.***
   Payment shall be for the time reasonably required to repair or replace the damage.
   We do not cover loss or expense due to cancellation of a lease or agreement.

3. If a civil authority prohibits you from use of the ***residence premises*** as a result of direct damage to neighboring premises by a cause of loss we cover in this policy we cover the **Additional Living Expense** as provided under **1.** or **Fair Rental Value** as provided under **2.** above for no more than two weeks during which use is prohibited.

The period of time under 1., 2., and 3. above are not limited by expiration of this policy.
No deductible applies to this coverage

I am also required to direct your attention to Section 1 – Property Conditions, "Suit Against Us," within the policy that states, "No action shall be brought against us unless there has been compliance with the policy provisions and the action is started within two years after the inception of the loss or damage."

Safeco Insurance™
A Liberty Mutual Company

**SECTION I — PROPERTY CONDITIONS**
3. An Insured's Duties After Loss. In case of a loss to which this insurance may apply, you must perform the following duties:
a. cooperate with us in the investigation, settlement or defense of any claim or suit;
d. protect the property from further damage, make reasonable and necessary repairs required to protect the property and keep an accurate record of repair expenses;
e. prepare an inventory of the loss to the building and damaged personal property showing in detail the quantity, description, replacement cost and age. Attach all bills, receipts and related documents that justify the figures in the inventory;
f. as often as we reasonably require:
(1) exhibit the damaged and undamaged property;
(2) provide us with records and documents we request and permit us to make copies; and

The Policy is incorporated by reference into this letter in its entirety. Although we have attempted to include all of the policy provisions that we believe are pertinent to this matter, the provisions set forth above in no way replace the provisions of the actual Policy issued. If you have any questions regarding the terms contained in the applicable Policy, you should refer to the Policy itself. To the extent there is any discrepancy between this letter and the Policy, the Policy controls.

**Our Coverage Position**

Based on the information available, the reasons for our reservation of rights under the Policy or under applicable law include, but are not limited to, the following:

> We must review the file in full as there is concern of long-term damage such as rot and black mold that was reported in the home.

**INVESTIGATION UNDER A RESERVATION OF RIGHTS**

We will continue to investigate this loss, but we wanted to bring the above policy provisions to your attention as they may be applicable. We completely reserve our rights under the Policy and applicable law to apply the above provisions at a later date as warranted to the loss that may impact coverage for the loss. Please note that other provisions of the policy may also be relevant to the loss, and we reserve the right to rely on all such provisions. It is our intent to incorporate by reference all of the terms and conditions of the Policy through this reservation of rights.

If you have any information relative to the loss, please provide it to us at your earliest convenience.

Although we tried to identify and address above all relevant insurance coverage considerations, the foregoing specificity is not intended and should not be understood as a waiver or estoppel of any right or basis we have to disclaim coverage under the policy or applicable law, and we reserve all rights in this regard.

**We're Here To Help**

If you have any additional information, questions or comments related to this letter, please feel free to call me at (800) 225-2467 or email me at Alexia.Lawson-Hooks@LibertyMutual.com.

Sincerely,
ALEXIA LAWSON-HOOKS
Claims Department

Safeco Insurance™
A Liberty Mutual Company

RIMKUS

5707 S. Laburnum Avenue
Richmond, VA 23231
(757) 229-2226

# Supplemental Report of Findings

Pohlman Plumbing Evaluation
Claim Number: 060776175

Rimkus Matter No: 100332953

Prepared For:
Liberty Mutual Insurance Company
175 Berkeley Street
Boston, MA 02116

Attention:
Ms. Alexia Lawson

Jack K Burkhardt Digitally signed by: Jack K Burkhardt
DN: CN = Jack K Burkhardt C = US O = Unaffiliated
Date: 2026.03.25 13:08:41 -04'00'

Jack K. Burkhardt, P.E.
NJ Reg. Engr. Number GE024186300
Senior Consultant

STATE OF NEW JERSEY
JACK K. BURKHARDT
No. 24GE06186300
LICENSED
PROFESSIONAL ENGINEER

March 25, 2026

EXHIBIT
C

[redacted]

# TABLE OF CONTENTS


I. Introduction 1

II. Conclusions 2

III. Discussion 3

Background

Interview

Site Observations

Analysis

IV. Basis of Report 10

V. Attachments 11

A. Photographs

B. Curriculum Vitae

## Section I

## INTRODUCTION

On the morning of January 14, 2026, a reported water leak located underneath the kitchen sink was discovered within the residence owned by Mr. Matthew Pohlman (Mr. Pohlman), located at 103 Court Deayllon in Poquoson, Virginia.

Rimkus was retained to conduct a site inspection of the property and to determine the cause of the reported water leak. Jack K. Burkhardt, P.E., Rimkus Senior Consultant, conducted a site inspection of the subject property on February 18, 2026. Following the Rimkus site inspection, the faucet and hose assembly were photo-documented and collected. Mr. Burhardt's images and notes were the basis for this report.

Subsequent to our **Report of Findings**, Rimkus was asked to address if the water damage observed in the documentation provided and conditions observed on site were indicative of additional leak sources, separate from the reported sink loss.

This report was prepared for the exclusive use of Liberty Mutual Insurance Company and is not intended for any other purpose. The opinions and conclusions herein are based on sufficient facts or data; they are the product of our analysis utilizing reliable, generally accepted principles and methods in our applicable professional field; and they reflect a reliable application of these principles and methods to the facts of this matter. This report is based on the information available to us at this time, as described in the **Basis of Report**. Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on the opinions and conclusions set forth herein and to revise these opinions and conclusions if necessary. This report was reviewed by Mr. Richard Rambacher, Practice Leader.

## Section II
## CONCLUSIONS

We affirm our conclusions one through three made in our original **Report of Findings.** Conclusion four has been added as stated below. The conclusions from our original **Report of Findings** are provided below for reference.

1. The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line. This was the only observed source of water noted during the site inspection and review of mitigation photographs.

2. Mechanical damage to the stainless-steel supply line led to fraying and fracture of individual strands within the braiding, which likely punctured the inner hose, resulting in small weeps onto the stainless-steel surface. The accumulation of chlorides from the city water on the stainless steel strands likely led to stress corrosion cracking (SCC) of the stainless-steel supply line. Once the braided reinforcement was compromised, the line pressure was sufficient to rupture the polymer liner, resulting in the water event.

3. Destructive analysis, including scanning electron microscopy (SEM) and energy dispersive spectroscopy (EDS), would be needed to confirm SCC as the fracture mechanism.

### Supplemental Conclusions

4. Based on the provided documentation and observations made during the Rimkus site inspection, the dark discoloration observed at the ground-level bathroom plywood subfloor area was consistent with an additional source of water damage.

## Section III
## DISCUSSION

**Background**

The property at 103 Court Deayllon was a 3-bedroom, 2.5-bathroom, 1,824-square-foot, single-family residence, originally built in 1973 and last sold in 2014 to the current owners.[1] The subject residence was reportedly serviced by the local municipal water supply.[2] On January 14, 2026, a water leak reportedly occurred in the cabinet underneath the kitchen sink. The source of the water was a breach in the braided stainless steel water supply line feeding the faucet, identified as a Moen Single-Handle High Arc Pulldown Kitchen Faucet, Model Number CA87003BRB.[3] This model included a pull-down hose, which allowed for the extension of the dispensing wand/faucet (**Figure 1**). During extension of the faucet, the pull-down hose supply line moved up and down, adjacent to the supply line connection, beneath the sink.




**Figure 1** - Quick connect hose connection between supply line and pull-down hose (left) and replacement hose kit.

[1]Property information, from 103 Ct Deayllon, Poquoson, VA 23662 | Redfin accessed March 10, 2026.
[2]Newport News, VA Waterworks, from https://www.nnva.gov/275/Drinking-Water-Quality, accessed March 11, 2026.
[3]Replacement hose from Moen, from https://shop.moen.com/products/150259?variant=48238025179446, accessed March 11, 2026.

**Interview**

During the on-site inspection on February 18, 2026, Mr. Burkhardt spoke with Mr. Pohlman and obtained the following information:

> Mr. Pohlman purchased the residence in May 2014. It was the primary residence for Mr. Pohlman and his two children.
>
> In 2023, Mr. Pohlman purchased the faucet from The Home Depot and installed it as part of a kitchen remodel project.
>
> At approximately 6:00 a.m. on January 14, 2026, Mr. Pohlman's father (who was visiting) discovered standing water throughout the ground level of the residence and an active water leak in the kitchen. Mr. Pohlman and his father observed a rupture in the stainless-steel braided hot water supply line.
>
> After turning off the main water supply valve to the property, Mr. Pohlman called a local property management company, GR Management, to assist with water remediation. They arrived later that day to perform mitigation work and placed several blower fans and dehumidifiers throughout the ground level of the property to assist with drying. They also closed the water supply valves beneath the sink and disconnected the water supply lines and faucet.

**Site Observations**

An on-site inspection was performed by Mr. Burkhardt on February 18, 2026. Photographs of the observed conditions are included in **Attachment A**. The photographs and information outlined below were representative and were not intended to include all conditions that may have existed during the inspection. During the course of the inspection, Mr. Pohlman provided access to the residence (**Photograph 1**). The demolition/partial remediation of the kitchen area, including removal of all construction materials within the kitchen area (flooring, cabinetry, plumbing piping and fixtures, etc.) had been completed prior to our inspection (**Photograph 2**). A pair of multi-turn isolation valves were in the closed position in the cabinet underneath where the subject kitchen sink and faucet fixture had been installed (**Photographs 3 and 4**). The faucet was still connected to the stainless steel braided hot and cold-water supply lines (**Photograph 5**). The faucet was manufactured by Moen, a Single-Handle High Arc Pulldown Kitchen

Faucet with Model Number CA87003BRB. The pull-down hose line was not visible or connected.

The exterior surface of the braided stainless steel hot water supply line was frayed, and the inner liner had ruptured and severely deteriorated (e.g., strands were discolored, bent, fractured) (**Photographs 6 through 8**). In areas away from the rupture/burst, including on the cold-water line, there were additional strands visible that had been frayed/fractured, accompanied by local discoloration (**Photographs 9 and 10**).

Following our site inspection, the faucet and hose assemblies were collected and transferred to Rimkus's Westerville, Ohio, office for further documentation and storage (**Photograph 11**). Images taken in the office were reviewed by Gregory Smith, Ph. D., Rimkus Senior Consultant. As previously documented, the primary rupture/burst site was located on the hot water supply hose and was heavily discolored/corroded, with substantial fiber fracture and bending (**Photographs 12 and 13**). Areas away from the primary rupture/burst site also exhibited bent and fractured strands; these areas were accompanied by local discoloration, though less severe than the primary burst/rupture site (**Photographs 14 and 15**). Higher magnification images of both the rupture site and away from the rupture site showed highly bent and fractured strands, which were accompanied by dark orange/black corrosion product (**Photographs 16 through 18**).

The photographs within Safeco Insurance Company Onsite Inspection Report, dated February 13, 2026, were reviewed. These photographs were taken after the "partial mitigation demo" phase of the remediation work was completed. As shown in the provided Photograph 12 from this document, there was localized dark discoloration in the plywood subfloor concentrated around the toilet area, where the O-ring seal meets the subfloor, as shown below, in **Figure 2**:



Figure 2: Photograph 12 taken from the Safeco Insurance Company Onsite Inspection Report.

Although there were other areas where the plywood subfloor looked slightly discolored or worn, the toilet area was the only area of note that displayed signs of a potential independent leak source. The ground-level dining room and entry foyer had also been demolished, with several layers of subfloor and finished floor removed prior to the Rimkus site inspection. These areas did not show any signs of independent water leaks, but these areas had also had multiple layers of flooring removed prior to the Safeco Insurance Company site visit, as well as the Rimkus site inspection.

**Analysis**

Stainless steel braided reinforcement is commonly used for flexible water supply lines. The combination of the water-sealing inner liner and outer structural reinforcement is commonly used for these applications by many different manufacturers where a flexible water supply conduit is desired (e.g., for end connections to appliances) or in cases where movement is expected (e.g., for a pull-down faucet). If damage occurs to the outer stainless steel, e.g., via abrasion, rubbing, or other mechanical force, the individual stainless-steel strands can fracture or fray. Such fraying of stainless-steel strands, which was observed on the incident supply line (**Photographs 8 through 10, 15, and 16**), can

occur during installation and/or operation of the sink/faucet. When the line is kinked or pressed, the individual frayed/fractured stainless-steel strands can then puncture the inner lining, creating a slow water weep.

The design of the supply line is such that water is contained within the polymer inner liner. The outer stainless steel braiding acts as a support structure to the inner liner. If the inner liner is compromised, e.g., punctures or ruptures from frayed strands, unmitigated weeps or leaks will allow water to wet the braids. As the water from the slow weep or leak evaporates, the chloride-containing salts dissolved in the water for disinfection are left behind on the stainless-steel surface, leading to and accelerating a condition called SCC. These ongoing leaks represent non-normal operating conditions. SCC is a well-known failure mechanism in austenitic stainless steel and is consistent with observations made on the supply line to date. SCC is driven by pre-existing conditions, namely a residual "stress" present within the material system and ongoing exposure to an aggressive service environment. Chloride-induced SCC can occur when the local service environment contains chloride salts.

Fractured stainless steel strands, consistent with installation-related abrasion or movement of the water supply line, were observed along the length of the incident supply line, including both at the primary rupture/burst site as well as areas away from the burst site (**Photographs 8 through 10, 15, and 16**). Both the primary site and other locations exhibited local discoloration, evidence of the ongoing corrosion at these locations (**Photographs 9, 10, and 12**). Discoloration was more pronounced around the primary burst/rupture site.

Other sources of potential water to the exterior surface of the hot water supply line may have originated from small leaks at the plumbing connections, especially at the quick-connect connection to the pull-down supply line. However, because the supply line had been disconnected and the pull-down supply line was not available prior to Rimkus's site inspection, this could not be verified. Mitigation photographs show the location of the burst at a loop/bend of the hot water supply line (**Figure 2**); if a leak was present from above, water would accumulate at or near the burst location, accelerating the SCC.

Based on the above, the source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line. This was the only observed source of water noted during the site inspection and review of mitigation photographs.

Mechanical damage to the stainless-steel supply line led to fraying and fracture of individual strands within the braiding, which likely punctured the inner hose, resulting in small weeps onto the stainless-steel surface. The accumulation of chlorides from the city water on the stainless-steel strands likely led to SCC of the stainless-steel supply line. Once the braided reinforcement was compromised, the line pressure was sufficient to rupture the polymer liner, resulting in the water event. Destructive analysis, including scanning electron microscopy (SEM) and energy dispersive spectroscopy (EDS), would be needed to confirm SCC as the fracture mechanism.



**Figure 3** – Provided photograph to Rimkus from Liberty Mutual Insurance Company, of the supply line connection prior to removal.

Although demolition of the various construction finishes and additional layers of subfloor throughout the ground level of the subject property had been completed prior to the Rimkus site inspection, the only reported source of water intrusion came from beneath the kitchen sink area. However, based on the review of the Safeco photographs, taken on February 13, 2026, the dark discoloration of the plywood subfloor surrounding the toilet

area was consistent with a long-term, independent leak source within the ground-level bathroom as well. Mr. Pohlman had stated that he purchased and installed the subject faucet in the kitchen area in 2023. The hot water supply line connected to the kitchen faucet was the source of the reported water damage, and therefore, this was the central focus of the Rimkus inspection. However, in the course of the Rimkus inspection, the adjacent rooms, including the dining room, entry foyer, and bathroom, had also been inspected for additional sources of water damage. Due to the demolition work conducted at the property prior to the Rimkus site inspection, several layers of additional subfloor and finished floor materials had already been removed in the dining room and entry foyer areas; therefore, additional potential independent leak sources could not be determined in these locations. However, the bathroom, located adjacent to the kitchen, contained water supply piping to various bathroom fixtures, including the toilet, sink, and laundry equipment. The dark, discolored plywood subfloor that remained in place where the toilet had been removed displayed signs of an independent leak source. Typically, a toilet's deteriorated wax seal O-ring can loosen and dry out over time, causing long-term slow water leakage. Although the other construction materials, as well as the toilet and O-ring seal, had been removed prior to the Rimkus site inspection, the remaining subfloor discoloration pattern was not consistent with damage from the kitchen sink area. Therefore, based on the provided documentation and observations made during the Rimkus site inspection, the dark discoloration observed at the ground-level bathroom plywood subfloor area was consistent with an additional potential source of water damage. Additional inspection is needed to determine any further extent of this source of water damage.

## Section IV

## BASIS OF REPORT


1. Property Information, https://www.redfin.com/VA/Poquoson/103-Ct-Deayllon-23662/home/49252359, accessed March 10, 2026.

2. On February 18, 2026, Jack K. Burkhardt, P.E., inspected the subject residence, located at 103 Court Deayllon in Poquoson, Virginia, and documented the physical inspection with photographs.

3. On February 18, 2026, Jack K. Burkhardt, P.E., interviewed the homeowner, Mr. Matthew Pohlman, during the Rimkus site inspection.

4. Product literature for the Moen Single-Handle High Arc Pulldown Kitchen Faucet was reviewed.

5. Safeco Insurance Company Site Inspection Photographs and additional PV and NPV Photographs provided to Rimkus.

6. ASM Handbook Volume 11: Failure Analysis and Prevention, ed. Brett A. Miller, Roch J. Shipley, Ronald J. Parrington, and Daniel P. Dennies. ASM International, 2021.

7. ASM Handbook, Volume 11A: Analysis and Prevention of Component and Equipment Failures, ed. B.A. Miller, R.J. Shipley, R.J. Parrington, D.P. Dennies. ASM International, 2021.

8. ASM Handbook Volume 13A: Corrosion: Fundamentals, Testing, and Protection, ed., Stephen D. Cramer and Bernard S. Covino, Jr., ASM International, 2023.

9. Newport News Waterworks, Newport News, VA, Drinking Water Quality, from https://www.nnva.gov/275/Drinking-Water-Quality, accessed March 11, 2026.

10. Newport News Waterworks, Newport News, VA, Combined Annual Summarizing Test Results from 2024 (*latest available*).

## Section V
## ATTACHMENTS

A. Photographs

B. Curriculum Vitae

## Section V
## ATTACHMENT A

# Photographs

Photographs taken during our inspection, including photographs that were not included in this report, were retained in our files and are available to you upon request.

**Photograph 1**
Exterior view of the subject residence.



**Photograph 2**
View of the subject kitchen area with plumbing connection locations indicated by RED arrows.



**Photograph 3**
Additional view of the plumbing connections within the kitchen area.



**Photograph 4**
View of the multi-turn valve at the hot water plumbing connection.



**Photograph 5**
View of the subject faucet and stainless-steel braided hoses assembly.



**Photograph 6**
Additional view of the hoses with fracture location indicated by a **BLACK** arrow.



**Photograph 7**
View of the burst/fracture location. Frayed and fractured strands are visible both at and away from the primary burst location.



**Photograph 8**
Additional view of the fracture location. Frayed and fractured strands are visible both at and away from the primary burst location.



**Photograph 9**
View of hot-water hose, away from the burst site. Frayed and fractured strands are visible away from the primary burst location.



**Photograph 10**
View of the cold-water hose. Frayed and fractured strands are visible away from the primary burst location.



**Photograph 11**
Office photographs of subject faucet and supply lines.



**Photograph 12**
Area of rupture/bust on hot water supply line.



**Photograph 13**
Additional view of rupture/bust site.



**Photograph 14**
Area slightly away from rupture/bust site, with additional fraying strands and localized discoloration.



**Photograph 15**
Area slightly away from rupture/bust site, with additional fraying strands and localized discoloration.



**Photograph 16**
Higher magnification image with bent and fractured strands, near the primary burst/rupture site.



**Photograph 17**
Higher magnification image with bent and fractured strands, near the primary burst/rupture site.



**Photograph 18**
Higher magnification image with bent and fractured strands, away from the primary burst/rupture site.



Section V

ATTACHMENT B

# Curriculum Vitae

RIMKUS

**Jack Burkhardt, P.E.**
Senior Consultant

930 Harvest Drive, Suite 210
Blue Bell, PA 19422



(267) 649-1575

JBurkhardt@rimkus.com

## Background

Mr. Jack Burkhardt received his B.S. degree in Mechanical Engineering from Trinity College in 2011. He is a licensed professional engineer with a broad background of knowledge in mechanical engineering in commercial and residential construction. As a forensic engineer, he has provided consulting services for legal, insurance, and corporate clients in both plaintiff and defendant matters.

His professional background consists of over 10 years of experience in heating, ventilation, and air conditioning (HVAC) design, project management, construction management, and forensic engineering. Mr. Burkhardt has analyzed and determined the causations of mechanical component failures of consumer products, HVAC systems, plumbing systems, and fire protection systems. He has also investigated incidents and accidents related to equipment use and safety.

Mr. Burkhardt's technical evaluations of equipment failures include a variety of commercial and residential air conditioning systems and associated piping and ductwork, fire suppression systems, building envelope leaks, and refrigeration systems. His forensic experience includes investigating oil-fired boilers and furnaces, indoor air quality issues, kitchen hoods and cooking equipment, natural gas explosions, and product liability evaluation and testing of items such as electric cooktops, lawnmowers, and overhead rolling doors.

## Professional Engagements

- **HVAC Design and Analysis**
  - South Windsor, CT (2013), Provided projected heating and cooling load calculations for a new build-out and selected equipment for LEED-certified New Construction project. Accounted for and documented all HVAC-related LEED points.
  - New Haven, CT (2013), Performed heating and cooling load calculations for existing buildings and utilized energy modeling software to forecast upgrades and potential savings for local performing arts theatre.
  - Danbury, CT (2012), Designed and selected package of high-efficiency rooftop equipment and controls for industrial property. Provided utility company with projected energy savings for qualified tax incentive rebate.

- **Engineering and Construction Management**
  - Easton, PA (2020), Expanded the active hospital intensive care unit by overseeing the installation of additional medical gas outlets and associated piping.

- Scottsdale, AZ (2018), Managed the installation and implementation of high-efficiency variable refrigerant flow system with integrated controls for an out-of-the-ground, 40,000-square-foot retail store.
- Denver, CO (2017), Supervised the rebuild of severe water-damaged wing of shopping mall through a reconstruction of roof system and redistribution of rainwater runoff and storm drain piping.
- New York, NY (2016), Oversaw the installation and implementation of six submersible sump pumps and commercial-grade air dehumidifier in the basement-storage level of a newly constructed retail store to address excessive, ongoing humidity problems.
- New York, NY (2015), Investigated and fixed pipe freeze for a commercial client with exploded sprinkler pipe in a stock room.
- New York, NY (2014), Coordinated replacement of rooftop packaged equipment in high-traffic, densely populated area of lower Manhattan.

## Forensic Engagements

- **Mechanical Analysis**
  - Bristol, PA (2024), Mechanical evaluation of a material hoist lift and determined reusability and appropriate repair cost estimate for replacement components.
  - York, PA (2024), Performed load calculations to determine cooling demands for school classrooms served by PTAC units.
  - Milford, PA (2024), Investigated the failure of a residential water treatment system that leaked.
  - Pocopson, PA (2024), Evaluated the effects of a power surge to a commercial property and determined reusability of traction elevator system, HVAC system, and associated electrical components.
  - Glenolden, PA (2024), Investigated the cause of water loss within a residential B vent pipe installation.
  - Allentown, PA (2024), Evaluated the resultant damage to an overloaded tractor-trailer assembly.
  - Wilkes Barre, PA (2024), Conducted smoke damage evaluation to hotel property and assessment of hydraulic elevator system.
  - Kingston, PA (2024), Mechanical evaluation of water damage to laundromat equipment and determined reusability and appropriate repair cost estimate for replacement equipment.
  - Horsham, PA (2024), Determined cause of reported oil tank leak within an oil-fired furnace system.
  - Fairless Hills, PA (2023), Evaluated residential washing machine and associated stainless steel water supply hoses following reported water loss.
  - Lewes, DE (2023), Evaluated residential dishwasher circulation pump that reportedly failed and caused water damage to the property.
  - Coatesville, PA (2023), Investigated the PEX water supply piping system of an apartment complex that reportedly leaked.
  - Tamaqua, PA (2023), Evaluated black soot and smoke damage within a residential property related to a furnace heating system puffback.
  - Harrisburg, PA (2023), Evaluated a commercial fire pump system and determined reusability and appropriate repair cost estimate for replacement components.
  - Philadelphia, PA (2023), Evaluated a reported fuel contamination within the fuel system of a commercial vehicle.
  - Philadelphia, PA (2023), Assessed electrical service and hydraulic elevator system damage related to water intrusion.
  - Media, PA (2022), Investigated water loss causation related to an improperly pressed fitting on a copper domestic water supply line.
  - Wilmington, DE (2022), Evaluated an electrical short circuit within a commercial HVAC system.

- Harleysville, PA (2022), Evaluated a hydronic circulator pump and associated piping fittings within a commercial office complex.
- Bethesda, MD (2022), Evaluated a residential pipe freeze burst at an exterior hose bibb.
- Woodlyn, PA (2022), Evaluated a brass ball valve substituted for the plastic drain valve on a residential water heater that failed, causing water damage throughout the property.
- Lebannon, PA (2022), Mechanical evaluation of refrigerant piping and alarm system wiring of an indoor climate control system for a medical marijuana growing facility.
- Stroudsburg, PA (2022), Investigated the mechanical failure of a mobile fire pump that was being utilized for firefighter training by the county.
- Philadelphia, PA (2022), Evaluated the failure of a cast-iron sectional boiler serving the office and classrooms within a church building.
- Langhorne, PA (2021), Evaluated residential fuel oil-fired boiler and associated piping and equipment. Determined origin and cause of failure resulting in soot, smoke, and oil damage throughout the property.
- Saint Clair, PA (2021), Investigated a propane-fired water heater to determine the root cause of fire damage to a commercial laundromat.
- Elkins Park, PA (2021), Investigated failure and corrosion of cast-iron drainpipe serving commercial athletic facility.
- Hazleton, PA (2021), Evaluated and performed destructive testing on fire suppression hood system that failed to mitigate commercial kitchen grease fire.
- Princeton, NJ (2021), Evaluated hydraulic fluid line and associated equipment failure on a platform scissor lift at a commercial property loading dock.
- Philadelphia, PA (2021), Evaluated water leak in supply line of above-ceiling water source heat pump unit serving tenant in a commercial apartment complex building.
- Bridgeport, PA (2021), Evaluated fire damage to gas-fired, HVAC rooftop units serving a commercial property.
- Kunkletown, PA (2021), Investigated oil spill and associated equipment failure of a residential, oil-fired furnace heating system.
- Willow Grove, PA (2021), Evaluated brake system and associated controls for commercial-use aerial platform boom lift.
- South Sterling, PA (2021), Investigated pipe freeze within residential hydronic heating system served by oil-fired boiler unit.
- Chester, PA (2021), Investigated a reported dryer fire within a residential basement apartment unit.
- Paradise, PA (2021), Evaluated water damage to fire pump equipment and associated commercial property as a direct result of tropical storm.

## Professional Experience

- **Rimkus** **2021 – Present**
  - Senior Consultant

    Responsible for investigation and evaluation of deficiencies, failures, design, construction, maintenance, and operation of commercial and residential HVAC, plumbing, and fire protection systems. Capable of preparing damage assessments, repair estimates, as well as code compliance and safety evaluations.

- **Irwin & Leighton Commercial Builders** **2018 – 2020**
  - Project Superintendent

    Oversaw construction of commercial and residential projects including office buildings, retail stores, hospital renovations, and multi-family residential communities. Verified all MEP equipment, building materials, and finishes were installed in accordance with manufacturer requirements, local codes, and standards.

- **Shawmut Design & Construction** **2013 – 2018**
  - Project Manager/Project Superintendent

    Composed and evaluated detailed budgets and scopes of work for restoration and remodel projects in high-end retail division ranging from $50K to $10M. Worked closely with architects and engineers of record to determine constructability and implementation of design/build scope.

- **Controlled Air Inc.** **2011 – 2013**
  - HVAC Design Engineer

    Provided engineering analysis to the sales team on all design/build projects, evaluated existing HVAC equipment and building conditions on renovation projects, and selected new equipment to optimize overall mechanical system efficiency.

## Education and Certifications

- **Mechanical Engineering, B.S.:** Trinity College (2011)
- **Registered Professional Engineer:** Delaware, Maryland, and Pennsylvania
- **OSHA 30 Certified**

# FLETCHER & ASSOCIATES
CONSULTING STRUCTURAL ENGINEERS

April 8, 2026

Mr Matthew Pohlman
103 Court Deayllon
Poquoson, VA 23662

**RE: STRUCTURAL INSPECTION - 103 COURT DEAYLLON, POQUOSON, VA**

Dear Mr. Pohlman:

Fletcher and Associates, P.C. has carefully inspected and analyzed the above referenced project. The purpose of this inspection is to provide an engineering opinion regarding apparent damage to the floor system.

James H. Fletcher, P.E.
Fletcher And Associates
201 Woodroof Rd, Newport News, VA 23606
757-508-3156 | jfandassoc@gmail.com
Virginia Professional Engineer License No. 0402026629
INSPECTION DATE: April 2, 2026
FILE NO: 26-12569
SUBJECT: Structural Engineering Assessment: Nature of Water Damage to Building Components
PROPERTY: 103 Court Deayllon, Poquoson, VA
DATE OF LOSS: January 14, 2026
CLIENT: Mr. Matthew Pohlman

1.0 INTRODUCTION ; ASSIGNMENT

I, James Fletcher, a licensed Professional Engineer in the Commonwealth of Virginia specializing in structural engineering, was retained by the homeowner, Mr. Matthew Pohlman. My firm was contacted following a denial of an insurance claim (Claim #060776175-01) and after significant demolition of interior finishes had been performed by the insurance carriers vendor.

The purpose of this investigation was twofold:

1. To assess the condition of the water-affected structural and sub-structural components (wood framing, subfloor) and provide a professional opinion as to whether the damage patterns are consistent with a single, high-volume water event or a long-term, chronic leak, in preparation for the eventual reconstruction of the home.

2. To conduct a professional review of the engineering report prepared by Mr. Jack Burkhardt of Rimkus Consulting Group, Inc. (Rimkus Supplemental Report of Findings, Pohlman Plumbing Evaluation Claim Number: 060776175 Rimkus Matter No: 100332953), dated March 25, 2026, which was cited as the basis for the claim denial.
The scope of this structural engineering report is to analyze the effects of the reported water loss on the building's structural components and to conduct a professional review of the report prepared by Rimkus Consulting Group, Inc. The precise metallurgical failure mechanism of the plumbing hardware is outside the scope of this structural assessment. Therefore, this report will focus primarily on the effects of the water on the buildings structure and the validity of the conclusions in the Rimkus report from a structural and professional practice perspective.



EXHIBIT D

2.0 DOCUMENTS ; EVIDENCE REVIEWED

Site Visit: A physical inspection of the subject property was conducted on April 2, 2026.
Rimkus Report: Report prepared by Mr. Jack Burkhardt, dated [Date of Rimkus Report].
Photographic Evidence: Mitigation photographs and high-resolution photographs of the failed plumbing components.
Client Statement: First-hand account from Mr. Matthew Pohlman regarding the loss and the history of a prior, repaired toilet wax ring leak.

3.0 STRUCTURAL ANALYSIS OF WATER-DAMAGED BUILDING COMPONENTS

My site investigation focused on the condition of the exposed wood subfloor and framing members in the kitchen, dining room, living room, and ground-level bathroom.

3.1 Analysis of Widespread Water Damage: The wood subfloor components across the kitchen, dining room, and foyer exhibited evidence of significant, recent saturation. However, these materials remain structurally sound. There is a complete absence of the wood rot, delamination, fungal decay, or loss of section that are the unambiguous hallmarks of exposure to moisture over a period of days; weeks, months, or years; The observed damage is exclusively consistent with a single, high-volume wetting event.

3.2 Analysis of Localized Bathroom Staining: A dark, localized stain was observed on the subfloor at the location of the previously removed toilet. This area was tested with a moisture meter and found to be dry at the time of my inspection. The client provided testimony that this stain was the result of a previous, minor leak from a toilet wax ring, which had been repaired. My analysis confirms this account. The stain is an historical artifact—a cosmetic, dry-set stain—and does not represent active moisture or structural degradation. The Rimkus reports conclusion that this was an " independent leak source" is incorrect; a competent engineering investigation requires differentiating between historical and active conditions, a fundamental step that was clearly omitted.

4.0 REVIEW AND PROFESSIONAL REBUTTAL OF RIMKUS ENGINEERING

REPORT

From the perspective of a licensed Professional Engineer in Virginia, the report authored by Mr. Burkhardt contains multiple jurisdictional, factual, and methodological failures that render its conclusions unreliable and invalid.

4.1 Jurisdictional ; Professional Invalidity: The report is fundamentally invalid for use in the Commonwealth of Virginia. Its author does not hold a Virginia P.E. license, constituting the unauthorized practice of engineering per Virginia Code §54.1-406. Furthermore, the contradictory license numbers on the reports face invalidate its professional seal and demonstrate a lack of professional rigor.

4.2 Gross Misinterpretation of Structural Evidence: The reports author demonstrated an inability to perform a basic differential diagnosis of water damage. By misidentifying a historical, dry, and structurally insignificant stain as an active, long-term leak, he has shown a lack of the fundamental skills required for water intrusion investigation. His conclusions regarding the condition of the structure are therefore unreliable.

4.3 Reliance on Unproven and Contradicted Theories: The reports primary conclusion rests on a theory of ;Stress Corrosion Cracking; that is admittedly unproven. As a structural engineer, my expertise is in evaluating how materials fail. Any credible failure analysis must be based on evidence, not speculation. The Rimkus report fails to correctly identify the product that failed, rendering its entire technical analysis irrelevant.

5.0 CONCLUSIONS

Based on my site investigation and professional engineering analysis, I have made the following conclusions to a reasonable degree of professional certainty:

1. The damage to the homes structural and sub-structural components is exclusively consistent with a single, sudden, high-volume water event.
2. There is no physical evidence of long-term or chronic water exposure that would result in the degradation of wood building materials. The subfloor and framing, while saturated, remain structurally sound.
3. The discoloration observed in the bathroom is a historical, dry-set stain from a previously repaired issue and is not evidence of an ongoing leak contributing to the current loss.
4. The engineering report prepared by Rimkus Consulting Group, Inc. is professionally and jurisdictionally invalid. Its conclusions are based on a misinterpretation of structural evidence, speculation instead of fact, and a fundamental misidentification of the core components. It is my professional opinion that this report is without merit and cannot be relied upon for any purpose. This property is structurally sound for repair, and reconstruction can proceed once the source of the single, catastrophic water event has been addressed.

Fletcher and Associates, P.C. appreciates this opportunity to be of service to you in this matter. If you have any questions, please call at your convenience.

COMMONWEALTH OF VIRGINIA
JAMES H. FLETCHER
April 8, 2026
No. 26629
PROFESSIONAL ENGINEER

Sincerely,

James H. Fletcher, P.E.
Fletcher and Associates
VA Reg #26629

JHF:kcf

P.O. BOX 5592 WILLIAMSBURG, VA 23188
(757) 508-3156 (O) / (757) 508-3156 (M) / (757) 240-5017 (F) jfandassoc@gmail.com

FORENSIC™
ANALYSIS CORPORATION
"Establishing Why"™ since 1966

PREPARED FOR:

Kimberly Marchant, Matt Pohlman

SUBJECT:

Documentation Review

Company Claim: 060776175-01
Insured: Matthew Pohlman
D.O.L.: January 14, 2026
FAEC File No.: IND-3741-VA-26L

PREPARED BY:

FORENSIC ANALYSIS & ENGINEERING CORPORATION

Craig Callewaert, PE
Lab Manager and Staff Engineer
Virginia State License Number: 0402063244

May 4, 2026

EXHIBIT
E

We appreciate the opportunity to be of support to you, State Farm Insurance and your insured in this matter. We trust that you will find our report to be suitable for its intended purposes. We look forward to earning an opportunity to prove our technical competence once again in the near future.

Respectfully submitted,
**FORENSIC ANALYSIS & ENGINEERING CORPORATION**

COMMONWEALTH OF VIRGINIA
CRAIG A. CALLEWAERT
Lic. No. 0402063244
PROFESSIONAL ENGINEER

E-SIGNED by Craig Callewaert
on 2026-05-04 15:45:23 GMT

Craig Callewaert, P.E.
Lab Manager and Staff Engineer
Virginia State PE No: 0402063244

This firm follows the practice of having all technical reports read and reviewed by a peer for completeness, reader comprehension, technical approach, and reasonableness of the stated conclusions and repair protocols. This report has been reviewed by the undersigned for the firm.

E-SIGNED by Todd Ford
on 2026-05-04 16:00:21 GMT

Todd Ford, P.E.
Vice President of Engineering

FORENSIC™
ANALYSIS & ENGINEERING

Matthew Pohlman
060776175-01
500-3741-VA-26L
Date of Loss/Damage: January 14, 2026

## BACKGROUND INFORMATION

FAEC was contacted on April 1, 2026, and requested to evaluate and perform a forensic investigation into the cause of the claimed loss. Specifically, we were asked to examine the reports and documentation surrounding a water claim from a kitchen sink burst supply line that was located at 103 Court Deayllon, in Poquoson, Virginia and to provide an objective expert opinion including supporting rationale that fulfilled the following provided request:

- Perform a documentation review of the report of findings contained in the March 25, 2026, Rimkus report, Supplemental Report of Findings, Rimkus matter no. 100332953; and other documents to determine the cause of failure leading to the water damage claim
- Summarize the Rimkus report identifying areas of facts, errors, and open questions requiring further investigation
- Analyze the Safeco Insurance claim denial letter with regards to the facts of the case

For quick reference, the Opinions & Conclusions in response to the provided question(s) may be found on page 8.

FAEC received the documentation via email at our Newport News, Virginia Evidence Examination Center April 2 through 27, 2026.

A complete list of the documents received is shown in Appendix A. Relevant pictures and references from this documentation have been copied to Appendix B for use in this report.

## OBSERVATIONS & FINDINGS

FAEC was asked to perform an engineering investigation and evaluation into the causation of the water loss at the documented residence. Based upon the documentation provided and other information identified during our laboratory investigation, FAEC was able to determine the following:

1. The subject is a commercial style (or spring pull down style) kitchen faucet, claimed to be a Glacier Bay (Home Depot) brand. The faucet had been removed from the kitchen sink by the homeowner shortly after the incident. Photographs 1 and 2.

2. The faucet and its connection lines were analyzed and reported by Rimkus, an engineering firm in Richmond, Virginia. The original report was not available for review, but a follow-up supplemental report was available - the March 25, 2026, Rimkus report; Supplemental Report of Findings, Rimkus matter no. 100332953. The subject faucet was pictured in this report. Photograph 3.
3. This faucet was claimed by the homeowner to be a Glacier Bay brand purchased from Home Depot in 2023. The product could not be located on the current Home Depot website, but a similar product was located on Amazon. Photograph 4.
4. Although the product is called a pull-down faucet, the sprayer hose is fixed. The sprayer can be unhooked from its mount and moved where desired, flexibility provided by the flexible hose and guide spring on the high arch.
5. A photo taken before removal from the underside of the faucet shows only the two supply lines. A third line with a loop and weight typical of most pull-down faucets does not exist on this model of faucet. Other under sink photos show the burst location in the hot water supply line. Photographs 5 through 7.
6. The burst location and supply hoses were analyzed and shown in the Rimkus engineering report. Photographs 8 through 16.
7. These photos also show areas of discolorations appearing as rust stains. Several frayed and fractured stainless-steel braid strands were visible away from the primary burst location. Photographs 11 through 16.
8. One error in the Rimkus report is the identification of the faucet. The report misidentified the faucet as a Moen CA87003BRB, the bronze Anabelle One-Handle High Arc Pulldown Kitchen Faucet. With the failed faucet, a soap dispenser was also recovered for analysis by Rimkus. This part, with a Moen label and logo, is seen in the background of one of the Rimkus report photos. Photograph 17.
9. The model CA87003BRB Moen faucet was located online and is a distinctly different style than the subject failed faucet. Photographs 18 and 19.
10. Examination of pictures from the GR Management mitigation work show the Moen faucet installed on the sink. Photographs 20 through 24.
11. The extent of the water damage was not immediately known to the homeowner. He replaced the failed faucet with the Moen faucet to provide functionality and livability in the home as soon as possible after the initial failure. After the mitigation company arrived and measured moisture levels, they determined it was necessary to remove flooring and cabinets to be able to dry the house and mitigate the damage.
12. The house was built in 1973 and purchased by the current owner in 2014. Removal of the flooring indicated several layers of flooring needed to be

removed. Beneath these layers, the subfloor in the bathroom had dark staining at the entryway and in front of the toilet. The kitchen and living room floors were clear. The staining indicates a previous event or events. Photographs 25 through 27.

13. The conclusions of the Rimkus supplemental report are shown in Photograph 28:

Conclusion 1: "The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line. This was the only observed source of water noted during the site inspection and review of mitigation photographs."

Agree, all evidence suggests the burst hose was the single source of water creating the damage observed and requiring extensive mitigation.

Conclusion 2: "Mechanical damage to the stainless-steel supply line led to fraying and fracture of individual strands within the braiding, which likely punctured the inner hose, resulting in small weeps onto the stainless-steel surface. The accumulation of chlorides from the city water on the stainless-steel strands likely led to stress corrosion cracking (SCC) of the stainless-steel supply line. Once the braided reinforcement was compromised, the line pressure was sufficient to rupture the polymer liner, resulting in the water event."

Partially Agree, the stainless-steel braiding had fraying and fracture damage. It is, however, highly unlikely that these small frays and fractures could puncture the inner hose. It is more likely that these frays and fractures themselves cause weakening of the cover and eventual burst failure.

The cause of the frays and fractures is not known. They could be mechanical, although the failed faucet did NOT have a pulldown hose loop and weight that could abrade the supply lines. This is common and was wrongly suggested by Rimkus guided by their misidentification of the subject faucet. Photograph 29.

The supply lines were looped close to each other, close to the shut off valves, and close to the dishwasher drain hose. Under sink storage of many items is also common. All of these are possible causes of mechanical damage.

The rust staining on the supply lines is indicative of some water presence. Some possible sources include the supply line attachment joint to the faucet, the faucet to countertop seal, drain leaks, or even wet items stored under the sink. This moisture could

have corroded or caused SCC, further weakening the stainless-steel strands.

Conclusion 3: "Destructive analysis, including scanning electron microscopy (SEM) and energy dispersive spectroscopy (EDS), would be needed to confirm SCC as the fracture mechanism."

Agree, further testing is required to identify the exact mechanism by which the stainless-steel braids weakened and failed.

In this case, however, the exact failure mechanism does not need to be known. The stainless-steel braiding had weakened, leading to a sudden and unexpected burst rupture of the hot water faucet supply line, resulting in the water event.

Supplemental Conclusion 4: "Based on the provided documentation and observations made during the Rimkus site inspection, the dark discoloration observed at the ground-level bathroom plywood subfloor area was consistent with an additional source of water damage."

Agree, the discoloration indicates a separate prior event, likely occurring years before the faucet failure and resulting water loss. This earlier event (likely a failed toilet wax ring) did not contribute to the water damage that was observed or remediated.

Pictures and further exploration of this stained floor were in the Rimkus report. Photograph 30.

14. Portions of the Safeco Insurance denial letter are shown in Photographs 31. The main detail for denial is contained in the following paragraph:

During our onsite inspection, water damage was found in your kitchen, dining room, living room, hallway, family room, bathroom, pantry, and crawlspace. Rimkus Engineering completed an onsite inspection of your home on 02/18/2026. The damaged pipe was sent to lab facilities where the cause of loss was confirmed as a long-term leak due to the individual frayed/fractured stainless-steel strands puncturing the inner lining, creating a slow water weep. The observed deterioration condition of the materials in the kitchen and surrounding rooms impacted in the loss were consistent with a long-term seepage issue. The engineer also confirmed a secondary leak that occurred in the bathroom wax ring causing deterioration and water damage in the observed material. The policy will not extend coverage for this loss as the policy excludes long-term seepage, deterioration, and wear and tear.

15. This paragraph is countered by the Rimkus report where Conclusion 1 states: "The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line. This was the only observed source of water noted during the site inspection and review of mitigation photographs."

16. The slow water weep was speculated as a potential cause for weakening of the stainless-steel braids, not as a source of water damage.

17. Regarding the "observed deterioration condition of the materials in the kitchen and surrounding rooms", this is also counter to the Rimkus report where Conclusion 4 states: "Based on the provided documentation and observations made during the Rimkus site inspection, the dark discoloration observed at the ground-level bathroom plywood subfloor area was consistent with an additional source of water damage." The report mentions dark discoloration, NOT deterioration conditions. Furthermore, this discoloration was only evident in the bathroom, not the kitchen and other surrounding rooms. The discoloration indicates a separate prior event, likely occurring years before the faucet failure and resulting in water loss. This earlier event (likely a failed toilet wax ring) did not contribute to the water damage that was observed or remediated.

18. Portions of the Safeco Insurance denial letter are shown in Photographs 32. The Coverage Position detail for denial is contained in the following paragraph:

The policy does not provide coverage for continuous or repeated seepage or leakage of water or steam, or the presence or condensation of humidity, moisture or vapor which occurs over a period of weeks, months or years,

whether hidden or not. Because the damage was caused by a long-term leak, you have no coverage for the claim.

19. This paragraph is countered by the Rimkus report where Conclusion 1 states: "The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line. This was the only observed source of water noted during the site inspection and review of mitigation photographs." A burst occurs in seconds, not weeks, months or years. The insurance claim is solely for the mitigation effort and damages from this burst failure. The fact that evidence of prior events was found in a 53-year-old home should not be surprising.

## OPINIONS AND CONCLUSIONS

The conclusions and opinions presented in this report are based on the results of FAEC's investigation and analysis of this incident based upon the facts, as we know them to be at this time. If additional information or facts become available which materially affect the analysis performed, the conclusions and opinions presented herein are subject to revision accordingly. Based upon our laboratory evaluation and examination of the physical evidence along with the information that was provided to FAEC, we have been able to conclude the following:

1. The subject is a commercial style (or spring pull down style) kitchen faucet, claimed to be a Glacier Bay (Home Depot) brand. The hot water supply line to the faucet burst, leading to water damage in the home located at 103 Deayllon Court in Poquoson, Virginia.
2. The faucet and its connection lines were analyzed and reported by Rimkus, an engineering firm in Richmond, VA. The original report was not available for review, but a follow-up supplemental report was available - the March 25, 2026, Rimkus report, Supplemental Report of Findings, Rimkus matter no. 100332953.
3. Other documents were obtained and reviewed including photograph compilations by water mitigation companies GR Management and Stanley Steemer. Other miscellaneous documents and correspondence were also obtained. The complete list of documents is shown in Appendix A.
4. Although the subject faucet is called a pull-down faucet, the sprayer hose is fixed. The sprayer can be unhooked from its mount and moved where desired, flexibility provided by the flexible hose and guide spring on the high arch. As such, a third line with a loop and weight typical of most pull-down faucets does not exist on this model of faucet.
5. Errors identified in the Rimkus report include misidentification of the subject faucet as a Moen faucet and the presence of a third pull down hose line causing mechanical damage to the supply lines. The subject faucet is not a Moen and does not have a third pull down hose line.
6. The three conclusions and a fourth supplemental conclusion were evaluated. The first conclusion is correct; all evidence suggests the burst hose was the single source of water creating the damage observed and requiring extensive mitigation.
7. The second conclusion was regarding the source of damage to the stainless-steel braid wires. As the faucet was misidentified, the potential source of damage does not exist, and the speculations here need to be reconsidered.

8. The third conclusion identifies suggested testing for identifying the exact failure mechanism. This conclusion is correct; additional testing is needed to determine the wire braid and supply hose failure mechanism.

9. The fourth supplemental conclusion is correct; "Based on the provided documentation and observations made during the Rimkus site inspection, the dark discoloration observed at the ground-level bathroom plywood subfloor area was consistent with an additional source of water damage." The discoloration indicates a separate prior event, likely occurring years before the faucet failure and resulting in water loss. This earlier event (likely a failed toilet wax ring) did not contribute to the water damage that was observed or remediated.

10. The insurance denial letter was evaluated. Two details in the Claim Details section were clearly counter to statements made in the Rimkus report. The first statement; "the cause of loss was confirmed as a long-term leak" was clearly counter to the Rimkus report conclusion "The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line." The second statement; "The engineer also confirmed a secondary leak that occurred in the bathroom wax ring causing deterioration and water damage in the observed material" is clearly counter to the complete conclusion 1 in the Rimkus report stating: "The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line. This was the only observed source of water noted during the site inspection and review of mitigation photographs."

11. The summarizing statement in the Our Coverage Position section was also counter to the Rimkus report and other facts found in the other documentation. The statement "The policy does not provide coverage for continuous or repeated seepage or leakage of water or steam, or the presence or condensation of humidity, moisture or vapor which occurs over a period of weeks, months or years whether hidden or not" is clearly counter to the Rimkus report conclusion "The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line." Obviously, a burst occurs in seconds, not weeks, months or years.

FORENSIC ANALYSIS & ENGINEERING

Matthew Pohlman
060776175-01
500-3741-VA-26L
Date of Loss/Damage: January 14, 2026

# Appendix A:
# Document List

Taken or obtained by
FAEC
April 2 through 27, 2026

FORENSIC™ ANALYSIS & ENGINEERING

Matthew Pohlman
060776175-01
500-3741-VA-26L
Date of Loss/Damage: January 14, 2026

## Document list:

Forensic Analysis & Engineering > FAEC > CASE FILES > CASE FILES 2026 > IND-3741-VA-26 Matt Pohlman

| Name | Modified | Modified By | File size | Sharing | Activity |
|---|---|---|---|---|---|
| SUMMARY OF EVENTS 16 MARCH ALL.pdf | [illegible] | Meagan McBride | 183 KB | Shared | |
| tink bare cabinet (1).pdf | [illegible] | Alex Lane | 205 KB | Shared | |
| RE_ Non-DoD Source_ Fwd_ 103 Court DeAyllon POST Water Da. | [illegible] | Meagan McBride | 4.20 MB | Shared | |
| Possible Engineering Job in Poquoson_ VA.msg | [illegible] | Meagan McBride | 13.5 MB | Shared | |
| Pohlman Full Denial Letter Final.pdf | [illegible] | Alex Lane | 238 KB | Shared | |
| Payment received_ Invoice #120924-(IND-3741-VA-26).msg | [illegible] | Meagan McBride | 132 KB | Shared | |
| MOISTURE READING REPORT 12 FEB_16 FEB.pdf | [illegible] | Meagan McBride | 301 KB | Shared | |
| MICA_Photo_Report_20260216_013824PM(UTC).pdf | [illegible] | Meagan McBride | 4.23 MB | Shared | |
| IND-3741-VA-26 Claim #060776175-01 RE_ 103 Court DeAyllon P | [illegible] | Alex Lane | | Shared | |
| Fw_ 103 Court DeAyllon POST Water Damage Inspection E-mail 2 | [illegible] | Meagan McBride | 101 KB | Shared | |
| FULL PACKAGE REVERSAL LETTER.pdf | [illegible] | Meagan McBride | 2.91 MB | Shared | |
| Formal Rebuttal to Engineering Report Concerning Water Loss Eve. | [illegible] | Meagan McBride | 20.4 KB | Shared | |
| FINAL EMAIL TO INSURANCE COMPANY.pdf | [illegible] | Meagan McBride | 150 KB | Shared | |
| Exhibit F_A collection of damning photographic evidence.pdf | [illegible] | Alex Lane | 1.30 MB | Shared | |
| Exhibit A_Pohlman 103 Court Structural Inspection Report 4 26- 2. | [illegible] | Alex Lane | 313 KB | Shared | |
| email from MCM to insured.eml | [illegible] | Alex Lane | 305 KB | Shared | |
| email from insured to CC.eml | [illegible] | Alex Lane | 2.94 MB | Shared | |
| corporate@an6engr.com_20260401_130201.pdf | [illegible] | Meagan McBride | 236 KB | Shared | |
| 103 PICTURES GR WORK.pdf | [illegible] | Meagan McBride | 1.60 MB | Shared | |
| 103 COURT DEAYLLON INSURANCE PICTURES_SOE.pdf | [illegible] | Meagan McBride | 1.19 MB | Shared | |
| 060776175 Rimkus Engineer's Report.pdf | [illegible] | Meagan McBride | 2.44 MB | Shared | |
| #060776175-01 RE_ 103 Court DeAyllon POST Water Damage Insp. | [illegible] | Meagan McBride | 101 KB | Shared | |

# Appendix B: Photographs

Taken or obtained by
Craig Callewaert, PE
On April 28, 2026



**Photograph 1** – The failed faucet with burst hot water supply line from file: 103 PICTURES GR WORK.pdf



**Photograph 2** – Zoom in on faucet from file: 103 PICTURES GR WORK.pdf



**Photograph 3** – The Rimkus report "photograph 5 - View of the subject faucet and stainless-steel braided hoses assembly" from the report: 060776175 Rimkus Engineer's Report.pdf



Photograph 4 – A similar product located on Amazon:
https://www.amazon.com/gp/product/B0FQ4MYCWW?th=1

FORENSIC ANALYSIS & ENGINEERING

Matthew Pohlman
060776175-01
500-3741-VA-26L
Date of Loss/Damage: January 14, 2026



**Photograph 5** – The b[illegible] water supply line from file: **103 PICTURES GR** WORK.pdf



**Photograph 6** – The b[illegible] hot water supply line from file: **103 PICTURES GR** WORK.pdf



**Photograph 7** – The [illegible] from file: **103 PICTURES GR** [illegible]



**Photograph 8 –** "Pho[illegible] of the **fracture location. Frayed and fractured strands** are visi[illegible] from the **primary burst location" from the** report [illegible] gineer's Report.pdf



Photograph 9 – "Pho... ...hot water hose, away from the burst site. Frayed and fractured s... ...wa... from the primary burst location" from the repo... ...Engineer's Report.pdf



Photograph 10 – "Pho... ...ture/burst on hot water supply line" from the ... ...s Engineer's Report.pdf

FORENS[illegible]
ANALYSIS & ENGINEER[illegible]

Matthew Pohlman
060776175-01
500-3741-VA-26L
Date of Loss/Damage: January 14, 2026



**Photograph 11** – "Photograph [illegible] - A[illegible] view of rupture/bust site" from the report: [illegible] 0607[illegible] 5 Rir[illegible] Engineer's Report.pdf



**Photograph 12** – "Ph[illegible] 11 [illegible] slightly away from rupture/bust site, with additional fraying str[illegible] [illegible] discoloration" from the report: 060776175 [illegible] Report.pdf

FOR... ANALYSIS & E...

Matthew Pohlman
060776175-01
500-3741-VA-26L
Date of Loss/Damage: January 14, 2026



**Photograph 13** – "[illegible] ...ification image with bent and fractured strands, near the ori[illegible] ... from the report: 060776175 Rimkus [illegible] ...port.pdf



**Photograph 14** – "Photo 17 - [illegible] ...ification image with bent and fractured strands, near the ori[illegible] ...rst/n[illegible] from the report: 060776175 Rimkus ... Engi[illegible] ...port.pdf

FOR[illegible] ANALYSIS &[illegible]

Matthew Pohlman
060776175-01
500-3741-VA-26L
Date of Loss/Damage: January 14, 2026



**Photograph 15** – "[illegible] [illegible]ication image with bent and fractured strands, away fr[illegible] [illegible]" from the report: 060776175 Rimkus [illegible]'s [illegible]ort.pdf



**Photograph 16** – "Photog[illegible] of [illegible] cold-water hose. Frayed and fractured strands are visible [illegible] location" from the report: 060776175 [illegible] Report.pdf

FORENSIC ANALYSIS & ENGINEERING

Matthew Pohlman
060776175-01
500-3741-VA-26L
Date of Loss/Damage: January 14, 2026



**Photograph 17** - n on a in the background of the previous photograph. Moeri Mo ogo, and possibly CA87003BRB.




Photograph 18 – The Moen CA87003BRB found here:
https://www.hardw... world.com/p9v76i7/High-Arch-Kitchen-Faucet-with-Spray-Mediterranean-Bronze?gclid=CjwKCAj...iPBhADEiwAWo3sJqNBXX8hxU7RM76ylpVev81fLJHKCAlx...bMhW9ufT...hHYhoCHaQQAvD_BwE




Photograph 19 – The Moen CA87003BRB also found here:
https://shop.m... .com/products/ca87003?variant=47989350826294



Photograph – Page 6 from 103 PICTURES GR WORK.pdf



Photograph 21 – Zoom in on faucet.

FORENSIC ANALYSIS & ENGINEERING

Matthew Pohlman
060776175-01
500-3741-VA-26L
Date of Loss/Damage: January 14, 2026

**Kitchen [ IMG_1770172722561_LOSS.1341313469468361 26.jpg ]**



**Photograph 22 – Page from Photo_Report20260216_013824PM(UTC).pdf**

FORENSIC ANALYSIS & ENGINEERING

Matthew Pohlman
060776175-01
500-3741-VA-26L
Date of Loss/Damage: January 14, 2026

**Kitchen [ IMG_1770477222437_LOSS.134131346946836126.jpg ]**



Photograph 23 – Photo_Report20260216_013824PM(UTC).pdf

FORENSIC ANALYSIS & ENGINEERING

Matthew Pohlman
060776175-01
500-3741-VA-26L
Date of Loss/Damage: January 14, 2026

**Kitchen [ IMG_[illegible]166_LOSS.134131346946836126.jpg ]**



Photograph 24 – P[illegible]CA_Photo_Report20260216_013824PM(UTC).pdf



Photograph 25 – Page 9 from 103 PICTURES GR WORK.pdf Note the many layers of flooring and the staining from a previous event.

LOSS... [ Loss_260208162239_7.jpg ]



Photograph 26 – Page ... from ... CA_Photo_Report20260216_013824PM(UTC).pdf

FORENSIC ANALYSIS & ENGINEERING

Matthew Pohlman
060776175-01
500-3741-VA-26L
Date of Loss/Damage: January 14, 2026

LOSS#:134131. [illegible] [ LOSS_8135828_IMG_8103.jpeg ]



Photograph 2[illegible] _Report20260216_013824PM(UTC).pdf
[illegible] yers of flooring.

FORENSIC ANALY[illegible] [illegible], INC.

Matthew Pohlman
060776175-01
500-3741-VA-26L
Date of Loss/Damage: January 14, 2026

Section II

CONCLUSIONS

We [illegible] our [illegible] made in our original Report of Findings. Conclusion [illegible] been [illegible] stated below. The conclusions from our original Report [illegible] below for reference.

1. The source of [illegible] beneath the kitchen sink was due to a burst/rupture of [illegible] line. This was the only observed source of water [illegible] of mitigation photographs.

2. Mechanical [illegible] steel supply line led to fraying and fracture of individ[illegible] which likely punctured the inner hose, resulting in [illegible] surface. The accumulation of chlorides from the [illegible] strands likely led to stress corrosion cracking (SC[illegible]) of the [illegible]. Once the braided reinforcement was co[illegible] to rupture the polymer liner, resulting in the [illegible] event.

3. Destructive [illegible] electron microscopy (SEM) and energy dispe[illegible] needed to confirm SCC as the fracture mec[illegible].

Supplemental Conclusions

4. Based on the provided doc[illegible] observations made during the Rimkus site insp[illegible] served at the ground-level bathroom plywood sub[illegible] additional source of water damage.

Photograph [illegible] – [illegible] 0776715 Rimkus Engineer's Report.pdf

FORENSIC ANALYSIS & ENGINEERING

Matthew Pohlman
060776175-01
500-3741-VA-26L
Date of Loss/Damage: January 14, 2026

Section III
DISCUSSION

Background

The property at [illegible] was a 3-bedroom, 2.5-bathroom, 1,824-square-foot, single-family residence, originally built in 1973 and last sold in 2014 to the current owners.[1] The subject residence was reportedly serviced by the local municipal water supply.[2] On January 14, 2026, a water leak reportedly occurred in the cabinet underneath the kitchen sink. The source of the water was a breach in the braided stainless steel water supply line feeding the faucet, identified as a Moen Single-Handle High Arc Pulldown Kitchen Faucet, Model Number [illegible]87005808.[3] This model included a pull-down hose, which allowed for extension of the dispensing wand/faucet (Figure 1). During extension of the faucet, the pull-down hose supply line moved up and down, adjacent to the supply line connection beneath the sink.



Figure 1 - Quick-connect hose connection between supply line and pull-down hose (left) and replacement hose kit.

[1]Property information, [illegible], accessed March 10, 2026.
[2]Newport News, VA [illegible] networks, [illegible] Drinking Water Quality, accessed March 11, 2026.
[3]Replacement Hose from Moen, Inc. [illegible] 4825802517944[illegible], accessed March 11, 20[illegible].

Photograph [illegible] – F[illegible] page [illegible] from 060776715 Rimkus Engineer's Report.pdf

[illegible] Company Onsite Inspection Report, dated [illegible] photographs were taken after the "partial [illegible] work was completed. As shown in the [illegible] there was localized dark discoloration in the [illegible] area, where the O-ring seal meets the [illegible]



[illegible] taken from the Safeco [illegible] Inspection Report

[illegible] plywood subfloor looked slightly discolored or worn, [illegible] of note that displayed signs of a potential [illegible] dining room and entry foyer had also been [illegible] finished floor removed prior to the Rimkus [illegible] any signs of independent water leaks, but [illegible] ring removed prior to the Safeco Insurance [illegible] inspection.

Photograph 3[illegible] 776715 Rimkus Engineer's Report.pdf

FORENSIC ANALYSIS & ENGINEERING

Matthew Pohlman
060776175-01
500-3741-VA-26L
Date of Loss/Damage: January 14, 2026

Dear Matthew Pohlman,

We're writing to inform you [illegible] we com[illegible] review of your claim based on information provided by you or on your behalf. [illegible] summary of our [illegible]ings and position on coverage for this claim.

The insurance policy provides coverage [illegible] policy terms and conditions. Based on our review of the policy, there is no coverage [illegible] for your loss as outlined below.

**Claim Details**

Our first notice of loss [illegible] 01/17/20[illegible] was reported as an Accidental/Sudden Plumbing/HVAC - Broken Pipe/Hose/Fixture [illegible]

Our review of your claim [illegible] the fol[illegible] information:

During our onsite inspection [illegible] water dam[illegible] in your kitchen, dining room, living room, hallway, family room, bathroom, [illegible] crawlspace [illegible] engineering completed an onsite inspection of your home on 02/16/2026. The dam[illegible] was sent [illegible] where the cause of loss was confirmed as a long-term leak due to the individual [illegible] fracture [illegible] steel strands puncturing the inner lining, creating a slow

1PDEN First Party [illegible] 060776[illegible] Page 1 of 4

Safeco Insurance™
A Liberty Mutual Company

water weep. The observed deterioration [illegible] materials in the kitchen and surrounding rooms impacted in the loss were consistent wi[illegible] long [illegible] seepage issue. The engineer also confirmed a secondary leak that occurre[illegible] in the bathroom wax [illegible] deterioration and water damage in the observed material. The policy will not [illegible] coverage for [illegible] policy excludes long-term seepage, deterioration, and wear and tear.

The additional demolition [illegible] conducted [illegible] advised not to do so as we investigated coverage denied Safeco Insurance [illegible] to conduct [illegible] investigation. This is a breach of the Insured Duties After a Loss as outlined in the policy conditions.

Photograph [illegible] – From pages [illegible] Pohlman Full Denial Letter Final.pdf

FORENSIC ANALYSIS & ENGINEERING

Matthew Pohlman
060776175-01
500-3741-VA-26L
Date of Loss/Damage: January 14, 2026

**Our Coverage Position**

Based upon the information available to date, the grounds for our denial of coverage under the Policy, or under applicable law, with respect to the claim, include, but are not limited to, the following:

The policy does not provide coverage for continuous or repeated seepage or leakage of water or steam, or the presence or condensation of humidity, moisture or vapor which occurs over a period of weeks, months or years,

1PDEN First Party Coverage Denial 060776175-01 Page 3 of 4

Safeco Insurance™
A Liberty Mutual Company

whether hidden or not. Because the damage was caused by a long-term leak, you have no coverage for the claim.

Based on these grounds, no insurance coverage is available to you for the claim. While we sought to identify and address all relevant insurance coverage considerations above, these specific considerations are not intended and should not be understood as a waiver of any other right or basis we may have to deny coverage, and we reserve all rights in this regard.

If you have any information you believe may impact our coverage position, please bring it to our immediate attention, so we may assess whether such information or pleading impacts our coverage position or obligations.

Photograph 32 – From pages 3-4 from Pohlman Full Denial Letter Final.pdf

RIMKUS

5707 S. Laburnum Avenue
Richmond, VA 23231
(757) 229-2226

# Second Supplemental Report of Findings

Pohlman Plumbing Evaluation
Claim Number: 060776175

Rimkus Matter No: 100332953

Prepared For:
Liberty Mutual Insurance Company
175 Berkeley Street
Boston, MA 02116

Attention:
Ms. Alexia Lawson

**Digitally signed by: Gregory M Smith**
**Date: 2026.05.27 12:19:24 -04'00'**

Gregory M. Smith, Ph.D., P.E.
Virginia Engineering License No. 0402071960
Principal Consultant

COMMONWEALTH OF VIRGINIA
GREGORY MICHAEL SMITH
Lic. No. 0402071960
PROFESSIONAL ENGINEER

Jack Burkhardt
Jack Burkhardt
Senior Consultant

May 27, 2026

EXHIBIT
F

[redacted]

# TABLE OF CONTENTS


| | | |
|---|---|---|
| I. | Introduction | 1 |
| II. | Conclusions | 2 |
| III. | Discussion | 5 |
| IV. | Basis of Report | 11 |
| V. | Attachments | 13 |
| | A. Curricula Vitae | |

## Section I
## INTRODUCTION

On the morning of January 14, 2026, a reported water leak located underneath the kitchen sink was discovered within the residence owned by Mr. Matthew Pohlman (Mr. Pohlman), located at 103 Court Deayllon in Poquoson, Virginia.

Rimkus was retained to conduct a site inspection of the property and to determine the cause of the reported water leak. Jack K. Burkhardt, P.E., Rimkus Senior Consultant, conducted a site inspection of the subject property on February 18, 2026. Following the Rimkus site inspection, the faucet and hose assembly were photo-documented and collected. Mr. Burhardt's images and notes were the basis for this report.

Subsequent to our initial Report of Findings, Rimkus was asked to address whether the water damage observed in the documentation provided, and conditions observed on site, were indicative of additional leak sources, separate from the reported sink loss, the findings of which were included in a March 25, 2026 **Supplemental Report of Findings**. Following that, Rimkus was also asked to review a May 6, 2026 report by Craig Callewaert, P.E., of Forensic Analysis & Engineering Corporation (FAEC).

This report was prepared for the exclusive use of Liberty Mutual Insurance Company and is not intended for any other purpose. The opinions and conclusions herein are based on sufficient facts or data; they are the product of our analysis utilizing reliable, generally accepted principles and methods in our applicable professional field; and they reflect a reliable application of these principles and methods to the facts of this matter. This report is based on the information available to us at this time, as described in the **Basis of Report**. Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on the opinions and conclusions set forth herein and to revise these opinions and conclusions if necessary. This report was reviewed by Mr. Richard Rambacher, Practice Leader.

# Section II
# CONCLUSIONS

We affirm our Conclusions 1 through 4, made in our original **Report of Findings** (Conclusions No. 1 through 3) and **Supplemental Report of Findings** (Conclusion No. 4). Conclusion 5 has been added as stated below to reflect new information gathered during the review of Mr. Callewaert's report. The conclusions from our original **Report of Findings** are provided below for reference.

1. The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line. This was the only observed source of water noted during the site inspection and review of mitigation photographs.

2. Mechanical damage to the stainless-steel supply line led to fraying and fracture of individual strands within the braiding, which likely punctured the inner hose, resulting in small weeps onto the stainless-steel surface. The accumulation of chlorides from the city water on the stainless steel strands likely led to stress corrosion cracking (SCC) of the stainless-steel supply line. Once the braided reinforcement was compromised, the line pressure was sufficient to rupture the polymer liner, resulting in the water event.

3. Destructive analysis, including scanning electron microscopy (SEM) and energy dispersive spectroscopy (EDS), would be needed to confirm SCC as the fracture mechanism.

4. Based on the provided documentation and observations made during the Rimkus site inspection, the dark discoloration observed at the ground-level bathroom plywood subfloor area was consistent with an additional source of water damage.

## Supplemental Conclusions

5. The findings of the May 6, 2026 FAEC Report included 11 conclusions. The Rimkus response to each conclusion is provided in detail in the Analysis section. A summary response to each conclusion is shown below:

   a. Rimkus agrees with *FAEC Conclusion 1*; however, we note (and being applicable to later conclusions) that Rimkus had previously identified the incident faucet as

manufactured by Moen, based on information provided by the homeowner, and agrees it is likely not a Moen faucet. Mr. Calleaert provided no additional affirmative identification of the faucet, except for the reported identification of the manufacturer by the Homeowner. No additional documentation was provided to substantiate the make or model of the faucet. The identification of the faucet as being manufactured by Glacier Bay relies exclusively on the homeowner's information. While the faucet may not be a Moen, we cannot be certain it was manufactured by Glacier Bay. Its manufacturer makes no substantive difference to the cause of the loss.

b. Rimkus neither agrees nor disagrees with *FAEC Conclusions 2 and* 3. As stated, these FAEC Conclusions do not contain an opinion or finding.

c. Rimkus agrees with *FAEC Conclusions 4 and* 5 related to the different reported manufacturers of the faucet but disagrees that manufacturer identification has a meaningful impact on the investigation or conclusions. The manufacturer does not change the location of the reported failure, failure mode, underlying mechanism, or the result of the hose burst.

d. Rimkus agrees with *FAEC Conclusion 6.*

e. Rimkus disagrees with *FAEC Conclusion 7*, that the "*potential source of damage does not exist,*" simply because of a misidentification of the faucet. The burst occurred on a supply line hose, damage to which very much existed and which Mr. Caelleaert described elsewhere in his report. While the faucet manufacturer was potentially misidentified, the stainless-steel braided water supply hose, which contained the subject rupture, was properly identified throughout the Rimkus analysis. Mr. Caelleaert also identified the fraying and fracture damage of the stainless-steel braiding and even suggests several different mechanical causes for said damage.

f. Rimkus agrees with *FAEC Conclusions 8 and 9.*

g. Rimkus neither agrees nor disagrees with *FAEC Conclusions 10 and 11* related to the analysis of the SafeCo Insurance (SafeCo) denial letter. As written, our Conclusion 4 references additional, prior water damage present in the residence, unrelated to the subject water intrusion, which, while likely to have occurred in a

matter of seconds, as stipulated by Mr. Caelleaert, the damage to the external surface of the supply line, as evidenced by the ongoing corrosion and staining, reflects long-term degradation of the supply line.

## Section III
## DISCUSSION

**Review of Forensic Analysis & Engineering Corporation Report**

The May 6, 2026 Forensic Analysis & Engineering Corporation (FAEC) report by Craig Calleaert, P.E., reviews broad details of the water loss at 103 Court Deayllon as well as details of the Safeco Insurance claim denial letter. Rimkus's review of the FAEC report will be focused on the evaluation of the report's technical merits and rebuttal of Rimkus's prior conclusions.

In the report, Mr. Calleaert stated 19 observations and findings, which include discussion of the subject faucet and its attributes and manufacturer, make, and model (Observations & Findings Nos. 1 through 7). Mr. Calleaert identifies a potential misidentification in the original Rimkus report, which identified the incident faucet as a Moen CA87003BRB, which Rimkus had made based on homeowner identification and a replacement Moen faucet installed post-incident (Observations & Findings Nos. 8 through 10). Mr. Calleaert reported the faucet to be a Glacier Bay product, purchased from Home Depot, but does not provide further model details or purchase information. Upon further review, Rimkus agrees that the subject faucet was likely not a Moen faucet, but has not provided further evidence to support it being manufactured by Glacier Bay or others.

Mr. Calleaert continued to describe the events of the loss as well as the mitigation procedures that were conducted at the Pohlman residence following the subject water leak (Observations & Findings Nos. 11 and 12).

Observations & Findings No. 13 discussed Mr. Caelleaert's review of the Rimkus report, and his agreement with Rimkus Conclusions 1, 3, and 4. With regards to Rimkus Conclusion 3, Mr. Caelleaert stated, "...the exact failure mechanism does not need to be known. The stainless steel braiding had weakened, leading to a sudden and unexpected burst rupture of the hot water faucet supply line, resulting in the water event."[1] Regarding Rimkus Conclusion 2, Mr. Caelleaert stated he "Partially Agree (sic), the stainless-steel braiding had fraying and fracture damage. It is, however, highly unlikely that these small frays and fractures could puncture the inner hose. It is more likely that these frays and

[1] May 6, 2026, FAEC Report, Pg. 6

fractures themselves cause weakening of the cover and eventual burst failure". While he dismisses the contention of a pull-down hose loop as a potential mechanism for abrasion, he does identify other mechanical modes of abrasion to the supply line, including the proximity of other hoses and under-sink storage. He does not include installation-related abrasion in that discussion.

The subsequent observations and findings (Observations & Findings Nos. 14 through 19) address verbiage stated within the Safeco Insurance denial letter and Mr. Caelleaert's discussion of said language. This will not be directly addressed by Rimkus; however, it is worth noting that Mr. Caelleaert's assertion in Observations & Findings No. 16 is in agreement with Rimkus's prior findings – the long-term and ongoing slow weep or leak was indicated as the cause of the stainless-steel braid degradation and not an independent source or cause of water damage.

At the end of his report, Mr. Caelleaert stated 11 conclusions. These are restated below, followed by a Rimkus response.

**FAEC Conclusion 1:** *The subject is a commercial style (or spring pull down style) kitchen faucet, claimed to be a Glacier Bay (Home Depot) brand. The hot water supply line to the faucet burst, leading to water damage in the home located at 103 Deayllon Court in Poquoson, Virginia.*

**Rimkus Response:** Rimkus agrees. Rimkus had previously identified the incident faucet as a Moen, based on information provided by the homeowner, and agrees it is likely not a Moen faucet. Mr. Caelleaert provided no additional affirmative identification of the faucet, except for the reported identification of the manufacturer by the homeowner. No additional documentation was provided to substantiate the make or model of the faucet.

**FAEC Conclusion 2:** *The faucet and its connection lines were analyzed and reported by Rimkus, an engineering firm in Richmond, VA. The original report was not available for review, but a follow-up supplemental report was available - the March 25, 2026, Rimkus report, Supplemental Report of Findings, Rimkus matter no. 100332953.*

**Rimkus Response:** Rimkus neither agrees nor disagrees. As stated, the FAEC Conclusion does not contain an opinion or finding and is rather just stating Rimkus's prior scope.

**FAEC Conclusion 3:** *Other documents were obtained and reviewed including photograph compilations by water mitigation companies GR Management and Stanley Steemer. Other miscellaneous documents and correspondence were also obtained. The complete list of documents is shown in Appendix A.*

**Rimkus Response:** Rimkus neither agrees nor disagrees. As stated, the FAEC Conclusion does not contain an opinion or finding and is rather just stating FAEC's scope and materials reviewed.

**FAEC Conclusion 4:** *Although the subject faucet is called a pull-down faucet, the sprayer hose is fixed. The sprayer can be unhooked from its mount and moved where desired, flexibility provided by the flexible hose and guide spring on the high arch. As such, a third line with a loop and weight typical of most pull-down faucets does not exist on this model of faucet.*

**Rimkus Response:** Rimkus agrees. Rimkus had previously identified the incident faucet as a Moen, based on information provided by the homeowner.

**FAEC Conclusion 5:** *Errors identified in the Rimkus report include misidentification of the subject faucet as a Moen faucet and the presence of a third pull down hose line causing mechanical damage to the supply lines. The subject faucet is not a Moen and does not have a third pull down hose line.*

**Rimkus Response:** Rimkus agrees that the hose was misidentified; however, disagrees that this has a meaningful impact on the investigation or conclusions. Rimkus had previously identified the incident faucet as a Moen, based on information provided by the homeowner and the subsequently installed faucet. However, this does not change the location of the reported failure, failure mode, underlying mechanism, or the result of the hose burst.

**FAEC Conclusion 6:** *The three conclusions and a fourth supplemental conclusion were evaluated. The first conclusion is correct; all evidence suggests the burst hose was the single source of water creating the damage observed and requiring extensive mitigation.*

**Rimkus Response:** Rimkus agrees. Rimkus had previously identified the source of water as the burst/rupture of the stainless-steel hot-water supply line beneath the kitchen sink

(Rimkus Conclusion ...). The discoloration observed in the ground-floor bathroom subfloor was consistent with an additional source *of prior* water damage.

**FAEC Conclusion:** *The second conclusion was regarding the source of damage to the stainless-steel braided wires. As the faucet was misidentified, the potential source of damage does not exist, and the speculations here need to be reconsidered.*

**Rimkus Response:** Rimkus disagrees that the "*potential source of damage does not exist,"* simply because of a misidentification of the faucet. The burst occurred on a supply line hose, damage which very much existed and which Mr. Caelleaert described elsewhere in his report. While the faucet manufacturer was potentially misidentified, the stainless-steel braided water supply hose, which contained the subject rupture, was properly identified throughout the Rimkus analysis. Mr. Caelleaert also identified the fraying and fracture damage of the stainless-steel braiding and even suggests several different mechanical causes for said damage.

It should be noted that Mr. Callaaert has not provided any affirmative identification of the incident faucet. However, Rimkus reviewed several potential candidate Home Depot/Glacier Bay faucets, including Model HD67458, which was labeled both as the Paulina Single-Handle Spring Neck Pull-Down Sprayer Kitchen Faucet and the Gage Single-Handle Spring Neck Pull-Down Sprayer Kitchen Faucet With Soap Dispenser. The respective Installation and Care Guide contained a warning, "NOTE: The hot side inlet tube is indicated with a label. Avoid twisting wires together or placing the wires close to each other and damaging." In Rimkus's experience, similar supply lines by other manufacturers often will contain similar warnings in their installation literature, cautioning against abrasion, kinking, or other hose damage.

**FAEC Conclusion:** *The third conclusion identifies suggested testing for identifying the exact failure mechanism. This conclusion is correct; additional testing is needed to determine the wire braid and supply hose failure mechanism.*

**Rimkus Response:** Rimkus agrees.

**FAEC Conclusion:** *The fourth supplemental conclusion is correct; "Based on the provided documentation and observations made during the Rimkus site inspection, the dark discoloration observed at the ground-level bathroom plywood subfloor area was*

*consistent with an additional source of water damage." The discoloration indicates a separate prior event, likely occurring years before the faucet failure and resulting in water loss. This earlier event (likely a failed toilet wax ring) did not contribute to the water damage that was observed or remediated.*

**Rimkus Response:** Rimkus agrees.

**FAEC Conclusion 4:** *The insurance denial letter was evaluated. Two details in the Claim Details section are clearly counter to statements made in the Rimkus report. The first statement; "the cause of loss was confirmed as a long-term leak" was clearly counter to the Rimkus report conclusion "The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line." The second statement; "The adjuster also confirmed a secondary leak that occurred in the bathroom wax ring causing deterioration and water damage in the observed material" is clearly counter to the conclusion in the Rimkus report stating: "The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line. This was the only observed source of water noted during the site inspection and review of mitigation photographs."*

**Rimkus Response:** Rimkus neither agrees nor disagrees with the analysis related to the SafeCo denial letter but agrees as to the restating of conclusions from the Rimkus report. Conclusion 4 stated that the Supplemental Report of Findings referenced an additional, prior water damage event in the residence.

**FAEC Conclusion 5:** *The summarizing statement in the Our Coverage Position section was also counter to the Rimkus report and other facts found in the other documentation. The statement "The policy does not provide coverage for continuous or repeated seepage or leakage of water or steam, or the presence or condensation of humidity, moisture or vapor which occurs over a period of weeks, months or years whether hidden or not" is clearly counter to the Rimkus report conclusion "The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply line. Obviously, a burst occurs in seconds, not weeks, months or years.*

**Rimkus Response:** Rimkus neither agrees nor disagrees with the analysis related to the SafeCo denial letter. As stated in our Conclusion 1, "The source of the water leak from beneath the kitchen sink was due to a burst/rupture of the stainless-steel hot-water supply

**line". While** this [illegible] likely occurred **in a matter of seconds, as stipulated by Mr. Caelleaert,** the da[illegible] external **surface** of the supply **line, as evidenced by the ongoing** corrosion and staining, reflects **long-term** degradation **of the supply line.**

## Section IV
## BASIS OF REPORT

1. Property Information, https://www.redfin.com/VA/Poquoson/103-Ct-Deayllon-23662/home/4[illegible], accessed March 10, 2026.

2. On February 18, 2026, Jack K. Burkhardt, P.E., inspected the subject residence, located at 103 Cr [illegible] Deayllon in Poquoson, Virginia, and documented the physical inspection with photographs.

3. On February 18, 2026, Jack K. Burkhardt, P.E., interviewed the homeowner, Mr. Matthew Pohlman, during the Rimkus site inspection.

4. Product literature [illegible] the Moen Single-Handle High Arc Pulldown Kitchen Faucet was reviewed.

5. Safeco Insurance Company Site Inspection Photographs and additional PV and NPV Photographs provided to Rimkus.

6. ASM Handbook Volume 11: Failure Analysis and Prevention, ed. Brett A. Miller, Roch J. Shipley, Ronald J. Parrington, and Daniel P. Dennies, ASM International, 2021.

7. ASM Handbook, Volume 11A: Analysis and Prevention of Component and Equipment Failures, ed. B.A. Miller, R.J. Shipley, R.J. Parrington, D.P. Dennies. ASM International, 2021.

8. ASM Handbook Volume 13A: Corrosion: Fundamentals, Testing, and Protection, ed. Stephen D. Cramer and Bernard S. Covino, Jr., ASM International, 2023.

9. Newport News Waterworks, Newport News, VA, Drinking Water Quality, from https://www.nn[illegible]/275/Drinking-Water-Quality, accessed March 11, 2026.

10. Newport News Waterworks, Newport News, VA, Combined Annual Summarizing Test Results from 202[illegible] (*latest available*).

11. Engineering Report authored by Craig Calleaert, P.E., dated May 6, 2026, was reviewed.

12. **Home** Depot website listings for **Paulina** Single-Handle **Spring Neck Pull-Down Sprayer** Kitchen Faucet in Stainless **Steel, and** Gage **Single-Handle Spring Neck Pull-Down** Sprayer Kitchen Faucet With **Soap Dispenser** in **Stainless Steel, by Glacier Bay, and respective** Installation and Care **Guide,** with shared **model number, HD67458.**

# Section V

## ATTACHMENTS

A. Curricula Vitae

## Section V

### ATTACHMENT A

# Curricula Vitae

RIMKUS



**Gregory Smith**, Ph.D., P.E.
Principal Consultant

229 West 28th St., 9th Floor
New York, NY 10001

(551) 215-0739

gregory.smith@rimkus.com

## Background

Dr. Gregory Smith is a Materials Scientist, licensed Professional Engineer (including Connecticut, Florida, Massachusetts, Maryland, New Jersey, New York, and Pennsylvania), and AMPP Certified Coatings Inspector (NACE CIP Level 2). Dr. Smith has a B.E. in Engineering Science, a B.S. in Marine Sciences, and a Ph.D. in Materials Science and Engineering from Stony Brook University, State University of New York. Dr. Smith has experience in the analysis and forensic investigation of failures and other technical issues related to mechanical equipment, products, components, and systems. Dr. Smith's prior experience has included a focus on both research and development and practical engineering-related failure analysis, statistical process control, process and design engineering, and mechanical/thermal testing.

Dr. Smith has experience with and has inspected various aerospace-, sea-, and land-based power generation systems heavy machinery equipment, chemical processing equipment, boilers, furnaces, water heaters, water circulation and supply systems, water filtration systems, HVAC systems and components, valves/actuators, heat exchangers, plumbing, piping, and fire suppression system failures (including valves, unions, fittings, couplings, sprinklers, piping and joints in copper, brass, steel, stainless steel, PEX, PVC/CPVC, and other materials), weld failures, metallurgical, and fire protection system failures. He combines his background in both materials science and mechanical engineering to provide an in-depth analysis of complex system and component failures. Additionally, he has over 10 years of experience working with surface engineering and protective coatings for corrosive, marine, and other harsh environments and for general corrosion protection, involving paints, polymers, and cladding.

Dr. Smith began his professional career working as a process engineer with a start-up firm developing characterization tools and sensors for process measurement of welding, plating, metallizing, plasma spray, thermal spray, and cold spray activities. This included advancing a DARPA-funded non-distributive evaluation (NDE) inspection program using flash infrared thermography (FIT) to identify and visualize defects below spray-coated Navy ship decks using a digital image correlation algorithm that he developed.

He extended his NDE coating inspection focus internationally at GKN Aerospace Engines Sweden, where he implemented an eddy current based thickness probe for contact thickness measurement of complex geometry ceramic thermal barrier coating (TBC) layers applied to a range of FeCrAlY and NiCoCrAlY metallic bond coats and Fe, Ni, and Ti-based substrates. Additionally, Dr. Smith supported statistical process control and process

engineering for commercial aerospace-, land-, and sea-based power generation gas turbines in the development of test reduction plans, to reduce QC/QA test burdens, and supported failure analysis on critical systems.

Dr. Smith's Materials Science and Engineering graduate work focused on mechanical property characterization of spray-coated systems, including thermal spray and cold spray coating systems. Externally facing, he heavily supported an Army Futures Command program developing temperature-resistant diesel piston coatings for improved power generation in heavy duty track vehicles. Additionally, he supported process parameter development and mechanical testing for aerospace original equipment manufacturer (OEM) components, such as $Al_2O_3$ clearance coatings in turbine compressor sections and WC-CoCr and CrC-NiCr hard-chrome alternative materials in landing gear struts where resistance to fatigue and impact-based damage was a primary concern.

As a Materials Research Engineer for the US Navy, Dr. Smith supported shipyards, warfare centers, regional maintenance centers, and Navy technical authorities on a wide range of corrosion-related mitigation and prevention efforts. He was recognized as an expert in surface preparation, non-skid materials, and research and development within NAVSEA 05P Coatings and Corrosion Control technical pyramid and directly supported updates to NAVSEA Standard Item 009-32 and 009-124 to improve technology transfer to shipboard and fleet operation. Dr. Smith worked with a range of polymeric and thermal spray coatings systems under MIL-PRF-32577, -23236, and -24667, and with a range of aluminum, stainless steel, CuNi, Inconel, and high-yield carbon steel material components. Additionally, he is certified as a NACE/SSPC Level 1 Coatings Inspector.

Dr. Smith is an active member of ASM's Thermal Spray Society sub-committee and involved in the publication and peer-review of the Journal of Thermal Spray Technology papers. He additionally mentors and supports graduate students at his alma mater and participates as a member of the Department of Materials Science and Engineering's Industrial Advisory Board (IAB), as well as an active member of the Long Island, New York, ASM Professional Society Chapter.

Dr. Smith has testified in multiple depositions and arbitrations regarding the origin and cause of mechanical and materials failures.

## Professional Engagements

- **Residential and Commercial**
  - **Freeze-Related Pipe Freezes** – Investigated pipe freeze bursts in unconditioned spaces or due to failure to maintain heat in the residence, including via heating degree day analyses.
  - **Corrosion-Related Copper, Stainless Steel, and Other Metallic and Plastic Fitting/Plumbing Failures** – Investigated fitting and plumbing systems faucet, pipe fittings, and connections and other plumbing failures from residual stress, contamination, water chemistry, and stress corrosion cracking.
  - **Oil Storage Tank Leaks** – Investigated metal corrosion within chemical processing plant, underground storage tanks leaks, and transport system failures resulting in oil or feedstock product spills.
  - **HVAC Equipment Transit Damage** – Investigated damage for commercial "all-in-one" HVAC unit and other mechanical systems after transit-related accidents, installation damage, and other incident damage.
  - **Fire Suppression System Sprinkler Activations** – Investigated plumbing- and sprinkler-related failures resulting in water damage to multiple spaces.
  - **Drainage and Age-Related Plumbing Failures** – Investigated drainage, HVAC, fire suppression, and mechanical failures resulting in damage to multiple units in luxury condominiums and commercial buildings.
  - **Window and Glass Product Defects** – Investigated multiple window-related failures, including those related to UV transmittance, mechanical failures, and staining.

- Furniture Accidents – Investigated product failures and resulting injuries from wood and metal furniture failures or collapses, resulting in associated injuries.
- Paint and Surface Failures – Investigated widespread paint issues during repainting of residential condominiums, paint failures from parking structures, and on commercial applications.
- Roofing Paint Failures – Investigated paint failures on metal roofing coils.
- Beverage Dispenser System Failures – Investigated leaks, bursts, and damage to filtration components.
- Water Treatment and Membrane Failures – Investigated damage and effectiveness of water filter membranes, filter cartridges, and filter media.
- Cooking Appliances and Residential Appliance Failures – Investigated coffee machines, water dispensers, pressure cookers, etc. related to potential failures and resulting injuries.

- **Industrial**
  - Roller Bearing Surfaces – Evaluated surface coating options for a commercial fabricator for a friction-related component and performed tribological testing on a range of WC-Co, diamond-like carbon (DLC), MoS2, and dry-film lubricant (DFL) coatings.
  - Water Treatment and Storage Plant Paint Failures – Investigated coating failures on a range of water treatment and filtration plants, involving paint defects, application issues, and contaminant/foreign damage.
  - Heavy equipment paint failures – Investigated paint failures on equipment operating at a steel plant.
  - DoT Infrastructure Repair – Developed test procedures to assess strain tolerance, shear lag, and composite strengths of rebuild/repair material applied using metal deposition and evaluated feasibility of repair as a function of base substrate hardness and yield strengths.
  - Diesel Piston Crowns – Developed a multi-layer surface coating for protection of diesel piston crowns under high-load operating conditions, with low thermal inertia for reciprocating operation.
  - Boiler System Corrosion – Investigated brewery corrosion scale and steam boiler failure related to lack of water treatment.
  - Surface and Flooring Failures – Investigated flooring delamination at a chemical treatment plant related to concrete surface preparation.
  - Hospital Floor Coating Failures – Investigated adhesive and flooring failures in a healthcare facility.

- **Aerospace**
  - TBC Turbine Failure – Investigated failure of TBC layers applied to Haynes 240 and Hastalloy X superalloy turbine exhaust casings, including compositional analysis, furnace cycle life, application and process data, and equipment cooling water temperatures to determine thermally grown oxide (TGO) differences, hardness, and strain tolerance stemming from base alloy chemistry differences.
  - Landing Gear Coating Optimization – Characterized residual stress differences due to processing and metallurgy of different cermet powders used in deposition of chrome-replacement landing gear coatings and performed fatigue measurements on coated Ti6, 4, and 4340 steel to provide recommendations to OEM for material selection and processing guidance.
  - Deposition Torch Influence on Compressor Clearance Coatings – Evaluated two deposition options for an OEM and performed microscopy and mechanical testing to determine quantity and effect of retained powder unmelts. Develop testing methodologies to measure in-plane fracture resistance of the resulting coatings to quantify functional differences and performance.
  - Structure Corrosion Failures – Investigated corrosion on structural longeron member due to hydraulic and other fluid contamination.

- **DoD, Navy, and Marine**
  - CuNi Seawater Valves – [illegible] long-term environmental corrosion testing support for replacement of brush-plating with cold spray for corrosion repair. Generated process parameters and compliance data for different powder blends [illegible] with [illegible] repair components as a function of both the corrosive nature of the operation environment and anticipated loading.
  - RAST Deck and Jet Blast Deflectors – Develop spray-applied Al-Ti and Al-$Al_2O_3$ wire-based coating system for protection of HY80/HY100 steel deck plate and facilitated a multi-year shipboard demonstration on an active DDG-51 class destroyer to prove effectiveness of the coating system in a shipboard environment and expanded application to [illegible] phase of similar material on Nimitz class aircraft carrier aluminum jet blast deflector panels.
  - Shipboard Capstan – Do[illegible] and Fe-NiCr laser weld overlay coatings to protect exposed wear surfaces. Process and [illegible] optimization was performed to control residual stress and crack formation during cooling [illegible] full [illegible] systems were subjected to long-duration environmental exposure.
  - Flight Deck Tie-Downs – [illegible] lity of 4130 metal deck fittings. Existing, non-metallic coating layers would fail during operation [illegible] underlying metal to corrosive attack. In the course of a multi-agency program, developed a Si[illegible] diamond-like carbon (DLC) and Al-Ti wire-spray system to provide improved resistance.
  - Non-Skid Epoxy Coating [illegible] investigated failure of a two-component deck epoxy system, falling under MIL-PRF-42667, which [illegible] over several thousand square feet of ship decking and prematurely failed. Evaluated the fail[illegible] system [illegible] a control with a range of accelerated corrosion, mechanical, and chemical analysis techniques. Differential scanning calorimetry (DSC) revealed the contractor had not adequately mixed the tw[illegible] system.

- **Fire and Explosions**
  - Gas Storage Cylinder Explosions – Investigated explosions and bursts in fuel and air gas cylinders, cylinder valve failures, and [illegible] hose failures.
  - Biofuel Blend Steam Boiler Explosion – Investigated damage to a steam boiler related to burner fuel changes, resulting in an explosion.
  - Intumescent Paint Failure – Investigated adhesion and delamination of a multi-layer fire-retardant coating system on an external s[illegible].
  - Metal Sintering Plant Explosion – Investigated hydrogen explosion in metals processing plant.
  - Clothes Dryers and Kitchen Appliance Fires – Investigation of residential fires with mechanical and electrical originations.

## Professional Experience

- **Rimkus** **2022 – Present**
  - Principal Consultant
  
  Provides materials engineering consulting services to law firms, insurance companies, and corporations for the purpose of determining the root cause of product and equipment failures. Determine materials and mechanical systems failures, based on corrosion, fatigue, wear, or environmental-based degradation of metallic, ceramic, composite, or polymeric components, systems, and structures.

- **US Naval Research Laboratory** **2018 – 2022**
  - Materials Research Engineer
  
  Initiated and directed programs as a Principal Investigator addressing dynamic corrosion-related naval issues and maintenance practices involving thermal spray, cold spray, directed energy deposition, and laser

RIMKUS

cladding for use in gas turbines, hypersonic applications, aerospace structural rebuild, barrier protection, functional integration, and localized material repair. Provided facilities support, technical advisement, surface and feedstock material characterization, processing and parameter modifications, and laboratory assessment for thermal spray, cold spray, and laser cladding coatings via microscopy, digital image correlation, corrosion testing, uniaxial tensile and fatigue, and mechanical evaluation for warfare centers, maintenance depots, and shipyards. Solicited and developed programs with a range of government sponsors to address fleet needs and transitioned solutions to active service. Managed multi-million-dollar annual budgets, program scope, and technical responsibilities of small teams.

- **Center for Thermal Spray Research** **2014 – 2018**
  - Coatings Researcher

    Managed R&D programs involving structural and functional integration of thermal spray coatings for commercial and government customers and collaborated with internal researchers and technicians to develop test plans, spray studies, and comprehensive reports. Developed R&D test methodologies and instrumentation techniques for industrially relevant characterization of thermal spray and cold spray coatings in component-level applications, including of high "thermal swing" diesel piston coatings, TBC and abradable gas turbine coatings, hypersonic applications, carbide hard-facing coatings, and metal rebuild/repair.

- **GKN Aerospace** Engines **2013 – 2014**
  - Process Engineer

    Optimized thermal spray process controls, performed failure analysis, and reported on long-term statistical trends to improve lean manufacturing capabilities and maintain ISO 9001 compliance in production of industrial coatings. Reduced DOE required testing frequencies and transitioned 20+ reduction plans through concise reporting of statistical trends, resulting in multi-million-dollar annual savings, including $1.2 million annually for a single component. Introduced eddy current NDE thickness measurements and calibration protocols into production, reviewed a burner rig "hot" test for dynamic assessment of TBC performance, and optimized powder and metallography protocols.

- **ReliaCoat Technologies/Center for Thermal Spray Research** **2012 – 2013**
  - Project Engineer

    Supported spray-based coating processing, property data collection and analysis, and advanced a DARPA remote sensing program developing an image-processing algorithm to identify sub-surface coating defects. Supported development of in situ thickness sensor and implemented changes to materials based on the coefficient of thermal expansion (CTE) and weld-induced stresses.

## Education and Certifications

- **Engineering Science**, B.S., State University of New York, Stony Brook (2013)
- **Marine Sciences**, B.S., State University of New York, Stony Brook (2013)
- **Professional Engineer** (Connecticut Engineering No. PEN.0036905, Florida Engineering No. 102153, New York Engineering No. [illegible], New Jersey Engineering No. 24GE05941200; Maryland Engineering No. 62040, Massachusetts Engineering No. [illegible]735, and Pennsylvania Engineering No. PE096807
- **Materials Science** and Engineering, Ph.D., State University of New York, Stony Brook (2018)
- **PADI Advanced** Open Water Diver
- **Association for** Materials Protection and Performance (AMPP) Basic Coatings Inspector / CIP Level 2 Certification (formerly [illegible] CIP Level 2, N-82104)

## Continuing Education

- **Georgia Tech:** Materials Data Science and Informatics Short Course, via Coursera (online)
- **Pohang University of Science and Technology:** Ferrous Technology I & II, via Coursera (online)
- **SSPC:** Fundamentals of Protective Coatings (C1) Short Course (online)
- **Association for Materials Protection and Performance:** Corrosion eCourse (online), Coating Inspection Program Level 1, 2 courses (in-person)
- **Assorted safety,** hazardous [illegible], and ethics trainings as part of professional memberships and license upkeep.

## Publications

- Liddell, H., Erickson, [illegible], Tagert, J., [illegible], Smith, GM., Martin, J., **"Mode Mixity and Fracture in Pull-off Adhesion Tests,"** Eng. Fract. Mech. [illegible] (2023).
- Smith, GM., et al., "Discerning [illegible] Adhesion/Cohesion Character **of Cold Spray and Thermal Spray Particle Bonding** [illegible] Structural Integration **of Corrosion Repair Coatings"**, Navy Memorandum Report, 61[illegible] (2021).
- Brown, RF., Smith, GM., [illegible] "Ultrasonic Consolidation **Post Treatment of Composite CuNi Cold Spray** [illegible] and Microstructure **Assessment"**, J. Therm. Spray Technol., 30, 2069–2082. ([illegible]).
- Gingrich, E., Tess, [illegible], Saputo, J., Smith, GM., Sampath, S., Ghandhi, J., **"The Impact of Piston Thermal** [illegible] on High Load **Diesel Operation"**, Int. J. Engine Res., 3, 890–910. (2021).
- Weathers, B., Smith, GM., [illegible] "Test Method for **Constrained Compressive Properties of Rubber and Rigid** [illegible] technical test method assessment, NAVSEA PMS 450. (2020).
- Brown, RF., Smith, GM., [illegible] "Parameter **Development via In-Situ Residual Stress Measurement** and Post [illegible] of Cold Spray CuNi **Coatings"**, J. Therm. Spray Technol., 29, 1876–1891. ([illegible]).
- Saputo, JC., Smith, GM., [illegible], Gingrich, E., Tess, M., **"Thermal Swing Evaluation of Thermal Barrier** [illegible]", J. Therm. Spray Technol., 29, 1943–1957. (2020).
- Liddell, H., Smith, [illegible], Erickson, [illegible] of Mode Mixity and **Other Fracture Data from Crack Paths in Pull-Off Adhe**[illegible] J. Adh. Soc., (2020).
- **Smith, GM.,** et al., [illegible] Stress and Fatigue **Behavior of SI-TS Nickel Coatings"**, J. Therm. Spray Tec[illegible], Stress., 29, 1229–1241. (2020).
- Abbas, M., Smith, [illegible] Microstructural Investigation **of bonding and melting-induced rebound of HVOF** [illegible] aluminum substrate", J Surf. Coat. Technol., 402, 126353 (2020).
- Abbas, M., Smith, [illegible] structural characterization **of HVOF-sprayed Ni on polished and oxidized** [illegible]", J. Therm. Spray Technol., 29, 1093-1110. (2020).
- Abbas, M., Smith, [illegible] Microstructural Evolution **and Bonding of HVOF Sprayed Ni Particles on Bo**[illegible] substrates", Surf. Coat. Technol., 394, 125909 (2020).
- Smith, GM., et al [illegible] Surface Performance of **Thermally Sprayed Carbide Coatings Produced Unde**[illegible]", Surf. Coat. Technol. 387, 12536 (2020).
- Smith, GM., Smi[illegible], Sam[illegible] Toughness of **Thermal Spray Ceramics: Measurement Techniques an**[illegible]", J. Therm. Spray Technol. 27, 1076–1089 (2018).

RIMKUS

- Luo, X., Smith, [illegible] Interplay between Adhesion Strength and Tensile Properties...P[illegible] Technol. 27, 296 –318 (2018).
- Smith, GM., et al., "Ors[illegible] Thermal and Mechanical Properties of Plasma Sprayed Ceramics", J. Am. [illegible]er. S[illegible] 101 [illegible]
- Smith, GM. and Sa[illegible]path, S., "[illegible]bility of Metal Structures Via Spray Clad Remanufacturing", TMS JOM., 70, 512–52[illegible] 2018)
- Smith, GM., Hig[illegible] O., [illegible] Situ Observation of Strain and Cracking in Coated Laminates by Digital Imag[illegible] Technol. 328 (2017).
- Wang, Q., Seshad[illegible] R.C., Smith, [illegible] S., "Sliding Wear Behavior of Air Plasma Sprayed Al2O3 Coatings Seale[illegible] Al[illegible]", Tribol. Int. 116 (2017).
- Smith, GM., et al., "[illegible] Technique for Bi-Layer Thermal Barrier Systems", ITSC 2015—Proc. Int. [illegible] (2015).

## Presentations

- **"Leaks, Lawsui[illegible] failures and insurance through a series of case studies"**, [illegible] (ASM), Long Island, NY Chapter, Centereach, NY, March 20, 2024.
- **"Measurement** [illegible] Thermal Spray Coatings", Stony Brook University, Consortium for Thermal Spr[illegible] June 14, 2023.
- **"Jet-Blast Def[illegible] and [illegible] 1057 Update"**, Naval Research Laboratory, Code 6138 Port [illegible] Meeting, February 15 – 16, 2023.
- **"System and** [illegible] Coatings", Stony Brook University, Consortium for Thermal Spray Rese[illegible]rch, [illegible] August 3 – 4, 2022.
- **"Cold Spray** [illegible] 5130", NAVAIR Cold Spray Technical Interchange Meeting, Pensacola, Flori[illegible]
- **"Enabling Stru[illegible] Additive Manufacturing"**, NRL RAC New Start, Washington, DC, November [illegible] 21.
- **"Chemical Po[illegible] Ship Capst[illegible] 6350 Project"**, NRL RAST Working Group Meeting, Key West, [illegible]
- **"Use of Proce[illegible] Stress Measurements for Characterization and Design of High-Velocity** [illegible] Thermal Spray Technology Spring Meeting, Jun. 25, 2020.
- **"Moving Beyo[illegible] High-Velocity Spray Coatings for Determination and Assessment** [illegible] ties", Consortium for Thermal Spray Technology Spring Meeting, Jun. 25, [illegible]
- **"Mechanical** [illegible] to Assess Cure Behavior and Integrated System Performance", [illegible] ach, CA, Feb. 3-6, 2020.
- **"Mechanical P[illegible] Machinery Overlay and Repair Coatings Enabled via S[illegible]** Thermal Spray Conference, Yokohama, Japan, May 26 – 31, 2019.
- **"Spray-based** [illegible] Coatings", Consortium for Thermal Spray Technology 201[illegible] Schenectady, NY Nov. 12-13, 2019.
- **"DLA Aviation,** [illegible] Update", Briefing to MIDPAC N43 Commanding Officer CAPT Namam, [illegible] ember 9, 2019.

- **"Overcoming** [illegible] **d** [illegible] Measurement of Fracture **Toughness of Plasma Sprayed Ceramics"**, ICA [illegible] ton [illegible] January 2018.
- **"Infrastructure** [illegible] **M** [illegible] oration [illegible] **via Additive Manufacturing Spray Processing"**, [illegible] d C [illegible] ach, NY [illegible] mber 2017.
- **"Bio-Inspired,** [illegible] **ge** [illegible] ings, Indo-US Bilateral **Workshop on Coatings and Multi-Layers"**, Coorg [illegible] F [illegible] y 2 [illegible]
- **"Multi-System,** [illegible] **l A** [illegible] Thermal Sprayed **Processing and Coatings"**, Institute for Plasma Physics, Czech Academy of Sciences, Czech Republic, August 2015.

## Patents

- **US2022035658** [illegible] Pos [illegible] tm [illegible] Consolidation of Spray Coatings
- **US2022001105** [illegible] ooli [illegible] Syst [illegible] tion Method Thereof
- **Application 17** [illegible] 081, [illegible] No [illegible] Assembly for Cold Spray

RIMKUS



**Jack Burkhardt, P.E.**
Senior Consultant

930 Harvest Drive, Suite 2..
Blue Bell, PA 194..

(267) 649-1575

JBurkhardt@rimkus.com

## Background

Mr. Jack Burkhardt received his B.S. ... Mechanical Engineering from Trinity College in 2011. He is a licensed professional engineer with a ... background of knowledge in mechanical engineering in commercial and residential construction. As a forensic ... he has provided consulting services for legal, insurance, and corporate clients in both plaintiff ... matters.

His professional background consists ... years of experience in heating, ventilation, and air conditioning (HVAC) design, project management, ... management, and forensic engineering. Mr. Burkhardt has analyzed and determined the cause ... mechanical component failures of consumer products, HVAC systems, plumbing systems, and fire protection systems. He has also investigated incidents and accidents related to equipment ... safety.

Mr. Burkhardt's technical evaluations ... failures include a variety of commercial and residential air conditioning systems and associated ... ductwork, fire suppression systems, building envelope leaks, and refrigeration systems. His forensic ... includes investigating oil-fired boilers and furnaces, indoor air quality issues, kitchen hoods ... cook... natural gas explosions, and product liability evaluation and testing of items such as electric cooktops, ... and overhead rolling doors.

## Professional Engagements

- **HVAC Design and Analysis**
  - South Windsor, CT (201..): Provided ... heating and cooling load calculations for a new build-out and selected equipment for LEED-certified ... construction project. Accounted for and documented all HVAC-related LEED points.
  - New Haven, CT (2013): Performed heating and cooling load calculations for existing buildings and utilized energy modeling software to forecast ... and potential savings for local performing arts theatre.
  - Danbury, CT (..1..): Designed a ... package of high-efficiency rooftop equipment and controls for industrial property. Provided utility ... projected energy savings for qualified tax incentive rebate.

- **Engineering and Construction Management**
  - Easton, PA (20..): Expanded ... hospital intensive care unit by overseeing the installation of additional medical gas outlets and ... piping.

- Scottsdale, AZ ... nged ... and implementation of high-efficiency variable refrigerant flow system with ... contr ... the-ground 10,000-square-foot retail store.
- Denver, CO ... Supervised ... damaged wing of shopping mall through a reconstruction ... an ... rainwater runoff and storm drain piping.
- New York, N ... saw ... and implementation of six submersible sump pumps and commercial-gr ... humidif ... level of a newly constructed retail store to address exces ... hum
- New York, NY ... igat ... for a commercial client with exploded sprinkler pipe in a stock roo
- New York, N ... rding ... of ... packaged equipment in high-traffic, densely populated are ... habit

## Forensic Eng...

- **Mechanical An...**
  - Bristol, PA (20 ... Mechanical ... and determined reusability and appropriate repair cost es ... icen
  - York, PA (20 ... load ... determine cooling demands for school classrooms served by PTAC units
  - Milford, PA (2 ... ied ... residential water treatment system that leaked.
  - Pocopson, P ... uated ... a power surge to a commercial property and determined reusability of ... on ele ... r sys ... and associated electrical components.
  - Glenolden, PA ... tigat ... water loss within a residential B vent pipe installation.
  - Allentown, PA ... ated ... damage to an overloaded tractor-trailer assembly.
  - Wilkes Barre ... Cond ... damage evaluation to hotel property and assessment of hydraulic ele
  - Kingston, PA ... anica ... water damage to laundromat equipment and determined reusability and ... repair ... replacement equipment.
  - Horsham, PA ... ined ... oil tank leak within an oil-fired furnace system.
  - Fairless Hills, ... 2023). ... luate ... washing machine and associated stainless steel water supply hoses followin ... er los
  - Lewes, DE (2 ... Evalu ... resi ... circulation pump that reportedly failed and caused water damage to the
  - Coatesville, P ... 23), ... estiga ... water supply piping system of an apartment complex that reportedly lea
  - Tamaqua, PA ... 23), E ... ated ... smoke damage within a residential property related to a furnace heati ... ack.
  - Harrisburg, PA ... 3), E ... ated ... system and determined reusability and appropriate repair cost es ... for ... items.
  - Philadelphia, ... 023). ... luat ... contamination within the fuel system of a commercial vehicle.
  - Philadelphia, PA (2023). Assessed ... and hydraulic elevator system damage related to water intrusion.
  - Media, PA (20 ... Inves ... ed ... related to an improperly pressed fitting on a copper domestic wate ... ply lin
  - Wilmington, DE ... 22). E ... ated ... circuit within a commercial HVAC system.

- Harleysville, [illegible] (2022) [illegible] pump and associated piping fittings within a commercial of[illegible] [illegible]
- Bethesda, MD [illegible] 22), [illegible] [illegible] to burst at an exterior hose bibb.
- Woodlyn, PA [illegible]), [illegible] the plastic drain valve on a residential water heater that fail[illegible] [illegible] property.
- Lebannon, PA [illegible] 22) [illegible] piping and alarm system wiring of an indoor climate control [illegible]
- Stroudsburg, [illegible] 2022) [illegible] mobile fire pump that was being utilized for firefighter train[illegible]
- Philadelphia, [illegible] [illegible] boiler serving the office and classrooms within a churc[illegible]
- Langhorne, P[illegible] 021), [illegible] and associated piping and equipment. Determined or[illegible] and oil damage throughout the property.
- Saint Clair, PA [illegible] to determine the root cause of fire damage to a commerc[illegible]
- Elkins Park, P[illegible] 2021), [illegible] iron drainpipe serving commercial athletic facility.
- Hazleton, PA [illegible] on fire suppression hood system that failed to mitig[illegible]
- Princeton, NJ [illegible] equipment failure on a platform scissor lift at a comm[illegible]
- Philadelphia, [illegible] 2021) [illegible] above-ceiling water source heat pump unit serving tenan[illegible]
- Bridgeport, P[illegible] 021), [illegible] HVAC rooftop units serving a commercial property.
- Kunkletown, [illegible] equipment failure of a residential, oil-fired furnace heati[illegible]
- Willow Grove [illegible] associated controls for commercial-use aerial platform boo[illegible]
- South Sterling [illegible] [illegible] hydronic heating system served by oil-fired boiler uni[illegible]
- Chester, PA ([illegible] residential basement apartment unit.
- Paradise, PA [illegible] equipment and associated commercial property as a direct res[illegible]

## Professional [illegible]

- **Rimkus** **2021 – Present**
  - Senior Consu[illegible]
    Responsible [illegible] and [illegible] failures, design, construction, maintenance, and operation of [illegible] fire protection systems. Capable of preparing damage asse[illegible] [illegible] compliance and safety evaluations.

- **Irwin & Leighto** ... **2018 – 2020**
  - Project Super... ndent
    Oversaw consi... tion of ... including office buildings, retail stores, hospital renovations, a... multi-f... y re... ed all MEP equipment, building materials, and finishes were installed in ... ccordan... requirements, local codes, and standards.

- **Shawmut Desig... Cons...** ... **2013 – 2018**
  - Project Mana... Project ... perin...
    Composed an... evaluate ... ... for restoration and remodel projects in high-end retail divis... ranging ... om ... ely with architects and engineers of record to determine cons... stabili... scope.

- **Controlled Air I...** ... **2011 – 2013**
  - HVAC Design ... ineer
    Provided eng... ring a... ... build projects, evaluated existing HVAC equipment an... ilding ... selected new equipment to optimize overall mechanical sy... n effici...

## Education an... Certifi... ations

- **Mechanical En...** ...
- **Registered Pro...** ... Pennsylvania
- **OSHA 30 Cert...**

American Economy Insurance Company
P.O. Box 5014
Scranton, PA 18505-5014

Liberty Mutual.
INSURANCE

## CONTACT US

tiffany.putenis@libertymutual.com

Direct: 862-432-5164
Fax: 888-268-8840

**American Economy Insurance Company**
P.O. Box 5014
Scranton, PA 18505-5014

800-332-3226

LibertyMutual.com

Kaufman & Canoles
11815 Fountain Way
Newport News, VA 23606

September 08, 2026

| | |
|---|---|
| Claim Number: | 060776175-01 |
| Date of Loss: | 01/14/2026 |
| Insured: | Matthew Pohlman |
| Policy Number: | OF3302464 |

Dear Ahmed Mohamed Khalil,

Thank you for reaching out regarding Mr. Pohlman's claim. As no new information has been provided for consideration, we are upholding the previously communicated coverage decision.

The insurance policy provides coverage subject to policy terms and conditions. Based on our review of the policy, there is no coverage available for your loss as outlined below.

**Claim Details**
Our first notice of loss was on 01/17/2026. It was reported as an Accidental/Sudden Plumbing/HVAC - Broken Pipe/Hose/Fixture loss.
Our review of your claim revealed the following relevant information:
During our onsite inspection, water damage was found in your kitchen, dining room, living room, hallway, family room, bathroom, pantry and crawlspace. Rimkus Engineering completed an onsite inspection of your home on 02/18/2026. The damaged pipe was sent to lab facilities where the cause of loss was confirmed as a long-term leak due to the individual frayed/fractured stainless-steel strands puncturing the inner lining, creating a slow water weep. The observed deterioration condition of the materials in the kitchen and surrounding rooms impacted in the loss were consistent with a long-term seepage issue. The engineer also confirmed a secondary leak that occurred in the bathroom wax ring causing deterioration and water damage in the observed material.

The policy will not extend coverage for this loss as the policy excludes long-term seepage, deterioration, and wear and tear. The additional demolition you conducted after being advised not to do so as we investigated coverage denied Safeco Insurance the ability to conduct an unprejudiced investigation. This is a breach of the Insured Duties After a Loss as outlined in the policy conditions.

**Policy Information**
We issued the following Home Policy to Matthew Pohlman
Policy Number: OF3302464
Policy Period: 09/15/2025 - 09/15/2026

The applicable Policy form and relevant endorsements (your coverages) state in part:

EXHIBIT
K

Liberty Mutual
INSURANCE

**SAFECO HOMEOWNERS POLICY — VIRGINIA**
**INSURING AGREEMENT**
In reliance on the information you have given us, we will pay claims and provide coverage as described in this policy if you pay your premiums when due, comply with all applicable provisions outlined in this policy, and inform us of any change in title, use, or occupancy of the residence premises. This policy applies only to losses occurring during the policy period.
**SECTION I — PROPERTY COVERAGES**
**BUILDING PROPERTY LOSSES WE COVER**
We cover accidental direct physical loss to property described in Building Property We Cover except as limited or excluded.
**BUILDING PROPERTY LOSSES WE DO NOT COVER**
We do not cover direct loss caused by any of the following excluded perils:
...
5. Continuous or repeated seepage or leakage of water or steam from within a plumbing, heating, or air conditioning system or from within a domestic appliance which occurs over a period of weeks, months, or years.
6. a. wear and tear, marring, scratching, deterioration;
b. inherent vice, latent defect, mechanical breakdown;
c. smog, rust, corrosion, mold, fungus, wet or dry rot;
We provide coverage for ensuing loss that results from items 1. through 6. unless the ensuing loss is itself excluded under Building Property Losses We Do Not Cover in this Section.
...
18. Planning, Construction, or Maintenance, meaning faulty, inadequate, or defective:
a. planning, zoning, development, surveying, siting;
b. design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
c. materials used in repair, construction, renovation, or remodeling; or
d. maintenance;
of property whether on or off the insured location by any person or organization. However, any ensuing loss not excluded is covered.
**COVERAGE D — ADDITIONAL LIVING EXPENSE AND LOSS OF RENT**
The limit of liability for Coverage D applies separately to 1. and 2. and includes any coverage provided under 3. below. Coverage provided under 3. does not increase the limit of liability for Additional Living Expense or Fair Rental Value.
If a loss covered under this Section makes that part of the residence premises where you reside uninhabitable we cover Additional Living Expense, meaning any necessary increase in living expenses you incur so that your household can maintain its normal standard of living.
Payment shall be for the time reasonably required to repair or replace the damage or, if you permanently relocate, the time reasonably required for your household to settle elsewhere.
...
The period of time under 1. above are not limited by expiration of this policy.
No deductible applies to this coverage.
**SECTION I — PROPERTY CONDITIONS**
...

1. **An Insured's Duties After Loss.** In case of a loss to which this insurance may apply, you must perform the following duties:
   a. cooperate with us in the investigation, settlement or defense of any claim or suit;
   d. protect the property from further damage, make reasonable and necessary repairs required to protect the property and keep an accurate record of repair expenses;
   f. as often as we reasonably require:
   (1) exhibit the damaged and undamaged property;
   (2) provide us with records and documents we request and permit us to make copies; and
   (3) submit to examinations under oath and subscribe the same.
   ...
2. **Suit Against Us.** No action shall be brought against us unless there has been compliance with the policy provisions and the action is started within two years after the inception of the loss or damage.

Liberty Mutual. INSURANCE

The Policy is incorp... by referen... ...etter in its entirety. Although we have attempted to include all of the policy provisions ... believ... ...to this matter, the provisions set forth above in no way replace the provisions of the actual Policy issued. If you have any questions regarding the terms contained in the applicable Policy, you should refer to the Poli... itself. To the extent there is any discrepancy between this letter and the Policy, the Policy controls.

**Our Coverage Positi...**
Based upon the inform...n available... ...grounds for our denial of coverage under the Policy, or under applicable law, with res... to the cl... ...but are not limited to, the following:

The policy does not provide coverage ... con... ...s or repeated seepage or leakage of water or steam, or the presence or condensation of humidity... ...vapor which occurs over a period of weeks, months or years, whether hidden or not. Because the d...age ... caused by a long-term leak, you have no coverage for the claim.

Based on these gro..., no insuran... ...is available to you for the claim. While we sought to identify and address all relevant ins... ...ce cover... ...ations above, these specific considerations are not intended and should not be underst... as a waiv... ...right or basis we may have to deny coverage, and we reserve all rights in this regard.

If you have any informa...on you belie... ...not our coverage position, please bring it to our immediate attention, so we may d...uss whether s... ...ation or pleading impacts our coverage position or obligations.

Sincerely,

TIFFANY PUTENIS

Claims Department